## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MORRIS SATLOFF, 245 Waterman Street, Providence, Rhode Island 02906, Individually and on Behalf of all Others Similarly Situated, | ) ) ) ) **CASE NO.** |
| Plaintiff, | ) ) ) |
| vs. | ) **JURY TRIAL DEMANDED** ) |
| XM SATELLITE RADIO HOLDINGS INC., 1500 Eckingon Pl., N.E., Washington, D.C. 20002, and HUGH PANERO, 1500 Eckingon Pl., N.E. Washington, D.C. 20002 | ) ) ) ) ) ) |
| Defendants. | ) |

### CLASS ACTION COMPLAINT
### FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by XM Satellite Radio Holdings Inc. ("XM" or the "Company"), press releases issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the common stock of XM between July 28, 2005 and February 15, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, defendants maintain their principal executive office within this District at 1500 Eckington Place, N.E.

## PARTIES

6.      Plaintiff Morris Satloff, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of XM at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant XM, a Delaware corporation, describes itself as the number one satellite radio service in America broadcasting live daily shows from several venues including Washington, D.C., with a lineup that includes more than 150 digital channels of

choice from coast to coast. XM also bills itself as the leader in satellite-delivered entertainment and data services for the automobile market. XM has yet to report a profit. Thus, XM's value and, thus, the value of its stock, is based principally on the number of subscribers it reports and the costs of acquiring those subscribers. In XM's SEC Forms 10-Q, filed during the Class Period, defendants state that, "the key metrics we use to monitor our business growth and operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Costs Per Gross Addition ("CPGA") and EBIDTA." Accordingly, when XM releases its financial results, it reports the specific dollar amount of SAC and CPGA and the market looks to these costs, as well as the number of ending subscribers as the key factors in assessing the value of XM and its stock price. XM's only rival is SIRIUS, which bills itself as the "premium satellite radio provider." The two companies are locked in a heated race for new subscribers and new programming deals. The announced business decisions of one company affects the business decisions of the other company. The market looks at both of these competitors comparatively in valuing each of them. XM is actively followed by more than 25 securities analysts, including Bear Stearns, Merrill Lynch and JP Morgan.

8.     Defendant Hugh Pane ro ("Panero") is and has been since 1998, the President and Chief Executive Officer of XM and a director of XM. Panero is the principal executive officer of XM and signed the certifications required by the Section 302 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, attesting to the accuracy of the Forms 10-Q filed by XM with the SEC during the Class Period, including the specific certification that the SEC Form 10-K does not contain any false or misleading material fact

3

or statement of fact. Panero is also the principal spokesperson for XM and is familiar with all aspects of it business, operations and finances. Panero controlled and/or possessed the authority to control the contents of XM's SEC filings and press releases and presentations to securities analysts and through them, to the investing public and had the opportunity to commit the fraudulent acts alleged herein.

9.      Panero is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, Panero, by reason of his positions at XM, was a "controlling person" of XM within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his position of control, Panero was able to and did, directly control the conduct of XM's business and the dissemination of material information XM.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

10.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of XM between July 28, 2005 and February 15, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

11.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, XM had more than 221 million shares of common

stock outstanding, which were actively traded on the NASDAQ, under the ticker symbol "XMSR," and tens of millions of shares of common stock were traded during the Class Period.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by XM or its transfer agent and  brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

12.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

13.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of XM; and

5

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

15.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

16.    Throughout the Class Period, in furtherance of their scheme, conspiracy and course of conduct, defendants disseminated a series of false and misleading statements in the following documents, all of which statements misrepresented that XM was able to reduce the costs of its new subscribers as it reached its goal of 6 million subscribers by year end 2005. In reality and as known to or recklessly disregarded by defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005, in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to defendants since before the beginning of the Class Period. Despite defendants' knowledge that XM would be making those huge expenditures in the fourth quarter of 2005, defendants failed to disclose to the market that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to huge increases in XM's net losses, which was in complete reversal of the trends of declining subscriber acquisition costs and net losses defendants were reporting and touting throughout the Class Period.

