Steven J. Toll (DC bar No. 25623)
Daniel S. Sommers (DC Bar No. 416549)
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Proposed Liaison Counsel for*
*The XM Shareholder Group*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE XM SATELLITE RADIO HOLDINGS SECURITIES LITIGATION | JOINT REPLY OF THE ZARIF GROUP AND ADAM BARBER IN FURTHER SUPPORT OF THEIR MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF AND SELECTION OF COUNSEL |
| This document relates to: All Actions | Master File No.: 06-0802 (ESH) |

Avi Zarif, Brock Ketcher, Victor Ventimiglia, and Corey Spohn (the "Zarif Group"), and Adam Barber (collectively the "XM Shareholder Group"), respectfully submit their "Joint Reply in Further Support of Their Motions for Appointment as Lead Plaintiff and Selection of Counsel."

## I.    Introduction

The XM Shareholder Group has the largest loss of any of the competing movants for appointment as Lead Plaintiff regardless of the methodology used. Under the First In-First Out methodology ("FIFO"), the XM Shareholder Group suffered losses of $736,206.31. In comparison, the Boca Raton Fire Fighters and Police Pension Fund ("Boca Raton") and Plumbers Local 267 Pension Fund ("Plumbers Local 267") suffered a loss of $554,431.25.

Similarly, under the Last In-First Out methodology ("LIFO"), the XM Shareholder Group suffered losses of $562,506.31, as compared to Boca Raton and Plumbers Local 267[1], which suffered losses of $509,931.83. Thus, under either methodology, the XM Shareholder Group has the greatest financial stake in the relief sought by the Class - - the cornerstone of the mandated criteria in determining the most adequate plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Importantly, the XM Shareholder Group is *not* some "lawyer driven" "cobbled together" group as contended by the other competing movants. In fact, as demonstrated in the prior moving papers of the XM Shareholders Group, this Group was formed as a direct result of the failure of the competing Lerach Group to provide any information about itself, how that group was composed, how it intended to monitor or oversee the litigation and how it intended to work cooperatively together. The members of the XM Shareholders Group were particularly alarmed

---

[1] Boca Raton and Plumbers Local 267 are collectively referred to as the "Lerach Group."

by the fact that no indication was given as to how dissention within the Lerach Group would be resolved among its two equal members.

Moreover, the cohesive and cooperative nature of the XM Shareholder's Group is readily apparent from its adoption of a formal organizational structure, governed by a set of written by-laws (the "By-laws"), that allow it to "effectively monitor and control this litigation in order to achieve the best results possible for the class." Each of the members has signed the group's by-laws and one of its members, Brock Ketcher, has been elected the group's President and Secretary. Clearly, the XM Shareholder's Group is an investor-driven group, fully satisfying the congressional purpose and its intent behind the passage of the PSLRA.[2]

The XM Shareholder Group also meets the adequacy and typicality prongs of Rule 23 and the PSLRA. While certain competing movants have challenged various members of the XM Shareholder Group on the grounds of adequacy or typicality, none of these arguments proffered render the XM Shareholder Group inadequate or atypical. On the contrary, the diverse trading patterns of the XM Shareholder Group covers the spectrum of the various trading patterns of the putative Class members they seek to represent.

For example, Mr. Victor Ventimiglia, purchased his shares prior to the February 16, 2006 partial disclosure and retained all of those shares at the close of the Class Period on May 24, 2006. Group member Corey Spohn purchased and sold all of his shares prior to the February 16, 2006 partial disclosure. Messrs. Brock Ketcher, Adam Barber and Avi Zarif purchased all of their shares prior to the February 16 partial disclosure, and sold shares both prior and subsequent

---

[2] The Class Period used to calculate losses under both the FIFO and LIFO methodologies is July 28, 2005 to May 24, 2006. The settle out price for this Class Period is $13.66 as of July 24, 2006. Even utilizing the shorter Class Period of July 28, 2005 to February 15, 2006, the XM Shareholder Group has the largest loss under either methodology. Under FIFO, the XM Shareholder Group's loss is $472,647.17 as compared to the Lerach Group's loss of $317,056.77. Under LIFO, the XM Shareholder Group suffered losses of $344,756.02 versus losses of the Lerach Group of $312,180.26.

to such disclosure. Thus, these diverse trading patterns likely parallel the trading patterns of the thousands of other potential class members.

