## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| IN RE: XM SATELLITE | ) | |
| RADIO HOLDINGS | ) | Civil Action No. 06-0802 (ESH) |
| SECURITIES LITIGATION | ) | |
| _____ | ) | |

### MEMORANDUM OPINION AND ORDER

Before the Court are competing motions for appointment as lead plaintiff in a securities class action under Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Because the Court finds that the institutional investors -- Boca Raton Firefighters and Police Pension Fund, and Plumbers Local 267 Pension Fund -- best satisfy the requirements and purpose of the PSLRA, it appoints them as lead plaintiffs in this action, and approves their choice of lead counsel -- Lerach Coughlin Stoia Geller Rudman & Robbins LLP.

### BACKGROUND

Plaintiffs seek recovery for their purchase of stock or stock options in XM Satellite Radio Holdings, Inc. ("XM"), between July 28, 2005 and May 24, 2006. XM is a Delaware corporation with its principal place of business and chief operating offices located in Washington D.C.

According to plaintiffs' allegations,[1] on February 15, 2006, XM disclosed that it had suffered a significant loss in its fourth quarter and subsequently XM's stock dropped by nearly

_____

[1] On June 7, 2006, this Court, after considering the parties' Consent Motion to Consolidate, entered an Order consolidating the eight actions pending before it and all subsequent, related actions. All actions have been consolidated under the above case number, 06-0802.

28.5 percent.  Since XM had never reported profits, its value and the value of its stock were based on the number of subscribers it reported.  During the class period, XM had stated it would be able to meet its goal of signing up 9 million subscribers by year-end 2006.  As it tried to meet this target, XM spent extraordinary amounts on marketing without disclosing these expenditures to plaintiffs.  Plaintiffs contend that XM knew it would be incapable of meeting its targets, and that several key XM insiders liquidated their own shares while in possession of material, adverse non-public information about XM.  Plaintiffs therefore claim that the announcement on February 16, 2006, of the drop in XM's earnings -- in which it disclosed that acquisition costs for new subscribers had risen to $89 from $64 in the same period a year ago -- was foreseeable, and that the company misrepresented its ability to meet its earnings target.

The first complaint filed against defendants was *Satloff v. XM Satellite Radio Holdings, Inc.,* Civil Action No. 06-0802, which was commenced on May 1, 2006.  The first notice regarding the pendency of these actions was published on *PrimeZone Media Network*, a business newswire service, on May 3, 2006.

The consolidated complaints seek recovery for plaintiffs' losses under Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B), as amended by Section 101(a) of the PSLRA.  Initially, five individuals or plaintiff groups moved for lead plaintiff designation.  They were: (1) Boca Raton Firefighters and Police Pension Fund, and Plumbers Local 267 Pension Fund (the "Union Pension Group"), whose losses total $551,872, and its choice of Lerach Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel; (2) a group of four individuals, "the Zarif Group," whose losses total $471,671, and its selection of Motley Rice LLC and Kahn Gauthrier Swick, LLC as co-lead counsel, and Cohen, Milstein,

2

Hausfeld & Toll, PLC as liaison counsel; (3) an individual, Victor Ventimiglia, whose losses

total $46,390, and his choice of co-lead counsel, Stull, Stull & Brody and Kantrowitz Goldhamer

& Graifman, P.C., as well as The Mason Law Firm, P.C., as liaison counsel; (4) an individual,

Ron Price, who seeks to be named lead plaintiff of the sub-class of options purchasers, whose

losses total $13,616, and his selection of Finkelstein, Thompson & Loughran as lead counsel;

and (5) an individual, Adam Barber, whose losses total $252,000, and his choice of Yourman

Alexander & Parkh as lead counsel and Cuneo Gilbert & Ladura LLP as liaison counsel.

      Some seventeen days after the parties filed their motions, two of the individual movants

-- Adam Barber and Victor Ventimiglia[2] -- withdrew their motions and joined forces with the

Zarif Group, and the newly reconstituted group re-named itself the "XM Shareholder Group."

(Joint Opp'n of Pls. the Zarif Group and Adam Barber to Competing Motions ("Joint Opp'n") at

2.)  This new aggregation of plaintiffs was accomplished after the 60-day filing limitation, and

narrowed the field of competing plaintiffs to three.  This new group claims combined losses of

$730,304.81.  (*Id.* at 3.)

