UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re XM SATELLITE RADIO HOLDINGS SECURITIES LITIGATION | ) ) ) | Civil Action No. 1:06-cv-00802-ESH |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |
| | ) ) | |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR SECURITIES FRAUD**

1.    Lead Plaintiffs Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund (collectively, the "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded securities of XM Satellite Holdings, Inc. ("XM" or the "Company") (NASDAQ: XMSR) between July 28, 2005 and February 16, 2006 (the "Class Period"), by and through their undersigned counsel, allege the following against XM and certain of its top officers seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

2.    XM describes itself as the number one satellite radio service in the United States, broadcasting live daily shows from several venues, including Washington D.C., with a lineup that includes more than 150 digital channels of choice from coast-to-coast.  XM also bills itself as the leader in satellite-delivered entertainment and data services for the automobile market.  XM sells its service through two primary formats: (a) the new automobile market, through partnerships with General Motors, Honda/Acura, Toyota/Lexus/Scion, Hyundai, Nissan/Infiniti, Porsche, Suzuki, and Isuzu; and (b) in the aftermarket under the Delphi Corp. ("Delphi"), Pioneer, Alpine, Audiovox, Tao, Sony, Polk, and etón/Grundig brand names at national consumer electronics retailers, such as Best Buy, Circuit City, Wal-Mart and other national and regional retailers.  These mass market retailers support XM's line of car stereo, home stereo, plug and play and portable handheld products.

3.    Plaintiffs bring this case to remedy the massive damages caused by defendants' securities fraud, including defendants' numerous misrepresentations and omissions regarding the true financial condition of the Company and its stated ability to reduce the costs of adding new subscribers as it attempted to reach its stated goal of 6 million subscribers by year end 2005.

4.      Throughout the Class Period, in furtherance of their scheme, conspiracy, and course of conduct, defendants disseminated a series of false and misleading statements, which misrepresented that XM was reducing the costs of acquiring its new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005.  In reality, as known to or recklessly disregarded by defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005 in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to defendants since before the beginning of the Class Period.  To be sure, defendants were keenly aware of the competitive threat posed by its competitor, Sirius Satellite Radio Inc. ("Sirius") and the launch of the Howard Stern radio program in January 2006, and, as a result, pulled out all the stops to market its brand during the fourth quarter of 2005.

5.      Despite defendants' knowledge that XM would be making those huge expenditures in the fourth quarter of 2005, defendants failed to disclose to the market that XM's costs of subscriber acquisitions would rise to ***extraordinary*** levels – levels far exceeding even the most aggressive financial forecasts – leading to huge, unexpected increases in XM's net losses and other key metrics used by the market to evaluate XM's financial performance.  This tidal wave of subscriber acquisition costs was a complete reversal of the trends of declining subscriber acquisition costs and shrinking net losses that defendants were reporting and highlighting throughout the Class Period – trends the market expected to continue in the fourth quarter of 2005.  Hand-in-hand with XM's scheme to mislead the market regarding subscriber acquisition costs, XM also manipulated the metrics by which it calculated these costs.

6.      While defendants' scheme caused severe financial damages to the Class once the truth was revealed, it allowed XM insiders to line their pockets with millions of dollars.  As detailed

throughout this Consolidated Complaint (the "Complaint"), defendant Hugh Panero ("Panero"), the President and Chief Executive Officer ("CEO") of XM, pocketed more than ***$11,800,000*** as a result of his Class Period sales of XM stock at artificially inflated prices as high as $28.95 per share. Panero sold 99% of his then-owned shares of XM during the Class Period. Other high-ranking XM insiders followed suit, reaping millions of dollars in illicit proceeds. Indeed, one director sold approximately 72% of his then-owned XM shares and reaped ***approximately $59 million*** in proceeds, selling his shares between $27.85 and $29.61 per share.

7.    On February 16, 2006, the true condition of XM's business was revealed when XM issued a press release announcing its results for the fourth quarter and year end 2005. In that press release, defendants shocked the market by reporting that key company metrics relating to subscriber acquisition costs had soared to incredible levels. In fact, XM's subscriber acquisition costs ("SAC") increased a startling 39% and costs per gross addition ("CPGA") soared 36% over and above fourth quarter 2004 levels. Moreover, compared to the third quarter of 2005, SAC sequentially increased from $53 to $89, a whopping 68%, and CPGA climbed from $89 to $141, a 58% jump, in just three months. All told, despite making representations to the market that caused the market to expect declining SAC and CPGA numbers, defendants knowingly abandoned that established plan in favor of a growth at any costs strategy, which led to reported SAC and CPGA numbers that far exceeded any number reported by XM in the last two fiscal years.

8.    The bad news did not stop there, however. Also on February 16, 2006, XM issued a press release announcing the resignation of Board of Director Pierce J. Roberts ("Roberts") via a letter dated February 13, 2006. In his resignation letter, Roberts stated that he was "troubled by the current direction of the company" and believed that there was "a significant crisis on the horizon." The press release specifically acknowledged Roberts' "disagreement" with the Company and other

Board members, and suggested that the dispute centered on the Company's "operational direction" as it pertained to "cost controls" related to "lower marketing, programming and promotional expenditures."

9.    The resulting market reaction was swift, as XM's common stock fell 13% on abnormally high trading volume, causing economic damages to Plaintiffs and the Class.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j (b) and 78t (a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and XM maintained its principal place of business in this District.

13.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.    Plaintiffs purchased XM securities on the open market during the Class Period as set forth in their certifications previously filed with the Court.  The Court's August 1, 2006 Memorandum Opinion and Order appointed Plaintiffs as Lead Plaintiffs in this consolidated action.

15.    Defendant XM, a Delaware corporation, maintains its principal place of business at 1500 Eckington Place N.E., Washington, D.C. 20002-2194.

16.    During the Class Period, defendant Panero was CEO, President, and a Director of XM. Panero, who assisted in the preparation of the false and misleading statements and repeated the contents therein to the market, sold 99% of his then-owned XM stock during the Class Period and pocketed nearly $12 million in the process. Panero is the principal executive officer of XM and signed the certifications required by Section 302 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350, attesting to the accuracy of the Forms 10-Q filed by XM with the SEC during the Class Period, including the specific certification that the SEC Form 10-K did not contain any false or misleading material fact or statement of fact. Panero is also the principal spokesperson for XM and is familiar with all aspects of its business, operations, and finances.

17.    According to a former VP of Advanced Applications, defendant Panero was a "hands-on" executive, who was "excellent in that way" (*i.e.*, in terms of being closely involved in operations). This witness explained that Panero always "asked a lot of questions" and was involved in decision-making at XM regarding marketing and "business-side" operations. In fact, the witness characterized Panero as "one of those 'floor-walkers,' [who] knows everything and everyone" at the Company and who is "not a distance-type manager." The witness said that the XM senior executive team, including Panero, is mostly comprised of "Type-A personality" individuals.

18.    Defendant Panero was privy to non-public information concerning XM's business, finances, sales, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. Because of his possession of such information, Panero knew or with deliberate recklessness disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Except to the extent set

forth in this Complaint as provided by confidential witnesses who are primarily former XM employees, Plaintiffs and other members of the Class had no access to such information, which was, and remains solely under the control of defendants. Panero was involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. Panero was aware, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company and nevertheless approved, ratified, and/or failed to correct those statements, in violation of the federal securities laws.

19.    Throughout the Class Period, Panero was able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. Panero was provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Defendant Panero was able to, and did, directly or indirectly, control the conduct of XM's business, the information contained in its filings with the SEC, and its public statements. Moreover, Panero made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings, conference calls, and discussions concerning such statements. Because of his position and access to material information available to him but not the public, Panero knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were then false and misleading. As a result, Panero is responsible for the accuracy of XM's corporate releases detailed herein and is therefore responsible and liable for the representations contained therein.

20.    Each of the defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a

fraud or deceit on purchasers of XM securities during the Class Period. The defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, *i.e.*, artificially inflating the trading price of XM securities, which was based in large part on XM's professed ability to substantially add new subscribers while containing or even lowering subscriber acquisition costs, by making false and misleading statements and concealing material adverse information. The fraudulent scheme and course of business was designed to and did: (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate the price of XM securities during the Class Period; (iii) cause Plaintiffs and other members of the Class to purchase XM securities at inflated prices; (iv) allow XM to conceal and cover up the true financial condition of XM to the detriment of its investors, but to the financial benefit of Panero and other Company insiders who unloaded massive quantities of XM stock at artificially inflated prices; and (v) substantially cause the significant decline in XM's stock price as the artificial inflation was released, resulting in economic damages to Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased the securities of XM during the Class Period. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

22.     Because XM has millions of shares of stock outstanding, and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable. According to XM's SEC filings, as of January 31, 2006 (shortly before the close of the Class Period), XM had more than 257 million shares outstanding. While the

exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

23.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

24.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with the members of the Class they seek to represent.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the federal securities laws as alleged herein;

(b)     whether defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)    whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)    whether the market prices of XM securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of XM's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

#### 1.    XM's Early Years

27.    XM Satellite Radio Inc. was incorporated on December 15, 1992 in the State of Delaware for the purpose of operating a digital audio radio service under a license from the Federal Communications Commission.  Defendant XM was formed as a holding company for XM Satellite Radio, Inc. on May 16, 1997.

28.    XM provides satellite delivered digital music, talk shows, sports broadcasts and special events.  Subscribers receive channels of music and audio content via satellite for a set monthly subscription fee.  In early 2001, XM launched its first two satellites, XM-1 and XM-2, and a third satellite, XM-3, was launched in February 2005.  The Company commenced commercial

operations in two markets on September 25, 2001 and completed its national rollout on November 12, 2001 when it began offering satellite radio service to consumers throughout the country.

