IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re XM Satellite Radio Holdings Inc.<br>Securities Litigation | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-0802 |
| This Document Relates To:<br>All Actions | | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:    202-663-6000
Fax:    202-663-6363

*Attorneys for Defendants XM Satellite Radio*
*Holdings Inc. and Hugh Panero*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 4

ARGUMENT .............................................................................................................. 12

    I.     PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS XM AND
          PANERO MADE ANY MATERIAL MISSTATEMENT OR OMISSION. ........ 15

          A.     XM Disclosed That SAC and CPGA for the Fourth Quarter of 2005
                 Would Increase. ......................................................................................... 16

          B.     XM's Past SAC and CPGA Results Were Not An Implicit Guarantee
                 of Similar Future Results. ......................................................................... 19

    II.    XM'S STATEMENTS CONCERNING SAC AND CPGA ARE NOT
          ACTIONABLE UNDER THE PSLRA's "SAFE HARBOR" FOR
          FORWARD-LOOKING STATEMENTS. ........................................................... 20

    III.   PLAINTIFFS' CLAIMS ARE LARGELY PREMISED ON
          INACTIONABLE PUFFERY ................................................................................. 26

    IV.   PLAINTIFFS' COMPLAINT IS IN LARGE PART A CRITICISM OF
          XM'S BUSINESS STRATEGY. ........................................................................... 28

    V.    PLAINTIFFS FAIL TO ALLEGE FACTS THAT SUPPORT A STRONG
          INFERENCE OF SCIENTER ............................................................................... 30

          A.     Because the Stock Sales by XM Officers and Directors Were Not
                 Suspicious in Timing or Amount, Plaintiffs Have Not Pleaded a
                 Cognizable Motive for Fraud. .................................................................. 31

          B.     Plaintiffs Fail to Allege Particularized Circumstantial Facts Supporting
                 a Strong Inference of Scienter. ................................................................. 35

    VI.   PLAINTIFFS FAIL TO STATE A VALID CONTROL PERSON CLAIM
          AGAINST PANERO. .......................................................................................... 40

CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) ................................. 39

*Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ......................................................... 32

*Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203 (S.D. Cal. 2005) .............. 28, 38

*Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005) ......................................... 37

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) ..................................... 15

*Burman v. Phoenix Worldwide Indus, Inc.*, 384 F. Supp. 2d 316 (D.D.C. 2005) ........................ 21

*Calif. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) .......................... 39

*Fitzer v. Security Dynamics Techs.*, 119 F. Supp. 2d 12 (D. Mass. 2000) .............................. 27, 30

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001) ........... 13, 35, 37

*Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845 (W.D. Wis. 2003) ........................................ 38

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) .................................... 23

*Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001) ............................................... 17

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) .................................................. 15

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ................................... 22

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994) ...................................... 17

*Ieradi v. Mylan Lab. Inc.*, 230 F.3d 594 (3d Cir. 2000) .................................................. 4

*In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ............................... 21

*In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................ 38

*In re Alpharma Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004) ............................................... 15

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) .................................... 13, 14, 26, 32

*In re Best Buy Co. Sec. Litig.*, 2005 WL 839099 (D. Minn. Apr. 12, 2005)................................. 25

*In re Bio-Tech. Corp. Sec. Litig.*, 380 F. Supp. 2d 574 (D.N.J. 2005)............................................ 38

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................. 38

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ................ 16, 17, 18, 19

*In re Business Objects S.A. Sec. Litig.*, 2005 WL 1787860, 7 (N.D. Cal. July 27, 2005)............. 37

*In re Cable & Wireless, PLC,* 332 F. Supp. 2d 896 (E.D. Va. 2004)  .......................................... 27

*In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749 (E.D. Va. 2004) .................. 26, 29

*In re Champion Enters., Inc. Sec. Litig.*, 145 F. Supp. 2d 871 (E.D. Mich. 2001) ...................... 13

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .......................... 19, 20, 28

*In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) .................................................... 15

*In re Convergent Technologies Sec. Litig.,* 948 F.2d 507 (9th Cir. 1991) ............................. 19, 20

*In re Credit Suisse First Boston Corp.*, 431 F.3d 36 (1st Cir. 2005) ........................................... 15

*In re Cross Media Marketing Corp. Sec. Litig.*, 314 F. Supp. 2d 256 (S.D.N.Y. 2004).............. 25

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005)............................................................... 22, 38

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002).............. 38

*In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031 (N.D. Cal. 2000) ............................................. 33

*In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559 (E.D. Mich. 2001)......................... 27

*In re Forest Labs. Inc. Deriv. Litig.*, 2006 WL 2670988 (S.D.N.Y. Sept. 18, 2006) ................... 35

*In re GeoPharma Inc. Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................... 28

*In re GeoPharma Inc. Sec. Litig.*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) .................................... 35

*In re GlaxoSmithkline PLC*, 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006).................................... 23

*In re IBM Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998)............................................................. 17

*In re Interbank Funding Corp. Sec. Litig.*, 432 F. Supp. 2d 51 (D.D.C. 2006) ........................... 13

*In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d 84 (D.D.C. 2004), *vacated on other grounds*, *Belizan v. Hershon,* 434 F.3d 579 (D.C. Cir. 2005) .................... 13, 14, 15

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................. 27

*In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998) ....................................... 27

*In re Lexar Media, Inc. Sec. Litig.*, 2005 WL 1566534 (N.D. Cal. July 5, 2005) ....................... 31

*In re Lexmark Int'l Sec. Litig.*, 234 F. Supp. 2d 680 (E.D. Ky. 2002) ......................................... 31

*In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 928 (C.D. Cal. 2002) ........................ 25

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ......................................................... 4

*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735 (8th Cir. 2002) ..................................................... 15

*In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006) .......................................... 24

*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001) .................................................. 34

*In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999) ........................................... 31

*In re Prestige Brands Holding, Inc.*, 2006 WL 2147719 (S.D.N.Y. July 10, 2006).................... 33

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002) ............................... 37

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .................................................... 39

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)................. 11, 13, 15, 34, 39

*In re Spectrum Brands, Inc. Sec. Litig.*, 2006 WL 3250835 (N.D. Ga. Oct. 27, 2006) ............... 34

*In re Synovis Life Techs., Inc., Sec. Litig.*, 2005 WL 2063870 (Aug. 25, 2005) ........................ 24

*In re Trex Co. Sec. Litig.*, 2006 WL 2868233 (W.D. Va. Oct. 6, 2006) ....................................... 23

*In re United Telecommunications Sec. Litig.,*781 F. Supp. 2d 696 (D. Kan. 1991) ................... 30

*In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68 (D.D.C. 2004) ........................... 13, 14, 40

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002).................................................... 33

-iv-

*In re Watchguard Sec. Litig.*, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ......................... 40

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571
    (E.D. Va. 2006) ...................................................................................................... 28

*Israeli v. Team Telecom Int'l Ltd.*, 2006 WL 2883237 (D.N.J. Oct. 10, 2006) ........................... 40

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ............................................................... 35

*Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508 (D.C. Cir. 1986) ..................................... 29

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ................... 13, 16, 17, 25

*Kushner v. Beverly Enters, Inc.*, 317 F.3d 820 (8th Cir. 2003) ..................................................... 15

*Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ..................................... 27

*Limatour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................... 33

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) ................................ 21

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................................ 31, 39

*Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981) ..................................................... 30

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) .............................................................. 24

*R2 Investments LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) ..................................................... 15

*Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998) ............................................. 34

*Rockies Fund, Inc. v. SEC*, 428 F.3d 1088 (D.C. Cir. 2005) ........................................................ 14

*Rombach v. Chang*, 355 F.3d 154 (2nd Cir. 2004) ........................................................... 14, 26, 40

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ..................................................................... 11, 29

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75
    F.3d 801 (2d Cir. 1996) ........................................................................................ 26

*Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950 (W.D. Wis. Aug 12, 2003) .................. 23

*Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977) ...................................................... 3, 28, 29

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996)....................................................18, 19

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).............................................31, 39

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 363 (5th Cir. 2004).....................28

*The Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ....................................................4

*Theoharous v. Fong*, 256 F.3d 1219 (11th Cir. 2001) ..................................................................25

*Winick v. Pacific Gateway Exchange, Inc.*, 73 Fed. Appx. 250 (9th Cir. 2003)...........................18

*Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005) ............................................................32

*Yellen v. Hake*, 437 F. Supp. 2d 941 (S.D. Iowa 2006) ................................................................23

## RULES AND STATUTES

Fed. R. Civ. P. 9(b).................................................................................................*passim*

15 U.S.C. § 78t(a)............................................................................................... 12

15 U.S.C. § 78u-4(b)(1) ................................................................................ 13, 17

15 U.S.C. § 78u-4(b)(2) ............................................................................. 3, 14, 35

15 U.S.C. § 78u-4(b)(3) ...................................................................................... 15

15 U.S.C. § 78u-5(c)(1)(A) ............................................................................... 2, 21

15 U.S.C. § 78u-5(c)(1)(B)(i)......................................................................... 22, 25

15 U.S.C. § 78u-5(i)(1) ................................................................................... 21, 22

## MISCELLANEOUS

H. Rep. No. 104-369 (Nov. 28, 1995)................................................................. 21

Defendants XM Satellite Radio Holdings Inc. ("XM" or the "Company") and Hugh

Panero respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the

Consolidated Class Action Complaint ("Complaint") pursuant to Rules 9(b) and 12(b)(6) of the

Federal Rules of Civil Procedure.

## INTRODUCTION

This is a putative securities fraud class action under sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 alleging "fraud by hindsight" based on XM's alleged failure to

meet investors' expectations in the fourth quarter of 2005. Plaintiffs do not dispute the accuracy

of any historical financial or operational results that XM announced. Rather, they argue

principally that in the course of releasing accurate information about the costs per new subscriber

in earlier quarters and giving forward-looking guidance as to its expectations in future periods,

XM led analysts and investors to believe that the cost per new subscriber in the fourth quarter of

2005 would be lower than it ultimately proved to be. They argue that XM should have warned

that those costs would increase in the fourth quarter due to aggressive marketing and rebates.