6

17.    On July 28, 2005, XM issued a press release announcing second quarter 2005 results and stating that, "with XM's first half performance and even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers." In the release, the Company reported that second quarter revenues had increased 136% to $125 million, stating that, "the significant revenue growth was driven by record second quarter net subscriber additions of 647,226," and that the quarter ended with 4,417,490 subscribers.  XM reported that its net loss had declined to ($146.6) million, as compared to a net loss of ($166.1) million in the second quarter of 2004. "Second quarter 2005 cost per gross addition (CPGA) was $98, an improvement of $3, or 3 percent, from the $101 CPGA reported in the second quarter of 2004."

18.    Shortly thereafter on July 29, 2005, Bernstein Research Call analysts, Craig Moffett and Amelia Wong, issued a report entitled XMSR: Few Surprises But Strong Second Quarter Affirms Positive Long Term Trends.  In this report, the analysts were pleased that XM's second quarter results provided "little in the way of surprises."  Lack of surprises was good news in their mind and "longer term profitability trend appeared to be playing out nicely."  The report noted that "the operating cost story was a positive, with variable margins growing, and Subscriber Acquisition Costs (SAC) and Cost Per Gross Addition (CPGA) continuing to decline nicely despite a Buy One Get One free promotion during the quarter."  In conclusion they stated "we find that XM is continuing to reduce its net loss as well as still accelerating subscriber net ads very encouraging.  This indicates that costs are continuing to fall (especially SAC and CPGA) even while XM sustains a very fast rate of growth."  Thus, in their chart setting forth Bernstein's expectations for the third

and fourth quarters of 2005 for SAC and CPGA, these analysts expected SAC $48 for Q3

2005 and $47 for Q4 2005 and for CPGA, $78 for Q3 2005 and $91 Q4 2005.

19.    On August 5, 2005, defendants filed XM's SEC Form 10-Q for the second

quarter of 2005.  Defendants stated that XM was

> continuing to grow our gross margin (calculated as revenues less variable
> costs, which include revenue share & royalties, customer care & billing
> operations, cost of merchandise & ad sales) during the three months and six
> months ended June 30, 2005 while **reducing our costs to acquire each
> new subscriber**
>
> ***
>
> We will continue to incur operating losses until we substantially increase the
> number of our subscribers.  We are focusing on increasing subscribers and
> scaling our business while managing growth and **containing costs**.
>
> ***
>
> **We expect SAC to decline in 2005** as compared to 2004.
>
> ***
>
> **We expect CPGA to decline in 2005** as compared to 2004.(emphasis added)

20.    On September 27, 2005, in an XM press release, entitled, "XM Satellite Radio

Tops Five Million Subscribers," Panero stated:

> With more than five million subscribers today, XM continues to expand its
> position as the leader in the satellite radio industry.  We are on track to have
> more than six million subscribers by the end of the year.  Consumers are
> choosing XM because we offer the most choices,  including the most
> commercial;-free music and live sporting events, and the most advanced
> technology.  With the winning combination of outstanding new channels and
> breakthrough products in advance of the holiday season, XM is poised for
> **record growth during the fourth quarter**. (Emphasis added)

21.    On October 28, 2005, one month into the fourth quarter of 2005, XM issued

a press release announcing third quarter 2005 results and reaffirming "its guidance of

exceeding 6 million subscribers by the end of 2005." In the release, the Company reported

that it had achieved **"Record Revenue from Cost-Effective Subscriber Growth."**

(Emphasis in the original) The press release stated that

> For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004 . . . Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 were $89 . . . XM expects to accelerate its subscriber and revenue growth through the fourth quarter.