Finally, any challenge by the Lerach Group to the proposed co-Lead Counsel structure of the XM Shareholder Group is misplaced. Interestingly enough, in a recent case, *Argento Trading Company v. Coca-Cola Enterprises Inc.*, et al., No. 1: 06-CV-0275-TWT (N.D. Ga), Boca Raton (one of the members of the Lerach Group), moved for Lead Plaintiff and requested that the court approve a Lead Counsel leadership structure consisting of two law firms, as the XM Shareholder Group requests here. In fact, Boca Raton's proposed Lead Counsel has served as a co-lead counsel in numerous PSLRA cases and would undoubtedly affirm that no duplicative efforts or expenses took place as a result of such a counsel structure. Similarly, proposed co-Lead Counsel for the XM Shareholder Group assure the Court that its service to the Class will not involve any duplicative efforts or expenses in this instance.

**II.      The XM Shareholder Group Has The Greatest Financial Interest In the Relief Sought By The Class**

Regardless of whether the FIFO or LIFO methodology is utilized in calculating losses, the XM Shareholder Group has suffered the greatest loss during the longer proposed Class Period of July 28, 2005 through May 24, 2006 inclusive.[3] Under FIFO, the XM Shareholder Group has losses of $736,206.31,[4] as compared to the Lerach Group's losses of $554,430.71.[5]

---

[3] Contrary to the contention of movant Ron Rubin that the longer Class Period was not adequately noticed, the law firm of Schatz & Nobel issued a press release notifying investors of the expanded class period. *See* Schatz & Nobel Press Release, attached as Exhibit A, hereto.

[4] The losses of the individual members of the XM Shareholder Group are as follows: (i) Adam Barber - $258,633.42; (ii) Avi Zarif - $187,471.50; (iii) Brock Ketcher - $111,014.72; (iv) Corey Spohn - $81,600.00; and (v) Victor Ventimiglia - $97,486.67.

[5] The loses of the individual members of the Lerach Group are as follows: (i) Boca Raton - $375,035.72; and (ii) Plumbers Local 267 - $179,394.99.

Likewise, under LIFO, the XM Shareholder Group suffered losses of $562,506.31,[6] with the

Lerach Group suffering losses of $509,931.83.[7]

Moreover, the XM Shareholder Group purchased 187,891 shares of XM stock during the

Class Period, expending $5,773,838.27. In comparison, the Lerach Group purchased only

34,775 shares during the Class Period, and expended only $1,045,888.05.[8]

III.              The XM Shareholder Group Is An Appropriate Lead Plaintiff

The XM Shareholder Group was formed to foster the effective management and

coordination of this litigation on behalf of the proposed Class. Its By-laws include provisions for

holding meetings, voting on significant litigation issues, communicating amongst Group

members, and otherwise coordinating with selected counsel to oversee and monitor the litigation.

As set forth in the XM Shareholder Group By-laws, the purpose of the Group is to:

- Represent the interests of shareholders who purchased XM
  common stock who are eligible to participate in the XM securities
  fraud class action pending in D.C. Federal Court;

---

[6] The losses of the individual members of the XM Shareholder Group are the same under LIFO as they are under FIFO, with the exception of Avi Zarif, whose losses under LIFO are $13,771.50.

[7] The losses of the Boca Raton under LIFO are the same as they are under FIFO. The losses of Plumbers Local 267 are $267,896.11 under LIFO.

[8] Recognizing the superiority of the losses submitted by the XM Shareholders Group, the Lerach Group also argues that they should be appointed as lead plaintiff because of a preference for appointing institutional investors. Lerach Group opposition at 5-6. However, the PSLRA lead plaintiff rebuttable presumption provision is silent on the type of investor that should be appointed as lead plaintiff and says absolutely nothing about a preference for an institutional investor. 15 U.S.C. § 78u-4(a) (3) (B) (iii) (I). While some courts have held that an institutional investor is a preferable lead plaintiff, see *Osher v. Guess, Inc.*, 2001 U.S. Dist . Lexis 6057, *11-12 (C.D. Cal . April 26 , 2001) (preference for the City of Detroit because they have assets that exceed $3 billion), those conclusions are based on the fact that most institutions are sophisticated investors with large holdings in a company that can better control the litigation . *Id.* Here, in contrast, there is no evidence in the record, or that Counsel can find, that indicates that the Lerach Group are as large or sophisticated as institutions such as the City of Detroit or can control the litigation any better than an individual investor who also suffered great losses. Thus, the simple fact that the Lerach Group is comprised of institutions should not be the deciding factor in this litigation. *See Weisz v. Calpine Corp.*, No. C 02-1200 SBA, 2002 U.S. Dist. LEXIS 27831, *29 (N.D. Cal. 2002) ("The court does not hold that institutional investors are presumptively the most adequate lead plaintiff solely by virtue of their status as institutional investors.")