## ANALYSIS

### I.   Lead Plaintiff

#### A.  Standard

      Under the PSLRA, the court is to appoint as lead plaintiff the member or members of the

purported class that is or are "the most capable of adequately representing the interests of the

class members."  15 U.S.C. § 78u-4(a)(3)(B)(I).  Under the Act, there is a "rebuttable

_____

    [2]Vincent Ventimiglia now claims that the first motion filed in his name was done without
his authorization. (*See* Joint Rep. of Zarif Group and Adam Barber Ex. B.)  This motion has been
withdrawn and Mr. Ventimiglia has joined with the Zarif Group.  (*Id.* at 2 n.2.)

presumption . . . that the most adequate plaintiff . . . is the person or group of persons that -- (aa) has either filed the complaint or made a motion in response to a notice . . . ; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 78u-4(a)(3)(B)(iii)(I).  The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff -- (aa) will not fairly and adequately represent the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II).  Finally, the PSLRA states that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u-4(a)(3)(B)(v).

The selection process begins once the first plaintiff files an action and publicizes the pendency of the action, the claims made, and the purported class period.  *Id.* § 78u-4(a)(3)(A)(i). "The plain language of the statute precludes consideration of a financial loss asserted the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed."  *In re Telxon, Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999).  The intent of this requirement is to promote the early appointment of a lead plaintiff.  *Id.* at 818-19.

The second step is for the court to choose the plaintiff who has the greatest financial stake in the outcome of the case.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  As noted, there is a rebuttable presumption that the most capable plaintiff is the class member with the largest financial interest in the relief sought.  *Id.*; *see also In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 433 (E.D. Va. 2000); *In re Fannie Mae Sec. Litig.,* 355 F. Supp. 2d 261, 263 (D.D.C. 2005) (recognizing that this Court "must" find the movant with the largest financial interest the

4

presumptive lead plaintiff if it "makes a *prima facie* showing that it satisfies the typicality and adequacy requirements of Rule 23").  Some courts, including the Third Circuit, have identified three factors bearing on this inquiry: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001).

The PSLRA's presumption that the most adequate plaintiff is the one with the largest financial interest reflects Congress' desire to curtail lawyer-driven securities class actions.  *See* H.R. Conf. Rep. No. 104-369, at *31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730. To achieve this goal, Congress sought to attract lead plaintiffs with a significant financial stake in the litigation on the assumption that they would be more likely to play an active role in directing and overseeing the litigation.  *See Barnet v. Elan,* 2005 WL 1902855, at *3 (S.D.N.Y 2005). Furthermore, Congress explicitly stated that it hoped that by selecting the plaintiff with the greatest financial loss, the PSLRA would thereby "increase the likelihood that institutional investors will serve as lead plaintiffs."  H.R. Conf. Rep. No. 104-369, at *34.  In Congress' view, institutional investors should serve as lead plaintiffs where possible, since they are most likely to have the most at stake in the case and be the most sophisticated and competent litigants.  *See Schriver v. Impac Mortg. Holdings, Inc.*, No. SACV-06-31 (CJC), 2006 U.S. Dist. LEXIS 40607, at *14 (C.D. Cal. May 1, 2006); *see also In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997) ("[a]ppointing lead plaintiff on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the

litigation, not lawyers"); *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1152 (N.D.

Cal. 1999) ("The framers of the [PSLRA] envisioned that established institutional investors

would take control of securities litigation, taking it away from figurehead plaintiffs who exercise

no meaningful supervision of litigation.") (internal citations omitted); *Yousefi v. Lockheed*

*Martin Corp.,* 70 F. Supp. 2d 1061, 1066 (C.D. Cal. 1999) ("As Congress and academics have

noted, institutional investors have incentives to monitor their suits closely because of their

substantial stakes in the stock at issue, thereby eliminating frivolous tactics and settlements that

inflate attorneys' fees.").

  Once a plaintiff is identified, the PSLRA requires that the court evaluate whether that

plaintiff satisfies Rule 23(a). It should be noted, however, that at this stage, "the party moving

for lead plaintiff of the consolidated action need only make a preliminary showing that it satisfies

the typicality and adequacy requirements of Rule 23." *In re Olsten Corp. Sec. Litig.,* 3 F. Supp.