29.    XM derives its subscribers from two primary sources:  various retail outlets and original equipment manufacturers, or OEMs.  On the retail side, XM sells radios and subscription services at various consumer electronics retailers, such as Best Buy, Circuit City, Wal-Mart and other national and regional retailers.  On the OEM side, XM enters into partnerships with various automobile companies through which XM Radio is offered in various makes and models at the time of purchase or lease.  According to the Company, "[b]road distribution of XM Radio through the new automobile market is a central element of our business strategy."

30.    More to the point, XM enjoys a cozy relationship with General Motors ("GM") and Honda, which, in addition to certain strategic partnerships, also serve as major investors in XM.  To be sure, according to a former Financial Analyst who worked for the Onstar division of GM, GM is XM's largest shareholder and there "would not be an XM without GM."  Moreover, a former Regional Sales Manager pointed out that most of the money to launch XM was "put up" by the Company's largest shareholders, who also happen to be XM customers and partners – GM and Honda.  The former Financial Analyst explained that GM "enabled" XM to achieve the level of success that XM has so far been able to claim by essentially creating the OEM market for XM.

31.    XM's only competition in the satellite radio market is Sirius.  Sirius launched service in selected markets on February 14, 2002 and nationwide on July 1, 2002.  Because of its almost one year head start, XM initially enjoyed a considerable advantage over Sirius in terms of technological advances, subscriber numbers and brand awareness.

32.    By late 2003, however, competition between XM and Sirius intensified.  Indeed, at that time, Sirius struck a significant blow when it outbid XM for the rights to broadcast National Football League games.

33.    Then, in October 2004, Sirius made another huge splash in the satellite radio pool when it announced a deal to broadcast the daily radio show of shock jock Howard Stern beginning on or around January 1, 2006.  This was a significant deal for Sirius as Howard Stern was the No. 1 national radio host among males 18-49 years of age.  Indeed, Sirius characterized landing Howard Stern as a "landmark deal" that would provide Sirius with "significant potential to accelerate growth."

34.    XM was obviously disappointed by the news that Howard Stern had signed on with Sirius because XM had initially, but unsuccessfully, courted him to broadcast his show on XM Radio.  Nevertheless, XM went to great efforts to downplay the impact of this announcement on its business, despite the fact that the addition of Howard Stern to Sirius' lineup was thought by some to be the most significant event in satellite radio's short history.  For example, in an April 28, 2005 interview with *TheMotleyFool.com*, Panero stated:

> I don't know if it is a good move for Sirius. It is clearly a very good move for Howard Stern. He is a smart guy and he has obviously done a deal that is very good for him. I think that there will be a number of ... his hardcore fans who will subscribe to listen to him in that environment.
>
> Whether it is a good business deal, I think time is going to tell. It is a lot, a lot of money. I had also spoken to Howard and some of his people and there was some interest in us doing some sort of a deal with him, but I never, ever contemplated a deal of that magnitude. That is more money than people like Oprah Winfrey make. That is more money than some of the biggest stars that exist. It is quite a gamble, but it was clearly a very good business deal for Howard Stern.

35.    Thus, although, in the time leading up to the Class Period, XM continued to maintain its lead over its competitor, Sirius was steadily chipping away at XM's market share and erasing the benefits XM enjoyed from its one-year head start.  As a result, defendants knew that, in order to

effectively compete with the media blitz that would accompany the start of Howard Stern's radio show on Sirius, XM would have to massively ramp up its own advertising, marketing, and promotional efforts, thereby substantially increasing its subscriber acquisition costs, and, consequently, decreasing the value of its stock.

### 2. XM's Subscriber Metrics

36.     XM has never turned a profit, nor is it expected to for a number of years.  To the contrary, since the Company's inception, it has lost hundreds of millions of dollars as satellite radio attempts to gain a foothold in an already crowded consumer entertainment market.  As a result, in reporting its financial results to the market, XM focuses its attention, as well as the attention of the market, on a number of self-created subscriber-related metrics designed to demonstrate that it is heading in the right direction.  To be sure, those metrics are essential to the value of XM's stock and are closely watched by shareholders and analysts alike.

37.     For example, at various times, the Company reports on its net and gross subscriber counts, average monthly subscription revenue per subscriber, churn, subscriber acquisition costs and costs per gross acquisition.  The problem, however, in relying on several of these metrics is that the actual numbers are in the sole province of the Company and can be subject to manipulation.

38.     As explained in a May 6, 2004 article entitled "XM Curdles as Churn Comes to Light" by *TheStreet.com*:

> At first glance, subscriber losses seem like a nonissue at XM. After all, the company reported Thursday that, on average, a mere 1.35% of its subscribers canceled service each month in the first quarter.

> But like the pro forma profit calculations of yesteryear, this so-called churn number can be a slippery critter. The number is calculated at the company's discretion and, as critics point out, can include whatever numbers executives choose.

> This latest wrinkle was exposed on a conference call with analysts Thursday. XM executives, responding to a question, revealed for the first time in memory a gross

subscriber-addition figure. That's a figure the company hasn't routinely disclosed, preferring instead to focus on the ever-rising net figure.

A bit of back-of-the-envelope math shows why XM hasn't been eager to share the gross-adds figure. The company says it added a total of 475,000 customers in the first quarter.

That looks good, but recall that XM added 321,675 new subscribers in the quarter on a net basis. That means 153,325 customers somehow vanished -- putting the monthly churn at something like 3.8%, nearly three times the official count.

That churn figure looks substantially less rosy, though XM representatives were quick to explain why. They say their churn number excludes customers who drop the service after a three-month introduction when they buy an XM-equipped car. "We felt comfortable" disclosing the gross subscriber figure on the call rather than having analysts guess at it, says a company rep.

XM adds that it converts about 70% of these promotional users into monthly subscribers. But as observers note, all the promotional users are counted in the overall subscriber totals.

Counting freeloaders as actual customers helps XM pump up its subscriber growth and helps spread the per-gross-add costs over a much wider base, say critics. That makes it look like acquisition expenses are coming down, an important consideration at a cash-burning company.

39.     In addition, a former District Manager who was employed by XM during the Class period explained that, concerning OEM sales, vehicle purchasers often get free trial periods of XM satellite radio service with the purchase of a new vehicle that has an XM radio factory installed. According to the witness, manufacturers such as Honda and GM pay for the free trial period and offer it to their customers as an incentive toward purchasing the vehicle. The witness noted that once an individual purchases a Honda or GM vehicle with an XM radio installed, the free trial subscription is activated and an XM account is created for the consumer based on the consumer's name, address, phone number, and radio identification number. The witness said that XM counted consumers who received a free trial through the purchase of a new vehicle as full-fledged subscribers. According to the witness, subscriptions are an easy metric to manipulate and investors

should have been paying attention to the Company's revenues and whether the Company was cash flow positive.

40.    Of the various subscriber metrics described above that are reported to the public, XM emphasizes two significant cost measurements that are particularly indicative of the health of the Company.  To be sure, in an April 28, 2005 interview with *TheMotleyFool.com*, Panero responded to a question about the "most important numbers" that investors should be following:

> Well, I think the numbers that I mentioned before are the ones that people focus on -- the subscriber acquisition cost, which is a subcomponent of an even more important metric, the cost per gross add. That is, basically, what is the cost to get that next subscriber? Those are the ones that we actually break out for The Street and show to them in detail. That is the big issue.

41.    According to the Company, SAC include subsidies and distribution costs, excluding on-going loyalty payments to distribution partners, and negative margins from direct sales of merchandise, which are divided by the appropriate per unit gross additions or units manufactured to calculate what XM reports as "SAC."  Moreover, CPGA includes the amounts in SAC, as well as advertising and marketing expenses, such as advertising, media and other discretionary marketing expenses.

42.    Prior to the beginning of the Class Period, XM repeatedly emphasized to the market that, while it sought to achieve rapid subscriber growth, it would do so in a cost effective manner. For example, during XM's February 10, 2005 conference call with analysts to discuss its fourth quarter 2004 financial results, Joe Euteneuer ("Euteneuer"), XM's Chief Financial Officer ("CFO"), stated, "We continued to build a solid business by exceeding our expectations for total lending subscribers with lower than expected CPGA costs. . . . The bottom line, XM continues to demonstrate very cost effective growth."

43.    Similarly, during the April 27, 2005 conference call to discuss XM's first quarter 2005 results, Panero stated:

> Our goals of rapid subscriber growth and manageable subscriber acquisition costs were achieved this quarter. We remain on track to meet our 2005 year-end guidance of 5.5 million subscribers and to do so in a cost effective manner.

Euteneuer added:

> XM has continued to demonstrate cost-effective growth in both its subscriber acquisition costs or SAC and its fully loaded cost per gross addition metric.

44.    Additionally, in an April 27, 2005 interview with *TheMotleyFool.com*, Panero explained XM's goals "to hit cash-flow breakeven in 2006" and stated:

> We are still, and if you look at the metrics of the company and some of the key expense areas that contribute to getting to breakeven, such as our subscriber acquisition costs or our cost per gross ads, what The Street has given us a lot of credit for is that we have driven those costs down. They are significantly lower than they were a year ago or two years ago.

45.    As demonstrated below, XM's mantra is that it is adding subscribers and keeping SAC and CPGA low. At the root of defendants' fraud is the all-encompassing desire to convince the market, by any means necessary, that subscriber costs would remain low.

46.    In line with its stated goal of rapid and cost effective subscriber growth, XM reported quarter-after-quarter of declines in its SAC and CPGA metrics prior to the Class Period. In fact, for 2004, the Company reported a 17% decrease in SAC and a 27% decrease in CPGA in a year-over-year comparison to 2003 numbers. Similarly, for the first quarter of 2005, XM reported a 22% improvement in SAC and a 15% improvement in CPGA when compared to the results for the first quarter of 2004. The defendants' scheme was designed to trick the market into believing that SAC and CPGA would continue to decline when they knew that such figures would rise appreciably during the Class Period.