This theory has several defects, the most basic of which is that it is inconsistent with the

plain language of XM's statements and the reports of analysts who commented on those

statements at the time – including those quoted in the Complaint. In an earnings call on October

27, 2006, XM's CEO and CFO *did* warn that XM expected its subscriber acquisition costs in the

fourth quarter (its prime selling season) would be higher due to an aggressive advertising and

marketing campaign aimed at holiday shoppers. *See* Consol. Class Action Compl. ("Compl.") ¶¶

68-69 (emphasis added). Based on those disclosures, securities analysts (such as Deutsche Bank,

Bear Stearns, and Lehman Brothers) published reports expressly noting XM's expectation of

higher costs (*see* Compl. ¶ 71) and, in the case of Deutsche Bank, predicting two metrics that measure costs for the full year with striking accuracy: Subscriber Acquisition Cost ("SAC") of $62 (it proved to be $64), and Cost Per Gross Addition ("CPGA") of $108 (it proved to be $109). *Compare* Compl. ¶ 71(c) *with id. ¶* 75. There is accordingly no factual basis for Plaintiffs' assertion that XM misled investors about its cost metrics for the fourth quarter of 2005.

Plaintiffs also ignore the plainly forward-looking nature of the predictions on which they base their claims. The metrics on which they focus are fractions: certain costs divided by number of new subscribers. The numerators include certain marketing and other costs over which, they assert (only partially correctly), XM had control. The denominators, however, were subscriber counts – something XM could (and did) forecast, but could not know until it learned not only how many people bought satellite radios as Christmas presents, but also how many recipients, upon finding radios under their Christmas trees, chose to activate those radios and become subscribers by December 31. As Plaintiffs allege, those subscriber counts proved to be lower than XM had forecast. As a result, the denominators of the fractions were lower than anticipated, and – as basic arithmetic dictates – the fractions (SAC and CPGA) were therefore somewhat higher than anticipated. Under the safe harbor of the Private Securities Litigation Reform Act ("PSLRA") for forward-looking statements, 15 U.S.C. § 78u-5(c)(1)(A), as well as common sense, the fact that fewer people (than both XM and the market anticipated) actually activated radios promptly after Christmas and before New Year's is no basis for a securities fraud claim.

Moreover, Plaintiffs impermissibly ground their claims on XM's positive descriptions of its past successes or expressions of corporate optimism regarding the Company's ability to

achieve "rapid and cost effective growth."  Compl. ¶ 46.  Such inherently imprecise "puffing" statements are immaterial – and inactionable – as a matter of law.

Plaintiffs' Complaint also relies on allegations that XM exercised bad business judgment by spending too much on marketing, discounts, and rebates in executing its strategy to obtain 6 million subscribers by the end of the fourth quarter of 2005.  *See* Compl. ¶¶ 53-58, 79-83.  Under longstanding Supreme Court precedent set forth in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), Plaintiffs' hindsight criticism of XM's business strategy does not state a securities fraud claim under section 10(b).

Lastly, Plaintiffs have failed to satisfy the PSLRA's requirement that they plead with particularity facts giving rise to a "strong inference" of scienter (*i.e.*, fraudulent intent).  15 U.S.C. § 78u-4(b)(2).  The Complaint is devoid of factual allegations suggesting that anyone at XM knew that the Company would not reach its goal of 6 million subscribers (which would consequently result in higher SAC and CPGA figures – although very close to analyst projections, as noted above) until the very end of the year, when the Company fell short of that goal with 5.933 million subscribers.  The stock sales by XM officers and directors – most of whom are non-defendants and thus irrelevant to the Court's scienter analysis – do not supply the missing scienter because their sales occurred before the fourth quarter results for 2005 could have been known and they retained the vast majority of their exercisable XM securities holdings.

For each of these reasons, explained in greater detail below, the Court should dismiss Plaintiffs' Complaint with prejudice.

## FACTUAL BACKGROUND

**Defendants.**  Headquartered in Washington, D.C., XM is "America's leading satellite radio service company, providing music, news, talk, information, entertainment and sports programming for reception by vehicle, home and portable radios nationwide and over the Internet to over 6 million subscribers."  Form 10-K at 1 (Mar. 3, 2006), attached to the Declaration of John A. Valentine in Support of Mot. to Dismiss ("Valentine Decl.") as Ex. C.[1/] Its "full channel lineup as of January 31, 2006 includes over 160 channels, featuring 67 commercial-free music channels; 34 news, talk and entertainment channels; 39 sports channels; 21 Instant Traffic & Weather channels; and one emergency alert channel."  *Id.*  XM's stock is traded on the NASDAQ under the ticker symbol "XMSR."  *See* Compl. ¶ 1.  Hugh Panero has been XM's Chief Executive Officer and a member of the Company's Board of Directors since June 10, 1998.  *See* Compl. ¶ 16; Proxy Statement at 4 (Apr. 25, 2006), Valentine Decl., Ex. D.[2/]

**XM's Key Metrics.**  Because the satellite radio industry is relatively new and XM has not yet generated profits, the market tends not to value XM stock on the basis of earnings per share and instead focuses on growth in revenues and the number of subscribers, and, to a lesser

---

[1/]      On a motion to dismiss, the Court may consider documents incorporated in the Complaint by reference, well-publicized public announcements such as newspaper articles, and indisputably authentic parts of the public record, such as public filings with the Securities and Exchange Commission.  *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656-57 (4th Cir. 2004) (internal quotes omitted) ("[A] court ruling on a 12(b)(6) motion may look to documents cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely."); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of SEC filings and Company press releases, whether relied on in the complaint or not); *Ieradi v. Mylan Lab. Inc.*, 230 F.3d 594, 598 (3d Cir. 2000) (taking judicial notice of newspaper article in Rule 10b-5 action); *The Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (taking judicial notice of newspaper articles to ascertain whether a fact was within public knowledge).  Defendants accordingly request that the Court take judicial notice of the exhibits appended to the Valentine Declaration that are referenced in this memorandum.

[2/]      Panero was also XM's President until July 24, 2006, when the Company hired a Chief Operating Officer who assumed the title of President.  *See* News Release (July 24, 2006), Valentine Decl., Ex. E.

extent, the cost of obtaining subscribers. *See* Compl. ¶ 36-37. The key metrics XM uses to monitor those factors are: "ending subscribers, Average Monthly Subscription Revenue Per Subscriber ('ARPU'), Subscriber Acquisition Costs ('SAC'), Cost Per Gross Addition ('CPGA') and EBITDA." Form 10-Q at 13-14 (Nov. 7, 2005), Valentine Decl., Ex. F.

     Plaintiffs' Complaint focuses on XM's "ending subscribers" and "SAC" and "CPGA" results. As the term implies, "ending subscribers" is simply the total number of subscribers XM has at the end of a particular period. *See, e.g.*, *id.* Subscriber acquisition costs are calculated on per unit basis and "include [s]ubsidies[3] & distribution [expenses] (excluding on-going loyalty payments to distribution partners) and the negative margins from direct sales of merchandise. Subscriber acquisition costs are divided by the appropriate … gross additions [of subscribers] or units manufactured to calculate what [is] refer[red] to as 'SAC.'"[4] *See* Form 10-Q at 46 (Nov. 9, 2006), Valentine Decl., Ex. G; Compl. ¶ 41. CPGA costs are also calculated on a per unit basis and "include the amounts in SAC, as well as [a]dvertising & marketing and on-going loyalty payments to distribution partners…. These costs are divided by the gross additions [of subscribers] for the period to calculate CPGA."[5] *See id.* at 47; Compl. ¶ 41.

     Because SAC and CPGA are driven by the relationship between final expenditures and

---

[3]     XM regularly subsidizes the costs of radios in anticipation of gaining ongoing subscription revenues if and when the purchaser or recipient of the radio buys a subscription to its satellite radio service. *See* Form 10-Q at 24 (Nov. 7, 2005) ("We currently provide incentives and subsidies for the manufacture, purchase, installation and activation of XM radios …."). These subsidies are reflected as costs when the radio is purchased, regardless of whether (or when) the purchaser or recipient of the radio becomes a subscriber.

[4]     SAC (on a per unit basis) equals: $\dfrac{\text{subsidies} + \text{distribution costs} + \text{negative margins}}{\text{gross subscriber additions or units manufactured, as appropriate}}$ (hereinafter, for SAC, referred to as "gross subscriber additions")

[5]     CPGA equals: $\dfrac{\text{subsidies} + \text{distribution costs} + \text{negative margins} + \text{advertising/marketing expenses}}{\text{gross subscriber additions for the period}}$

final subscriber acquisitions, the final results for SAC and CPGA are inherently unknowable until the end of the quarterly or annual period for which they are calculated.  (In other words, XM cannot know SAC and CPGA results for the fourth quarter of 2005 until it knows how many radios were sold (and thus how large the subsidies that are treated as expenses) and how many of those buyers actually activated those radios in that time period.)  In the public disclosures identified in the Complaint, XM provided guidance only as to whether it anticipated SAC and CPGA would increase or decrease in future periods; it did not disclose specific projections of SAC and CPGA for future periods.  *See*, *e.g.*, News Release (Feb. 16, 2006) ("XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006."), Valentine Decl., Ex. H.

    **Disclosure of Projections and Guidance for Fiscal 2005**.  Plaintiffs base their claims on three types of statements during the alleged class period:  (1) the Company's subscriber projections; (2) suggestions that the Company would experience "cost-effective" growth in the third and fourth quarters of 2005; and (3) SAC and CPGA guidance.  With respect to subscriber projections, Plaintiffs point to the fact that XM raised its subscriber projections during 2005 from 5.5 million to 6 million for year-end 2005 and subsequently reaffirmed those projections.  *See* Compl. ¶¶ 59-61, 67-69.[6/]  With respect to the Company's business and growth strategy,

---

[6/]    News Release (July 28, 2005) ("With XM's first half performance and an even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers."), Valentine Decl., Ex. I; 2Q 2005 Conference Call Tr. (July 28, 2005) ("Based on our performance in the first half of the year and continued strong demand for our service, we are increasing our year-end subscriber guidance from 5.5 million subscribers to 6 million year-end subscribers.… This new target better reflects the momentum of XM subscriber growth and the strong second half of the year we expect."), Valentine Decl., Ex. J; News Release (Oct. 27, 2005) ("Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005."), Valentine, Decl., Ex. K; 3Q 2005 Conference Call Tr.