22.    After the third quarter earnings release, XM Radio held its conference call

during which defendant Panero was present and spoke. Panero stated that the third

quarter 2005 was a quarter "that exemplified what I've characterized as the smart

subscriber growth the company has demonstrated quarter after quarter and year after year

since we started service in November 2001." He emphasized that "the third quarter again

demonstrated XM's ability to deliver dramatically increasing subscriber and revenue growth

with the lowest subscriber acquisition costs, or SAC, in the industry." He emphasized that

> "the secret to XM's smart subscriber growth rather than growth at any costs is the ability to control marketing and product expenses while rapidly growing subscribers. This quarter XM kept its fully loaded per unit costs capturing a new subscriber, or CPGA, constant at $89 – the same CPGA that we reported in the third quarter last year. These results provide us with the flexibility to aggressively advertise and market our service in the fourth quarter. In fact, that is what we are doing implementing a comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday selling season again this year."

23.    Following the third quarter earnings release and earnings conference call,

Bernstein Research Call Analysts Craig Moffett and Amelia Wong issued a report dated

October 20, 2005, in which they noted that XM reported solid 3Q results yesterday. In

discussing costs, the Bernstein Research Call noted "subscriber acquisition costs (SAC)

9

and costs per gross additions (CPGA) were both slightly higher than we expected. Part of the difference appeared to be higher than expected negative equipment margins associated with the costs of their "buy one get one free promotion" that ran during 2Q and their $49.99 discount offer on the Rodie2 Radio during 3Q. More radios being manufactured during the quarter to stock up retail channels in advance of the Christmas season could also have played a part; the Company commented that XM products were "well stocked for the holiday season." The report continued, "management guided to higher SAC and CPGA in 4Q. XM continues to offer the Rodie2 at the $49.99 discounted price as its entry-level equipment offer, which can be expected to be popular with consumers. In addition, XM management stated on the earnings call that there will be more rebate offers and promotions to come for the holiday season. These strategies will keep the pressure on equipment margins and SAC in 4Q." These "aggressive marketing and advertising campaign planned for the holidays will mean higher advertising and marketing expenses, and therefore CPGA." As a result, Bernstein changed its estimates for fourth quarter for SAC to $61 and for CPGA to $110.

24.    Joe Euteneuer, Executive Vice President and Chief Financial of XM when discussing specific financial and operational metrics during the Q3 conference call stated,

> XM's SAC during the third quarter was a modest $53 per gross addition, a decline of $4 or 7%, from the $57 per gross addition in the third quarter of 2004. CPGA for the third quarter 2005 was $89 per gross addition, unchanged from the third quarter 2004 and down from $98 in the second quarter 2005. Similar to past trends, we expect fourth quarter SAC and CPGA to increase due to media and promotional activities during the upcoming holiday selling season.

25.    In a press release dated November 1, 2005, one-third of the way through the fourth quarter, XM issued a press release, touting the fact that it had increased its retail

market share to 59% in the third quarter, from 56% in the second quarter. In the press release, defendant Panero stated, "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

26.    On November 7, 2005, defendants filed XM's SEC Form 10-Q for the third quarter of 2005. Defendants stated that XM was

> continuing to grow our subscription margin (calculated as Subscription revenue less variable costs, which include Revenue share & royalties, and Customer care & billing operations) during the three months and nine months ended September 30, 2005 while **reducing our Subscription acquisition costs)**

***

> **The timin g of promotions and new contracts may cause SAC to fluctuate from period to period**

***

> **The timing of promotions and new contracts may cause SAC to fluctuate from period to period**

27.    Defendants did not disclose that one of its most senior and knowledgeable directors, Pierce J. Roberts, Jr., who had been Bear Stearns' lead telecom banker, had become increasingly troubled about the current direction of XM and had become increasingly strident within the Company, at both the Board and senior managerial levels, about the fact that the current direction was not in the best interests of XM. Roberts was emphatic that XM needed to reign in its skyrocketing marketing, programming and promotional expenditures.

**The Company's Belated Disclosure of the Truth**

28.    On February 16, 2006, defendants issued a press release announcing XM's results for the fourth quarter 2005 and year 2005 results. Defendants disclosed the

11

shocking and theretofore undisclosed truth about the skyrocketing level of XM's subscriber

acquisition costs in the fourth quarter of 2005

> For the fourth quarter, subscriber acquisition cost (SAC), a component of
> cost per gross addition (CPGA) was $89 compared to $64 in the same period
> last year.  CPGA in the fourth quarter was $141 compared to $104 in the
> same period last year.  These increases were primarily due to higher
> marketing expenses to meet one-time competitive event in the fourth quarter.