- Ensure that the members have access to up-to-date and accurate information regarding the ongoing securities fraud class action litigation;

- Foster communication among XM Shareholder Group members concerning the progress of the litigation; and

- Take any and all measures to ensure that the interests of the XM Shareholder Group members and XM class members are represented and that any available recovery for losses related to XM securities fraud are made available and distributed to Class members.

Moreover, the elected President and Secretary of the Group understands the Group's responsibilities should the Group be appointed Lead Plaintiff in this matter, "including a fiduciary obligation to the Class, an obligation to oversee choice of Lead Counsel, the responsibility to stay abreast of the litigation and effectively communicate with counsel, and the ultimate goal of assuring maximum recovery for the Class." *See* Declaration of Brock Ketcher.

Any issue as to the bona fides of the XM Shareholder Group is transparent at best and easily rebutted by the By-laws and the Declaration of Brock Ketcher.[9]

## IV.        THE PERMISSIBLE NATURE OF XM SHAREHOLDER GROUP

This District long ago realized that "[w]hile Congress provided flexibility for a 'group of persons' to be lead plaintiff, 'the most important open question under the lead plaintiff section of the PLSRA is whether unrelated individuals or institutions may aggregate their shares in order to be deemed the most 'adequate plaintiff''." *In re The Baan Company Sec. Litig.*, 186 F.R.D. 214,

---

[9] One of the competing movants raised an issue concerning Mr. Victor Ventimiglia's role in the XM Shareholder group due to his allegedly being retained by two different law firms, both of which submitted Lead Plaintiff motion papers on his behalf. However, as set forth in his declaration, Mr. Ventimiglia informed other counsel, prior to the initial Lead Plaintiff papers being filed that he was revoking their authority to move for his appointment as Lead Plaintiff. See Declaration of Victor Ventimiglia at ¶ ¶ 2-5 attached hereto as Exhibit B. Additionally, Mr. Ventimiglia is a signatory to the XM Shareholder Group by-laws which is indicative of his commitment to serve as a Lead Plaintiff in this litigation as a member of the XM Shareholder Group.

217 (D. DC 1999) quoting, John C. Coffee Jr., *Developments Under the Private Securities Litigation Reform Act of 1995: The Impact After Two Years*, SC53 ALI-ABA 395, 423, (1997).

The Courts in this District and others following its guidance have generally allowed such aggregation and have held that, "[t]he text of the PSLRA does not limit the composition of a 'group of persons' to those only with a pre-litigation relationship, nor does the legislative history provide a sound enough foundation to support such a gloss. *Baan* at 216-17, *See also, In re Microstrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 434-35 (E.D. Va. 2000); *In re Network Associates, Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1024-25 (N.D. Cal. 1999); *Takeda v. Turbodyne Techs. Inc.*, 67 F. Supp. 2d 1129, 1136 (C.D. Cal. 1999); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 112 (D.N.J. 1999); *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 408-09 (D. Minn. 1998); *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 352 (S.D. Cal. 1998); *In re Milestone Scientific Sec. Litig.*, 183 F.R.D. 404, 417 (D.N.J. 1998).

In addition to the foregoing, the *Baan* Court specifically recognized the legitimacy of groups or plaintiffs reconfiguring their positions and stated, in footnote 1 of that opinion, ***"It sometimes occurs that groups which start out in adverse positions form alliances*** leaving it to the Court to divine the arguments adverse to the alliance and to weigh the relative merit of those arguments." Here, since opposition presumably still exists, the Court may be somewhat relieved of this analytical burden; yet, the underlying proposition, favoring combinations of Lead Plaintiffs and Lead Plaintiff groups following the filing of initial motions, is sound.