2d 286, 296 (E.D.N.Y. 1998); *see also MicroStrategy,* 110 F. Supp. 2d at 433; *Takeda v.*

*Turbodyne Technologies, Inc.,* 67 F. Supp. 2d 1129, 1136 (C.D. Cal. 1999) (citing *Fischler v.*

*AMSouth Bancorp.,* 1997 WL 118429, at *2 (M.D. Fla. 1997)).

  Typicality is generally satisfied when the plaintiff's claims arise from the same course of

conduct, series of events, or legal theories as the claims of other class members. *See Rossini v.*

*Oqilvy & Mather, Inc.,* 798 F.2d 590, 598 (2d Cir. 1986); *In re Oxford Health Plans Inc. Sec.*

*Litig.,* 182 F.R.D. 42, 46 (S.D.N.Y. 1998). The class representative need not necessarily have

claims that are identical to those of the class to satisfy the typicality requirement. *See In re*

*Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir. 1992). In general, the

typicality requirement "assess[es] whether the action can be efficiently maintained as a class and

whether the [lead plaintiffs] have incentives that align with those of absent class members so as

to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey,* 43 F.3d 48,

58 (3d Cir. 1994) (citation omitted).

      The adequacy of a lead plaintiff is determined by considering whether the plaintiff "has

the ability and incentive to represent the claims of the class vigorously," has retained "adequate

counsel," and if there exists any "conflict between [the movant's] claims and those asserted on

behalf of the class." *Hassine v. Jeffes,* 846 F.2d 169, 179 (3d Cir. 1988); *In re Northern Dist. Of*

*Cal., Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 855 (9th Cir. 1982).  Whether a lead

plaintiff is adequate to the task "depends on the circumstances of each case." *Takeda*, 67 F. Supp.

2d at 1137 (citing *McGowan v. Faukner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir. 1981)).

      The final step of the process is to give other plaintiffs an opportunity to rebut the

presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy

requirements.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  If the presumption is overcome, the court

must then turn to the plaintiff with the next highest financial interest in the litigation and start the

process over again until all challenges have been exhausted.

      **B.**    **Competing Motions**

      As noted, within the 60-day period, five individuals or entities sought to be appointed as

lead plaintiff.  Of these five, one stood out as the presumptive winner -- the Union Pension

Group.  Although all five motions for appointment as lead plaintiff were timely filed, the Union

Pension Group had the largest financial interest (with losses of $551,872, as compared to the

Zarif Group, which was next, with losses of $471,671), and it is the only institutional investor.  It

also satisfies the requirements of Rule 23(a).

But not surprisingly, the situation became more complex after the initial motions were filed and the unseemly jockeying for position as lead plaintiff began, when, on July 17, 2006, the Zarif Group and Adam Barber filed a Joint Opposition. Despite each having filed timely initial motions, the Zarif Group and Adam Barber joined forces and Victor Ventimiglia withdrew his motion, claiming that he was always a member of the Zarif Group. *See supra* note 2. This newly created alliance, called the "XM Shareholder Group," consists of five unrelated individual investors who now lay claim to the largest financial loss (over $730,000, as compared to the $551,872 of the Union Pension Group). The XM Shareholder Group has pared down its list of proposed lead counsel, selecting one counsel who previously had represented the Zarif Group (Kahn Gauthier Swick, LLC), and one who had previously represented Adam Barber (Yourman Alexander & Parekh LLP), along with Cohen, Milstein, Hausfeld & Toll, PLLC, as liaison counsel. To explain their maneuver, the lawyers for the XM Shareholder Group allege in their opposition that their "initial contact with each other was prompted, in part, by concern over the lack of information available on the backgrounds or qualifications of the [Union Pension Group] and the fact that individual members of the XM Shareholder Group likely had losses significantly greater then [sic] individual participants in the Lerach Group funds. Moreover, there is no evidence that . . . [this] Group has any meaningful litigation plan or organizational structure or any type of mechanism in place for resolving issues upon which each potential member of that group may disagree." (Joint Opp'n at 15.)