## B.    DEFENDANTS KNEW THAT SUBSCRIBER COSTS WERE GOING TO RISE SUBSTANTIALLY DURING THE CLASS PERIOD

47.    Despite creating market expectations of substantial subscriber growth at steadily declining costs, XM effectively abandoned that strategy during the Class Period for a "growth at any

cost" approach. XM undertook this reversal of course because there was tremendous pressure to compete with Sirius and the media blitz surrounding the launch of Howard Stern's satellite radio program in January 2006. According to a former Associate Accountant who worked for XM from July 2004 to December 2005 and was responsible for approval of royalty payments, tracking expenditures, reconciling invoices and processing purchase requisitions, throughout the Class Period, XM was "in a frenzy to try to one-up" its prime competitor, Sirius. In fact, the witness personally witnessed Panero "in a frenzy" exhorting XM employees to sign up new subscribers. To that end, Panero frequently called impromptu meetings of all XM employees where he stressed the importance of XM's sales initiatives because "every subscriber counts."

48.     As the fourth quarter of 2005 approached, XM developed a widespread marketing campaign, called "Listen Large," that was intended to counter the heavy promotion of Howard Stern by Sirius. A former District Manager, who worked for XM from approximately August 2005 through August 2006, explained that the Listen Large campaign was designed to advertise the fact that XM had a wider array of musical and broadcasting content than Sirius. Reportedly costing the Company more than $25 million, the campaign included "plastering" XM's name in a variety of posters, retail store displays, and kiosks throughout various malls, in addition to television commercials featuring XM's celebrity broadcasters that would air during prime time viewing hours and during other special events such as the National Football League divisional playoffs.

49.     In reality, the former District Manager indicated that, instead of the $25 million reportedly spent, XM actually spent somewhere between $100,000,000 and $150,000,000 on the Listen Large campaign during the fourth quarter of 2005. Thus, the former District Manager commented that, because the Listen Large campaign was so expensive, any subscriber gains achieved by XM came at a significant cost.

50.    Based upon the statements of the confidential witnesses cited above, XM spent between $25 million and $150 million on the Listen Large campaign.  Accordingly, XM knew or recklessly disregarded that the costs and expenses involved with the Listen Large campaign would cause a direct increase to XM's CPGA.  In other words, XM knew or recklessly disregarded the fact that the Listen Large campaign, which was necessary to achieve XM's stated 6 million subscriber goal, would cause a huge increase in CPGA during the fourth quarter of 2005.

51.    In this regard, a former SVP of Human Resources employed at XM during the Class Period commented that the major marketing and subscriber growth initiatives undertaken during the fourth quarter of 2005 (including Listen Large) had been fully budgeted well in advance because it was known as early as October 2004 that Howard Stern would begin broadcasting on Sirius in January 2006.  The witness said these costs could simply not be viewed as any kind of a surprise or unanticipated event.

52.    Despite the extraordinary amount spent on the Listen Large marketing campaign, XM narrowly missed its subscriber goals for 2005.  As a result, the former District Manager said that XM, led by Panero, fired its entire marketing team in early 2006 because the campaign had been so expensive, and was not as effective as management believed it should have been.

53.    In addition to the tremendous amount of money spent on advertising at the national level during the Class Period, XM poured money into its advertising efforts on the local level.  According to a former Regional Sales Manager who was employed by XM from December 2004 to November 2005 and was responsible for overseeing numerous retail sales personnel, XM was "spending fortunes" on advertising and merchandising at retail locations, even though it was readily apparent to the witness that the retail store personnel did not care about selling XM satellite radio.  According to the witness, XM "wasted a lot of money" on so-called point-of-purchase displays,

which were promotional displays set up on the premises of retail stores like Best Buy that sold XM radios.

54.    This former Regional Sales Manager noted that, although XM had always been able to meet and/or exceed its subscriber goals while reducing its costs per subscriber acquisition, this situation changed dramatically during the second half of 2005, as XM's costs for attaining and retaining subscribers began to increase due to, *inter alia*, increased advertising expenditures, including merchandising programs in retail stores (such as point of purchasing displays and giving away radios to leading sales personnel in the retail stores).

55.    XM's strategy for competing with Sirius by "any means necessary" was not limited to huge advertising expenditures, however.  Numerous witnesses, such as the former Associate Accountant, explained that XM drastically reduced the price of its radios during the Class Period as an incentive for consumers to subscribe with XM for satellite radio service.  To be sure, a former Regional Account Manager of Sales and Activations who worked for Alloy Mall Marketing ("Alloy"), a company retained to sell XM Radio at mall-based kiosks across the country, commented that, in an effort to gain subscribers, XM directed Alloy to offer steep "subsidies" on radios such that they would be offered to consumers at significantly reduced prices.  This was further corroborated by a former District Activation Manager who, while working for XM assisting retailers in selling XM products and services during 2005, noted that XM essentially gave customers radios normally valued at $300-400 for free in order to get them to sign up for XM service.  Finally, a former Regional Sales Manager concluded that XM "subsidized" the cost of the radios it sold in retail stores like Circuit City and Best Buy.  Defendants knew that offering large subsidies and rebates in this manner would cause XM to experience a substantial increase in subscriber acquisition costs during the Class Period.

56.     These acquisition cost increases were further exacerbated by the fact that XM had been experiencing product supply shortages prior to and during the Class Period.  In this regard, Delphi, XM's primary supplier of radios, was facing severe financial and operational difficulties, which, according to a former National Account Manager who worked for Alloy during the Class Period, meant that Delphi was "having trouble producing enough equipment to meet demand."  The witness said that product shortages and resulting rebate issues escalated in the fourth quarter of 2005.

57.     For example, according to this former National Account Manager, who was responsible for overseeing the operations of Alloy's XM kiosks in malls across the U.S., the delayed launch of Delphi's "MyFi" and the unavailability of certain accessories for Delphi's "SkyFi" and "Roady" radios meant that XM had to rebate the radios and offer promotional programs to keep subscribers interested.  These "subsidies" included: (1) offering rebates of $50 and $35, as well as free accessories, which were covered "100 percent" by XM; (2) giving away certain hardware accessories, such as power cords, for free; and (3) offering free activation, a reduced activation price, or three-months free service.  All of these "subsidies" directly impacted and increased XM's SAC and CPGA metrics.  XM and Panero knew this by virtue of simple math.

58.     This witness further noted that, in November and December 2005, XM offered a program in which the Company represented that XM's "Christmas gift to the consumer" was free activation on the SkyFi and MyFi radios, and three-months free service.  However, the witness said that the only products that Alloy was able to make available to customers around Christmas 2005 were the old Roady products, which meant that XM was rebating and offering free products "left and right" in order to entice disappointed customers to take the Roady.  Accordingly, the witness understood that that the subsidies (*i.e.*, rebates and promotions) that XM had to pay in order to appease customers who wanted product that was unavailable was a "major contributing factor" to

rising costs at XM.  The witness explained that Alloy representatives discussed XM's inventory and

rebate issues with XM representatives on numerous occasions.

C.    **DEFENDANTS' FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD**

59.    The Class Period begins on July 28, 2005.  On that date, XM issued a press release

entitled "XM Satellite Radio Holdings Inc. Announces Second Quarter 2005 Results and Increases

Year-End Subscriber Guidance to 6 Million," which stated in relevant part:[1]

**$125 Million in Revenues More than Double Prior Year Period**
**Ends Quarter at 4.4 Million Subs with 647,226 Net Subscriber Additions**

Washington, DC, July 28, 2005 – XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the second quarter ended June 30, 2005. For the quarter, XM reported revenue of $125 million, an increase of 136 percent over the $53 million reported in the second quarter 2004. The significant revenue growth was driven by record second quarter net subscriber additions of 647,226, a 55 percent increase over the 418,449 subscribers added in the second quarter 2004. XM ended the quarter with 4,417,490 subscribers compared with 2,100,352 subscribers reported for the second quarter 2004.

*With XM's first half performance and an even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers.*

XM's net loss for the second quarter 2005 was ($146.6) million, as compared to ($166.1) million in the second quarter 2004. XM reported an EBITDA loss of ($89.9) million for the second quarter 2005 compared to ($107.8) million for the second quarter 2004. XM's net loss and EBITDA for the second quarter 2004 each included a ($35.0) million charge for de-leveraging activities.

*Efficient Quarterly Subscriber Growth*

XM's second quarter subscriber growth was strong across both the retail aftermarket and automotive distribution channels.  Second quarter 2005 Cost Per Gross Addition (CPGA) was $98, an improvement of $3, or 3 percent, from the $101 CPGA reported in the second quarter 2004.  XM's CPGA is the fully-loaded cost to acquire each new

---

[1] Unless otherwise indicated herein, all emphasis is added.

subscriber, including Subscriber Acquisition Costs (SAC) of $50, as well as advertising and marketing expenses.

60.    On July 28, 2005, XM hosted a conference call to discuss its Second Quarter 2005 Earnings and financial outlook.  Panero, Joe Titlebaum, General Counsel of XM ("Titlebaum"), Gary Parsons, Chairman of the Board ("Parsons"), Euteneuer, and Steve Cook, Executive Vice President of Sales and Marketing ("Cook"), participated in the call on behalf of XM.  During the call, defendant Panero made or otherwise failed to correct numerous false and misleading statements designed to artificially inflate XM's stock price.  For example, Panero stated:

> This morning, we will review XM's results for the second quarter 2005, one of the most successful quarters in XM Satellite Radio's history.  Obviously, the growth in subscribers and revenue were strong this quarter, but we will also look at the underlying economics of the business and our strategic initiatives to see what really makes this quarter stand out.
>
> *    *    *
>
> Now let's look at the most significant quarterly growth indicator, net subscriber additions.  XM's subscriber growth continues to climb rapidly, surpassing the 4 million subscriber mark in May.  In 23 months, XM reached 1 million subscribers.  Eight months later we reached our second million.  Six months later, 3 million, and then in less than five months, XM exceeded 4 million subscribers.  ***Based on our performance in the first half of the year and continued strong demand for our service, we are increasing year-end subscriber guidance from 5.5 million subscribers to 6 million year-end subscribers.***
>
> *    *    *
>
> For the second quarter 2005, XM reported total revenues of 125 million, an increase of 136% compared to 53 million one year ago.  We exited the second quarter with an annualized total revenue run rate of almost $550 million.  ***Although we are quite pleased with the progress of our revenue growth, the more important long-term question is what did it cost to generate this increase of 136%.  On this front, the news is also good.***  XM's fully loaded per unit cost of capturing a new subscriber, or CPGA, was $98 for the second quarter of 2005, an improvement of 3% from the [$]101 CPGA reported a year ago.
>
> Subscriber acquisition costs, or SAC, a component of CPGA, were $50 per gross connect for the second quarter of 2005, improving 12% from $57 a year ago.  Joe will discuss the second-quarter figures in more depth later.