Plaintiffs focus on the Company's general statements that it had experienced and would continue to experience "cost-effective subscriber growth[,]" "smart" subscriber growth, and "rapid growth with sound financial performance." *See* Compl. ¶¶ 59-61, 64, 67-69, 72-73.[7/]  Finally, with respect to general SAC and CPGA guidance, Plaintiffs premise their claim on XM's predictions *on or before August 5, 2005* that those cost metrics would "remain stable during the second half of the year" and "decline in 2005 as compared to 2004."  Compl. ¶¶ 61-62, 64.  Plaintiffs quote general statements after August 5, 2005 about XM working to pursue "smart" or "cost-effective" subscriber growth and maintain subscriber acquisition costs at "reasonable" levels, but do not identify any statements after that time predicting lower subscriber acquisition costs for the fourth quarter of 2005.  *See id.* ¶¶ 67-70, 72-73, 75-80.  In addition, the Complaint does not quote the cautionary language accompanying these forward-looking statements, which warned that actual results could differ materially from the Company's guidance.[8/]

**Alleged "Manipulation" of Metrics.**  Although Plaintiffs allege that XM used subscriber metrics that "can be subject to manipulation" (Compl. ¶¶ 37, 39), the Complaint

---

(Oct. 27, 2005) ("In summary, the strong progress we've made in the third quarter enables me to reaffirm the 2005 guidance that we had previously given[,] ending the year with over 6 million subscribers."), Valentine Decl., Ex. L.

[7/]    News Release (July 28, 2005) (noting "Efficient Quarterly Subscriber Growth"); 2Q 2005 Conference Call Tr. (July 28, 2005) ("[W]e are achieving rapid growth with sound financial performance.… XM's targeted and efficient marketing efforts have enabled us to continue demonstrating cost-effective subscriber growth[.]"); Form 10-Q (Aug. 5, 2005) ("We are focused on increasing subscribers and scaling our business while managing growth and containing costs."), Valentine Decl., Ex. M; News Release (Oct. 27, 2005) (touting "Record Revenue from Cost-Effective Subscriber Growth"); 3Q 2005 Conference Call Tr. (Oct. 27, 2005) ("The secret to XM's smart subscriber growth rather than growth at any cost is the ability to control marketing and product expenses while rapidly growing subscribers.…  XM's targeted and efficient sales and marketing efforts have enabled us to continue to demonstrate cost-effective subscriber growth[.]"); News Release (Nov. 1, 2005) ("XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."), Valentine Decl., Ex. N; Form 10-Q (Nov. 7, 2005) ("We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.").

[8/]    The extensive cautionary language accompanying XM's forward-looking statements is described *infra* at 20-25.

makes no allegations that XM actually manipulated such metrics.[9/]  Indeed, Plaintiffs do not

challenge the accuracy of any of XM's historical financial reporting.

**Disclosure of Anticipated Increases in SAC and CPGA for 4Q 2005**.  Plaintiffs

contend that XM "caused the market to expect declining SAC and CPGA numbers" in the fourth

quarter of 2005.  *See* Compl. ¶ 7; *see also id.* ¶¶ 42, 60-64.  In reality, however, XM's public

statements and historical SAC and CPGA figures demonstrate precisely the opposite.[10/]  During

the Company's October 27, 2005 public earnings call, XM management explicitly advised the

market that SAC and CPGA would *increase* for the fourth quarter of 2005:

- ❑ XM Chief Financial Officer Joe Euteneuer stated:  "Similar to past trends, *we expect fourth quarter SAC and CPGA to increase* due to greater media and promotional activities during the upcoming holiday season."  *Id.* ¶ 69 (emphasis added).

- ❑ Panero noted that strong third quarter results "provide us the flexibility to *aggressively advertise and market our service in the fourth quarter*.  And in fact, that is what we are doing – implementing a comprehensive media campaign comprised of advertisements, rebates, and other promotional techniques to fully exploit the holiday selling season again this year."  *Id.* ¶ 68 (emphasis added).

Analysts from Lehman Brothers, Deutsche Bank, and Bear Stearns issued reports

reflecting an understanding that SAC and CPGA would increase due to higher marketing

expenses in the fourth quarter and built those costs into their SAC and CPGA estimates.  *See id.*

¶¶ 71(b)-71(d).  On October 28, 2005, Lehman Brothers reported the "increased advertising and

---

[9/]    The closest Plaintiffs come to a direct allegation of manipulation involves XM's reporting of churn – the percentage of subscribers that canceled service – in May 2004, well before the start of the purported class period in July 2005.  *See* Compl. ¶ 38.  As the article referenced in the Complaint indicates, however, XM in fact disclosed how it calculated churn.  *See id.*  Plaintiffs also imply that the Company manipulated its subscriber count by "count[ing] customers who received a free trial through the purchase of a new vehicle as full-fledged subscribers."  Compl. ¶ 39.  But Plaintiffs fail to mention that XM's public disclosures broke out the number of subscribers in these promotional programs.  *See, e.g.*, Form 10-Q (Aug. 5, 2005) at 13 (describing how the number of subscribers is calculated).  That is to say, XM hid nothing from investors.

[10/]    Defendants include a chart at Ex. B containing XM's public statements made during the putative class period and identified by Plaintiffs in their Complaint.  XM Public Statements Chart, Valentine Decl., Ex. B.

-8-

marketing spend forecast" for the fourth quarter.  *Id.* ¶ 71(b); Lehman Report at 3, Valentine

Decl., Ex. O.  Lehman Brothers further predicted that a "large portion of subscribers will not be

activated until the very end of the quarter, in the period between Christmas and New Year," and

commented, "we believe the Street is *underestimating 4Q marketing spending*."  *Id.* at 2

(emphasis added).  On October 28, 2005, Deutsche Bank raised their fourth quarter and yearly

SAC and CPGA estimates "[i]n anticipation of more extensive marketing efforts than we

previously expected" (Compl. ¶ 71(c); *see also* Deutsche Bank Report at 4, Valentine Decl., Ex.

P),[11]/ and Bear Stearns reported its expectation of "[h]igher marketing expense in 4Q[,]" adding

that "XM …effectively shift[ed] the marketing dollars [from 3Q05] to 4Q05."  Compl. ¶ 71(d);

Bear Stearns Report at 3, Valentine Decl., Ex. Q.

       In addition, on November 14, 2005, more than two weeks after XM disclosed its plan to

increase marketing expenditures in the fourth quarter, the Company publicly launched a $25

million advertising campaign called "Listen Large" aimed at countering the heavy promotion of

shock jock Howard Stern's debut on its main competitor, Sirius Satellite Radio.  *See* Compl.

¶ 48; *see also* Brian Steinberg, *Advertising:  XM Aims to Neutralize Sirius, Stern*, WALL ST. J.,

Nov. 14, 2005, at B8 ("In a TV ad campaign that starts today, XM will focus attention on its

broad range of programming, including shows and music featuring Ellen DeGeneres, David

Bowie and Snoop Dogg.…  XM is putting more than $25 million behind the new effort,

according to a person familiar with the matter."), Valentine Decl., Ex. R.

       **Final Results for 4Q 2005**.  XM ended its fiscal year on December 31, 2005 with

---

[11]/       Deutsche Bank also estimated that XM's fourth quarter CPGA would be $126, $37 *above* XM's CPGA in
the third quarter of 2005.  *See* Compl. ¶ 71(c).

5,932,957 total subscribers – 67,043 short of its publicly stated goal of 6 million (which it met a few days later on January 4, 2006). *See* Compl. ¶ 75. Consistent with the disclosures in its October 27, 2005 earnings call, SAC and CPGA had increased from $53 and $89, respectively, in the third quarter of 2005, to $89 and $141, respectively, in the fourth quarter of 2005. *See id.*; *see also* February 16, 2006 News Release.

Given the holiday marketing efforts that typically take place in the fourth quarter of the year, the fact that fourth quarter SAC and CPGA results were higher than in the third quarter was consistent with what the Company experienced in 2004, when SAC and CPGA increased from $57 and $89, respectively, to $64 and $104, respectively.[12] Moreover, total SAC and CPGA for full year fiscal 2005 proved to be consistent with Deutsche Bank's October 2005 forecast: total SAC of $64 (Deutsche Bank had predicted $62), and total CPGA of $109 (Deutsche Bank had predicted $108). *Compare* Compl. ¶ 71(d) *with id.* ¶ 75.

**Stock Sales by XM Officers and Directors**. Shortly after the Company disclosed that SAC and CPGA were expected to increase, but well before the end of the fourth quarter, four of XM's officers and/or directors sold portions of their XM securities holdings. *See* Stock Sale Tables, Valentine Decl., Ex. A; *see also* Compl. ¶¶ 88-89. On November 8, 9, and 10, 2005, George Haywood, a member of XM's Board, divested a total of 2,071,000 shares of XM stock, or 35.8% of his total exercisable holdings. *See* Stock Sale Tables. On December 6, 2005, Panero sold 413,334 shares, or 27.1% of his total exercisable holdings (*see id.*); Executive Vice President/Engineering and Technology Stelios Patsiokas disposed of 103,514 shares, or 22.3% of

---

[12] *See* Form 10-Q (Nov. 5, 2004) (reporting SAC and CPGA for third quarter of 2004), Valentine Decl., Ex. S; Form 8-K, Exhibit 99.1 (Feb. 10, 2005) (reporting SAC and CPGA for fourth quarter of 2004) Valentine Decl., Ex. T.

his total exercisable holdings (*see id.*); General Counsel and Executive Vice President Joseph

Titlebaum also disposed of 103,514 shares, or 29.2% of his total exercisable holdings (*see id.*);

and Executive Vice President/Sales and Marketing Stephen Cook sold 78,514 shares, or 18.1%

of his total exercisable holdings (*see id.*).[13/]

**Resignation of Pierce J. Roberts from Board of Directors**.  On February 16, 2006, the

Company announced that Pierce J. Roberts – a member of its Board of Directors – had tendered

his letter of resignation due to a disagreement with the rest of the Board.  *See* Form 8-K at 2

(Feb. 16, 2006), Valentine Decl., Ex. U; *see also* Compl. ¶¶ 8, 79-80.  The Company described

the disagreement as follows:

> Although the letter [of resignation] does not explicitly state the nature of
> the disagreement, the Company believes the disagreement with Director
> Roberts primarily involves the strategic balance of growth versus cash
> flow.  Director Roberts has historically favored more stringent cost control
> in the Company, specifically involving lower marketing, programming
> and promotional expenditures.   While Director Roberts believed that
> expenses could be lowered without jeopardizing subscriber and revenue
> growth and/or market share, he was prepared to risk growth or market
> share impacts if they resulted, with the belief that positive cash generation
> would occur sooner, and the Company's stock would be valued more
> highly as a smaller, but more profitable enterprise.

*See* Form 8-K at 2 (Feb. 16, 2006).  The Complaint does not take issue with this description.