Thus, former director Roberts was right on the mark with respect to his "vociferous"

objections to XM's skyrocketing costs.  XM's SAC increased a whopping 39% and CPGA

increased 36%.  Although defendants knew about their skyrocketing costs as they were

planning for and incurring them, and as former director Roberts was decrying them,

defendants never once made full disclosure of them to the market while they were

misleading the market with their descriptions of "efficient" subscriber acquisition costs and

declining acquisition costs throughout 2005.

29.    The market reacted negatively to defendants' belated disclosure.   On

February 15, 2005, XM's common stock price closed at $25.25.  With the disclosure on

February 16, 2005, XM's common stock, on abnormally heavy trading volume fell 13% to

close at $21.96 on February 17, 2006.

30.    To the Chairman of the Board of Directors of XM – defendants made another

startling disclosure on February 16, 2006 when XM filed an SEC Form 8-K disclosing that

Director Pierce J. Roberts, Jr., had submitted a letter of resignation.  In the February 13,

2006 resignation letter, Roberts stated that

> I have been troubled about the direction of the company and do not believe
> that it is in the best interest of the company's shareholders.  For some time
> I have made my analyses and observations known in an increasingly
> vociferous manner to the Board and a number of senior managers of the

Company. I am not having any useful effect and I care too much and believe in my own views too much to just "go along."

Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes.

31.    In explaining the resignation, defendants in XM's Form 8-K elaborated on the views Mr. Roberts had long made known to defendants, stating

Although the letter does not explicitly state the nature of the disagreement, the Company believes the disagreement with Director Roberts primarily involves the strategic balance of growth versus cash flow. Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures.

32.    As alleged herein, defendants acted with scienter in that defendants knew that they were planning to spend and were spending huge sums in the fourth quarter of 2005 which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in earlier quarters and continued to tout would continue to decline throughout the rest of 2005. Defendants also knew that their public statements in press releases and SEC filings were materially false and misleading as alleged above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

33.    The market for XM's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose material facts, XM's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until February 16, 2006, as

alleged above.  Plaintiff and other members of the Class purchased or otherwise acquired XM common stock relying upon the integrity of the market price of the Company's common stock, and have been damaged thereby.

34.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of XM common stock, by publicly issuing false and misleading statements and omitting to disclose materia l facts necessary to make defendants' statements, as set forth herein not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

35.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about XM.  These material misstatements and omissions created in the market an unrealistically positive assessment of XM, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the truth was revealed and admitted by defendants, and the market was able to accurately value the Company.

14

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

36.    At all relevant times, the market for XM's common stock was an efficient market for the following reasons, among others:

(a)    XM's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, XM filed periodic public reports with the SEC and the NASDAQ;

(c)    XM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    XM was followed by more than 25 securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

37.    As a result of the foregoing, the market for XM's promptly digested current information regarding XM from all publicly available sources and reflected such information in XM's stock price. Under these circumstances, all purchasers of XM common stock during the Class Period suffered similar injury through their purchase of XM's common stock at artificially inflated prices and a presumption of reliance applies.

15

**Additional Scienter Allegations**

38.     In the In the conference call with analysts on Febraury16, 2006, defendant Panero admitted that the huge increase in SAC and CPGA in the fourth quarter of 2005 were the results of the campaign XM waged in the fourth quarter to counter the  arrival of Howard Stern on SIRIUS radio at the outset of 2006, primarily on increased media spending.

39.     A November 14, 2005 article in *The Wall Street Journal On Line*, notes that XM began a new ad campaign to steal the limelight from Howard Stern and SIRIUS, spending $25 million to advertise XM's broad range of programming.