The *Baan* Court Opinion and the Memorandum of the Securities and Exchange Commission, filed *amicus curiae* therein, both instruct that a group of movants seeking to serve as Lead Plaintiff, who have no pre-litigation relationship, should not exceed five (SEC's recommended limit) or six (the *Baan* Court's recommended limit). In any event, both the SEC

and the Baan Court also both instruct that the Court should only approve a group that can

establish that it is capable of effectively managing the litigation and its counsel. *Id.* at 218. The

five member XM Shareholder Group, with its demonstrated cohesive organization, is capable of

such oversight and management.

Thus, while the *Baan* Court placed almost no restrictions upon the formation of groups of

proposed Lead Plaintiffs, it did state that the appointment of Lead Plaintiffs should be made

under a rule of reason. *Id.* Courts that have adopted this approach generally adopt an "all

relevant factors" analysis to determine if the group is permitted to serve as Lead Plaintiff in an

action. Accordingly, as the court in *MicroStrategy* stated:

> Under this approach, a court may consider all relevant factors, such as
> "descriptions of [the group's] members, including any pre-existing relationships
> among them; an explanation of how its members would function collectively; and
> a description of the mechanism that its members and the proposed lead counsel
> have established to communicate with one another about the litigation." ... This
> approach, which relies on no single factor, allows a district court maximum
> flexibility to select a lead plaintiff who will best represent the interests of the class
> and exercise control of the litigation.

*Microstrategy,* 110 F. Supp. 2d at 434-435, quoting *In re Network Associates Inc. Sec Litig,*

76 F. Supp 2d 1017, 1026 (N.D. CA 1999)(quoting Amicus Brief of the SEC filed in *Parnes, et*

*al v. Digital Lightwave, Inc.,* No 99-11293 (11th Cir. Aug 25, 1999).

In addition to the foregoing general propositions that favor the appointment of small,

cohesive groups such as the XM Shareholder Group as Lead Plaintiff under the PSLRA, other

courts that have considered the issue as to whether groups of plaintiffs can be allowed to unite

during the pendancy of the lead application process have also generally allowed such

combinations, provided mainly that such actions were **not** merely an "artifice" and were not

primarily "lawyer driven." *See, In re: Able Laboratories Sec Litig.,* 425 F. Supp 2d 562 (D. NJ

2006) (Court allows movants, each of whom filed a motion and certification for appointment as Lead Plaintiff within the 60 day to form a group, provided only that such group was not formed by counsel in order to satisfy the largest financial loss requirement), citing *Cendant*, 264 F3d at 266.[10] Indeed, it was the legitimate concerns regarding the Lerach Group's ability to effectively monitor and control this litigation that prompted the formation of the XM Shareholder Group.

The actions taken by the members of The XM Shareholder Group, documented by its bylaws, and representations regarding its structure and formation, demonstrate the cohesive structure of this Group and the active nature of its participants. These actions also demonstrate that the XM Shareholder Group has not manipulated the Lead Plaintiff selection process, and it has also not manipulated the size of its financial loss by enlarging the Class Period or adding additional persons to a group in supplemental filings, in a manner that would "thwart the intent of the PSLRA." Rather, in joining forces, the members of the XM Shareholder Group have taken actions to exert their personal influence over this litigation, thereby furthering the intent of the PSLRA - - which is to empower investors and reduce lawyer driven litigation.

---

[10] See also, *Montoya v. Mamma.com Inc.*, No 05 Civ 2313 (HB), 2005 US Dist LEXIS 10224 (S.D. NY May 31, 2005)(appointing as Lead Plaintiff a group of investors that initially filed independent motions even when neither of these movants initially had the largest financial interest in the relief sought); *Malasky v. IAC/Interactive Corp.*, CIV No. 04-7447, 2004 US Dist LEXIS 25832 (S.D. NY Dec. 21, 2004)(court appointed Lead Plaintiff structure consisting of parties who initially filed independent motions in order to address adequacy concerns).

**V.**        **The XM Shareholder Group Otherwise Meets the Requirements of Rule 23**

    **A.**        **The XM Shareholder Group's Status As A Net Seller Is No Impediment To Its Serving As A Lead Plaintiff**

According to the opposing movants, the XM Shareholder Group is a net seller, because it sold 3,000 more shares collectively as a group during the Class Period than it purchased. Primarily, this is due to one Group member, Victor Ventimiglia, having sold 10,000 more shares than he purchased during the Class Period. According to opposing movants, this purportedly renders the Group inadequate or atypical because, as net sellers, the XM Shareholder Group may have profited from the alleged fraud. *Citing, In re Cardinal Health, Inc. Securities Litigation,* 226 F.R.D. 298, 308 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Company Securities Litigation,* 2004 WL 3314943 at *4 (N.D. Ohio May 12, 2004); *In re Cable & Wireless, PLC, Securities Litigation,* 217 F.R.D. 372, 378 (E.D. Va. 2003); *Weisz v. Calpine Corp.,* 2002 WL 32818827 *7 (N.D. Cal. Aug. 19, 2002).