These "concerns," however, ring hollow. As an initial matter, the group's unsubstantiated "concerns," as expressed by counsel in their opposition, hardly rise to the level of "proof" that the presumptive lead plaintiff "will not fairly and adequately represent the interests

of the class." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Fannie Mae Sec. Litig.*, 355 F. Supp. 2d at 263 (rejecting as "speculative and hypothetical" claims regarding potential conflicts between the presumptive lead plaintiff and the class where movants "offer no proof" how such potential conflicts might affect the presumptive lead plaintiff's "capacity to fairly and adequately represent the class").

Their "concerns" are also voiced in language that closely tracks that used in *In re Able Laboratories Sec. Litig.*, 425 F. Supp. 2d 562 (D.N.J. 2006), even though that case involved two large institutional investors who had provided signed declarations and were, unlike the XM Shareholder Group, experienced fiduciaries who had in the past overseen outside counsel. *Id.* at 569.

Moreover, the disingenuousness of these "concerns" is even more apparent when one learns that the lead counsel that the Zarif Group proposed in its initial motion -- Motley Rice -- recently filed a motion seeking the appointment of a group of institutional investors that included the Boca Raton Firefighters and Police Pension Fund as lead plaintiff and attested to that group's adequacy as lead plaintiff. (*See* Union Pension Group's Rep. at 5; Union Pension Group's Rep. Ex. A at 12 (Juda Declaration).) It is thus somewhat curious for the XM Shareholder Group to claim now a lack of information about this particular union pension.

This newly formed group also runs afoul of the strict deadlines imposed by the PSLRA, which require the filing of a motion for lead plaintiff within 60 days after notice is given. For, as observed by the court in *In re Vaxgen Securities Litigation,* No. C03-1129 (JSW), 2004 U.S. Dist. LEXIS 29812 (N.D. Cal. Apr. 14, 2004), "[a]llowing potential lead plaintiffs to manipulate the size of their financial loss by . . . adding additional persons to a 'group' in supplemental

9

filings . . . would effectively render the strict timeliness set forth in the PSLRA meaningless, and would nullify Congress' attempt to expedite the lead plaintiff appointment process." *Id.* at *16 (internal citation and quotation marks omitted); *see also In re Enron Corp. Sec. Litig.,* 206 F.R.D. 427, 455 (S.D. Tex. 2002).

Finally, most cases that have confronted a situation such as this one have soundly rejected belated attempts to aggregate unrelated plaintiffs into artificial groups, recognizing such manipulation to be the work of lawyers and in contravention of the policies underlying the PSLRA. *See, e.g., In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. at 157-58 (rejecting attempts to create a group after the 60-day window and observing that "[t]o allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff" as "[o]ne of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation"); *In re Pfizer, Inc. Sec. Litig.,* 233 F.R.D. 334, 337 (S.D.N.Y. 2005) ("Nothing before the Court indicates that this aggregation is anything other than an attempt to create the highest possible 'financial interest' figure under the PSLRA."); *Schriver*, 2006 U.S. Dist. LEXIS 40607, at *25-26 ("The Impac/IMH group provides no explanation of why its members combined in the first place, how they plan to coordinate litigation efforts, or why the Impac and IMH groups decided to consolidate."); *Vaxgen,* 2004 U.S. Dist. LEXIS 29812, at *13 n.1, *15 (in a case where the movants "made [their] first appearance on the scene by way of" an opposition memorandum, the court noted "a number of reasons why this new arrangement would be less than beneficial," including "the appearance that the Group was manufactured in an effort to have its members designated as lead plaintiffs, and more importantly its counsel designated as class counsel"); *In re Gemstar-TV Guide Int'l Inc. Sec. Litig.,* 209 F.R.D. 447, 452 (C.D. Cal. 2002)

10

(finding movants' explanation for joining together as a not very "credible explanation for the group's creation").

While the Court recognizes that groups of unrelated investors may be appointed as lead plaintiffs, *see In re Baan Co. Sec. Litig.,* 186 F.R.D. 214 (D.D.C. 1999),[3] or in rare circumstances, that movants may combine to achieve the largest financial interests after the 60-day deadline, *Able Labs, supra,* there is no reason in this case to reject the Union Pension Group in favor of the newly created XM Shareholder Group. Although the XM Shareholder Group may now present the greatest financial interest, the inescapable conclusion is that this group was formed to secure lead plaintiff status for the group and its multiple law firms.[4] This was not the intent of the PSLRA.