*     *     *

In summary, during the last few months XM has combined excellent business execution with a series of strategic moves to ensure even greater breadth of bandwidth, content, and geographical scope for the Company in the future. Operationally, we continue to have excellent execution and leadership across three key areas, content, technology, and distribution. *And the ultimate test, we are achieving rapid growth with sound financial performance*.

      61.    As the conference call continued, Euteneuer, XM's CFO, added the following:

*XM's targeted and efficient marketing efforts have enabled us to continue demonstrating cost-effective subscriber growth and improvements both in the direct costs to gain a subscriber, or SAC, and the fully-loaded total cost, including discretionary advertising and marketing costs, to gain a subscriber, or CPGA.* (indiscernable) SAC for the second quarter of 2005 was a modest $50 per gross addition, a decline of $7, or 12%, from the $57 per gross addition in the second quarter of 2004.

CPGA for the second quarter of 2005 was $98 per gross addition, a $3 improvement, or 3%, from the $101 reported in the second quarter of 2004. *We expect CPGA to remain stable during the second half of the year*.

*I would like to close by updating guidance for 2005. As Hugh [Panero] stated earlier, given XM's strong subscriber acquisition performance during the first half of 2005, we are raising our year-end 2005 subscriber guidance by 0.5 million subs, from 5.5 million to 6 million subscribers. This new target better reflects the momentum of XM subscriber growth and the strong second half of the year we expect.*

We are also increasing subscriber revenue guidance for the year from 480 million to 500 million. This increased subscriber growth target affects dividend, so we are revising our guidance on EBITDA loss from 360 million to 395 million. We still expect to achieve operational cash flow breakeven by the end of 2006.

      62.    During the question and answer session of the July 28, 2005 earnings conference call,

the following exchanges took place:

Barton Crocket:           I wanted to ask you a question about the outlook for the fourth quarter and then going into the beginning of next year, when your competitor is going to have Howard Stern coming in and you have just raised your sales forecast for the end of the year. Do you see Howard Stern as potentially a risk to your sub estimate in terms of if he turned out to be very popular, he could take some of the momentum out of

what you're seeing right now in terms of sub growth? Or do you see it as more of an opportunity in terms of increasing exposure for the whole category?

\*        \*        \*

Unidentified XM Representative:    ***On the Howard Stern question, clearly, we would not be upping our guidance if we though that there was an issue with regards to how he would affect demand for our product.*** Clearly, the announcement of Howard Stern has been in the marketplace for almost 1.5 years now, so we have seen no effect of that at all during that period, as we have not seen any effect by the other content that they offer. That has been around for awhile, so we continue to have strong demand. And Howard Stern has his positives and his negatives as is associated with consumers, and it will play out the way it plays out. I think people will migrate who are Howard Stern fans and then other people will basically have an unfavorable view of him being associated with that product and they will choose what company they want to participate with.

Unidentified Speaker:    I had three questions. Just quickly, Joe, you indicated that you expected CPGA to be consistent with the second quarter for the balance of the year. Does that also apply to what you expect for SAC, the SAC component of that?

\*        \*        \*

Unidentified XM Representative:    That kind of a range of different ones . . . The second item, before Joe addresses the SAC and CPGA question, ***because we do think CPGA will be stable***, and you can see SAC bounce around a bit depending upon what your actual hardware subsidy elements are on any given time frame. That is the reasons we try to focus on somewhat the broader and more comprehensive, and, in our view, more accurate measure, which is the CPGA.

***The only other point I really am kind of compelled to make on the whole SAC and CPGA issue as well too is, when we show "year-over-year" results comparing ourselves to last year, it is actually pretty important to remember last year was some pretty damn good numbers. If you look as the fact that last***

*year's second quarter we added 418,000 net new subscribers at basically a 50-50 mix of retail and OEM.  But the part that often gets lost in that is when we did that, at that level of volume, our SAC was $57 and our CPGA was $101.*

So we had some pretty tough, challenging, good performance from last year, and our belief is that this is clearly a significant improvement.  We were over 60% contribution margin then.  So even a year ago in time frame, when we were doing volumes more in the 400,000 level, we were doing so with positive economic efficiency and capability built in . . .

63.    In response to XM's Second Quarter 2005 earnings announcements, analysts proclaimed a very positive outlook for XM, citing to XM's ability to increase subscriber guidance while keeping its SAC and CPGA under control:

(a)    SG Cowen & Co. stated on July 28, 2005 that XM's SAC of $50 "come in much better than our $63 est." and that "CPGA of $98 beat our $100 est."  On July 29, 2005, SG Cowen & Co. analysts reported that "XM reported another solid quarter, outperforming on almost every metric . . . ***SAC and CPGA came in well ahead of expectations***.  This cost reduction came despite record sub growth, a recent price increase and an aggressive promotion period."

(b)    Hoefer & Arnett reported on July 28, 2005 that "XM reported an EBITDA loss of $89.9 million vs. our estimate of $96 million.  ***The improvement was primarily attributable to a lower SAC and CPGA for the quarter***.  XM successfully added 641,000 subscribers and kept CPGA in the sub $100 range."

(c)    Analysts from CIBC World Markets advised on July 29, 2005 that "[o]n the marketing side, cost per gross add (CPGA) was slightly higher than expected as a result of increased spending on advertising, while subscriber acquisition cost (SAC) was materially lower than expected.  ***Key metrics of SAC and CPGA were $50 and $98 vs. our estimates of $68 and $96, respectively.***  CIBC analysts added that because the Company expected CPGA to remain***

*unchanged at approximately $100 per quarter, "[t]his implies no material increase in advertising spending*.  Moreover, the company expects SAC to fluctuate within 3Q and 4Q, with 3Q SAC likely higher than 2Q, as a result of a spillover from promotional Roady2 activations."

(d)    RBC Capital Market analysts commented on July 29, 2005 that "647K net subscriber additional (in-line with pre-release) were accomplished on both a lower SAC and CPGA than we (and consensus) were expecting – actual SAC of $50 versus or $63 estimate and actual CPGA of $98 versus our $99 estimate driven by improving economies of scale and efficiency in distribution."

(e)    Bear Stearns research analysts noted on July 29, 2005 that XM had raised year-end subscriber guidance to 6 million from 5.5 million, that XM's revenue guidance had been increased, and that SAC, at $50, was "significantly below our $62 estimate" and that CPGA was "in line with our $98 projection."

(f)    Analysts from Deutsche Bank Securities Inc. proclaimed that XM had "*[c]osts under control as CPGA and SAC [were] better than expected*" and that "XM reported cost per gross activation (CPGA) of $98, nicely below our $109 estimate, and down from $101 in 2Q04.  The subscriber acquisition cost (SAC) component was $50, versus our $63 estimate.  The beat in SAC occurred despite the increase caused by the Roady2 promotion in the quarter.  XM in fact reduced the price of the Roady2 to $49.99 in a closeout at the end of 2Q."  The analysts continued: "Management indicated that it expected CPGA to be stable in the range of 2Q's $98 level, which would result in a lower full-year CPGA than our current $102 estimate.  That said, depending on promotional activity we would expect SAC to vary somewhat from quarter to quarter, although we still expect it to be down for the year from $62 in 2004."

(g)    On July 29, 2005, Bernstein Research Call analysts pointed to strong subscriber growth and told investors that "XM Satellite Radio reported strong results in the second quarter, reaffirming our bullish view of their long term economics[,]" that SAC and CPGA "continue to decline nicely, despite a Buy-One-Get-One-Free promotion during the quarter."  In conclusion, they stated "we find that XM is continuing to reduce its net loss as well as still accelerating subscriber net adds very encouraging.  This indicates that ***costs are continuing to fall (especially SAC and CPGA) even while XM sustains a very fast rate of growth***."

(h)    Analysts from Stifel, Nicolaus & Company, Inc. reported on July 29, 2005 that XM "mentioned on its conference call that it expects subscriber costs to remain roughly the same for the rest of the year.  We are slightly above management guidance to account for the potential for [Sirius] to price aggressively in retail.  We think SAC will decline slightly in 2H05 when the generation 4 chipsets are introduced.  Historically, the large reductions in SAC for both [XM and Sirius] have occurred amidst the introduction of cheaper smaller chipsets."

(i)    JP Morgan analysts reported the following on July 29, 2005:

XM's 2Q05 report featured solid fundamentals and guidance that we believe pushed back on bearish fears surrounding Sirius' Howard Stern deal, churn spikes from rate hikes and spending.

- By raising its yearend sub goal to 6m from 5.5m, XM is saying it sees no data or research that suggests it should be concerned that the popularity of Howard Stern on Sirius will slow XM's sub growth.  On the other hand, XM's baseball deal is looking like a winner, driving 23% of retain sub growth in May and June.