---

[13/]    Without exception, the XM executives identified in the Complaint exercised options and immediately sold the resulting stock.  The Complaint's description of the magnitude of the executives' stock sales is thus misleading. Rather than calculating the percentage of the executives' total exercisable XM securities holdings that were sold, Plaintiffs exclude from the analysis vested stock options, which constituted the vast majority of the executives' holdings.  Similarly, in calculating the percentage of securities holdings sold by Haywood, Plaintiffs exclude his large holdings of XM convertible debt securities.  Excluding stock options and convertible debt securities misleadingly suggests these individuals sold a much higher percentage of their total available investment in XM than they actually did.  For this reason, courts consider stock holdings and other types of securities holdings together in weighing the significance of securities sales by insiders.  *See, e.g.*, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (considering stock shares held as well as exercisable stock options to determine how much stock the individual had available for sale); *see also Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (same).

The resignation letter described the disagreement as one involving "the current direction of the company" and made no suggestion that Roberts questioned the accuracy or adequacy of the Company's public disclosures, or that any person associated with XM had engaged in improper conduct. *See id.*, Ex. 17.1, Resignation Letter; *see also* Compl. ¶¶ 8, 79, 81.

**Plaintiffs' Claims.** Lead Plaintiffs Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund filed their Consolidated Class Action Complaint on September 26, 2006. The Complaint alleges a Class Period from July 28, 2005, the date of XM's second quarter 2005 earnings release and increase of its "subscriber guidance" to 6 million, through February 16, 2006, the date on which XM announced SAC and CPGA for the fourth quarter of $89 and $141, respectively. *See* Compl. ¶¶ 59, 75. Count I asserts a securities fraud claim under section 10(b) of the Exchange Act and Rule 10b-5 thereunder against both XM and Panero. *See* Compl., Count I. That claim contends that XM and Panero made or participated in "misrepresentations and omissions regarding the true financial condition of the Company and its stated ability to reduce the costs of adding new subscribers as it attempted to reach its stated goal of 6 million subscribers by year end 2005." *Id.* ¶ 3; *see also* ¶ 109.

Count II asserts a "control person" claim against Panero under section 20(a) of the Exchange Act (*see id.*, Count II), 15 U.S.C. § 78t(a), on the theory that his position as CEO and participation in the Company's operations enabled him to "influence and control ... the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading." *See id.* ¶ 118.

## ARGUMENT

"To make out a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must

allege that each defendant (1) made a material misstatement or omission of a material fact, (2) with 'scienter,' (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that plaintiff's reliance was the proximate cause of its injury." *In re Interbank Funding Sec. Litig.*, 329 F. Supp. 2d 84, 89 (D.D.C. 2004), *vacated on other grounds*, *Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2005) [hereinafter, "*Interbank I*"] (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *see also In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 11 (D.D.C. 2000).

        In 1995, Congress enacted the PSLRA to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs."  *Silicon Graphics*, 183 F.3d at 973; *see also In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 75 (D.D.C. 2004) (same).[14/]  To achieve that objective, "Congress enacted two heightened pleading requirements for securities fraud cases."  *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001).  The first requires that any securities fraud complaint in which the plaintiff alleges a material misrepresentation or omission "'shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint *shall state with particularity all facts on which that belief is formed*.'"  *In re Interbank Funding Corp. Sec. Litig.*, 432 F. Supp. 2d 51, 89 (D.D.C. 2006) [hereinafter, *Interbank II*] (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis added);

---

[14/]        *See also In re Champion Enters., Inc. Sec. Litig.*, 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001) (noting that the PSLRA allows courts to act as a "filter at the earliest … stage to screen out lawsuits that have no factual basis").

*see also* Fed. R. Civ. P. 9(b).[15/]

The second mandates the pleading of particular facts – not accusations, assumptions, or surmise – "giving rise to a *strong inference* that," with respect to each alleged misstatement or omission, "the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also* Fed. R. Civ. P. 9(b). Scienter, the required state of mind, is the "intent to deceive, manipulate or defraud." *Interbank I*, 329 F. Supp. 2d at 89 (quoting, *inter alia, Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976)), *vacated in part and remanded on other grounds*, 434 F.3d 579 (D.C. Cir. 2006). A showing of scienter requires conduct that is so reckless it is effectively intentional, *i.e.*, "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Baan*, 103 F. Supp. 2d at 20; *see also Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (same).

Although the D.C. Circuit has not yet ruled on the standard for pleading scienter under the PSLRA, decisions in this District have relied upon the Second Circuit's interpretation of Rule 9(b)'s and the PSLRA's heightened pleading standards, which require a plaintiff to allege particularized facts that either: (1) constitute strong circumstantial evidence of knowing or reckless behavior; or (2) establish a motive and opportunity to commit fraud. *See, e.g.*, *U.S. Office Prods.*, 326 F. Supp. 2d at 75 (citing *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir.

---

[15/] The Complaint does not identify which allegations are based upon information and belief and which are based upon Plaintiffs' personal knowledge. Because the factual allegations in the Complaint involve circumstances about which Plaintiffs – two pension funds who presumably have no access to the internal workings of XM – could not possibly have personal knowledge, the only reasonable inference is that all allegations except those concerning Plaintiffs are based upon information and belief.

2004)).[16]  Under this standard, "'inferences of scienter do not survive if they are merely

reasonable…. Rather, inferences of scienter survive a motion to dismiss only if they are both

reasonable and "strong" inferences.'"  *Kushner* v. *Beverly Enters, Inc.*, 317 F.3d 820, 826 (8th

Cir. 2003) (citations omitted).[17]  "[W]hen determining whether plaintiffs have shown a strong

inference of scienter, the court must consider *all* reasonable inferences to be drawn from the

allegations, *including inferences unfavorable to the plaintiffs*."  *Gompper v. VISX, Inc.*, 298 F.3d

893, 897 (9th Cir. 2002) (emphasis added).  Plaintiffs may not rest their pleading on "bare

inferences" that defendants "must have known" their statements to be inaccurate or misleading at

the time they were made.  *Interbank I*, 329 F. Supp. 2d at 56.

     If the above pleading requirements are not met "the court *shall* … dismiss the

complaint."  15 U.S.C. § 78u-4(b)(3) (emphasis added).  Assuming the truth of all well pleaded

facts (but not conclusions masquerading as facts), the Complaint falls far short of satisfying the

stringent requirements for pleading securities fraud claims under the PSLRA and Rule 9(b).

## I.    PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS XM AND PANERO MADE ANY MATERIAL MISSTATEMENT OR OMISSION.

     XM, like many companies, provides guidance to the market about what it anticipates its

future financial performance will be.  Plaintiffs contend that XM's statements in that regard were

misleading because the market reacted negatively when XM disclosed its final SAC and CPGA

---

[16]      It should be noted, however, that several Circuits have held that by itself "an allegation that defendants had the motive and opportunity to make false or misleading statements is insufficient to support the strong inference of scienter required after the PSLRA." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999) (same); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir. 1999) (same); *Silicon Graphics*, 183 F.3d at 979 (same).

[17]      *Accord In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48 (1st Cir. 2005); *R2 Investments LDC v. Phillips*, 401 F.3d 638, 645 (5th Cir. 2005); *In re Alpharma Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004).

results for the fourth quarter of 2005.  *See, e.g.*, Compl. ¶¶ 7-8.  But because XM disclosed in advance that those metrics would *increase* in that period and made clear that it would be spending heavily on marketing and other promotional activities, the Complaint fails to allege any materially misleading statement or omission on which to premise a fraud claim.

> **A.    XM Disclosed That SAC and CPGA for the Fourth Quarter of 2005 Would Increase.**

Plaintiffs contend that Defendants XM and Panero "misl[ed] the market into believing that XM's business and financial prospects were first-rate, thus causing the market to expect and anticipate that XM's SAC and CPGA [for Q4 2005] would continue to decline[.]"  Compl. ¶ 85. They contend that XM did so by stating on August 5, 2005 that it anticipated SAC and CPGA would "decline in 2005 as compared to 2004" (*see* Compl. ¶ 64) and advising the market on other occasions that it sought to achieve rapid subscriber growth, but in a "cost effective manner."  Compl. ¶¶ 42-46.  For at least two reasons, these statements cannot support a fraud claim as a matter of law.

First, "where plaintiffs seek to base a claim of securities fraud on false and misleading projections or statements of optimism, their complaint must also plead sufficient facts that if true would substantiate the charge that the company lacked a reasonable basis for its projections or issued them in less than good faith."  *Kowal*, 16 F.3d at 1278; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997) ("[P]laintiffs bear the burden of 'plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference' that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.'" (citation omitted)).  Here, however, the Complaint is devoid of factual allegations suggesting that XM's SAC and CPGA guidance

-16-

lacked a reasonable basis at the time it was issued or was issued in bad faith. No facts are alleged showing that XM possessed information in August that was irreconcilable with its expectations as to year-end subscriber counts, radio sales, or subscriber acquisition costs. As a result, Plaintiffs have failed to plead the existence of a false or misleading statement or omission, as required by the PSLRA and Rule 9(b). *See Kowal*, 16 F.3d at 1278 ("The fact that the company's performance did not conform to that predicted supports no inference that MCI's statements lacked a reasonable basis when made."); *see also* 15 U.S.C. § 78u-4(b)(1).

Second, to the extent Plaintiffs premise their claim on the theory that XM had a "duty to update" its August 5, 2005 guidance by disclosing an expectation in the fourth quarter that SAC and CPGA would increase rather than decline for the full year, *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998), Plaintiffs misunderstand both the facts and the law. SEC regulations do not impose a duty on public companies to continuously update their financial projections, and several courts have held that a duty to update such projections does not exist under the federal securities laws. *See, e.g.*, *Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) ("a projection is not rendered false when the world turns out otherwise"). Even courts that recognize a duty to update in some contexts, moreover, acknowledge that it does not apply to "ordinary, run-of-the-mill forecasts" because "[a] judicially created rule that triggers a duty of continuous disclosure of material information every time a single specific earnings forecast is disclosed would likely result in a drastic reduction in the number of such projections made by companies." *Burlington Coat Factory*, 114 F.3d at 1433. *See also Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 219 (4th Cir. 1994) (concluding that the updated "projection disclosures urged by [appellant] [were] impractical, if not unreasonable").

-17-

In addition, to be subject to a duty to update, the statement must be forward-looking and "contain some factual representation that remains 'alive' in the minds of investors as a continuing representation." *Burlington Coat Factory*, 114 F.3d at 1433. Here, XM's August 5, 2005 guidance that it anticipated SAC and CPGA would decline in 2005 as compared to 2004 explicitly disclaimed any duty to update. *See* Form 10-Q at 12 (Aug. 5, 2005) ("We do not undertake any obligation to release publicly any revisions to such forward-looking statements to reflect the occurrence of unanticipated events."). "[T]hus, the company's predictions regarding its ability to meet its future obligations could not have remained 'alive' in the minds of reasonable investors." *Winick v. Pacific Gateway Exchange, Inc.*, 73 Fed. Appx. 250, 254 (9th Cir.), *withdrawn pursuant to parties' settlement*, 80 Fed. Appx. 1 (9th Cir. 2003).