40.     Several key insiders of XM made huge sales of their personal holdings in the fourth quarter of 2005, before any disclosure of the astronomical increases in XM's SAC and CPGA, taking advantage of the artificial inflation of XM's common stock prices:

(a)     Defendant Panero sold 413,334 shares on December 6, 2005 at prices ranging between $28.37 and $28.95 to reap proceeds of $11,846,000, thus selling 99% of his holdings in XM;

(b)     Stelios Patsiokas, XM Executive Vice President, sold 103,514 shares on December 6, 2005 at prices ranging between $28.55 and $28.95 to reap proceeds of $2,976,000, thus selling 62% of his holdings in XM;

(c)     Joseph M. Titlebaum, XM Executive Vice President, General Counsel and Secretary, sold 103,514 shares on December 6, 2005 at $28.4356 to reap proceeds of $2,943,482, thus selling 66% of his holdings in XM;

16

(d)    Stephen Cook, XM Executive Vice President Sales and Marketing, sold 78,514 shares on December 6, 2005 at prices ranging between $28.37 and $28.95 to reap proceeds of $2,238,000, thus selling 43% of his holdings in XM; and

(e)    Director George Weaver Haywood made three sales on November 8, 9, and 10, 2005 for a total of 2,071,000 shares at prices ranging between $27.85 and $29.61 to reap proceeds of $58,943,000, thus selling over 72% of his holdings in XM. None of these insiders sold any XM stock in the comparable year earlier time period.

## NO SAFE HARBOR

41.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint because they were not forward looking and the material facts were knowingly withheld from the market and are historical facts.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by defendant Panero who knew that those statements were false when made.

17

## FIRST CLAIM

### VIOLATION OF SECTION 10(B) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

42.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.    During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XM's common stock; and (iii) cause plaintiff and other members of the Class to purchase XM common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

44.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for XM common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

45.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material facts as alleged herein.

46.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of XM's common stock during the Class Period.

47.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of XM's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of XM's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class purchased XM common stock during the Class Period at artificially high prices and were damaged thereby.

48.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true facts,

as alleged herein, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their XM common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

49.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

50.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## SECOND CLAIM

### VIOLATION OF SECTION 20(A) OF
### THE EXCHANGE ACT AGAINST DEFENDANT PANERO

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.    Defendant Panero acted as a controlling person of XM within the meaning of Section 20(a) of the Exchange Act as alleged herein.

53.    As set forth above, XM violated Section 10(b) of the Exchange Act and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of defendant XM's position as a controlling person, he is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of such wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead and Liaison Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 1 , 2006

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

By:_____
Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Joseph Helms
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005
Telephone:  (202) 408-4600
Fax: (202) 408-4699

21

**LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross
Robert P. Frutkin
Suite 450, Wanamaker Building
Juniper and Market Streets
Philadelphia, PA 19107
Telephone:  215-561-3600
Fax: 215-561-3000

**Attorneys for Plaintiff**

LAW OFFICES BERNARD M. GROSS, P.C.

## AFFIDAVIT OF MORRIS SATLOFF

1.    I, Morris Satloff, have reviewed the Complaint and have authorized the filing of same;

2.    I did not purchase the securities that are the subject of the Complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under this title;

3.    I am willing to serve as class representative and provide testimony at deposition and trial if necessary;

4.    My transaction(s) in **XM Satellite** between July 28, 2005 and February 15, 2006 are set forth below:

| Date | Purchase(s) or Sales(s) | Amount | Price |
|------|-------------------------|--------|-------|
| 08/25/05 | Purchase | 700 | $33.70 |
| 11/23/05 | Purchase | 700 | $30.73 |

5.    During the previous three years, I have/have not been a lead plaintiff in the any securities fraud class actions.

6.    I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of MARCH , 2006, at PROVIDENCE R.I. .(City/state)

MORRIS SATLOFF

Please fax certification to 215-561-3000 or mail to: Law Offices Bernard M. Gross, P.C. The Wanamaker Bldg., 100 Penn Sq. East, Suite 450 Philadelphia, PA 19107, 866-561-3600 (toll-free).