Where, however, as in the instant matter, a proposed Lead Plaintiff who may otherwise be a net seller suffered a loss on its holdings of securities, some of which predated the alleged fraud, courts have not hesitated in appointing such movants as Lead Plaintiffs in securities fraud class actions. In fact, this is exactly the situation in *Frank v. Dana Corp.,* where the District Court for Ohio rejected the exact same type of net seller argument, and appointed a movant who would otherwise have been a net seller, but who suffered a significant loss related to this position as a result of the fraud alleged in that action. *See, Frank v Dana Corp.,* 2006 WL 1473547 *2 (N.D. Ohio May 24, 2006) (Once movant established a loss that included securities held prior to the immediate inception of the proposed Class Period, the Court concluded that, even though movant "may have been a net seller, it should have no trouble proving damages and, therefore, is qualified to serve as Lead Plaintiff").

Thus, consistent with the recent case law, when Mr. Ventimiglia's pre–Class Period purchases are taken into account, he individually suffered a loss of $183,471.50 under either the FIFO or LIFO methodology. Similarly the XM Shareholder Group as a whole, also suffered a loss of $732,206.31 under either the FIFO or LIFO methodology when such pre-Class Period purchases are considered - - which is well in excess of the losses suffered by any other movant.

**B.    Mr. Barber Is Not A Day-Trader And, Regardless, Such Activity Does Not Preclude Appointment As Lead Plaintiff**

The Lerach Group further attacks the adequacy and typicality of the XM Shareholders Group by asserting that Mr. Barber is not adequate to be appointed Lead Plaintiff because "his motion reveals high-volume in-and-out trading on various days between October 13, 2005 and October 21, 2005," that may subject him to unique defenses by defendants. *See* Lerach Group Opposition at 8.

Importantly, Mr. Barber's substantial losses arose as a result of his established holdings of XMSR common stock, *not* his trades occurring on five days in October 2005. Indeed, a cursory review of Mr. Barber's certification indicates that he did not "day-trade" throughout the proposed Class Period. Instead, Mr. Barber purchased and held a significant amount of shares in XMSR from November 7, 2005, through May 24, 2006, that were the transactions primarily resulting in his losses due to defendants' alleged fraud. Accordingly, the Lerach Group offers no proof and the record does not support a finding that Mr. Barber was ever engaged in day-trading XMSR common stock. *See Taubenfeld v. Career Education Corp.*, 2004 WL 554810 at *3 (N.D. Ill. March 19, 2004) (lead plaintiff movant not a "day trader" simply because he sold defendants' "common stock in the same day or, in one instance, sold it the day after purchasing it").

Nevertheless, and contrary to the Lerach Group's assertion, even if Mr. Barber had engaged in day-trading activity, it would not preclude his appointment as a Lead Plaintiff under the facts and circumstances of this case. As recently as April 2006, the United States District Court for the District of Connecticut appointed a day-trader movant as Lead Plaintiff in a securities fraud class action, holding that day-trading activity does not render a Lead Plaintiff movant atypical or inadequate to represent a Class. The Connecticut District Court stated, in part, the following:

> [M]any courts have concluded that the fact that a candidate for lead plaintiff engaged in day-trading does not necessarily render that individual or entity atypical or inadequate at representing the class, reasoning "where the public market of a quoted security is polluted by false information ... all types of investors are injured."

In re Host America Corp. Secur. Litig., 2006 WL 1031214 at *6 (D. Conn. April 10, 2006) (quoting In re Oxford Health Plans Inc, Securities Litigation, 199 F.R.D. 119, 124 (S.D.N.Y. 2001) (finding that market-maker traders met Rule 23 typicality requirement)).