The Court will also reject Ron Price's motion to appoint him as lead plaintiff of a subclass of XM "options purchasers," because the latter's interests may be inimical to those of

---

[3]XM Shareholder Group's citation to *In re Baan* provides absolutely no support for its position here (*see* Joint Rep. of Zarif Group and Adam Barber at 6-7), since in *Baan* there was no opposition to the proposed group of unrelated investors nor was there an institutional investor. Moreover, the concern here is not so much the nature of the group as the timing and suspicious nature of its creation.

[4]As aptly noted by the court in *Schriver*:

> It is not apparent why the Impac/IMY Group needs to retain two law firms to represent it, either of which would appear to be sufficient in itself. The Court is concerned that this multiplicity of counsel could impede the progress of the litigation, complicate discovery and communication among the parties, and increase the potential for conflict among the plaintiff class.

2006 U.S. Dist. LEXIS 40607, at *27; *see also Friedman v. Rayovac*, 219 F.R.D.603, 605-06 (W.D. Wis. 2002) (rejecting multiple counsel because of concern that "investor's ability to control the lawsuit is further heightened when proposed lead counsel consists of multiple law firms in different parts of the country").

stockholders.  (*See* Mem.in Supp. of Ron Price's Mot. for Appointment as Lead Pl. and Approval

of Selection as Lead Counsel ("Price Mem.") at 1.)  In other securities litigations, courts have

granted options purchasers certification as a sub-class only when there is concern that the named

plaintiff "must have standing to pursue each claim alleged." *Averdick v. Hutchinson Tech. Inc.,*

2006 U.S. Dist. LEXIS 47445, at *18 (D. Minn. Feb. 9, 2006) (internal citations omitted).

Standing for options purchasers is not at issue here, however, since under PSLRA, "[t]he fact that

plaintiffs might have different types of securities does not require a separate class or co-lead

plaintiffs because lead plaintiffs need not satisfy all elements of standing with respect to the

entire lawsuit under the PSLRA." *Id.* at 18 (citing *In re Salomon Analyst Level 3 Litig.,* 350 F.

Supp. 2d 477, 498 (S.D.N.Y. 2004)); *In re Cendant Corp. Litig.,* 182 F.R.D. 144, 148 (D.N.J.

1998)).  While there is merit to Price's argument that options purchasers, who do not have a

stake in the equity of the company, might perhaps seek a different litigation strategy to maximize

their recovery, this argument has been rejected by courts as a basis for creating a subclass of

purchases of call option contracts:

> Competing movants may be correct that the resolution of this case could ultimately
> favor holders of one type of security over others.  On the other hand, representation
> by a disparate group of plaintiffs, each seeking only a protection of its own interests,
> could well hamper the force and focus of the litigation. A balance must be struck.

 *In re Cendant Corp. Litig.,* 182 F.R.D. at 148.  Moreover, since Price's financial loss is so

dwarfed by that of the stockholders, the creation of a sub-class and the potential for fragmenting

the litigation strategy is not warranted.  *See In re Mills Corp. Sec. Litig.,* No. 1:06-77 (GBL),

2006 U.S. Dist. LEXIS 50485, at *12 (E.D.Va. May 30, 2006) (refusing to appoint a preferred

stock owner as co-lead plaintiff "because his financial interest is relatively small").

## II.    Lead Counsel

The PSLRA states that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  The PSLRA "evidences a strong presumption in favor of approving a properly-appointed lead plaintiff's decisions as to counsl selection and counsel retention."  *Cendant*, 264 F.3d at 276. The Union Pension Group has selected the firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP to serve as its counsel.  That firm has extensive experience litigating securities class actions and has been appointed lead counsel in cases such as *Enron Corporation Securities Litigation, supra*.  Given the lack of dispute regarding its experience and qualifications, the Court will appoint plaintiffs' choice as lead counsel.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Union Pension Group's motion for appointment as lead plaintiff [Nos. 14 and 18], and will appoint Lerach Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel.  All other pending motions [Nos. 8, 13, 17 and 19] are **DENIED**.  Unless the parties otherwise agree, lead plaintiff shall file an amended consolidated complaint within thirty days from the date of entry of this Order.  Defendants shall file a responsive pleading within thirty days from the date the amended consolidated complaint is filed.



s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 1, 2006

13