- Despite a 30% rate hike, core churn remained flat sequentially at 1.4%, while overall churn including OEM promotions decline sequentially to 2.5% from 2.7%.  Consumers clearly don't mind the higher rates, a testament to the appeal of the service.  Total ARPU of $10.34 topped our $9.85 est, driving $5m of sales upside.

- XM raised its EBITDA loss guidance to $395m from $360m to reflect the cost of additional sub growth.  We however, believe this is too conservative, and are cutting EBITDA loss to $352m from $363m.  We are maintaining our

year-end sub estimate at an above guidance 6.1m. **The earnings improvement is driven by lower churn and CPGA assumptions**. We continue to see FCF profits by 2006.

64.    On August 5, 2005, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2005, which was signed by defendant Panero. The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 28, 2005 press release. The August 5, 2005 10-Q included the following statements:

- [XM continued] to grow [its] gross margin (calculated as revenues less variable costs, which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months and six months ended June 30, 2005 **while reducing our costs to acquire each new subscriber**

*        *        *

The key metrics we use to monitor our business growth and our operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA, presented as follows:

| | Three Months ended June 30, | | |
|---|---|---|---|
| | **2005** | | **2004** |
| Net Subscriber Additions | 647,226 | | 418,449 |
| Aftermarket, OEM & Other Subscribers | 3,807,224 | | 1,705,191 |
| Subscribers in OEM Promotional Periods(1) | 565,929 | | 374,930 |
| XM Activated Vehicles with Rental Car Companies(2) | 44,337 | | 20,231 |
| Total Ending Subscribers(1)(2)(3) | 4,417,490 | | 2,100,352 |
| Average Monthly Subscription Revenue Per Subscriber(4) | $      9.35 | $ | 8.63 |
| Average Monthly Subscription Revenue Per Aftermarket, OEM & Other Subscriber(4) | $      9.84 | $ | 9.26 |
| Average Monthly Subscription Revenue Per Subscriber in OEM Promotional Periods(4) | $      5.63 | $ | 5.78 |
| Average Monthly Subscription Revenue Per XM Activated Vehicle with Rental Car Companies(4) | $      9.74 | $ | 9.23 |
| Subscriber Acquisition Costs (SAC)(5) | $      50 | $ | 57 |
| Cost Per Gross Addition (CPGA)(6) | $      98 | $ | 101 |
| EBITDA (in thousands)(7) | $ (89,905) | $ | (107,819) |

*        *        *

- 27 -

We will continue to incur operating losses until we substantially increase the number of our subscribers. *We are focused on increasing subscribers and scaling our business while managing growth and containing costs*.

\*        \*        \*

Subscriber Acquisition Costs. We consider subscriber acquisition costs to include radio manufacturer subsidies, certain sales, activation and installation commissions, and hardware-related promotions. These costs are reported in subsidies & distribution. The negative margins from equipment sales are also included in subscriber acquisition costs. Subscriber acquisition costs do not include on-going loyalty payments to retailers and distribution partners, payments under revenue sharing arrangements with radio manufacturers and distributors and certain guaranteed payments to GM. During the three months ended June 30, 2005 and 2004 we incurred SAC expenses of $47.9 million and $31.8 million, respectively. SAC for the three months ended June 30, 2005 and 2004 was $50 and $57, respectively. The decline in SAC for the three-month period ended June 30, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period. *We expect SAC to decline in 2005 as compared to 2004*.

Cost Per Gross Addition.  We consider CPGA to include the amounts in SAC, as well as advertising, media and other discretionary marketing expenses. In our condensed consolidated financial statements, SAC costs are captured in Subsidies & Distribution and the negative margins from equipment sales, while CPGA costs are primarily captured by the combination of subsidies & distribution, advertising & marketing, plus the negative margins from equipment sales. CPGA does not include marketing staff (included in Retention & Support) or the amortization of the GM guaranteed payments (included in Amortization of GM Liability). During the three-month periods ended June 30, 2005, and 2004, we incurred CPGA expenses of $93.2 million and $56.3 million, respectively. CPGA for the three-month periods ended June 30, 2005 and 2004 was $98 and $101, respectively. CPGA declined for the three-month period ended June 30, 2005 as compared to the three-month period ended June 30, 2004 primarily due to the combined impacts of subscriber additions increasing at a faster rate than our discretionary advertising and marketing expenses as well as the change in the mix of subscribers acquired. The timing of our media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period. The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a favorable impact on CPGA. *We expect CPGA to decline in 2005 as compared to 2004*.

\*        \*        \*

Our funding requirements are based on our current business plan, which in turn is based on our operating experience to date and our available resources.  *We are*

- 28 -

*pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.*

65.    The statements referenced in ¶¶59 through 62 and ¶64 were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to defendant Panero, among others, based upon his access to and review of internal XM data, were:

- Because of defendants' numerous statements highlighting XM's ability to pursue a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs, the market expected XM's most crucial performance metrics, SAC and CPGA, to decline, including in the second half of 2005 and as compared to 2004;

- XM misrepresented and omitted crucial facts regarding its ability to reduce the costs of adding crucial new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005;

- As was known, or disregarded with severe recklessness, by defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005 in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to defendants since before the beginning of the Class Period, including the impending arrival of Howard Stern at Sirius;

- Defendants knew or were severely reckless in ignoring that XM was deeply discounting radios and offering steep subsidies in order to combat supply shortages and inflate subscription numbers during the Class Period, which contributed to the sharp increase in SAC and CPGA in the fourth quarter of 2005;

- Defendants know or were severely reckless in ignoring that XM was planning to spend extraordinary sums of money as part of its Listen Large campaign in the fourth quarter of 2005, which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in previous quarters; and

- Despite defendants' knowledge that XM would be making huge expenditures in the fourth quarter of 2005, defendants failed to disclose to the market that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to huge increases in XM's net losses, which was in complete reversal of the trends of declining SAC and CPGA defendants reported and touted throughout the Class Period.

66.     Like investors in the market, analysts anxiously awaited XM's reported CPGA numbers for the Third Quarter of 2005.  Indeed, analysts from JP Morgan stated on October 5, 2005: "We believe the next keys for the stock should be CPGA and churn numbers disclosed in the earnings call, likely to be in late October."

67.     On October 27, 2005, XM issued a press release entitled "XM Satellite Radio Holdings Inc. Announces Third Quarter 2005 Results and Reaffirms 6 Million Subscriber Guidance," which stated in relevant part:

**Revenues up 134% to $153 million in third quarter, compared to prior year period;**

**Subscribers double to 5,034,642 from prior year; Expands lead with 617,152 net additions**

**GM and Honda to produce more than 2 million 2006 XM-equipped vehicles**

Washington D.C., October 27, 2005 – XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the third quarter ended September 30, 2005.  XM ended the quarter with 5,034,642 subscribers, doubling the 2,516,023 subscribers reported last year for the third quarter. The growth was driven by third quarter net subscriber additions of 617,152, a 48 percent increase over the 415,671 net subscribers added in the third quarter 2004.  ***Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005***.

XM's net loss for the third quarter 2005 was ($131.9) million, as compared to ($118.0) million in the third quarter 2004.  XM reported an EBITDA loss of ($73.8) million for the third quarter 2005 compared to a third quarter 2004 loss of ($62.9) million.

**Record Revenue from Cost-Effective Subscriber Growth**

For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004.  XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products.  Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004.  Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89. ***XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter.***

68.    On October 27, 2005, XM hosted a conference call to discuss its Third Quarter 2005 Earnings and financial outlook.  Panero, Titlebaum, Parsons, Euteneuer, and Cook participated in the call on behalf of XM.  During the call, XM executives, including defendant Panero, made numerous false and misleading statements designed to artificially inflate XM's stock price.  For example, Panero stated:

> XM's subscriber growth rate is reflected in the Company's rapidly increasing revenue, reaching a record 153 million in the third quarter of 2005 with subscription revenue of 140 million.  Third-quarter revenue more than double to 65 million in revenue reported in the third quarter of 2004, and is 22% more then the 125 million recorded in the second quarter of this year.
>
> ***The secret to XM's smart subscriber growth rather than growth at any cost is the ability to control marketing and product expenses while rapidly growing subscribers.  This quarter, XM kept its fully loaded per unit costs of capturing a new subscriber, or CPGA, constant at $89 – the same CPGA we reported in the third quarter last year.***  These results provide us the flexibility to aggressively advertise and market our service in the fourth quarter.  And in fact, that is what we are doing – implementing a comprehensive media campaign comprised of advertisements, rebates, and other promotional techniques to fully exploit the holiday selling season again this year.
>
> *            *            *
>
> So, in summary, the third quarter 2005 represents another quarter of XM market leadership and ***smart subscriber growth***.  XM's leadership in the OEM and retail channels resulted in it ending the quarter with more than twice as many subscribers as its competitor, our revenue rapidly increased, cost-effective programming additions broadened our appeal, new products are in flow, and strategic partnerships are on track.  ***We strengthened our foundation for a spectacular fourth quarter when we will exceed 6 million subscribers*** and for an exceptional 2006 and beyond.

69.    As the Third Quarter 2005 earnings conference call continued, Euteneuer stated:

> Now let's move to revenue.  Total revenue increased 134% to 153 million for the third quarter of 2005, from 65 million reported in the third quarter of 2004.  Recurring subscription revenue of 140 million for the third quarter of 2005 increased 135%, from 60 million in the third quarter of 2004.  Compared to the second quarter 2005, subscription revenue was up 23%, reflecting the continued significant growth in our subscriber base . . .
>
> *            *            *

- 31 -

*XM's targeted and efficient sales and marketing efforts have enabled us to continue to demonstrate cost-effective subscriber growth, both in the direct cost to gain a subscriber, or SAC, and the fully-loaded total cost, including discretionary advertising and marketing costs, to gain a subscriber, or CPGA.*

XM's SAC for the third quarter was a modest $53 per gross addition, a decline of $4 or 7%, from the $57 per gross addition in the third quarter 2004.  CPGA for the third quarter 2005 was $89 per gross addition, unchanged from the third quarter 2004 and down from the $98 in the second quarter 2005.  Similar to past trends, we expect fourth quarter SAC and CPGA to increase due to greater media and promotional activities during the upcoming holiday season.