In any event, XM's statements on October 27, 2005 that it expected SAC and CPGA to *increase* in the fourth quarter of 2005 (*see* Compl. ¶ 69), the disclosure of a "comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday season" (*see id.* ¶ 68), and the Wall Street Journal's report on XM's $25 million Listen Large campaign on November 14, 2005 (*see supra* at 9), were more than sufficient to extinguish any possible "continuing representation" that SAC and CPGA would decline. *See, e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1219 n.33 (1st Cir. 1996) (noting that, if a duty to update even exists, a company's disclosure of negative earnings information extinguished its duty to update positive earnings forecasts made before the class period began).

The securities analysts who followed XM plainly understood that SAC and CPGA would increase. Lehman Brothers, Deutsche Bank, and Bear Stearns all issued public reports predicting that XM's SAC and CPGA would increase for the fourth quarter due to the planned marketing

-18-

efforts. *See* Compl. ¶ 71(b-d). *Id.* ¶ 7. Notably, Deutsche Bank was able to forecast total SAC and CPGA for full-year 2005 that proved to be right on the mark: SAC of $62 (it proved to be $64), and CPGA of $108 (it proved to be $109). *Compare* Compl. ¶ 71(c) *with id.* ¶ 75.[18/]

It is thus abundantly clear that XM disclosed its intention to spend heavily on marketing and promotional activities in the fourth quarter of 2005, that it projected SAC and CPGA to *increase*, rather than decline, at that time, and that those disclosures were sufficient for at least one respected analyst to predict full-year SAC and CPGA results with a high level of accuracy. The very public disclosures on which Plaintiffs rely refute the notion that XM made false or misleading statements.

**B.    XM's Past SAC and CPGA Results Were Not An Implicit Guarantee of Similar Future Results.**

Unable to point to any misleading statements concerning the direction of SAC and CPGA in the fourth quarter, Plaintiffs argue that XM's alleged track record of significantly declining SAC and CPGA somehow constituted an implicit guarantee that those metrics would continue to decline in the fourth quarter, despite XM's explicit statements to the contrary. *See* Compl. ¶ 46. As a matter of law, however, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *Burlington Coat Factory*, 114 F.3d at 1432 (citing *Shaw*, 82 F.3d at 1202; *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513-14 (9th Cir. 1991); *Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J.), *aff'd*, 82 F.3d 408 (3d Cir. 1996)). *In re Citigroup, Inc. Securities*

---

[18/]    Nor did the analysts view XM's increased fourth quarter costs negatively. Bear Stearns specifically stated that "[h]igher marketing expense in 4Q does not imply [that XM's] economic model has broken down[.]" *Id.* ¶ 71(d).

*Litigation*, for example, involved allegations "that Citigroup's reporting of revenue figures implicitly represented that such results would continue." 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004). The court rejected that theory, holding that accurate reporting of past results does not implicitly represent that such results will continue in the future. *See id.*

The Ninth Circuit in *In re Convergent Technologies* likewise rejected the theory that past results constitute an implied guarantee of future results. *See* 948 F.2d at 513. In that case, the plaintiffs contended that Convergent's statements misled the market because they "implied growth would continue at the torrid pace Convergent had set in the past." *Id.* But the Ninth Circuit concluded otherwise, finding that "[t]he challenged statements [concerning the demand for the company's products did] not imply any comparison between the rate of past and future growth," but rather "simply report[ed] past performance and assert[ed] specific limited predictions for the future." *Id.*

Here, as in *Citigroup* and *Convergent*, XM merely made limited statements forecasting that SAC and CPGA would increase. Plaintiffs' contention that XM's past results implicitly guaranteed comparable results for the fourth quarter of 2005 is accordingly without merit.

## II.    XM'S STATEMENTS CONCERNING SAC AND CPGA ARE NOT ACTIONABLE UNDER THE PSLRA's "SAFE HARBOR" FOR FORWARD-LOOKING STATEMENTS.

The Complaint is founded on projections of future results as well as general statements that the Company planned to be "cost-effective" in its growth strategy and that SAC and CPGA would "remain stable" during the second half of the year. *See* Compl. ¶¶ 61-62. But these types of statements – like XM's guidance itself – are protected by the PSLRA's "safe harbor" for forward-looking statements and thus cannot form the basis of a securities fraud claim. *See* 15

-20-

U.S.C. § 78u-5(c)(1)(A).

The PSLRA defines "forward-looking" statements to include:

- statements containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

- statements of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; or

- statements of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission.

15 U.S.C. § 78u-5(i)(1); *see Burman v. Phoenix Worldwide Indus, Inc.*, 384 F. Supp. 2d 316, 334

(D.D.C. 2005).

The PSLRA was enacted to protect companies from complaints such as this one.  Indeed,

the justification for the safe harbor contained in the Conference Report accompanying the

PSLRA could have been written with this Complaint in mind:

> Technology companies – because of the volatility of their stock prices – are particularly vulnerable to securities fraud lawsuits when projections do not materialize.  If a company fails to satisfy its announced earnings projections – perhaps because of changes in the economy or the timing of an order or new product – the company is likely to face a lawsuit.

H. Rep. No. 104-369, at 43 (Nov. 28, 1995).

Under the PSLRA, forward-looking statements are insulated from liability if they are

identified as forward-looking and accompanied by "meaningful cautionary language."  *See, e.g.*,

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598-99 (7th Cir. 2006) (under

PSLRA, liability is foreclosed where a forward-looking statement is accompanied by meaningful

cautionary language); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *11 (S.D.N.Y. June 23,

2004) (granting motion to dismiss where plaintiffs' allegations of fraud were based, in part, on

-21-

forward-looking statements accompanied by cautionary language); *see also* 15 U.S.C. § 78u-5(i)(1). To overcome the safe harbor, a plaintiff "must prove that 'forward-looking' statements were made with 'actual knowledge' that they were false or misleading" before any recovery is possible. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005); *see also* 15 U.S.C. § 78u-5(c)(1)(B)(i) (requiring showing of "actual knowledge … that the statement was false or misleading" to overcome safe harbor for forward-looking statements).[19/]

Here, Defendants' projections of XM's future performance and disclosures concerning expectations for SAC and CPGA are protected under the PSLRA safe harbor because (i) all were identified as forward-looking statements and accompanied by a description of uncertainties that could alter actual results; and (ii) Plaintiffs allege no grounds to infer that any forecast or statement of expectations was made with actual knowledge it was inaccurate.

Plaintiffs' claims are based entirely on forward-looking statements:

❑ "The bottom line, XM continues to demonstrate very cost effective growth. [Euteneuer] … We remain on track to meet our 2005 year-end guidance of 5.5 million subscribers and to do so in a cost effective manner. [Panero]" Compl. ¶¶ 42-43 (Feb. 10 and Apr. 17, 2005 conf. calls).

❑ "Based on our performance in the first half of the year and continued strong demand for our service, we are increasing year-end subscriber guidance from 5.5 million subscribers to 6 million year-end subscribers." *Id.* ¶ 60 (July 28, 2005 conf. call).

❑ "We expect CPGA to remain stable during the second half of the year … This new target better reflects the momentum of XM subscriber growth and the strong second half of the year we expect. [Euteneuer]" *Id.* ¶ 61 (July 28, 2005 conf. call).

❑ "[W]e do think CPGA will be stable[.] [Unidentified Rep]" *Id.* ¶ 62 (July 28, 2005

---

[19/]     Moreover, where meaningful cautionary language is present, plaintiffs carry the burden of demonstrating that the cautionary language failed to expressly warn of, or does not directly relate to, the risk that brought about Plaintiffs' loss. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (plaintiffs must overcome existence of cautionary language to defeat motion to dismiss). Plaintiffs here do not even attempt that showing – a shortcoming that, as a matter of law, forecloses any claim based on the guidance quoted in the Complaint.

conf. call).

- ❑ "We expect SAC to decline in 2005 as compared to 2004. … We expect CPGA to decline in 2005 as compared to 2004. … We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs." *Id.* ¶ 64 (Aug. 5, 2005 Form 10-Q).

- ❑ "Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005. … XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter." *Id.* ¶ 67 (Oct. 27, 2005 news release).[20]

These disclosures all involved expectations of future performance and as such were "classic 'forward looking statements' clearly falling within the PSLRA definition." *Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950, 957 (W.D. Wis. Aug 12, 2003); *see also, e.g.*, *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242 (3d Cir. 2004) ("[B]ecause the statement about collectability is a prediction of the likelihood of collection on change orders and claims, it is a classic forward-looking statement."); *In re GlaxoSmithkline PLC*, 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) ("Garnier's and GSK's optimism that GSK would prevail in the litigation is a classic example of a forward-looking statement and is clearly protected as such."); *In re Trex Co. Sec. Litig.*, 2006 WL 2868233, *20 (W.D. Va. Oct. 6, 2006) (concluding that gross margin guidance was inactionable forward-looking statement); *Yellen v. Hake*, 437 F. Supp. 2d 941, 960-61 (S.D. Iowa 2006) (noting that reaffirmation of business strategies and guidance constituted inactionable forward-looking statement).

Each statement about fourth quarter performance was also accompanied by cautionary

---

[20] The other alleged misstatements in the Complaint are similarly forward-looking. *See* Compl. ¶¶ 59, 62, 68-70, 72-74.

-23-

language summarizing risk factors that could cause actual results to differ.[21]  XM's news

releases each referred to more extensive risk factor discussions in XM's SEC filings.[22]

Likewise, before every conference call, XM's General Counsel warned listeners that the

Company's representatives would make forward-looking statements, that XM could not

guarantee future results, and that listeners should review the cautionary language in the

Company's earnings releases.[23]  Courts have held similar cautionary language sufficient to

satisfy the requirements of the PSLRA safe harbor.[24]

---

[21]    *See* Form 10-Q (Aug. 5, 2005) ("Although we believe that our expectations are based on reasonable assumptions, we can give no assurance that our expectations will be achieved.… Our costs may exceed or our revenues may fall short of our estimates, our estimates may change, and future developments may affect our estimates.  The timing of promotions and new contracts may cause SAC to fluctuate from period to period.  The timing of our media campaigns and discretionary advertising may cause CPGA to fluctuate from period to period."); Form 8-K (Aug. 5, 2005) ("Higher than expected subscriber acquisition costs could adversely affect our financial performance."), Valentine Decl., Ex. V; Form 10-Q (Nov. 7, 2005) (noting as a risk factor competition from Sirius because "Sirius has announced that beginning in 2006 the Howard Stern nationwide radio show will air exclusively on Sirius"; "Although we believe that our expectations are based on reasonable assumptions, we can give no assurance that our expectations will be achieved.… The timing of promotions and new contracts may cause SAC to fluctuate from period to period.  The timing of promotion and new contracts may cause CPGA to fluctuate from period to period.  Higher than expected subscriber acquisition costs could adversely affect our financial performance.  We are still spending substantial funds on advertising and marketing and in transactions with car and radio manufacturers and other parties to obtain or as part of the expense of attracting new subscribers.").