The argument that Barber would not meet the Rule 23(a) typicality requirement because his day-trading activity subjects him to "unique defenses," has also been rejected by numerous courts. See, e.g., In re CMS Energy Secur. Litig., 2006 WL 763193 at *5 (E.D. Mich. March 24, 2006) (on motion for class certification, court held that "day-traders" were adequate class members and class representatives); Taubenfeld, 2004 WL 554810 at *3 (rejecting argument that day-trading activity rendered lead plaintiff movant atypical); In re Royal Ahold N.V. Secur. and Erisa Litig., 219 F.R.D. 343, 354-355 (D. Md. 2003) (rejecting argument that "day-trader" is atypical and subject to unique defenses).

In fact, as the Lerach Group is well aware, the cases upon which it relies to oppose the XM Shareholder Group's motion are inapposite to the facts here. The case upon which the

Lerach Group seems to hold most promise, *In re Safeguard Scientifics,* 216 F.R.D. 577 (E.D. Pa. 2003), is clearly distinguishable on its facts. In that case, which was a class certification opinion and not even a Lead Plaintiff motion, that Court held that a proposed class representative was inadequate because it *increased* its holdings in the stock in question *after* public disclosure of the alleged fraud. The Court held that, these additional purchases raised serious doubts concerning the materiality of the alleged fraud disclosures. *Id.* at 582-83.

Similarly, in *In re Bank One Shareholders Class Actions,* 96 F. Supp. 2d 780 (N.D. Ill. 2000), another case upon which opposing movants rely, one of the proposed Lead Plaintiffs in that action was an institutional investment manager (a hedge fund), that engaged in *extensive* day trading - - first shorting the stock in question, and then buying it to cover its position. The *Bank One* Court rightly found that the movant there was engaged in a unique trading strategy that subjected it to unique claims or defenses and rendered it inadequate or atypical to represent the interests of the Class. *Id.*

C.      **The Proposed Co-Lead Counsel Structure Is Entirely Appropriate**

The least genuine attack upon the XM Shareholder Group's motion for appointment as Lead Plaintiff is the Lerach Group's assertion that XM Shareholder Group is inadequate or atypical because it has dual counsel. *See* Lerach Group Opposition at 7. As the Lerach Group is well aware, there is absolutely nothing improper or inappropriate about a co-Lead Counsel structure in securities class action litigation, it is common practice and such leadership has been approved in scores of cases. This District is no exception. *In re Fannie Mae Securities Litigation,* 355 F.Supp2nd 261,265 (D.D.C. 2005)(Appointing two firms as co-lead counsel in PSLRA case).

Moreover, the Lerach firm itself has frequently been part of, or moved for, a co-Lead Counsel structure in securities fraud class actions when it has suited its interests. *See, e.g., In re Retek Inc. Securities Litigation,* 2006 WL 748326, (D.Minn., March 22, 2006) (appointing the Lerach firm and the Bernstein Litowitz Berger & Grossmann LLP firm as co-lead counsel); *In re Axis Capital Holdings Ltd. Securities Litigation,* 2005 WL 883008 (S.D.N.Y., April 13, 2005) (appointing the Lerach firm and the Schiffrin Barroway firm as co-lead counsel); and *In re IAC/InteractiveCorp Securities Litigation,* 2005 WL 549548 (S.D.N.Y., March 7, 2005) (appointing the Lerach firm and the Schatz & Nobel, P.C. firm as co-lead counsel).

Moreover, the certification filed by Boca Raton identifies the *Coca-Cola Enterprises Inc.* securities litigation as a recent securities class action matter in which it moved for appointment as Lead Plaintiff. In that case, Boca Raton and the Lerach firm moved jointly with the Argento Fund and the Motley Rice LLC firm for appointment as co-lead counsel. *See* Exhibit C, attached hereto.

**D.      Potential Loss Causation Issues Should Not Impact This Court's Lead Plaintiff Decision**

In its opposition to the XM Shareholder Group's motion for appointment as Lead Plaintiff, the Lerach Group notes that defendants may try to "take advantage" of Corey Spohn's sale of all of his shares of XM common stock "prior to the revelation of the alleged fraud. . . ." Lerach Group Opposition at 7, n 4. The tacit purpose of such commentary is to raise concern with the Court that Mr. Spohn's "in-and-out" stock sales could somehow be detrimental to class members' interests at the class certification or later stages of the litigation and, therefore, that the Lerach Group members are the more adequate and typical Lead Plaintiffs.

As a preliminary matter, the Court's analysis here is limited to resolving only those issues appropriate at the lead plaintiff motion stage and not ultimate issues of liability and damages.