*         *         *

In summary, the strong progress we've made in the third quarter enables me to *reaffirm the 2005 guidance that we had previously given*.  XM expects to report 500 million in subscription revenue and EBITDA loss of 395 million for 2005, while *ending the year with over 6 million subscribers*.  In addition, XM still expects to achieve operational cash flow breakeven by the end of 2006.  We will issue our next subscriber updated in the first week of January.

70.      During the question and answer session of the October 27, 2005 earnings conference call, the following exchanges took place:

Barton Crockett:          You guys seem to have stepped up the level of rebating for your radios going into the holiday season.  We haven't seen you guys be a significant rebater for much of this year.  What could that do – can you give us some sense of your early outlook on what that could do for ARPU, what the likely uptake is, and whether this is kind of a switch in strategy for you guys more towards rebating and less towards other ways of spending on subscriber acquisition?  So, that is my main question right now.

Steve Cook:              Sure, I'll handle that.  It really won't affect ARPU at all because we don't tie the rebate to a service commitment.  It's really a hardware-only rebate.  And really our intent there is we're reaching the point where we can start to hit lower and lower price points to really penetrate the mass-market.  Because this is – we do see this as a gigantic business as we're shooting towards 10 million by 00 or 20 million by 2010 and that sort of thing. ***So, we can maintain our SAC at very reasonable levels and still hit some of these attractive consumer price points.  So – and Christmas – the gift-giving season is the perfect time to do that.  So, that is really what you are seeing.***

- 32 -

Barton Crockett:              Just to clarify, you're saying because you're not requiring people to sign up for a six-month or one-year, you're not going to have this in ARPU, but it's going to be recorded where – in subsidies and distribution?

Steve Cook:                   It will be reflected in SAC.

71.     In response to XM's reported Third Quarter 2005 results and earnings conference call, analysts pointed to XM's steady SAC and CPGA numbers as a positive trend for the Company. Although they anticipated holiday marketing expenses to slightly impact XM's Fourth Quarter 2005 SAC and CPGA numbers, analysts expected only a slight uptick:

(a)     Analysts from Lehman Brothers stated on October 27, 2005 that:

XMSR 3Q05 results were generally better than expected, with higher-than-forecast ARPU and *lower-than-expected CPGA, due largely to discipline in advertising and marketing spending.*

\*        \*        \*

***CPGA and SAC Better Than Expected***.  SAC was $53, down 7.0% YoY and 3.6% below our $55 estimate.  The below-forecast CPGA was driven by a combination of inline subsidies and distribution expense and notably lower-than-expected advertising and marketing expense (13% below forecast), combined with gross adds that were 3.5% above our expectations.

(b)     Just one day later, analysts from Lehman Brothers reported on their estimates for XM's SAC and CPGA for the Fourth Quarter of 2005:

SAC Unchanged, CPGA Up to $107 On Higher Ad Spending.  We are maintaining our $55 SAC estimate for 4Q05E, and raising our CPGA forecast to $107 from $103 due to our increased advertising and marketing spend forecast.

(c)     Deutsche Bank analysts reported on October 28, 2005 that:

***CPGA and SAC again better than expected***

***XM reported cost per gross activation (CPGA) of $89, nicely below our $103 estimate, and even with the $89 reported in 3Q04.  The subscriber acquisition cost (SAC) component was $53, below our $62 estimate.***  Fixed operating expense did rise in the quarter to $78m from $68m in 2Q, reflecting primarily the incremental impact of new programming initiatives.

In anticipation of more extensive marketing efforts than we previously expected, we are raising our 4Q SAC estimate to $75 per gross add from $73. Reflecting this as well as raising our advertising and marketing expense estimate from $56m from $50m, our 4Q CPGA estimate has increased to $126 from $109. Our full year estimates for SAC go to $62 from $58 and for CPGA to $108 from $103.

   (d) Concerning XM's upcoming marketing plans for the Fourth Quarter of 2005,

analysts from Bear Stearns reported on October 28, 2005 that:

> Higher marketing expense in 4Q does not imply the economic model has broken down. XM reported significantly lower than expected marketing expense during 3Q, effectively shirting the marketing dollars to 4Q05. Taking advantage of the upcoming holiday selling season and its reduced equipment costs, XM plans to focus on reducing the upfront cost of entry for potential subscribers even as its advertising campaigns focus on building awareness of its programming lineup. While some could argue that XM will be hard pressed to maintain market share in face of significant marketing of Howard Stern from Sirius which could impact economics, we would like to point out two things. One, Howard Stern has proven to be a phenomenon in terrestrial radio and the fans that he will bring to the Sirius platform would go to Sirius regardless of any amount of marketing that XM does. In essence, we think Howard Stern will be expanding the market for satellite radio rather than merely moving market share to Sirius. **_Second, the total marketing outlay, based on XM's guidance, likely remains the same for the year, so XM is not destroying economics_**. In any case, the current $50 mail-in-rebate reduces that price point to negligible levels for the older generation XM products that it is looking to close out in any case before it launches the 4G based radios in 2006.

   72. In a press release dated November 1, 2005, one-third of the way through the fourth quarter, XM issued a press release highlighting the fact that it had increased its retail market share to 59% in the third quarter, from 56% in the second quarter. In the press release, defendant Panero stated, "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

   73. On November 7, 2005, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending September 30, 2005, which was signed by defendant Panero. The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 27, 2005 press release. The November 7, 2005 10-Q included the following statements:

- [XM continued] to grow [its] subscription margin (calculated as Subscription revenue less variable costs, which include Revenue share & royalties and Customer care & billing operations) during the three months and nine months ended September 30, 2005, *while reducing our Subscriber acquisition costs*

The key metrics we use to monitor our business growth and our operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA, presented as follows:

| | Three months ended September 30, | | |
|---|---|---|---|
| | 2005 | | 2004 |
| EBITDA *(in thousands)* (1) | $ (73,783) | $ | (62,873) |
| Subscriber Data: | | | |
| Net Subscriber Additions (2) | 617,152 | | 415,671 |
| Aftermarket, OEM & Other Subscribers (3) | 4,367,945 | | 2,092,600 |
| Subscribers in OEM Promotional Periods (4) | 624,580 | | 398,993 |
| XM Activated Vehicles with Rental Car Companies (5) | 42,117 | | 24,430 |
| Total Ending Subscribers (3) (4) (5) (6) | 5,034,642 | | 2,516,023 |
| Revenue Data *(monthly average)* : | | | |
| Subscription Revenue per Aftermarket, OEM & Other Subscriber | $ 10.36 | $ | 9.24 |
| Subscription Revenue per Subscriber in OEM Promotional Periods | $ 5.99 | $ | 5.63 |
| Subscription Revenue per XM Activated Vehicle with Rental Car Companies | $ 10.25 | $ | 9.47 |
| Average Monthly Subscription Revenue per Subscriber (ARPU) (7) | $ 9.78 | $ | 8.64 |
| Net Ad Sales Revenue per Subscriber (8) | $ 0.37 | $ | 0.30 |
| Activation, Equipment and Other Revenue per Subscriber | $ 0.54 | $ | 0.51 |
| Total Revenue per Subscriber | $ 10.69 | $ | 9.45 |
| Expense Data: | | | |
| Subscriber Acquisition Costs (SAC) (9) | $ 53 | $ | 57 |
| Cost Per Gross Addition (CPGA) (10) | $ 89 | $ | 89 |

\*        \*        \*

Subscriber Acquisition Costs (SAC). We consider SAC to include radio manufacturer subsidies, certain sales, activation and installation commissions, and hardware-related promotions. These costs are reported in Subsidies & distribution. The negative margins from equipment sales are also included in SAC. SAC does not include on-going loyalty payments to retailers and distribution partners, payments under revenue sharing arrangements with radio manufacturers and distributors and certain guaranteed payments to GM. During the three months ended September 30, 2005 and 2004 we incurred SAC expenses of $53.4 million and $34.8 million, respectively. SAC for the three months ended September 30, 2005 and 2004 was $53 and $57, respectively. The decline in SAC for the three month period ended September 30, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the

number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period.

*    *    *

Cost Per Gross Addition (CPGA). We consider CPGA to include the amounts in SAC, as well as Advertising & marketing which includes advertising, media and other discretionary marketing expenses. In our unaudited condensed consolidated financial statements, SAC costs are captured in Subsidies & distribution and the negative margins from equipment sales, while CPGA costs are primarily captured by the combination of Subsidies & distribution, Advertising & marketing, plus the negative margins from equipment sales. CPGA does not include marketing staff (included in Retention & support) or the amortization of the GM guaranteed payments (included in Amortization of GM liability). During the three month periods ended September 30, 2005, and 2004, we incurred CPGA expenses of $87.9 million and $54.8 million, respectively. CPGA for the three month periods ended September 30, 2005 and 2004 was $89. The timing of our media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period. The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a favorable impact on CPGA. The timing of promotions and new contracts may cause CPGA to fluctuate from period to period.

*    *    *

Our funding requirements are based on our current business plan, which in turn is based on our operating experience to date and our available resources. ***We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs***. Our plan contemplates our focusing on the new automobile market where we have relationships with automobile manufacturers, the continuing introduction of lower-priced and more user-friendly radio technology in the retail aftermarket and the use of our most productive distribution channels.