[22]    News Release (July 28, 2005) ("Please note that XM's guidance is comprised of forward looking statements, and as described in the last paragraph of this press release many factors could case actual results to differ from this guidance."); News Release (Oct. 27, 2005) ("Factors that could cause actual results to differ materially from those in the forward-looking statements in this press release include demand for the Company's service….").

[23]    *See* XM 2Q05 Conference Call Tr. (July 28, 2005) ("Before we begin our prepared remarks, I would like to remind everyone that certain information on this call may contain forward-looking statements.  Due to a number of factors, our actual results may differ materially from those projected in such forward-looking statements."); XM 3Q05 Conference Call Tr. (Oct. 27, 2005) ("I would like to remind everyone that certain information on this call may contain forward-looking statements.  Due to a number of factors, our actual results may differ materially from those projected in such forward-looking statements.  Those factors include future demand for the Company's service….").

[24]    *See, e.g.*, *Payne v. DeLuca*, 433 F. Supp. 2d 547, 585 (W.D. Pa. 2006) (finding sufficient cautionary language stating that "while management believes no additional material loss will be incurred related to these claims and change orders, as adjusted, the actual amounts realized could be materially different than the amount recorded"); *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 400-02 (S.D.N.Y. 2006) (holding that cautionary statements similar to those made by XM were sufficient); *In re Synovis Life Techs., Inc., Sec. Litig.*, 2005 WL 2063870, at *10 (Aug. 25, 2005) (deeming sufficient "cautionary language in the press releases direct[ing] investors to the full discussion of factors in the company's Annual Report on Form 10-K" and other disclosure of specific risks in press

The PSLRA further protects against unwarranted securities fraud claims by mandating that, even in the absence of cautionary language (which is present here), claims based on forward-looking statements may only proceed if supported by well-pleaded allegations showing the defendant had "actual knowledge" that the statements were false and misleading when made. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i); *In re Cross Media Marketing Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 268-69 (S.D.N.Y. 2004) (dismissing claims based on "optimistic statements about quarterly earnings" where plaintiffs alleged no contemporaneous facts known to defendants that belied those statements); *cf. Kowal*, 16 F.3d at 1277 (holding that "projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made," and affirming dismissal of securities fraud claim). It is Plaintiffs who bear the burden of alleging facts sufficient to support a strong inference that XM and Panero actually knew that the forward-looking statements at issue were knowingly false when made. 15 U.S.C. § 78u-5(c)(1)(B)(i); *see also Theoharous v. Fong*, 256 F.3d 1219, 1224-25 (11th Cir. 2001) ("First, for 'forward-looking' statements, the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'"); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 928, 937 n.10 (C.D. Cal. 2002) (plaintiffs bear the burden of showing that the statement was false when made). But here, Plaintiffs allege no facts beyond the statements themselves. The Complaint is devoid of any factual basis for inferring that anyone at XM lacked a reasonable basis at the time for

---

releases); *In re Best Buy Co. Sec. Litig.*, 2005 WL 839099, at *4 (D. Minn. Apr. 12, 2005) (considering sufficient statement that: "The Company's actual results could differ materially from those expressed in the forward-looking statements. Factors that could cause results to vary include, among others, those expressed in the Company's filings with the Securities and Exchange Commission.").

believing the Company's projections, or actually disbelieved them.[25]

## III.    PLAINTIFFS' CLAIMS ARE LARGELY PREMISED ON INACTIONABLE PUFFERY.

Plaintiffs predicate much of their fraud claim on Defendants' statements that XM would achieve "cost-effective" or "smart" growth at the same time the Company and Panero allegedly knew that marketing and advertising expenditures, and SAC and CPGA, would increase during the fourth quarter of 2005.[26] *See* Compl. ¶¶ 42, 61, 64, 67-68. As a matter of law, however, XM's assertions of fiscal discipline in pursuing its growth strategy were too general and imprecise to support a federal securities fraud claim, even if they had been inaccurate (which they were not). "Courts have demonstrated a willingness to find immaterial, as a matter of law, a certain kind of rosy affirmation commonly heard from corporate managers and familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004). Indeed, in *In re Baan*, Judge Green dismissed

---

[25] Such statements are also protected by the "bespeaks caution" doctrine, which (like the PSLRA safe harbor) provides that misrepresentations are "immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language" accompanying the statement. *Rombach*, 355 F.3d at 173 (affirming grant of motion to dismiss); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996).

[26] Undisputed facts within the Court's judicial notice show that XM's growth was, in fact, achieved at lower cost than its primary competitor's. In the fourth quarter of 2005, Sirius's SAC exceeded XM's by $24. *See* Sirius Form 8-K (Feb. 17, 2006) (reporting SAC for the fourth quarter of 2005 at $113 – well above the $89 that XM reported for the quarter), Valentine Decl., Ex. W. Analysts have long acknowledged that XM's subscriber acquisition costs are consistently well below Sirius's. *See, e.g.*, Compl. ¶ 63(d); RBC Capital Markets Report at 1 (stating that XM is "[t]rading [at] $1,983/sub versus SIRI at $3,856/sub (2005E ending subs)" and noting that XM's SAC and CPGA for 2004 and its estimated SAC and CPGA for 2005 are significantly lower than those of Sirius), Valentine Decl., Ex. X; Compl. ¶ 71(b); Lehman Report at 1 ("XM trades at $1,000 per YE 2006E subscriber, approximately half of SIRI, even though XM's 2006E acquisition costs are more than 40% less than SIRI's.").

securities fraud claims for precisely that reason, in part, holding that "general, positive, …

forward looking comments" concerning the defendant corporation's "strong" and "continued"

growth and sound business strategy were insufficient to support a claim under section 10(b).  103

F. Supp. 2d at 12-13.

      Numerous courts have recognized that "generalizations regarding ... fiscal discipline ...

amount to no more than [non-actionable] puffery."  *In re JP Morgan Chase Sec. Litig.*, 363 F.

Supp. 2d 595, 633 (S.D.N.Y. 2005) (dismissing complaint).  Claims premised on precisely the

kind of generalized descriptions of "cost-effective" and "smart" growth that Plaintiffs assert here

are thus routinely dismissed as immaterial.  *See, e.g.*, *Lasker v. New York State Elec. & Gas*

*Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements that a company refused to

"compromise its financial integrity," that it had a "commitment to create earnings opportunities"

and that these "business strategies [would] lead to continued prosperity" constituted "precisely

the type of 'puffery' that this and other circuits have consistently held to be inactionable")

(quotation marks omitted)); *Cable & Wireless*, 332 F. Supp. 2d at 901 (noting that corporation's

"soft" statements concerning its financial condition and prospects were mere puffery and

therefore not actionable as securities fraud); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp.

2d 559, 563 (E.D. Mich. 2001) (dismissing claims based upon puffing statements such as "we

continue to demonstrate the viability of our growth strategy[,] … [and] enhance our position as a

leader in the automotive industry[,]" and "the Company is on target to achieve projected

'synergies' and cost savings" (internal quotations and citations omitted)); *In re Kidder Peabody*

*Sec. Litig.*, 10 F. Supp. 2d 398, 413 n.15 (S.D.N.Y. 1998) (dismissing claims based on statements

relating to defendants' "cost controls" and "strategic planning" under puffery doctrine); *cf. Fitzer*

*v. Security Dynamics Techs*., 119 F. Supp. 2d 12, 26 (D. Mass. 2000) (concluding that statement

as to future market share constituted puffery because it did not specify a figure).

## IV.   PLAINTIFFS' COMPLAINT IS IN LARGE PART A CRITICISM OF XM'S BUSINESS STRATEGY.

Plaintiffs attempt to bolster their fraud claim with allegations sounding not in fraud, but

in disagreement with XM's business strategy.  Thus, for example, they argue that XM's spending

on marketing and advertising in the fourth quarter of 2005 "wasted a lot of money," that it

offered subsidies that adversely affected its results, and that it offered higher rebates because of

the unavailability of a popular product.  Compl. ¶¶ 53-58.  They rely on the resignation of a

director of XM, Pierce J. Roberts, who was allegedly "troubled by the current direction of the

Company" and advocated "lower marketing, programming and promotional expenditures."  *Id.*

¶¶ 8, 79-83.[27/]  But disagreement with business decisions is not a basis for a claim of fraud under

the federal securities laws.  "The securities laws were not designed to provide an umbrella cause

of action for the review of management practices, nor is 'fraud by hindsight' a viable basis upon

which to challenge management practices that ultimately result in losses."  *In re Citigroup, Inc.*

*Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).

The Supreme Court precluded such claims in *Santa Fe Industries v. Green*, 430 U.S. 462,

---

[27/]     It is also well settled that, absent a factually supported connection to the alleged fraud, the resignation of an officer or director is insufficient to support an inference of scienter.  *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 363, 383 (5th Cir. 2004) ("The subsequent resignations of INSpire executives is similarly unavailing as proof of the commission of fraud[.]"); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 593 (E.D. Va. 2006) ("[T]he Court finds that retirements and resignations are insufficient to show that Defendants acted with the requisite scienter."); *In re GeoPharma Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 451 (S.D.N.Y. 2006) (rejecting plaintiffs' allegations concerning director's resignation "in light of the overall weakness of the scienter inference created by the Amended Complaint"); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1222 (S.D. Cal. 2005) (noting that, in a securities fraud case, officers' and directors' "resignations are not per se indicative of scienter.").