*See generally, Ohio Public Employees Retirement System v. Fannie Mae*, 357 F.Supp.2d 1027, 1033 (S.D.Ohio 2005) (citing *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03CV2166, 2004 U.S. Dist. LEXIS 27043, at *17 (N.D.Ohio May 12, 2004)).

Regardless, this Court has expressly found that "in-and-out" sellers are not atypical and have appointed them as adequate class representatives in securities fraud class actions. *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 48-49 (D.D.C. 2006) (rejecting defendants' objection to class certification that, based on *Dura Pharmaceuticals*, Lead Plaintiff who sold his stock before the end of the Class Period, and was thus subject to possible loss causation defense, was atypical of subclass so as to disqualify him as class representative). "The Court cannot say, however, that the potential vulnerability to a lack of loss causation defense is unique to [plaintiff's] case. The presence of the loss causation defense does not defeat the typicality of his claims." *Id.* at 48.

Nor, however, would Mr. Spohn's trading run afoul of the "predominance" prong of the Rule 23(b)(3) analysis, albeit that issue also is not before this Court in the context of the competing Lead Plaintiff motions. In *In re Bearingpoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542-544 (E.D. Va. 2006), the district court addressed the "somewhat novel question" of whether "in-and-out traders, i.e., traders who buy and sell during the class period, can show loss causation." Rejecting defendants' reliance on *Dura Pharmaceuticals* as requiring "the dismissal of in-and-out traders" from the proposed class, the court held:

> In cases where, as here, there are multiple disclosures, in-and-out traders may well be able to show a loss. . . . Moreover, it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation. . . . The issue of whether in-and-out traders can satisfy loss causation is a single legal issue, not dependent on individual factual determinations, and the proper determination of individual damages can be determined at trial through the use of expert witnesses. . . . These issues, though

not common to all members of the proposed class, are common to many, and in any event, will not make class litigation unwieldy or inefficient.

232 F.R.D. at 544 (internal citations omitted).

There are likely many Class members just like Mr. Spohn who purchased and sold XMSR common shares during the proposed Class Period, but prior to the defendants' partial corrective disclosure on February 16, 2006. Apparently, the interests of Class members like Mr. Spohn would not be protected if the Lerach Group is appointed Lead Plaintiff. This militates in favor of the proposed XM Shareholder Group's appointment as Lead Plaintiff, not against it, where the XM Shareholder Group is more diverse.

## VI.        Conclusion

Accordingly, for the foregoing reasons, the XM Shareholder Group respectfully requests that it be appointed Lead Plaintiff, and that its selected counsel be approved by the Court as Co-Lead Counsel and Liaison Counsel.

Dated: July 27, 2006

Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.**

By: /s/ Daniel S. Sommers
Steven T. Toll (D.C. Bar No. 25623)
Daniel S. Sommers (D.C. Bar No. 41623)
**COHEN, MILSTEIN, HAUSFELD &
TOLL, PLLC**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699

*Proposed Liaison Counsel for the XM
Shareholder Group and the Class*

Michael Swick
(New York Bar No. MS-9970)
Lewis Kahn (Louisiana Bar No. 23805)
**KAHN GAUTHIER SWICK, LLC**
650 Poydras St., Suite 2150
New Orleans, Louisiana  70130
Telephone:  (504) 455-1400
Fax:  (504) 455-1498

Vahn Alexander
Janine Sperandeo
**YOURMAN ALEXANDER &**
 **PAREKH LLP**
3601 Aviation Blvd, Suite 3000
Manhattan Beach, CA  90266
Telephone:  (310) 725-6400
Fax:  (310) 725-6420

*Proposed Co-Lead Counsel for*
*the XM Shareholder Group and the Class*

Stuart J. Guber (Georgia Bar No. 14879)
James M. Evangelista
(New York Bar No. JE 1246)
**MOTLEY RICE  LLC**
One Georgia Center
600 West Peachtree Street – Suite 800
Atlanta, GA  30308
Telephone:  (404) 201-6900
Fax:  (404) 201-6959

Jonathan W. Cuneo (D.C. Bar N 939389)
**CUNEO, GILBERT & LADUCA, LLP**
507 C Street NW
Washington D.C.  2002
Telephone:  (202) 789-3960
Fax:  (202) 789-1813

*Additional Counsel*
*For Plaintiff and the Class*