74.    The statements referenced in ¶¶67 through 70 and ¶¶72 through 73 were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to defendant Panero, among others, based upon his access to and review of internal XM data, were:

- Because of defendants' numerous statements highlighting XM's ability to pursue a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs, the market expected XM's most crucial

performance metrics, SAC and CPGA, to decline, including in the second half of 2005 and as compared to 2004;

- XM misrepresented and omitted crucial facts regarding its ability to reduce the costs of adding crucial new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005;

- As was known, or disregarded with severe recklessness, by defendants, XM would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005 in order to stay on track to achieve its stated goal of 6 million subscribers at year end by reason of competitive factors known to defendants since before the beginning of the Class Period, including the impending arrival of Howard Stern at Sirius;

- Defendants knew or were severely reckless in ignoring that XM was deeply discounting radios and offering steep subsidies in order to combat supply shortages and inflate subscription numbers during the Class Period, which contributed to the sharp increase in SAC and CPGA in the fourth quarter of 2005;

- Defendants knew or were severely reckless in ignoring that XM was planning to spend extraordinary sums of money as part of its Listen Large campaign in the fourth quarter of 2005, which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in previous quarters;

- Defendants' statements that any increase in SAC and CPGA in the fourth quarter of 2005 would be "[s]imilar to past trends" of the holiday season gave the market a false indication of the true impact that the Listen Large campaign and competitive market forces would have on XM's financial performance in the fourth quarter; and

- Despite defendants' knowledge that XM would be making huge expenditures in the fourth quarter of 2005, defendants failed to disclose to the market that XM's cost of subscriber acquisition would rise to extraordinary levels, leading to huge increases in XM's net losses, which was in complete reversal of the trends of declining SAC and CPGA defendants reported and touted throughout the Class Period.

### D.    THE TRUTH IS REVEALED

75.    On February 16, 2006, XM issued a press release announcing its financial results for the fourth quarter of 2005 and the fiscal year ended December 31, 2005, entitled "XM Satellite Radio Holdings Inc. Announces Fourth Quarter and Full Year 2005 Results; XM to Exceed Nine Million Subscribers and Reach Cash Flow Break-Even by Year-End 2006," which stated in relevant part:

**XM Adds Over 2.7 Million Net Subscribers in 2005; 2005 Subscription Revenue More than Doubles to $503 Million**

Washington D.C., February 16, 2006 – XM Satellite Radio Holdings Inc. (Nasdaq: XMSR) today reported financial and operating results for the fourth quarter and full year ended December 31, 2005. XM reported sharply higher 2005 revenue, and the Company said it expected to report positive cash flow from operations in the fourth quarter of 2006.

"2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers," said Hugh Panero, President and CEO of XM Satellite Radio. "With more than six million subscribers today, XM expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010. We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year."

Panero continued, "Last week, we reinforced XM's position as the premium content leader across all of radio with our announcement of the "Oprah & Friends" channel that will complement our music, talk and sports programming starting in September."

XM ended 2005 with 5,932,957 subscribers, an increase of 84 percent over 2004. Despite an intensely competitive marketplace in the fourth quarter, XM achieved net subscriber additions of 898,315. Later than expected activations from strong holiday sales brought the total to more than six million during the first week of January.

"XM achieved significant growth, added quality content and signed up important new automotive distribution partners in 2005," Panero said. "At the start of 2005, XM had 3.2 million subscribers and led the satellite radio competition by 2.1 million subscribers. Over the course of the year, XM increased that lead to 2.6 million subscribers."

**Fourth Quarter and Full-Year Financial Results**

For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004. XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004.  These quarterly and annual increases in revenue were driven by our significant subscriber growth and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005.

*For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year.  These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter.  For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in*

*2004.  In the first quarter of 2006, XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006.*

XM reported an EBITDA loss of ($199.4) million for the fourth quarter of 2005, including $25.3 million in de-leveraging charges, compared to an EBITDA loss of ($139.7) million for the fourth quarter of 2004, which included $41.6 million in de-leveraging charges.  The full year EBITDA loss was ($434.3) million, including $27.6 million in de-leveraging charges, compared to a 2004 EBITDA loss of ($388.4) million which included $76.6 million of de-leveraging charges.  The increased EBITDA loss primarily resulted from our increase in subscribers as well as the higher fourth quarter marketing expenses.

76.     XM's February 16, 2006 earnings press release shocked the market, which had been expecting the Company to continue its touted ability to reduce and control SAC and CPGA costs while achieving "smart subscriber growth."   Indeed, XM's SAC increased a startling 39% and CPGA soared 36% over and above fourth quarter 2004 levels.

77.     Compared to the third quarter of 2005, SAC sequentially increased from $53 to $89, a whopping 68% in just three months.  Similarly, compared to the third quarter of 2005, CPGA climbed from $89 to $141, a 58% jump.

78.     In truth, as XM attempted to grow subscriber numbers at an aggressive pace, its SAC and CPGA skyrocketed to levels far greater than that reported to the market each quarter over the last two fiscal years:



79. On February 16, 2006, defendants made another startling disclosure when XM filed a Form 8-K disclosing that Director Roberts had submitted a letter of resignation. In his February 13, 2006 resignation letter, Director Roberts stated that:

> That said, ***I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders***. For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company. I am not having any useful effect and ***I care too much and believe in my own views too much to just "go along."***
>
> ***Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes.***

80. In explaining the resignation, defendants elaborated on the views Mr. Roberts had made long known to defendants, stating in the Company's February 16, 2006 Form 8-K that:

> Although the letter does not explicitly state the nature of the disagreement, the Company believes the disagreement with Director Roberts primarily involves the

strategic balance of growth versus cash flow. Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures.

81.    Thus, among other things, the market learned on February 16, 2006 that one of XM's most senior and knowledgeable directors, Roberts, who had been Bear Stearns' lead telecommunications banker and who had served on all major committees of XM's Board, including the Nominating Committee, Compensation Committee, Audit Committee, as well as the informal Finance Committee, had become increasingly strident within the Company, at both the Board and senior managerial levels, about the fact that the current direction was not in the best interests of XM. Roberts was emphatic that XM needed to reign in its skyrocketing spending habits related to marketing, programming, and promotional expenditures.

82.    According to the former District Manager, XM's expensive and not entirely effective marketing campaigns, as described above, were major factors that led to Roberts' resignation. In fact, this former District Manager understood that Roberts' resignation should have come as no surprise to Panero or anyone else because, prior to his resignation, it was clear that Roberts was not happy with the Company's direction, especially its marketing and advertising expenditures. The witness understood that Roberts did not "see eye to eye" with Panero and other members of the Board, who believed that XM had to do a "certain amount" of advertising to "have results." The witness said that XM was committed to spending money on advertising, but that Roberts was concerned about how much XM was spending. The witness added that XM was "not cash flow positive yet" and Roberts was "a bit disgruntled" about XM spending so much money on advertising when the Company was not "cash flow positive."

83.    This view of Roberts' opposition to XM's strategic plans was echoed by the comments of Gary Parsons, XM's Chairman, at the February 16, 2006 conference call with analysts:

On the Board issue, this is Gary Parsons. Bob, let me hit that one since it is a Board related issue, and go into a little bit of depth on it. This morning we did issue and 8-K noting that Jack Roberts who served four or five years on the Board was stepping down. And Jack's explanation of that departure involved his concerns that frankly XM was spending too heavily in order to achieve the rapid growth that we were experiencing, and his belief that slowing down that spending would result in a more immediate positive cash flow pop. And Jack has expressed his concerns for some period of time. While other Board members supported stronger programming content, marketing efforts and accelerated growth.

*        *        *

Frankly, based on the numbers from the fourth quarter, we did grow strongly, but we failed to do so economically as we had expected or planned to. In prior quarters and in prior years we have grown strongly, and we have grown cost effectively or economically. And we feel quite frankly when we look at the '06 plan that we will continue to grow strongly and economically, and we will can return to the pattern of solid economic return and growth with a moderating SAC and CPGA, declining EBITDA losses, positive operating cash flow later in the year, and very – we feel very positive about the upcoming '06 outlook.

84.    Now that a substantial part of the relevant truth behind XM's finances was exposed that had previously been concealed and misrepresented by defendants' fraud, between the close of trading on February 15, 2006 and the close of trading on February 17, 2006, the Company's stock price traded at an extraordinarily unusual and high volume as it collapsed nearly 13%, falling to a close of $21.57 on February 17, 2006, down approximately 40% from a Class Period peak of more than $36.00 per share.

85.    As indicated above, as XM's true financial condition was revealed to the market, a picture of the extent of defendants' fraud emerged. The defendants' motivation was to artificially inflate the price of XM's stock, thus misleading the market into believing that XM's business and financial prospects were first-rate, thus causing the market to expect and anticipate that XM's SAC and CPGA would continue to decline, thus enabling Panero and other XM insiders to unload vast sums of XM stock in order to reap millions of dollars in gains from illicit insider trading. Thus,

when the stock price dropped upon revelation of XM's true financial condition concealed by the fraud, Plaintiffs suffered losses proximately caused by defendants' fraud.

86.    In the months that followed this revelation, the Company disclosed additional disturbing news about its operations.  On April 27, 2006, XM announced that the Federal Trade Commission had launched an investigation into several of the Company's aggressive marketing practices, including XM's rebate programs.  In addition, on September 5, 2006, XM disclosed that "the Securities and Exchange Commission is looking into the company's handling of its estimates of subscriber counts as well as the cost of recruiting customers."  The SEC requested that XM produce documents regarding its subscriber targets and related matters for the third and fourth quarters of 2005.

### E.    INSIDER TRADING

87.    Defendants' inflated claims about XM's ability to continue to only pursue cost-effective growth had its intended effect of maintaining XM's stock price long enough for insiders to dump their XM shares on an unsuspecting market.