479 (1977). It held in that case that section 10(b) does not "regulate transactions which constitute no more than internal corporate mismanagement." Recognizing that breaches of fiduciary duty and other state law violations, unaccompanied by deception or manipulation aimed at securities investors, are beyond the scope of section 10(b), the Court affirmed the dismissal of a securities fraud claim predicated upon breaches of fiduciary duties that allegedly impacted securities transactions. *See id.* at 478-79. In doing so, the Court declined to federalize regulation of the "wide variety of corporate conduct traditionally left to state regulation." *Id.*[28/]

Here, this element of the Complaint's theory amounts to nothing more than criticism of XM's business strategy for the fourth quarter of 2005. Plaintiffs criticize XM's decision to launch its "Listen Large" campaign to "counter the heavy promotion of Howard Stern by Sirius" (Compl. ¶¶ 47-52) and imply that XM somehow mischaracterized the additional costs of that campaign as unanticipated. *See* Compl. ¶ 51. They further criticize XM's retail-focused advertising decisions in Q4 2005, alleging that one confidential witness thought XM "wasted a lot of money" on promotional displays (Compl. ¶¶ 53-54), and that another described significant subsidization of radios and rebates on hardware (*see* Compl. ¶¶ 55-58).

But XM in fact announced its plans to increase spending. The "Listen Large" campaign

---

[28] See also *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5."); *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[W]here the failure to disclose involves the 'true' motivations of the directors and so would require a court to probe the business judgment of the directors, *Santa Fe* holds that the claim states no cause of action under the 1934 Act. The federal securities laws do not impose any requirement that officers and directors or courts engage in public psychoanalysis about the real motives of corporate officers and directors for reaching a decision."); *Cable & Wireless*, 321 F. Supp. 2d at 770 ("Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives.").

– with its $25 million budget – was disclosed to the public.[29/]  XM's strategy of discounting radio purchases was disclosed and was, in any event, on display at, for example, mall kiosks. *See* Compl. ¶ 55.  And in its October 27, 2005 earnings call, XM openly discussed its discounting and rebate strategy.  *See* Compl. ¶ 70 (responding to an analyst question about increasing the level of rebating and confirming XM's intent to "start to hit lower and lower price point to really penetrate the mass market").  The courts have uniformly rejected similar claims of mismanagement masquerading as fraud claims.  In *In re United Telecommunications Sec. Litig.*, for example, the court granted the defendant's motion to dismiss, holding that an allegation that the defendant corporation did not spend "enough" on marketing constituted a claim of corporate mismanagement and was not cognizable under section 10(b).  *See* 781 F. Supp. 2d 696, 699-700 (D. Kan. 1991); *see also Fitzer*, 119 F. Supp. 2d at 31 ("[P]oor management is a risk that every investor takes[,] … [and] damages flowing therefrom are not actionable under the securities laws.").  The Court should likewise reject Plaintiffs' attempt to "bootstrap" hindsight disagreement with XM management's business decisions into a federal securities fraud action. *See, e.g.*, *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981).

## V.    PLAINTIFFS FAIL TO ALLEGE FACTS THAT SUPPORT A STRONG INFERENCE OF SCIENTER.

Plaintiffs also fail to allege grounds for a "strong inference" that Defendants made knowing or reckless misstatements concerning XM's fourth quarter 2005 guidance.  Plaintiffs allege in purely conclusory terms that, because XM did not hit its subscriber targets and

---

[29/]    *See* Compl. ¶¶ 68-69; Brian Steinberg, *Advertising:  XM Aims to Neutralize Sirius, Stern*, WALL ST. J., Nov. 14, 2005, at B8 ("In a TV ad campaign that starts today, XM will focus attention on its broad range of programming, including shows and music featuring Ellen DeGeneres, David Bowie and Snoop Dogg.…  XM is putting more than $25 million behind the new effort, according to a person familiar with the matter.").

experienced increased higher SAC and CPGA in the fourth quarter of 2005, XM and Panero must have intended to deceive the market or been reckless in doing so. Nowhere, however, does the Complaint provide particularized factual allegations supporting a strong inference that XM and Panero made intentional or reckless misstatements concerning XM's expected fourth quarter 2005 results.

### A.    Because the Stock Sales by XM Officers and Directors Were Not Suspicious in Timing or Amount, Plaintiffs Have Not Pleaded a Cognizable Motive.

Plaintiffs cannot overcome their lack of contemporaneous facts indicating scienter with respect to XM's fourth quarter 2005 guidance with conclusory allegations of insider trading by Panero and four other individual officers and directors, none of whom is even a named defendant. *See* Compl. ¶¶ 87-92. Under the PSLRA, sufficient motive allegations "'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). "'[M]otive-and-opportunity allegations of scienter anchored merely in a defendant's profit motive' are simply insufficient to survive a dismissal motion." *Burman*, 384 F. Supp. 2d at 332.

"[S]tock sales by non-defendants," in particular, "*cannot be a basis for establishing scienter* unless the non-defendant intended to assist defendants." *In re Lexar Media, Inc. Sec. Litig.*, 2005 WL 1566534, *6 n.1 (N.D. Cal. July 5, 2005) (emphasis added); *see also In re Lexmark Int'l Sec. Litig.*, 234 F. Supp. 2d 680, 685 (E.D. Ky. 2002) ("Even assuming that [non-defendants'] sales are relevant at all – and, for the record, the Court thinks they are not – such 'evidence' contributes little towards the creation of a 'strong inference [of scienter.]'"); *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 1001 (D. Ariz. 1999) (rejecting plaintiffs' "efforts

to bolster the perception of 'insider trading' by pleading the stock sales of unnamed defendants during the class period").  Plaintiffs do not even attempt to show such assistance to Defendants here.  The stock sales of non-defendants George Haywood, Stelios Patsiokas, Joseph Titlebaum, and Stephen Cook are accordingly irrelevant to the Court's scienter analysis.

Even if those stock sales could be considered relevant, Plaintiffs would still fail to allege a cognizable motive.  For stock sales to be at all probative, they must be made "in suspicious amounts or at suspicious times."  *Baan*, 103 F. Supp. 2d at 19; *see also Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Here, the sales of stock by XM officers and directors involved relatively modest portions of their XM holdings and occurred well before the results for the fourth quarter of 2005 could possibly have been known.

**Hugh Panero.**  Plaintiffs misleadingly allege that Panero sold 99% of his XM stock holdings on December 6, 2005.  *See* Compl. ¶ 88.[30/]  When one considers Panero's total XM securities holdings, however – including stock and vested options – he sold only 27.1% of his XM securities holdings.[31/]  Given Panero's retention of the vast majority of his holdings, Plaintiffs' assertion that his December 6, 2005 sales support a "strong inference" of scienter is

---

[30/]        As mentioned above (*supra* at 10-11 & n.13), Plaintiffs' calculation of the percentages of the executives' XM securities holdings that were sold fails to include vested, exercisable stock options.  *See* Compl. ¶¶ 88-89.  In doing so, Plaintiffs seek to obscure the fact that the executives had virtually their entire investments in XM in the form stock options rather than stock.  *See* Stock Sale Tables.  Because the executives exercised their options and immediately sold the resulting stock, Plaintiffs are able to allege that the executives sold nearly 100% of their stock.  Similarly, Plaintiffs fail to include Haywood's large holdings of convertible debt securities in their calculation of the percentage of his holdings sold.  *See* Compl. ¶ 89(a).  The omission of stock option and convertible debt holdings from Plaintiffs' calculations makes the percentages they allege meaningless and misleading.  As a result, those allegations "have no probative value in determining whether the amount of stock sold is suspicious."  *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1166 (D. Ariz. 2005) (rejecting calculations of percentages of stock holdings sold where plaintiffs failed to include exercisable stock options).

[31/]        *See* Stock Sale Tables.  Factoring Panero's unexercisable options (which also have significant value) into the calculation reduces the percentage of his holdings sold to 18.2%.  *See id.*

wrong. *See, e.g., Acito*, 47 F.3d at 54 (no inference of scienter where defendant retained 80% of his holdings); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094-95 (9th Cir. 2002) (executive's sale of 26% of his shares and vested options not unusual or suspicious); *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *5 (S.D.N.Y. July 10, 2006) ("Here, where each Defendant retained over 80% of the stock that he owned, Plaintiffs[] failed to demonstrate that the stock sales were suspicious and unusual …."); *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (vice president's sale of 29% of his total holdings cannot, without more, support an inference of scienter let alone a strong inference); *Limatour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1151 (W.D. Wash. 2006) (defendant's sale of 25% of his holdings was not suspicious).

Any possible inference of insider trading by Panero is also undermined by the timing of his sales, which occurred on December 6, 2005 (Compl. ¶¶ 88, 89(b)-(d)), more than two weeks before Christmas and more than three weeks before XM's year-end subscriber count or SAC and CPGA results could have been known. The market understood – even if Plaintiffs did not – that the final week of the fourth quarter was when XM would see the largest portion of its subscriber additions for the holiday selling season. *See, e.g.*, Lehman Report at 2 (noting that a "large portion of subscribers will not be activated until the very end of the quarter, in the period between Christmas and New Year"). Accordingly, Plaintiffs have alleged no basis for an inference that Panero knew what XM's final year-end subscriber number, or SAC or CPGA results, would be until after the Company tallied the final number of post-Christmas radio activations by subscribers and the final costs to be factored into SAC and CPGA. The "broad temporal distance between [those] stock sales and a disclosure of bad news defeats any possible

inference of scienter." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001); *see also In re Spectrum Brands, Inc. Sec. Litig.*, 2006 WL 3250835 78766, *18 (N.D. Ga. Oct. 27, 2006) (concluding that a more than two-month gap between sales and disclosure does not raise a strong inference of scienter).[32/]

**Stelios Patsiokas, Joseph Titlebaum, and Stephen Cook.**  The non-defendants' stock sales are similarly innocuous.  Plaintiffs allege that Patsiokas, Titlebaum, and Cook sold 62%, 66% and 43% of their respective XM stock holdings.  *See* Compl. ¶¶ 89(b)-(d).  In reality, however, XM's public filings demonstrate that those individuals sold 22.3%, 29.2%, and 18.1% of their total exercisable holdings, respectively.[33/]  What's more – like Panero – Patsiokas, Titlebaum, and Cook all executed their sales on December 6, 2005, well before the results for the fourth quarter could have been known.  *See* Compl. ¶¶ 89(b-d).

**George Haywood.**  Plaintiffs allege that outside director George Haywood sold 72% of his XM shares.  *See* Compl. ¶ 89(a).  In fact, XM's public filings show that he disposed of 35.8% of his exercisable holdings.  Haywood's retention of the large majority of his XM holdings is reason enough to put his sales beyond reproach.  *See Silicon Graphics*, 183 F.3d at 987 (concluding that insiders' sales of 43.6% and 75.3% did not give rise to a strong inference of scienter without anything more).  His sales, moreover, occurred earlier in the fourth quarter, on

---

[32/]     Panero's sale took place several weeks *after* XM disclosed to the market that the Company's costs in the fourth quarter would increase, another fact that undermines any inference of scienter.  *See Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) ("Such timing does not suggest that the defendants meant to realize profits immediately or prior to an expected and dramatic fall in the stock's price.").  If Panero had believed that an increase in SAC and CPGA would occur and be negatively received, and had he wished to sell on the basis of that information (which he clearly did not), it would have been far more logical for him to sell in advance of the Company's announcement that these costs would rise.