88.    Taking full advantage of the artificial inflation of XM's common stock prices during the Class Period, Panero and several key insiders of XM made huge sales of their personal holdings during the fourth quarter of 2005, before any disclosure of the astronomical increases in XM's SAC and CPGA were revealed to the unsuspecting market.  Notwithstanding their access to this and other non-public information, Panero and key insiders disposed of very large quantities of their stock.  The following chart shows Panero's trading of XM stock:

**Hugh Panero, President and CEO:**

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 12/06/2005 | 74,820 | $28.41 | $2,125,636.20 |
| 12/06/2005 | 50,000 | $28.53 | $1,426,500 |

| | | | |
|---|---|---|---|
| 12/06/2005 | 30,000 | $28.80 | $864,000 |
| 12/06/2005 | 30,000 | $28.52 | $855,462 |
| 12/06/2005 | 25,000 | $28.40 | $710,000 |
| 12/06/2005 | 23,514 | $28.55 | $671,324.70 |
| 12/06/2005 | 20,000 | $28.46 | $569,122 |
| 12/06/2005 | 20,000 | $28.38 | $567,600 |
| 12/06/2005 | 20,000 | $28.37 | $567,400 |
| 12/06/2005 | 10,000 | $28.95 | $289,500 |
| 12/06/2005 | 10,000 | $28.94 | $289,400 |
| 12/06/2005 | 10,000 | $28.90 | $289,000 |
| 12/06/2005 | 10,000 | $28.88 | $288,800 |
| 12/06/2005 | 10,000 | $28.78 | $287,800 |
| 12/06/2005 | 10,000 | $28.77 | $287,670 |
| 12/06/2005 | 10,000 | $28.64 | $286,400 |
| 12/06/2005 | 10,000 | $28.58 | $285,750 |
| 12/06/2005 | 10,000 | $28.52 | $285,200 |
| 12/06/2005 | 10,000 | $28.49 | $284,900 |
| 12/06/2005 | 10,000 | $28.48 | $284,700 |
| 12/06/2005 | 10,000 | $28.46 | $284,600 |
| **TOTAL** | **413,334 (99% OF THEN-OWNED XM SHARES)** | | **$11,800,764.90** |

89.     In addition to Panero, several other key XM insiders sold large quantities of XM stock at artificially inflated prices, reaping millions of dollars in illicit gains:

(a)     George W. Haywood ("Haywood"), one of XM's Directors, sold 2,071,000 shares of XM stock over the course of three days during the Class Period: November 8th, 9th, and 10th, 2005.  All told, Haywood sold approximately 72% of his then-owned XM shares and reaped ***approximately $59 million*** in proceeds, selling his shares between $27.85 and $29.61 per share;

(b)     Stelios Patsiokas, XM's Executive Vice President, sold 103,514 shares on December 6, 2005, at prices ranging from $28.55 to $28.95, to reap proceeds of $2,976,000, thus selling approximately 62% of his then-owned XM shares;

(c)     Titlebaum, XM's Executive Vice President, General Counsel, and Secretary, sold 103,514 shares on December 6, 2005 at $28.4356, to reap proceeds of $2,943,482, thus selling approximately 66% of this then-owned XM shares; and

(d)    Cook, XM's Executive Vice President of Sales and Marketing, sold 78,514 shares on December 6, 2005, at prices ranging from $28.37 to $28.95, to reap proceeds of $2,238,000, thus selling approximately 43% of his then-owned XM shares.

90.    Both the timing of the sales and the sales prices are suspicious.  Panero and other insiders sold all of the stock they actually owned between $27.85 and $29.61 during November and December 2005, shortly before XM would announce its bloated SAC and CPGA figures.

91.    Panero's knowledge about the false and misleading statements regarding SAC and CPGA highlights the unusual nature of his conspicuously well-timed stock sales.

92.    The unusual circumstances surrounding Panero's and other insiders' sales of their stock during November and December 2005 further demonstrate both Panero's motive to commit the fraud alleged herein as well as his scienter.  As described herein, defendants acted with scienter in that they knew, or with deliberate recklessness disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or with deliberate recklessness disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Panero, by virtue of his receipt of information reflecting the true facts regarding XM, his control over, and/or receipt and/or modification of XM's allegedly materially misleading misrepresentations and/or his associations with the Company which made him privy to confidential proprietary information concerning XM, participated in the fraudulent scheme alleged herein.

F.   **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

93.   At all relevant times, the market for XM's publicly traded securities was well-developed and efficient for the following reasons, among others:

(a)   XM's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   as a regulated issuer, XM filed periodic public reports with the SEC and the NASDAQ;

(c)   XM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   XM was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

94.   As a result, the market for XM's publicly traded securities promptly digested current information regarding XM from all publicly-available sources and reflected such information in XM's securities prices. Under these circumstances, all purchasers of XM's publicly traded securities during the Class Period suffered similar injury through their purchase of XM's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

G.   **LOSS CAUSATION**

95.   As detailed in this Complaint, defendants' scheme and false statements artificially inflated XM's stock price by failing to disclose that XM was expecting fourth quarter 2005 SAC and

CPGA to soar above historical levels, in complete reversal of the declining cost trends touted by defendants.  These false and misleading statements, individually and collectively, concealed XM's true financial circumstances and future business prospects, resulting in its stock being artificially inflated until, as indicated herein, the relevant truth about XM was revealed.  While each of these misrepresentations was independently fraudulent, they were all motivated by defendants' desire to artificially inflate XM's stock price and the image of its future business prospects to give the market the false notion that XM would continue to grow while reducing, not increasing, its costs of adding new subscribers.

96.     Defendants' false and misleading statements had the intended effect and causes, or were a substantial contributing cause of XM's stock trading at artificially inflated levels throughout the Class Period.

97.     The true picture of XM's business, operations, and finances was disclosed to the market on February 16, 2006, when XM announced that its SAC and CPGA figures had skyrocketed.  When defendants provided the market with this revelation, it was an indication to the market that defendants' prior Class Period statements were false and misleading.

98.     As a result of the information revealed to the market on February 16, 2006, doubt was cast on the veracity of defendants' prior statements and XM's true financial circumstances, which were known to defendants since the beginning of the Class Period, were revealed causing XM's stock price to drop approximately 13% on abnormally high trading volume.

99.     Indeed, the market reacted negatively to defendants' shocking disclosure, as demonstrated in the stock chart below:



100.    Moreover, as shown below, defendants' February 16, 2006 revelations sent the volume of XM shares traded soaring as the stock price fell:



101.    The rapid decline in XM's stock price following the February 16, 2006 revelations was a direct and foreseeable consequence of the falsity of defendants' Class Period misrepresentations and omissions to the market, *i.e.*, a materialization of previously undisclosed risks concealed by defendants' fraudulent scheme. Thus, the revelation of truth at the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that XM's prior statements were false and misleading.

102.    In sum, as the truth about defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged, suffering true economic losses.

103.    The decline in XM stock in February 2006 was a direct result of the nature and extent of the revelations to investors and the market of the impact on XM of business costs that had been concealed or misrepresented by defendants' scheme and misstatements. The timing and magnitude of XM's stock price decline negates any inference that the loss suffered by Plaintiffs was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs was a direct and proximate result of defendants' scheme and misrepresentations and omissions which artificially inflated XM's stock price, and the subsequent significant decline in the value of XM's stock when the truth concerning defendants' prior misrepresentations and fraudulent conduct, entered the market place.

### H.    NO SAFE HARBOR

104.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of XM who knew that those statements were false when made. Moreover, to the extent that defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

105.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

106.    During the Class Period, XM and Panero, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XM's publicly traded securities; and (iii) cause Plaintiffs and other members of the Class to purchase XM's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, XM and Panero, and each of them, took the actions set forth herein.

107.     These defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XM's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein. Defendant Panero is also sued as a controlling person of XM, as alleged below.

108.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition and operational performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

109.     XM and defendant Panero, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, sales performance, product marketing and promotion, operations and future prospects of XM as specified herein.

110.    These defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of XM's value and performance and continued substantial sales, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about XM and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of XM's securities during the Class Period.

111.    Defendant Panero's primary liability, and controlling person liability, arises from the following facts: a) defendant Panero was a high-level executive and director at the Company during the Class Period; b) defendant Panero, by virtue of his responsibilities and activities as a senior executive officer and director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal sales and marketing plans, projections and/or reports; c) defendant Panero enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) defendant Panero was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

112.    Each of the defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such defendants' material misrepresentations and/or omissions were done knowingly or with

deliberate recklessness and for the purpose and effect of concealing XM's operating condition, sales, product marketing and promotional practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, defendant Panero, if he did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

113.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of XM's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of XM's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with deliberate recklessness by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired XM securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price decline on or about February 16, 2006 when the artificial inflation was released from XM stock.

114.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, sales, marketing, promotion and other fraudulent business practices, future prospects and intrinsic value of XM, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have

purchased or otherwise acquired their XM publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

115.    By virtue of the foregoing, XM and defendant Panero have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

116.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about February 16, 2006 when the artificial inflation was released from XM stock.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST DEFENDANT PANERO

117.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against defendant Panero.

118.    Defendant Panero acted as a controlling person of XM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, defendant Panero had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendant Panero was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were

- 54 -

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.     In addition, defendant Panero had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

120.     As set forth above, XM and Panero each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his controlling position, defendant Panero is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Panero's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about February 16, 2006 when the artificial inflation was released from XM stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)     Declaring that this action is a proper class action, and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the proposed Class;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  September 26, 2006

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA (DC Bar # 445487)


               /S/ *Nancy M. Juda*
               NANCY M. JUDA

1100 Connecticut Avenue, N.W., Suite 730
Washington, DC  20036
Telephone:  202/822-6762
202/828-8528 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DAVID J. GEORGE
DOUGLAS WILENS
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiffs

LAW OFFICES BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd., Suite 750
Coral Gables, FL  33314
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of September, 2006, I presented the foregoing to the
Clerk of the Court for filing and uploading to the CM/ECF system.  I further certify that on the same
date I e-mailed and sent via U.S. mail the foregoing document to counsel of record listed below.

_____/S/ Nancy M. Juda_____

Charles E. Davidow
John Valentine
Michael A. Mugmon
WILMER CUTLER & PICKERING HALE
& DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

***Counsel for Defendants***