[33/]     *See* Stock Sale Tables.  Factoring Patsiokas's, Titlebaum's, and Cook's respective unexercisable options and unvested restricted stock into the calculation would reduce the percentage of their securities holdings sold to 16.0%, 19.2% and 12.7%, respectively.  *See id.*

November 8, 9, and 10, 2005 – before the commencement of the holiday sales season and nearly

seven weeks before year-end.  Given the temporal gap between Haywood's sales and the final

fourth quarter results at issue in the Complaint, as well as the fact that outside directors such as

Haywood cannot be presumed to have access to their companies' day-to-day expense

information or the other kinds of internal reports identified in the Complaint,[34/] the inclusion of

Haywood's sales in the Complaint's allegations provides no basis for inferring scienter on the

part of XM and Panero.

     In short, Plaintiffs fail to allege any facts supporting a strong inference that Defendants

were motivated by a desire to profit from improper stock sales.  The absence of any concrete

motive places even more emphasis on the need for "particularly strong" allegations of facts and

circumstances showing that Defendants acted knowingly or recklessly.  *Green Tree Fin. Corp.*,

270 F.3d at 660; *accord Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("Where motive is

not apparent … the strength of the circumstantial allegations must be correspondingly greater."

(citation omitted)).

    **B.    Plaintiffs Fail to Allege Particularized Circumstantial Facts Supporting a Strong Inference of Scienter.**

     The lack of allegations in the Complaint supporting a motive for fraud is matched by its

failure to plead any circumstantial facts giving rise to the requisite "strong inference" of scienter.

15 U.S.C. § 78u-4(b)(2).  Plaintiffs contend that XM knew its fourth quarter 2005 marketing and

---

[34/]    *See In re Forest Labs. Inc. Deriv. Litig.*, 2006 WL 2670988, at *9 (S.D.N.Y. Sept. 18, 2006) ("[T]here is no authority to support the attribution of knowledge to Outside Directors who are not alleged to be directly involved in the day-to-day operations of the company[;] … a top officer clearly has more direct access to information than an outside director[.]"); *In re GeoPharma Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 445 (S.D.N.Y. 2005) ("[O]utside directors … almost by definition [are] excluded from the day-to-day management of a corporation[.]") (internal citations and quotations omitted).

advertising costs would be higher than normal – and thus that SAC and CPGA results would be higher than Plaintiffs purportedly expected. *See* Compl. ¶ 74. However, the numerators of both SAC and CPGA depend in part on the number of radios manufactured and sold (and thus the subsidy taken into period expenses). And the denominators of SAC and CPGA calculations are the final number of new subscribers obtained. These are figures XM could (and did) forecast based on projections, but are not something that could have been known with any certainty until the number of people who purchased and activated XM radios and become subscribers during the fourth quarter of 2005 was tallied after the quarter ended on December 31, 2005. Because XM ultimately missed its subscriber target, the denominators of both calculations were smaller than they would have been if XM had reached or exceeded its goal. SAC and CPGA results were accordingly somewhat higher than they would have been if XM had obtained more new subscribers in the fourth quarter of 2005.

Given that final SAC and CPGA results are inherently unknowable until *after* a quarter ends, Plaintiffs must allege particularized facts showing that Defendants projected XM would reach 6 million subscribers in Q4 2005, while knowing or recklessly disregarding XM would miss that goal and that SAC and CPGA would skew higher as a result. The Complaint, however, includes no factual allegations that would support such a theory. Indeed, the Complaint does not even attempt to explain how XM management could have known *as early as November 7, 2005* – the date of the last alleged misstatement in the Complaint (¶ 73) – how many subsidized radios the Company would sell, or that XM would miss its subscriber target 54 days later on December 31, 2005.

The rest of Plaintiffs' circumstantial allegations are a hodgepodge of boilerplate

-36-

assertions that, because they fail to live up the particularity requirements of the PSLRA and Rule 9(b), contribute nothing to the Court's scienter analysis.[35/]

**SEC Informal Inquiry.**  Plaintiffs attempt to ground an inference of scienter on the fact that, after Plaintiffs filed their lawsuit, the SEC issued a request to XM asking for the voluntary production of documents relating to the issues alleged in the Complaint.  *See* Compl. ¶ 86. Considering the fact that the SEC has not yet concluded its inquiry (much less made any determination of wrongdoing), as well as XM's public denial that Plaintiffs' allegations have any merit (*see* Form 8-K (Sept. 5, 2006), Valentine Decl., Ex. Y), this informal request for documents by the SEC provides no more basis for inferring scienter than the existence of this lawsuit.  *See, e.g.*, *In re Business Objects S.A. Sec. Litig.*, 2005 WL 1787860, *7 (N.D. Cal. July 27, 2005) (refusing to infer scienter on the basis of a formal SEC investigation into revenue recognition practices).

**Panero's Management Style.**  Plaintiffs allege in vague terms that Panero:  was a "hands-on" executive who was "excellent in that way"; "always asked a lot of questions"; was "not a distance-type manager"; is a "Type-A personality"; and was "in a frenzy" to attract subscribers.  *See* Compl. ¶¶ 17-19, 47.  From these generic allegations, Plaintiffs leap to the conclusion that Panero *must have known* that XM's forecasts for the fourth quarter of 2005 were without basis.  *See* Compl. ¶ 19.  This theory has no merit.  Courts have repeatedly rejected

---

[35/]     *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir.), *modified,* 409 F.3d 653 (5th Cir. 2005) (Courts may only "assume the truth of the allegations *pleaded with particularity* in the complaint."); *Green Tree*, 270 F.3d at 660 (under PSLRA, courts "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute"); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002) ("If, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity," the Complaint must be dismissed.).

conclusory assertions that a corporate executive's position and "hands-on" management style may serve as a basis for inferring scienter. *See, e.g.*, *Daou Sys.*, 411 F.3d at 1022 ("General allegations of defendants' 'hands-on' management style cannot lead to a strong inference of scienter."); *In re Bio-Tech. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 597 (D.N.J. 2005) (plaintiffs must plead specific facts demonstrating executive's knowledge or involvement to demonstrate scienter, rather than engage in "the legal fiction of imputing knowledge"); *In re Adecco S.A.*, 371 F. Supp. 2d 1203, 1217 (S.D. Cal. 2005) ("Contrary to Plaintiffs' position that scienter can be imputed to Defendants because of their positions in the Company, … a complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions and involvement in the day-to-day management of the company.") (internal quotations and citations omitted).

Likewise, generalized allegations that Panero "exhort[ed] XM employees to sign up new subscribers" and "stressed the importance of XM's sales initiatives" (Compl. ¶ 47) merely indicate that Panero – like any good corporate executive – pushed the Company and its employees to succeed. *See In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 852 (N.D. Tex. 2005) ("Plaintiffs' allegations that the setting of aggressive price targets created pressure for these sales and marketing employees … is inadequate to create a strong inference of scienter…."); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004) (allegation of creating pressure to meet targets does not give rise to a strong inference of scienter); *Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845, 854 (W.D. Wis. 2003) ("[A]llegations of sales pressure were insufficient by themselves to create a strong implication of scienter[.]"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex.

-38-

2002) (concluding that allegations consistent with normal business activity, standing alone, are insufficient to state a claim of primary liability under the securities laws).  No facts are alleged suggesting Panero induced employees to engage in misconduct.

**Access to Unspecified Internal Reports.**  Plaintiffs also allege that Panero had access to unidentified filings, reports, releases, and other statements and thus "knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public[.]"  Compl. ¶ 19.  The vagueness of Plaintiffs' "internal reports" allegations conflicts directly with the PSLRA mandate that "[w]here plaintiffs contend defendants had access to contrary facts, they must *specifically identify* the reports or statements containing this information," *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (emphasis added), as well as "who prepared them and when, how firm the numbers were or which company officers reviewed them." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).[36/]  Absent such details, Plaintiffs' allegations that Panero had access to unspecified internal reports are "so broad and conclusory as to be meaningless." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal citations and quotations omitted).

**Confidential Witness Accounts.**  The accounts by Plaintiffs' "confidential witnesses" fail to include a single factual allegation suggesting that anyone at XM was aware that XM would miss its 2005 subscriber target or that anyone at XM misled the market about the Company's fourth quarter costs.  Instead, Plaintiffs' confidential witnesses merely provide general information concerning Panero's personality and management style (Compl. ¶ 17); the

---

[36/]    *Accord Calif. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002); *Silicon Graphics*, 183 F.3d at 985.

Company's longstanding, publicly-disclosed relationship with General Motors (Compl. ¶ 30); XM's business strategy and methods (Compl. ¶¶ 39, 47-58); background color on the busy 2005 holiday season (Compl. ¶ 47); and Roberts' resignation (Compl. ¶ 83). Where, as here, "none of the [confidential witnesses] … have any information regarding any Defendant's role in, or awareness of, the[] issues" underlying allegations of fraud, there can be no inference of culpable conduct. *In re Watchguard Sec. Litig.*, 2006 WL 2927663, at *4, *7 (W.D. Wash. Oct. 12, 2006); *see also Israeli v. Team Telecom Int'l Ltd.*, 2006 WL 2883237, at *7 (D.N.J. Oct. 10, 2006) (disregarding confidential witness allegations where the "substance of some of the information, including opinion allegations among some confidential witnesses, bears questionable relevance to the claims asserted").

## VI.   PLAINTIFFS FAIL TO STATE A VALID CONTROL PERSON CLAIM AGAINST PANERO.

Because the Complaint fails to allege a primary violation of section 10(b), Plaintiffs' claim that Panero, as a "control person," bears responsibility (Compl. ¶¶ 117-120) under section 20(a) of the Exchange Act for XM's non-existent violation fails as a matter of law. *See U.S. Office Prods.*, 326 F. Supp. 2d at 83 (citing *Rombach*, 355 F.3d at 177-78 (2d Cir. 2004)).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

Dated: November 14, 2006          WILMER CUTLER PICKERING HALE AND DORR LLP

/s/ Charles E. Davidow
Charles E. Davidow, D.C. Bar No. 331702
John A. Valentine, D.C. Bar No. 473072
Michael A. Mugmon, D.C. Bar No. 485150
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363