UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re XM SATELLITE RADIO HOLDINGS SECURITIES LITIGATION | ) ) ) ) | Civil No. 1:06-cv-00802-ESH |
| | ) | CLASS ACTION |
| This Document Relates to: All Actions | ) ) ) ) | |

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS .................................................................................2

        A.      Background ...............................................................................................2

        B.      XM's Key Financial Metrics and "Cost Effective" Growth Strategy.....................4

        C.      Defendants' Misrepresentations During the Class Period .......................................6

                1.      XM's Tremendous Advertising Expenses ...................................................6

                2.      XM Drastically Reduces the Prices of its Radios and Experiences
                        Supply Shortages ................................................................................7

        D.      The Truth is Revealed ....................................................................................8

        E.      Illicit Insider Trading ...................................................................................10

III.    ARGUMENT ...................................................................................................10

        A.      Applicable Standards ...................................................................................10

        B.      Plaintiffs Adequately Allege Falsity ...........................................................12

                1.      Defendants Made Material Statements and Omissions ...........................13

        C.      Plaintiffs Do Not Rely on Inactionable Statements or Puffery.............................19

        D.      Plaintiffs Allege a Fraudulent Scheme – Not Mere Corporate
                Mismanagement, Defendants' Fact-Bound Defense .............................................22

        E.      Defendants Cannot Sail Into the PSLRA's Safe Harbor .....................................25

        F.      Plaintiffs Allege Defendants Acted With Scienter .............................................28

                1.      The Complaint Sufficiently Pleads Facts Giving Rise to a Strong
                        Inference that Defendants had the Motive and Opportunity to
                        Commit Fraud .....................................................................................30

                2.      The Complaint Sufficiently Pleads Circumstantial Facts Giving
                        Rise to a Strong Inference that Defendants Were Reckless.....................32

IV.     CONTROL PERSON LIABILITY...................................................................37

V.      JUDICIAL NOTICE.......................................................................................37

VI.     CONCLUSION..............................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) .................................. 36

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) ........................................... 12

*Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363 (M.D. Fla. 1999) .......................... 11

*Barrie v. Intervoice-Brite*, 397 F.3d 249 (5th Cir. 2005) ....................................... 12, 36

*Basic, Inc. v. Levison*, 485 U.S. 224 (1988) ........................................................ 19

*Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239 (D. Mass. 2006) ...................................... 13

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) ................................... 38, 39

*Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316 (D.D.C. 2005) ................ passim

*Casella v. Webb*, 883 F.2d 805 (9th Cir. 1989) ...................................................... 20

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) *cert. denied* 126 S. Ct. 423 (2005) ................................................................ 20

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................. 11

*Croker v. Carrier Access Corp.*, No. 05-CV-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603 (D. Colo. July 18, 2006) ................................................................ 29

*Delano v. Roche,* No. Civ. A. 04-0830 RBW, 2006 WL 2687020 (D.D.C. Sept. 19, 2006) .................................................................................................. 38

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C.Cir.1997) ............................. 38

*Epstein v. Itron, Inc.*, 993 F. Supp. 1314 (E.D. Wash. 1998) ........................................ 34

*Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952 (S.D. Ohio Sept. 19, 2002) .................................................................................... 24

*First Am. Bank & Trust v. Frogel*, 726 F. Supp. 1292 (S.D. Fla. 1989) .................................. 23

*First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5th Cir. 1977) .................................. 13

*Fitzer v. Sec. Dynamics Techs.*, 119 F. Supp. 2d 12 (D. Mass. 2000) .................................. 18

*Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wis. 2003) .................................... 27

*Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F. 2d 1042 (11th Cir. 1987) ............................. 23

*Goldman v.* Belden, 754 F.2d 1059 (2d Cir. 1985) ............................................... 19, 20

*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) .............................................. 39

*Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir. 1992) ...................................................... 32

*Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997)......................................... 23

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999).............................................................. 27, 38

*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) ...................................................................... 23

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) .................................................... 12

*Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995)............................. 39

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ......................................................... 10

*Ieradi v. Mylan Lab., Inc.*, 230 F.3d 594 (3d Cir. 2000) ........................................ 40

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ..................................... 28

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) ................................. passim

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002)................................................ 36

*In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110 (M.D. Fla. 2005).......................... 36

*In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) ............................... 30, 31

*In re Dynex Capital, Inc. Sec. Litig.*, 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 35386 (S.D.N.Y. Jun. 2, 2006) .................................................................. 29, 32

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................................................................ 12

*In re F & M Distribs. Sec. Litig.*, 937 F. Supp. 647 (E. D. Mich. 1996) ...................................... 21

*In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001) .......... 11, 12

*In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881 (8th Cir. 2002)..................................................... 13

*In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000)................................. 29

*In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998) ......................................... 20

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ......................................................... 39

*In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996).............................. 17, 30

*In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166 (D.D.C. 1997) ............................... 17, 19

*In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854
(E.D. La. Dec. 14, 2006) ................................................................................ 34

*In re PeopleSoft, Inc. Sec. Litig.*, No. C99-00742 WHA, 2000 U.S. Dist. LEXIS
10953 (N.D. Cal. May 26, 2000) .................................................................... 34

*In re Premiere Techs., Inc. Sec. Litig.*, No. 1:98-CV-1804-JOF, 2000 WL 33231639
(N.D. Ga. Dec. 8, 2000) ................................................................................. 20

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ................................ 24

*In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002) ............ 19, 20, 22

*In re Splash Tech. Holdings Sec. Litig.*, 2000 U.S. Dist. LEXIS 15369 (N.D. Cal.
Sept. 29, 2000) ............................................................................................ 26

*In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858 (E.D. Tenn. 2005) ....................... 38

*In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472 (N.D. Ga. 1997) ........................... 12, 20

*In re Viropharma, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3,
2003) .................................................................................................... 26, 27

*In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................ 29, 30

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) .............................................................. 20

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................... 11, 17, 27

*Kurtzman v. Compaq Computer Corp.*, No. H-99-779, 2000 U.S. Dist. LEXIS 22476
(S.D. Tex. Dec. 12, 2000) ............................................................................ 13

*Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996) .................................... 38

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) *cert.
granted* 2007 U.S. LEXIS 15 (2007) ................................................................ 29

*Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169 (S.D. Fla.
2005) .................................................................................................... 25

*Marsden v. Select Med. Corp.*, No. Civ. A. 04-4020, 2006 WL 891445 (E.D. Pa. Apr.
6, 2006) ................................................................................................. 21

*McBride v. Vision Twenty-One, Inc.*, No. 8:99-CV-138-T-27F, 2000 U.S. Dist.
LEXIS 14742 (M.D. Fla. Aug. 18, 2000) ........................................................ 22

*Nathenson v. Zonagen, Inc.*, 267 F.3d 400 (5th Cir. 2001) .................................... 30, 34

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding
Corp.*, 320 F.3d 920 (9th Cir. 2003) ............................................................ 30, 31, 32, 34

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .......................................................... 30

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) .................................................................................................................. 35

*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ........................... 29

*R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) ............................................. 39

*Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994) .................................................... 26

*Santa Fe Indus. v.* Green, 430 U.S. 462 (1977) ................................................... 22, 23

*Scritchfield v. Paolo*, 274 F. Supp. 2d 163 (D.R.I. 2003) .......................................... 20

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................... 32

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................ 28

*Slavin v. Morgan Stanley & Co.,* 791 F. Supp. 327 (D. Mass. 1992) .......................... 25

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ............. 26, 27

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ..................................... 16, 19

*Virginia Bankshares  v. Sandberg*, 501 U.S. 1083 (1991).................................. 19, 20, 21

*Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991)..................................... 39

**STATUTES**

15 U.S.C. §78j(b)....................................................................................................... 11

15 U.S.C. §78u-4(b)(2) .............................................................................................. 28

15 U.S.C. §78u-5 .................................................................................................. 25, 26

**RULES**

17 C.F.R. §240.10b-5................................................................................................. 11

Fed. R. Civ. P. 12(b)(6).......................................................................................... 10, 20

Fed. R. Civ. P. 9(b) .............................................................................................. 11, 32

## I.    INTRODUCTION

In order to pump-up the value of XM Satellite Radio Holdings, Inc.'s ("XM" or the "Company") stock, Defendants[1] executed a scheme to misrepresent the financial condition and status of XM.  As part of their fraudulent scheme, Defendants misled investors by continuously misrepresenting that XM would continue to utilize and implement its publicly-stated strategy of cost-effective subscriber growth as the Company forged ahead to reach its goal of 6 million subscribers by year-end 2005.  In reality, contrary to the story that XM conditioned the market to accept, Defendants quietly abandoned that approach during the Class Period,[2] causing key Company metrics to soar to astronomically high levels in the fourth quarter of 2005.  These soaring metrics, along with the simultaneous public departure of one of XM's board members who warned of "a significant [Company] crisis on the horizon," took the market completely by surprise and, when XM disclosed its fourth quarter 2005 numbers, investors punished XM's stock price, causing an approximately 13% drop on abnormally high trading volume that was approximately seven times the stock's normal trading volume.

In their motion to dismiss (the "Motion"), Defendants do not appear to understand what this case is about.  To be sure, they mischaracterize and recast the allegations in Plaintiffs' Consolidated Class Action Complaint for Securities Fraud (the "Complaint"), and then raise irrelevant legal arguments based on those mischaracterizations.  More specifically, this action is not about missed cost or subscriber projections, a failure to update those projections, or even a disagreement with

---

[1] Defendants are XM and Hugh Panero ("Panero"), the Company's CEO, President, and a Director.

[2] This action was brought on behalf of a proposed class of all purchasers of the publicly traded securities of XM between July 28, 2005 and February 16, 2006.

Defendants' business judgment, as Defendants contend.  Rather, Plaintiffs[3] allege that Defendants failed to disclose to the market that they had undertaken a fundamental shift in XM's business model during the Class Period to combat the serious competitive threat posed by its competitor, Sirius Satellite Radio, Inc. ("Sirius").  This undisclosed shift and its concomitant exponential increase in marketing expenses were revealed when Defendants announced that key Company metrics – which were of critical importance to the market – rose substantially during the fourth quarter of 2005.

Defendants' efforts to re-write the Complaint and distract the Court with non-issues should be disregarded.  The Complaint delineates a simple case of securities fraud based on misrepresentations concerning a concealed change in business philosophy and the known adverse effect of that change on XM's operational results.  Because Plaintiffs have adequately alleged, *inter alia*, falsity, materiality, and scienter as required by the Private Securities Litigation Reform Act (the "PSLRA"), this Court should deny Defendants' motion to dismiss.

## II.    STATEMENT OF FACTS

### A.    Background

XM is a satellite radio service provider that broadcasts live daily shows, music, sports broadcasts, and special events from several venues on more than 150 digital channels of content throughout the United States.  ¶¶2, 28.[4]  The Company completed its national rollout and began offering satellite radio service nationwide on November 12, 2001.  *Id.*  XM touts itself as the number one satellite radio service provider in the country, as well as the leader in satellite-delivered

---

[3] This Court's August 1, 2006 Memorandum Opinion and Order appointed Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund as Lead Plaintiffs in this consolidated action.

[4] All citations to "¶___" herein refer to paragraphs of the Complaint.

entertainment and data services for the automobile market, through partnerships with a variety of car manufacturers, such as General Motors and Honda/Acura.  ¶2.

XM derives its subscribers from two primary sources:  retail outlets and original equipment manufacturers, or "OEMs."  ¶29.  For the retail portion of the Company's business, XM sells radios and subscriptions at consumer electronic retailers such as Best Buy, Circuit City, and Wal-Mart.  *Id.* For the OEM side of the Company's business, XM partners itself with various automobile companies through which XM radio is offered at the time of a car purchase or lease.  *Id.*

XM's only competition in the world of satellite radio is Sirius, which began its nationwide offering of satellite radio content in mid-2002.  ¶31.  Because of its one-year head start, XM had a considerable advantage over Sirius in terms of technological advances, subscriber numbers, and brand awareness.  *Id.*  As time passed, however, Sirius began to close the gap between the two companies.  By late 2003, Sirius struck a significant blow when it was awarded the exclusive broadcast rights for National Football League games.  ¶32.

In October 2004, Sirius intensified the pressure on XM when it announced a deal to broadcast the daily radio show of "shock jock" Howard Stern beginning on or around January 1, 2006.  ¶33.  Sirius characterized the Stern signing as a "landmark deal" that would provide Sirius with "significant potential to accelerate growth."  *Id.*  Considered by many to be a defining moment in the history of satellite radio, Sirius' signing of Howard Stern was particularly difficult for XM because it had initially, but unsuccessfully, attempted to sign Howard Stern to broadcast his show on XM.  ¶34.  In the wake of the announcement that Stern would be going to XM's only competitor, Panero publicly downplayed the event.  ¶34.  It was obvious to investors and the market, however, that XM had lost much of the momentum that it had achieved as the first satellite radio provider.  *See* ¶35 (Sirius "steadily chipping away at XM's market share").

**B.    XM's Key Financial Metrics and "Cost Effective" Growth Strategy**

Significantly, XM has never turned a profit and, in fact, has lost millions of dollars during its brief history.  ¶36.  What XM does offer, however, is growth potential in the lucrative consumer entertainment market.  As a result, XM, investors, and analysts focus on several key subscriber-related metrics, other than gains and losses, to gauge the health of the Company.  ¶36.

Of the various subscriber metrics reported to the public, XM emphasizes two significant cost measurements that serve as bellwethers of the Company's health and true financial condition: (1) subscriber acquisition cost ("SAC"); and (2) cost per gross addition ("CPGA").  ¶40.  As Panero has publicly stated, SAC and CPGA provide important information about how much it costs XM to add new subscribers:

> Well, I think the numbers that I mentioned before are the ones that people focus on – the subscriber acquisition cost, which is a subcomponent of an even more important metric, the cost per gross add.  That is, basically, what is the cost to get that next subscriber?  Those are the ones that we actually break out for The Street and show to them in detail.  That is a big issue.

¶40.

According to the Company, SAC is calculated on a per unit basis and includes subsidies and distribution costs, excluding ongoing loyalty payments to distribution partners, and negative margins from the direct sale of merchandise, divided by the appropriate gross additions of subscribers or units manufactured.  ¶41; *see* Def. Mem. at 5.[5]  CPGA includes the amounts in SAC, as well as advertising and marketing expenses and ongoing loyalty payments to distribution partners, divided by the gross additions of subscribers for the period.  *Id.*  The Company sought to keep these particular metrics as low as possible because it demonstrated that the Company was achieving its

---

[5] All citations to "Def. Mem. at ___" herein refer to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint.

publicly-stated goal of adding new subscribers while effectively maintaining and controlling costs. ¶36.

Because XM has never turned a profit, XM has consistently emphasized to the market that it would achieve rapid subscriber growth, but only in a cost effective manner. ¶42. In other words, Defendants made it abundantly clear that XM would not employ a "growth at any cost" business model. *See id.* ("The bottom line, XM continues to demonstrate very cost effective growth."); ¶43 (Panero stated that XM "remain[ed] on track to meet [its] 2005 year-end guidance of 5.5. million subscribers and [would] do so in a cost effective manner" and XM's Chief Financial Officer stated that "XM has continued to demonstrate cost-effective growth in both subscriber acquisition costs or SAC and its fully loaded cost per gross addition metric.").

For example, Panero stated in an April 27, 2005 interview with *TheMotleyFool.com* that he understood that the market price of XM's stock was impacted by the Company's ability to keep SAC and CPGA down, stating that ". . . The Street has given us a lot of credit for is [sic] that we have driven those costs [SAC and CPGA] down. They are significantly lower than they were a year ago or two years ago." ¶44. Defendants recognized that the market valued XM's stock based on the Company's ability to restrain its SAC and CPGA and, consequently, they consistently told the market that XM would continue to grow in a cost effective manner, *i.e.*, with declining SAC and CPGA. Put simply, "cost effective" growth was the Company's business model, and the market knew it.

Consistent with this business model, XM reported quarter-after-quarter of declines in its SAC and CPGA metrics prior to the Class Period. ¶46. For example, in 2004, the Company reported a 17% decrease in SAC and a 27% decrease in CPGA in a year-over-year comparison to 2003. ¶46. Likewise, for the first quarter of 2005, XM reported a 22% improvement in SAC and a 15% improvement in CPGA when compared to the first quarter of 2004. ¶46.

C.      **Defendants' Misrepresentations During the Class Period**

Throughout the Class Period, Defendants continued to condition the market to expect that XM was achieving efficient subscriber growth, reducing its costs to acquire each new subscriber, pursuing a "business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs," and that CPGA would remain stable in the second half of 2005, leading the market to understand that "costs [were] continuing to fall (especially SAC and CPGA) even while XM sustain[ed] a very fast rate of growth." *See* ¶¶59-74.[6]  Unlike before, however, the Class Period statements were false and misleading because Defendants knew or recklessly disregarded that the competitive environment facing XM began to change dramatically, as described below.  These false and misleading statements, which concealed XM's true financial condition, had the desired effect as XM's stock was viewed positively by numerous securities analysts and its price rose to artificially inflated levels during the Class Period.

1.      **XM's Tremendous Advertising Expenses**

Despite fostering market expectations of substantial subscriber growth at steadily declining costs, XM abandoned that strategy during the Class Period for a "growth at any cost" strategy designed to stave off the increasing pressure brought to bear by Sirius.  ¶47.  Indeed, as described in the Complaint, XM and Panero were "in a frenzy" to keep up with and outpace Sirius during the fourth quarter of 2005 to counter the media blitz associated with the highly anticipated launch of Howard Stern's satellite radio show.  *See* ¶47.

As part of this undisclosed change in business philosophy, XM launched a widespread marketing campaign called "Listen Large."  ¶48.  This comprehensive advertising campaign reportedly cost the Company $25 million.  ¶48.  According to confidential witnesses, however,

---

[6] The Complaint alleges that the statements made on the following dates were each false and misleading: (1) 7/28/2005; (2) 8/5/2005; (3) 10/27/2005; (4) 11/1/2005; and (5) 11/7/2005.

instead of $25 million, XM actually spent somewhere between $100,000,000 and $150,000,000 on

the Listen Large campaign during the fourth quarter of 2005 – between 4 and 6 times more than was

budgeted.  ¶49.  Thus, any subscriber gains culled from the Listen Large campaign came at a

tremendous cost.  *Id.*

      Former insiders also recalled that in conjunction with the substantial national advertising

expenditures in the fourth quarter of 2005, XM also poured significant amounts of money into its

locally targeted advertising.  ¶53.  According to one confidential witness, XM was "spending

fortunes" on advertising and merchandising at retail locations and XM "wasted a lot of money" on

so-called point-of-purchase displays.  ¶53.

### 2. XM Drastically Reduces the Prices of its Radios and Experiences Supply Shortages

      On top of the Company's significant advertising expenditures, XM further abandoned its

touted cost effective growth strategy by drastically reducing the price of its radios during the Class

Period as a further incentive for consumers to subscribe with XM.  ¶55 (numerous confidential

witnesses explained that XM dramatically cut its prices).  For example, a former District Activation

Manager recalled that XM essentially gave customers radios normally valued at $300-$400 for free

in order to get them to sign up for XM service.  *Id.*  Thus, on top of knowing or recklessly

disregarding that CPGA costs would soar because of the tremendous sums spent on advertising and

marketing during the fourth quarter of 2005, Defendants also knew or were reckless in disregarding

that the large subsidies they offered would cause a material increase in SAC during the Class Period.

*See id.*

      Prior to and during the Class Period, XM also experienced product supply shortages.  ¶56.

Delphi, XM's primary supplier of radios, was facing severe financial and operational difficulties that

caused Delphi to have trouble producing enough product to meet XM's demands.  *Id.*  According to

one confidential witness, the delayed launch of certain XM equipment meant that XM had to offer

additional rebates and promotional programs in order to keep subscribers interested. ¶57 (subsidies included $35 to $50 rebates, free accessories, free hardware accessories, and free activation, reduced activation prices, or three-months free service). Defendants were keenly aware during the Class Period that each of these "subsidies" would directly increase XM's key SAC and CPGA metrics and, consequently, drive down its stock price. ¶57.

Further exacerbating the Company's secretly soaring SAC and CPGA during the fourth quarter 2005 was the fact that XM offered a "Christmas gift" to its customers during November and December of 2005 – free activation and three months of free service. ¶58. According to one confidential witness, XM was rebating and offering free products "left and right" in order to entice its customers to sign up with, among other things, old equipment not impacted by supply shortages. ¶58. In short, XM's "subsidies" were a major contributing factor to the soaring costs XM faced for each subscriber it added. ¶58.

### D.    The Truth is Revealed

On February 16, 2006, the true condition of XM's business was revealed when XM issued a press release announcing its financial and operational results for the fourth-quarter and year-end 2005. ¶75. In that press release, Defendants shocked the market by reporting that the Company's key financial metrics, SAC and CPGA, had increased by startling amounts. Indeed, SAC increased 39% over and above fourth quarter 2004 levels and a whopping 68% more than third quarter 2005 levels. *See* ¶¶76-77. Similarly, CPGA soared 36% over fourth quarter 2004 levels and 58% more than third quarter 2005. *Id.* These numbers revealed to the investing public, for the first time, that XM had abandoned its established "cost-effective growth" plan in favor of an aggressive "growth at any cost" strategy to combat the expected loss of market share to Sirius. ¶¶7, 78.

Also on February 16, 2006, XM issued a press release announcing the resignation of Board of Directors member Pierce J. Roberts ("Roberts") via a letter dated February 13, 2006. ¶79.

Roberts resigned because he was "troubled by the current direction of [XM]" and believed there was "a significant crisis on the horizon." *Id.* The Company's press release specifically acknowledged Roberts' existing "disagreement" with the Company and other Board members, and suggested that the dispute centered on the Company's "operational direction" as it pertained to "cost controls" related to "lowering marketing, programming and promotional expenditures." ¶80. Thus, on the same day that XM reported skyrocketing SAC and CPGA numbers, the market learned that one of the Company's directors, a former lead telecommunications banker for Bear Stearns, had resigned because he could no longer "go along" with the Company's out of control spending habits, *i.e.*, its "growth at any cost" approach. *See* ¶¶80-83. Thus, Roberts' resignation is clearly related to the very facts alleged by Plaintiffs in the Complaint, XM's soaring expenses. While Roberts resigned because he wanted XM to control its spending, Plaintiffs' claims are based on XM's failure to disclose its change in business philosophy and that change's impact on SAC and CPGA.

In a direct and swift response to the two February 16, 2006 press releases, the price of XM's common stock fell significantly. Between the close of trading on February 15, 2006 and the close of trading on February 17, 2006, the Company's stock price traded at an extraordinarily unusual and high volume of nearly 35,000,000 shares traded, up nearly 7 times the prior day's volume, as it collapsed approximately 13%, falling to a close of $21.57 on February 17, 2006, down approximately 40% from a Class Period peak of more than $36.00 per share. ¶¶84, 99-100.

Following the close of the Class Period, the Company disclosed additional disturbing news about its business practices. ¶85. On April 27, 2006, XM announced that the Federal Trade Commission ("FTC") had launched an investigation into several of the Company's aggressive marketing practices, including XM's rebate programs. *Id.* On September 5, 2006, XM announced an SEC investigation, disclosing that "the Securities and Exchange Commission is looking into the company's handling of its estimates of subscriber counts as well as the cost of recruiting customers."

*Id.* The SEC requested that XM produce documents regarding its subscriber targets and related matters for the third and fourth quarters of 2005. *Id.*

### E.    Illicit Insider Trading

The motivation behind Defendants' fraud is clear. Panero desired to artificially inflate the price of XM's stock, thus misleading the market into believing that XM's business and financial prospects were positive, causing the market to expect and anticipate that XM's SAC and CPGA would continue to decline, enabling him and other XM insiders to unload vast sums of XM stock in order to reap millions of dollars in proceeds from illicit insider trading. ¶85. As set forth in the Complaint, Panero and several key XM insiders took full advantage of the artificial inflation of XM's common stock prices during the Class Period, making huge sales of their personal holdings during the fourth quarter of 2005 – but before any disclosure of skyrocketing SAC and CPGA or the resignation of Roberts was made. ¶88. In fact, Panero unloaded 99% of his then-owned shares, selling more than 400,000 shares of stock for proceeds of nearly $12 million. *See* ¶¶88-89 (other XM insiders sold tremendous amounts of XM stock prior to the end of the Class Period, reaping proceeds in excess of $60 million).

## III.    ARGUMENT

### A.    Applicable Standards

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the Complaint in the light most favorable to Plaintiffs and "must grant the plaintiffs the benefit of all inferences that can be derived from the alleged facts." *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 325 (D.D.C. 2005); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "At this point in the proceedings, 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

him to relief.'" *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 12 (D.D.C. 2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. To state a claim for securities fraud under Rule 10b-5, "a plaintiff must allege (1) a material misstatement or omission, (2) made with scienter (intent to deceive), (3) made in connection with the purchase or sale of a security, (4) furthered by the use of the mails or a national securities exchange, and (5) upon which plaintiff detrimentally relied." *Burman*, 384 F. Supp. 2d at 326; *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Allegations of securities fraud must satisfy the requirements of Fed. R. Civ. P. 9(b), which requires pleading with particularity. While Rule 9(b) requires Plaintiffs to specify the time, place, and content of a defendant's false representations, a securities fraud complaint "need only provide a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud." *Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363, 1369-70 (M.D. Fla. 1999). In addition, the PSLRA "provides that where plaintiffs allege that the defendant made a misleading statement or omission, the complaint must specify each such statement or omission and explain why it is misleading." *In re Baan*, 103 F. Supp. 2d at 12. "The PSLRA also heightened the requirement for pleading scienter, so that the plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.*

Unfortunately, as a result of heightened pleading requirements, "motions to dismiss in securities fraud cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile. Many motions to dismiss ask the court to engage in judgment calls which are better made by the trier of fact." *In re Indep. Energy Holdings PLC Sec.*

*Litig.*, 154 F. Supp. 2d 741, 748 (S.D.N.Y. 2001).  "Although the pleading requirements under the PSLRA are strict . . . they do not change the standard of review for a motion to dismiss."  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) ("Our willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA.  While Congress unquestionably strengthened the pleading standard for securities fraud, the Reform Act would hardly serve its purpose 'to protect investors and to maintain confidence in the securities markets,' were it to become a choke-point for meritorious claims.").

Defendants do not seriously challenge the particularized allegations set forth in the Complaint – nor could they.  Instead, they misconstrue those allegations to fit their false view of what this case is about.  This Court should reject Defendants' efforts to recast the Complaint, and raise straw man arguments that they can easily knock down.  Accordingly, the Motion should be denied in its entirety.

**B.     Plaintiffs Adequately Allege Falsity**

The Complaint provides detailed allegations of the materially false and misleading statements and omissions made by Defendants and identifies the specific press releases, SEC filings, and public statements that contain them.[7]  The Complaint also alleges why the representations were false and

---

[7] In addition to direct communications, Panero made "statements" when he signed documents filed with the SEC.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) (defendants who sign documents filed with the SEC containing material misrepresentations, regardless of whether they participated in drafting the document, make a statement and may be liable under §10(b)) (collecting cases); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1997) (allegations that individual officers signed misleading form 10-K were sufficient to allege securities fraud claims against each officer).  Panero can be liable not only for statements made, but for omissions in knowingly failing to correct another's misrepresentations.  *Barrie v. Intervoice-Brite*, 397 F.3d 249, 262 (5th Cir. 2005) (claims stated where pled with specificity as to each defendant that "one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant spoke and which defendant failed to speak.").

misleading when they were made by identifying specific contemporaneous facts and problems contradicting Defendants' Class Period statements. Accordingly, Defendants' Motion fails.

### 1. Defendants Made Material Statements and Omissions

Instead of confronting the specific allegations concerning their fraudulent scheme, Defendants argue that this case is about nothing more than missed projections. *See* Def. Mem. at 16-17. Defendants further assert that they warned the market that XM's costs of acquiring subscribers would be increasing in the fourth quarter of 2005, and that they disclosed that XM would "fully exploit the holiday season." *See* Def. Mem. at 18-19. In other words, Defendants argue they gave the market some indication of rising costs and that, as a result, their Class Period statements were not false and misleading – they were literally correct. *See id*. That is not what the Complaint alleges and Defendants, intentionally or otherwise, miss the point.

Defendants cannot rest on the fact that the information they disclosed was allegedly literally true; rather, it is clear that "a duty to speak the full truth arises when a defendant undertakes to say anything." *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir. 1977). Statements that are literally true are not immune from liability under the federal securities laws because "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 n.10 (D. Mass. 2006); *Kurtzman v. Compaq Computer Corp.*, No. H-99-779, 2000 U.S. Dist. LEXIS 22476, at *81 (S.D. Tex. Dec. 12, 2000) ("[i]t is well settled that once a company makes a disclosure, even if it is literally true, the company is under 'a duty to speak the full truth.'"). And, in any event, "whether a public statement is misleading is a mixed question of law and fact for the jury," unless "no reasonable investor could conclude public statements, taken together and in context, were misleading." *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002).

Throughout the Class Period, Defendants made false and misleading statements regarding: (1) the Company's ability to achieve rapid growth with sound financial performance; (2) the Company's key metrics remaining stable in the second half of 2005 and to decline as compared to 2004; and (3) the Company's business plan to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs. *See, e.g.,* ¶59 ("Efficient Quarterly Subscriber Growth"); ¶60 ("And the ultimate test, we are achieving rapid growth with sound financial performance."); ¶61 (XM's targeted and efficient marketing efforts have enabled us to continue demonstrating cost-effective subscriber growth and improvements both in the direct costs to gain a subscriber, or SAC, and the fully-loaded total costs, including discretionary advertising and marketing costs, to gain a subscriber, or CPGA . . . We expect CPGA to remain stable during the second half of the year."); ¶62 ("[W]e do think CPGA will be stable . . ."); ¶64 ("We are focused on increasing subscribers and scaling our business while managing growth and containing costs . . . We are pursing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs."); ¶68 (statement by Panero that "The secret to XM's smart subscriber growth rather than growth at any cost is the ability to control marketing and product expenses while rapidly growing subscribers."); ¶68 (statement by Euteneuer that "[T]he strong progress we've made in the third quarter enables me to reaffirm the 2005 guidance that we had previously given."); ¶73 ("We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.").

In this case, even assuming that Defendants' numerous public statements were literally true (which they were not), those statements were false and misleading because they failed to provide investors with the known facts concerning XM's choice to abandon its strategy of decreasing its key SAC and CPGA metrics while achieving rapid subscriber growth. Put simply, Defendants failed to disclose known facts about the Company's abandonment of its cost effective growth business

strategy. For example, the Complaint alleges that Defendants' statements were false and misleading because they did not disclose known facts to the market, falsely omitting that:

- Defendants were aware of crucial facts, namely increased competition and the imminent arrival of Howard Stern at Sirius, regarding XM's inability to reduce costs of adding critical new subscribers as it attempted to reach its goal of 6 million subscribers by year-end 2005, which Defendants recklessly disregarded was contrary to the market expectations they had fostered;

- Defendants knew that XM's deep discounting of radios and steep subsidies used to combat supply shortages and increase subscription numbers during the Class Period would contribute to a sharp increase in SAC and CPGA in the fourth quarter of 2005;

- Defendants knew that XM's Listen Large campaign, whose costs spiraled out of control, would dramatically increase the Company's fourth quarter 2005 SAC and CPGA metrics;

- throughout the Class Period, XM was anticipating that the fourth quarter of 2005 would suffer from a complete reversal of the trends of declining SAC and CPGA that had been reported and touted throughout the Class Period; and

- contrary to Defendants' public statements, XM's fourth quarter 2005 numbers would not be similar to past holiday season trends (even giving Defendants the benefit of the doubt as to historical fourth quarter cost increases due to holiday season trends).

*See, e.g.,* ¶¶65, 74. The impact of the numerous false and misleading statements identified in the Complaint is that Defendants' Class Period statements omitted critical information and materially misrepresented XM's true financial condition to the market throughout the Class Period. The omission of this critical information led the market to expect XM to continue to experience a decline in its key SAC and CPGA metrics. *See* ¶63 ("costs are continuing to fall even while XM sustains a very fast rate of growth"). As alleged in the Complaint, however, as XM's true financial condition came out, the market learned contrary to Defendants' prior incessant conditioning, that the Company was unable to maintain its "smart subscriber growth rather than growth at any cost" business model.

The small amount of information Defendants did disclose to the market cannot serve to insulate them from the Complaint's allegations. While they did disclose an expected cost increase due to the holiday sales season, Defendants made it seem as though it was not out of the ordinary when they, in fact, knew or recklessly disregarded that XM was abandoning its cost effective growth

business strategy in favor of a growth at any cost approach designed to counter steadily mounting

competition from Sirius and the looming and much anticipated arrival of Howard Stern to the world

of satellite radio.  They did not disclose that the competitive threat posed by Sirius during the fourth

quarter of 2005 was heightened and that XM had taken several concrete steps (with predictable

consequences) to address that threat.  In other words, Defendants never gave any indication that the

increase they expected was anything more than normal holiday trends that the market was already

aware of.  *See* ¶78 (chart comparing severe increase in SAC and CPGA in the fourth quarter of 2005

to past levels).[8]  At this stage of the proceedings, the absence of these (and other) facts rendered

Defendants' so-called truthful disclosures about its financial performance false and misleading.  *See*

*Burman*, 384 F. Supp. 2d at 325 (on a motion to dismiss, the Court must construe the allegations in

the Complaint in the light most favorable to Plaintiffs).[9]

Similarly, keeping in line with the false projection case Defendants would rather defend,

Defendants assert the Complaint fails to plead a misstatement or omission because Defendants had

"no duty to update" XM's guidance.  *See* Def. Mem. at 17.  Again, Plaintiffs do not claim that

Defendants should have updated XM's projections.  Rather, the Complaint contends that Defendants

---

[8] Defendants also assert that analysts predicted that SAC and CPGA would rise in the fourth quarter of 2005, and attempt to hide behind the fact that one analyst was able to predict XM's ***full-year 2005*** SAC and CPGA.  *See* Def. Mem. at 1-2, 18-19.  The fundamental problem with Defendants' assertion is that although analysts expected ***some*** increase to SAC and CPGA, there was no consensus anticipation or expectation of fourth quarter SAC and CPGA increases that were dramatically out of line with prior holiday season trends.  As a result, the fact that one analyst may have accurately predicted XM's full-year 2005 metrics cannot serve as justification, at the pleadings stage, for a determination that the market was not misled by Defendants' fraud, particularly because the analyst report did not comport with Defendants' public statements.

[9] Moreover, these additional facts could not have been more material to XM's investors.  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision.  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

knew or recklessly disregarded that XM's projections had no basis in reality because they omitted material information that impacted the reliability of those numbers.

"'[W]hile a company is generally under no obligation to disclose its expectations for the future to the investing public, . . . if the company chooses to volunteer such information, its disclosure must be full and fair, and the courts may conclude that the company was obliged "to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading . . ."'" *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1170 (D.D.C. 1996) ("*Newbridge I*") (quoting *Kowal*, 16 F.3d at 1277). Importantly, "[w]hether failure to disclose company problems is an omission causing statements to be misleading is now a factual determination left to the jury." *Id.* at 1170 ("Plaintiffs do not argue that defendants' statements were false; instead, plaintiffs argue that the statements were so incomplete as to be misleading. That argument raises questions for the finder of fact that may not be resolved by a motion to dismiss.").[10]

Here, Plaintiffs allege not that Defendants were under a constant duty to update their projections, but rather, as described by corroborating confidential witnesses, that Defendants knew of or recklessly disregarded material information that rendered the statements they did make false and misleading. *See, e.g.*, ¶¶48-49 (Listen Large campaign cost between $100 and $150 million); ¶53 (XM poured significant amounts of money into locally targeted advertising); ¶55 (XM

---

[10] Following the decision in *Newbridge I*, plaintiffs filed an amended complaint, which defendants subsequently moved to dismiss. *See In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 170 (D.D.C. 1997) (*"Newbridge II"*). In *Newbridge II*, this Court once again visited the issue of whether defendants were under a duty to disclose the information plaintiffs alleged was concealed. *Id.* at 180. The Court again applied a materiality analysis and reasoned that whether defendants were required to disclose the omitted information was an issue best left to the jury. *Id.* ("Here, as *Newbridge I* determined, plaintiffs have adequately identified a number of positive statements that may be misleading in light of the particular omissions alleged by the Second Amended Complaint. Thus, at this point, 'a trier of fact could find that several of these omissions bore tangentially, but materially, upon positive statements made by the defendants.'"). The *Newbridge II* court also recognized that the scope of defendants' disclosure duty is necessarily intertwined with an inquiry into the materiality of the alleged omissions. *Id.*

drastically reduced the price of its radios); ¶¶56-57 (XM's supply shortages).[11]  Defendants do not, because they cannot, challenge these reliable witness statements.[12]

Defendants next attempt to recast the Complaint by pointing to XM's historical SAC and CPGA declines and asserting that Plaintiffs contend XM guaranteed that future figures would also decline.  *See* Def. Mem. at 19-20.  Specifically, Defendants state that "Plaintiffs argue that XM's alleged track record of significantly declining SAC and CPGA somehow constituted an implicit guarantee that those metrics would continue to decline.  *Id.* at 19.  That is not what the Complaint alleges, and the Court cannot accept Defendants' competing theory of the case at the pleadings stage.

The Complaint includes XM's historical SAC and CPGA figures (*see, e.g.,* ¶78) to demonstrate XM's stated business model and to show how Defendants conditioned the market, through affirmative statements, to expect the application of the Company's stated business model to produce consistent results – declining or stabilizing SAC and CPGA.  Throughout the Class Period, Defendants continued to make affirmative statements and misrepresentations that XM was "focused on increasing subscribers and scaling our business while managing growth and containing costs," "reducing our costs to acquire each new subscriber," and "expect[ed] CPGA to remain stable during the second half of the year."  ¶¶61, 64.  By the time these statements were made, however, things had changed.  Defendants' Class Period statements were undermined by the looming threat of

---

[11]  Defendants claim that securities analysts following XM understood that SAC and CPGA would rise in the fourth quarter of 2005.  This case does not center on what analysts may or may not have understood; rather, it centers on what Defendants said to the market and, importantly, what they failed to say.  Without the benefit of understanding the interactions between XM and a select handful of analysts, or the basis for the analysts' projections, which can only be obtained through discovery, the Court cannot properly weigh Defendants arguments in this regard.

[12]  The only attack Defendants' mount on the Complaint's confidential witnesses is that their accounts fail to support Panero's scienter.  *See* Def. Mem. at 39-40.  Attacks on the credibility and reliability of the witnesses' statements, however, "are questions that go to the weight of the [] evidence," which are inappropriate for resolution on a motion to dismiss.  *Fitzer v. Sec. Dynamics Techs.,* 119 F. Supp. 2d 12, 21 (D. Mass. 2000).

Howard Stern and the corresponding severely increased competition and media blitz from Sirius. It is these changed circumstances, coupled with other factors, such as the tremendous expense of the Listen Large campaign, that made Defendants' Class Period statements false and misleading.

Because the Complaint identifies numerous statements that are alleged to be false and misleading, and provides specific reasons why those statements are false and misleading, Defendants' falsity-related arguments must fail.

### C.    Plaintiffs Do Not Rely on Inactionable Statements or Puffery

Defendants claim that their statements about XM's business model are nothing more than inactionable statements of opinion, and that Plaintiffs rely on puffery and imprecise generalizations that Defendants would exercise "fiscal discipline in pursuing its growth strategy." *See* Def. Mem. at 26-28. Defendants are wrong, as statements about XM's cost controls were probably the single most important factor that investors considered when evaluating XM's stock.

As the Supreme Court explained in *Virginia Bankshares  v. Sandberg*, 501 U.S. 1083, 1091 (1991), even "statements of reasons, opinions, or beliefs" are actionable. *Id.* at 1093 ("indefinite and unverifiable" terms such as "high value" or "fair" are actionable). Indeed, investors pay close attention to the opinions of corporate insiders who "usually have knowledge and expertness far exceeding the normal investor's resources." *Id.* at 1091; *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available.").

A plaintiff sufficiently pleads materiality by identifying information that would be considered significant to a reasonable investor. *Basic, Inc. v. Levison*, 485 U.S. 224, 234 (1988). Materiality, however, is a question of fact not typically resolved on a motion to dismiss. *Newbridge II*, 962 F. Supp. at 180 (citing *TSC Indus.,* 426 U.S. at 450); *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.

- 19 -

1985) ("Materiality is a mixed question of law and fact, and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the allege misstatement or omission are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."); *see also In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1330 (N.D. Ga. 1998) (same).

Consistent with *Virginia Bankshares*, courts have determined that opinions are actionable if "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, *or* (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994); *In re Premiere Techs., Inc. Sec. Litig.*, No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *15 (N.D. Ga. Dec. 8, 2000) ("To the extent that Defendants argue these statements are not actionable because they reflect the Defendants' opinions or 'subjective assessment,' the Supreme Court has held that statements of opinion or belief may be actionable."); *Scientific-Atlanta,* 239 F. Supp. 2d at 1360 ("Statements that do more than offer rosy predictions when a defendant knows that the statements are false can be the basis of a securities fraud action.").

Accordingly, courts have found many types of statements of opinion to be actionable. *See, e.g., ValuJet*, 984 F. Supp. at 1477-78 (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) *cert. denied* 126 S. Ct. 423 (2005) (representation regarding superior quality of product was actionable) (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or

'leading' must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery")); *see also In re F & M Distribs. Sec. Litig.*, 937 F. Supp. 647, 653 (E. D. Mich. 1996) (holding that the defendant chain store's failure to disclose an adverse industry trend that made the "deal buying" strategy touted in its prospectus less viable than otherwise known could be actionable).

Defendants' Class Period statements regarding SAC and CPGA were far more than inactionable statements of puffery or vague generalizations. Plaintiffs allege the SAC and CPGA metrics were the two key numbers relied on by investors and analysts to evaluate XM's financial performance.[13] Maintaining those key metrics formed the fundamental basis of the Company's touted business model. Without telling the market, Defendants abandoned that business model during the Class Period. Thus, each of Defendants' statements regarding the Company's ability to cut costs while rapidly growing was more than a rosy affirmation. Rather, they were a direct commentary on the Company's most important financial performance indicators, and could not have been more material to investors.[14]

Applying *Virginia Bankshares*, the statements at issue are actionable because they lack "a factual basis that justifies them as accurate, the absence of which renders them misleading." 501 U.S. at 1093. Defendants' statements touting the Company's ability to achieve rapid subscriber

---

[13] Moreover, the increased SAC and CPGA levels were not the fraud – the falsity of Defendants' misrepresentations and omissions was simply revealed by the increased SAC and CPGA levels. *See, e.g., Marsden v. Select Med. Corp.*, No. Civ. A. 04-4020, 2006 WL 891445, at *5 (E.D. Pa. Apr. 6, 2006) (plaintiffs did not base claim on defendants' failure to predict actions of regulatory agency, "but rather on the failure of Defendants to relate what they actually knew and to factor that knowledge into the projections and statements provided to stockholders and the market.").

[14] Defendants assert the immensely fact bound defense that XM's growth was achieved at lower cost than Sirius. *See* Def. Mem. at 26 n.26. Besides the fact that Sirius' performance metrics are entirely irrelevant to XM's, what Defendants misleadingly fail to mention is that because SAC and CPGA are Company-created metrics, they simply cannot be compared on an apples-to-apples basis with Sirius' subscriber related numbers.

growth as its key SAC and CPGA metrics would continue to decline were false and misleading when made because Defendants knew or recklessly disregarded the impact that increased spending would, and did, have on the Company's operations long before such statements were issued to the investing public. *See, e.g.*, ¶49 (XM spent between $100 million and $150 million on its Listen Large campaign).

Accordingly, Defendants' "puffing" and "generality" arguments are simply inapplicable where, as here, Plaintiffs have alleged specific facts showing that Defendants' positive statements did not have a reasonable basis when made. *Scientific-Atlanta*, 239 F. Supp. 2d at 1360 (statements about company's success, customer confidence, and business strategies were "not so exaggerated or vague that the Court can find as a matter of law that the statements were not material," in light of allegations that Defendants knew the statements were false when made and facts alleged supporting that conclusion); *McBride v. Vision Twenty-One, Inc.*, No. 8:99-CV-138-T-27F, 2000 U.S. Dist. LEXIS 14742, at *12-14 (M.D. Fla. Aug. 18, 2000), (optimistic statements that "they looked forward to reaping the benefits of the 'synergies of the combined company,'" that the company was "'integrating [its] acquisitions', its 'operating model [was] working well' and it was 'successfully integrating' its acquisitions" were not inactionable puffery because plaintiff alleged that defendants knew such statements were false when made). Plaintiffs allege Defendants knew or recklessly disregarded the fact that XM's fourth quarter 2005 costs of acquiring subscribers were tremendously out of line with prior periods, yet simultaneously fostered market expectations of declining costs. Defendants' puffery-related arguments must fail.

### D. Plaintiffs Allege a Fraudulent Scheme – Not Mere Corporate Mismanagement, Defendants' Fact-Bound Defense

Citing to *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977), Defendants claim that the Complaint amounts to nothing more than "allegations sounding not in fraud, but in disagreement with XM's business strategy." Def. Mem. at 28. Defendants again mischaracterize the Complaint.

The Complaint is not a "criticism of XM's business strategy for the fourth quarter of 2005," but, rather, it charges that Defendants, once adopting their new business strategy, omitted material facts that rendered statements about those business decisions false and misleading. *See* Def. Mem. at 29.

"[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *First Am. Bank & Trust v. Frogel*, 726 F. Supp. 1292, 1296 (S.D. Fla. 1989) ("Absent allegations of deception, misrepresentation, or nondisclosure, claims of a breach of fiduciary duty and internal corporate mismanagement are not actionable under §10(b) of the Securities Act.") (citing *Santa Fe Indus.*, 430 U.S. 462); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F. 2d 1042 (11th Cir. 1987)).

Indeed, §10(b) does not permit Defendants to falsely tout the strength of a critical aspect of their business despite knowing that existing mismanagement makes those statements false or misleading. *See Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under §10(b) or Rule 10b-5; nor will an allegation that a defendant failed to disclose the existence of mismanagement . . . [H]owever, . . .a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.").[15] Defendants are liable under §10(b), not because they mismanaged the Company, but because they kept the market in the dark about a critical aspect of XM's business – its inability to maintain its business model of

---

[15] *See also Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) (denying motion to dismiss where plaintiffs alleged defendants knew of mismanagement, rendering statements false and misleading).

reducing costs while rapidly adding new subscribers. Under §10(b), defendants can mismanage, but they cannot conceal mismanagement from investors if they affirmatively boast about the company's business – a distinction lost on, or ignored by, Defendants here. *Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *5 (S.D. Ohio Sept. 19, 2002), (denying motion to dismiss where defendants knew about mismanagement but did not disclose it to investors) (collecting cases).

Here, Plaintiffs do not complain about the Company's decision to go all out to counter the heavy promotion of Howard Stern by Sirius" during the fourth quarter of 2005. *See* Def. Mem. at 29. The Complaint seeks redress for Defendants' failure to disclose, for example, that soaring costs that became necessary in order to compete with Sirius meant that XM abandoned its prior business strategy in favor of a growth at any cost approach. The Complaint also alleges that Defendants hyped the Company's cost effective growth business model throughout the Class Period, deliberately overshadowing the tremendous pressure being brought to bear on the Company's key financial metrics due to increased advertising expenditures, subsidies, and supply shortages. Put simply, Plaintiffs claim that, once Defendants undertook the fundamental shift to their business model, they needed to disclose it and the adverse effects they knew or recklessly disregarded it would have on the Company's key financial metrics.

Regarding the resignation of one of XM's directors, Roberts, the Complaint alleges that Roberts resigned amidst concerns of over-spending – the same undisclosed over-spending that was inconsistent with XM's prior business strategy and caused the Company's SAC and CPGA to experience severe increases in the fourth quarter of 2005. Thus, the Complaint identifies a gross disparity between XM's internal state of affairs and what Defendants stated publicly. *In re Scholastic Corp. Sec. Litig.*, 252 F. 3d 63, 72-73 (2d Cir. 2001) (divergence between internal reports and public statements supported inference of scienter). As discussed below, Plaintiffs refer to Roberts' resignation not to show that Roberts was, in fact, right about the direction of XM, but

instead to demonstrate that rising costs and conflicts about XM's direction were at the forefront of issues discussed by Defendants and others during the Class Period.

As such, the allegations here "constitute adequate claims under federal securities law because their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well." *Slavin v. Morgan Stanley & Co.,* 791 F. Supp. 327, 333 (D. Mass. 1992); *see also Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1183 (S.D. Fla. 2005). Thus, the Complaint's allegations constitute adequate claims under federal securities law, and Defendants' efforts to recast Plaintiffs' allegations must be rejected.[16]

### E.    Defendants Cannot Sail Into the PSLRA's Safe Harbor

Defendants assert that their Class Period statements are immunized by the PSLRA's safe harbor. *See* Def. Mem. at 20-26. Defendants argue that "[e]ach statement about fourth quarter performance was also accompanied by cautionary language summarizing risk factors that could cause actual results to differ." Def. Mem. at 23-24. Contrary to their arguments, Defendants are not entitled to safe harbor protection.

The PSLRA established a "safe harbor" provision shielding forward-looking statements from liability under Rule 10b-5. *Burman*, 384 F. Supp. 2d at 334. To qualify for protection under the safe harbor provision of the PSLRA, a statement must be identified as forward-looking and be "accompanied by ***meaningful*** cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5.

---

[16] For example, in making their mismanagement assertions, Defendants argue that "XM in fact announced its plans to increase spending" and that "[t]he 'Listen Large' campaign – with its $25 million budget – was disclosed to the public." Def. Mem. at 29-30. Defendants overlook the Complaint's allegations that, contrary to what Defendants disclosed to the market, the Listen Large campaign actually cost the Company between $100 million and $150 million. ¶¶48-49. *See Burman*, 384 F. Supp. 2d at 325 (on a motion to dismiss, the Court must construe the allegations in the Complaint in the light most favorable to Plaintiffs). Defendants cannot rebut these well-supported allegations at the pleadings stage.

"This safe harbor provision shields 'forward-looking statements' from Rule 10b-5 liability where such a statement is made by a 'natural person' unless plaintiffs prove that it was made with 'actual knowledge . . . that the statement was false and misleading.'" *Burman*, 384 F. Supp. 2d at 334 (quoting 15 U.S.C. §78u-5).[17]

Cautionary language cannot be general or not specific to the statements made; routine listings of broad, ordinary, competitive, and political factors fail to bespeak caution. *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known, material adverse facts."); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (the "requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.").

Even if a statement is considered forward-looking, "[m]erely including general cautionary language does not excuse a defendant's alleged omission of 'known material, adverse facts.'" *In re Splash Tech. Holdings Sec. Litig.*, No. C99-00109 SBA, 2000 U.S. Dist. LEXIS 15369, at *34-35 (N.D. Cal. Sept. 29, 2000). "[A] defendant may not use cautionary language to protect himself when he is already aware that the risks he is cautioning against have come to fruition." *In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *29 (E.D. Pa. Apr. 3, 2003).

First, the purportedly cautionary language was not meaningful because it did not warn about a known risk: that competitive factors had forced XM to abandon its cost effective growth strategy

---

[17] As a corollary to the PSLRA's safe harbor, the judicially-created "'bespeaks caution' doctrine requires courts to consider alleged misstatements and omissions in the context of the warnings issued by the defendant." *In re Baan*, 103 F. Supp. 2d at 15. As demonstrated herein, because Defendants' warnings failed to acknowledge material, adverse facts, the bespeaks caution doctrine offers Defendants' no refuge.

in favor of a significantly more aggressive strategy that was necessary for the Company to achieve its subscriber goal for year-end 2005.  To the contrary, Defendants' cautionary statements suggested that unfavorable events, which had already occurred, were only a possibility.  *See* Def. Mem. at 24 n.21 ("our estimates *may* change;" "The timing of promotions and new contracts *may* cause SAC to fluctuate from period to period;" "The timing of our media campaigns and discretionary advertising *may* cause CPGA to fluctuate from period to period."); *see also In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *29.  Thus, the purported cautionary language was insufficient; it only spoke in terms of "may" and potential problems, not actual, then-existing unfavorable events.  Thus, it did not "provide notice of danger to the investment."  *Friedman v. Rayovac Corp.*, 295 F. Supp. 957, 990 (W.D. Wis. 2003); *Southland*, 365 F.3d at 372; *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).

Second, the inclusion of the purported warnings identified by Defendants cannot qualify for safe harbor protection because Defendants knew their forward-looking statements were false and misleading when made.  For example, the Complaint alleges that, among other things, the Roberts' resignation supports an inference that Defendants discussed, and were aware, throughout the Class Period that XM had abandoned its prior business model in such an aggressive manner that XM's key metrics were destined to soar at during the fourth quarter of 2005.  ¶¶79-83; *see In re Baan*, 103 F. Supp. 2d at 12 (citing *Kowal*, 16 F.3d at 1277 ("projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made")).  Such awareness demonstrates that Defendants had actual knowledge that their forward-looking statements were false and misleading, and that Defendants cannot benefit from safe harbor protection.

F.        **Plaintiffs Allege Defendants Acted With Scienter**

"Scienter is a required element that must be pled in alleging a violation of §10(b)."  *In re*

*Baan*, 103 F. Supp. 2d at 18.  As required by the PSLRA, the Complaint "states with particularity

facts giving rise to a strong inference that [XM and Panero] acted with the required state of mind."

15 U.S.C. §78u-4(b)(2).  "[A]s a member of this Court noted, '[t]here is no consensus among the

courts as to how a "strong inference" of scienter may be established, and our Circuit has yet to rule

on the issue.'"  *Burman* 384 F. Supp. 2d at 327 (quoting *In re Baan*, 103 F. Supp. 2d at 19).

Courts in this District recognize that "Courts are split as to how a 'strong inference' of

scienter may be established."  *Id.* at 331.  "For example, the Third Circuit, adopting the Second

Circuit's pre-PSLRA standard, concluded that the PSLRA requires that the facts demonstrate 'a

"strong inference" of defendant's fraudulent intent.'"  *Id.* (quoting *In re Advanta Corp. Sec. Litig.*,

180 F.3d 525, 532-35 (3d Cir. 1999)).  Thus, while this Circuit has not decided how scienter must be

pled, this Court has applied (as Defendants recognize), the Second Circuit's standard, which requires

that "the plaintiffs '(a) allege facts to show that defendants had both motive and opportunity to

commit fraud *or* (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness.'"  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128

(2d Cir. 1994)); *see also In re Baan*, 103 F. Supp. 2d at 20 (scienter can be established by setting

forth "'facts that constitute circumstantial evidence of either reckless or conscious behavior.'"  *Id.*

(quoting *Advanta*, 180 F.3d at 534-35).  "The second of the two tests requires a reckless statement,

which is a 'statement . . . involving not merely simple, or even inexcusable negligence, but an

extreme departure from the standards of ordinary care, and which presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it.'"  *Burman*, 384 F. Supp. 2d at 332; *see also In re Baan*, 103 F. Supp. 2d at 20 (same).

In determining whether a strong inference of scienter has been established, a court should not consider each relevant factual allegation solely in isolation, but rather, as a part of the overall factual picture painted by the Complaint. *In re Baan*, 103 F. Supp. 2d at 23 ("In combination, plaintiffs' allegations are sufficient to support a strong inference of recklessness or knowledge on the part of each defendant."); *see also Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) (the adequacy of allegations of scienter is determined by looking at all the facts in the aggregate); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000) (same).[18] Moreover, "[t]he jury has a preeminent role in deciding whether or not scienter has been established." *In re Baan*, 103 F. Supp. 2d at 23.

In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006) *cert. granted* 2007 U.S. LEXIS 15 (2007), the Seventh Circuit recently held "we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent. 'Faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for us to make a determination as to which inference will ultimately prevail, lest we invade the traditional role of factfinder.'"

Moreover, "[a] plaintiff may . . . allege [] scienter on the part of a corporate defendant without pleading scienter against any particular employees of the corporation." *In re Dynex Capital, Inc. Sec. Litig.*, 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 35386, at *4-5 (S.D.N.Y. Jun. 2, 2006). "To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient." *In re*

---

[18] *See also Croker v. Carrier Access Corp.*, No. 05-CV-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603, at *26 (D. Colo. July 18, 2006) (a divide and conquer approach to scienter is impermissible; district court rejected defendant's efforts to "challenge each allegation individually, correctly but misguidedly asserting that none of the allegations by itself is sufficient to establish scientor [sic].").

*Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005). "While [plaintiffs] may be able to show that individual . . . employees acted with scienter with respect to individual issues, it is also entitled to show that [the corporate defendant] as a firm was reckless . . . through the sum of its employees' activities and knowledge." *Id.* at 499-500.

**1.    The Complaint Sufficiently Pleads Facts Giving Rise to a Strong Inference that Defendants had the Motive and Opportunity to Commit Fraud**

"Under the 'motive and opportunity test,' it has been held that scienter is properly alleged when a complaint posits that the defendants '(1) benefited in a concrete and personal way from the purported fraud…; (2) engaged in deliberately illegal behavior…; (3) knew facts or had access to information suggesting that their public statements were not accurate…; *or* (4) failed to check information that they had a duty to monitor.'" *Burman*, 384 F. Supp. 2d at 332 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

The Complaint alleges facts that demonstrate Defendants had powerful motives to commit fraud. For example, Panero, along with several other key XM insiders, sold large portions of their XM stock holdings during the Class Period when the stock price was trading at artificially inflated levels due to Defendants' fraud. Numerous courts have held that unusual or suspicious stock sales by corporate insiders may constitute a strong inference of scienter. *In re Baan*, 103 F. Supp. 2d at 19 ("Insider sales 'in suspicious amounts or at suspicious times' can be evidence of scienter.") (quoting *Newbridge I*); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003)("Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 420-21 (5th Cir. 2001) ("'[i]nsider' trading must be 'unusual' to have meaningful probative value."); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (allegations about

- 30 -

insider sales "largely tend to illustrate that Defendants had the motive and opportunity to commit securities fraud."). The sales may be considered in combination with other indicia of scienter, even if they fall short of establishing scienter on their own. *In re Baan*, 103 F. Supp. 2d at 22-23.

The stock sales by Panero during the Class Period were unusual and suspicious in amount. The Complaint alleges that Panero sold more than 400,000 shares of XM stock, or approximately 99% of the XM shares that he actually owned, for gross proceeds of nearly $12 million. ¶88. Around the same time period, other key XM insiders sold significant amounts of XM stock for gross proceeds in excess of $60 million. ¶89. The percentage of stock holdings sold and the gross amount of proceeds obtained are more than enough to establish that these trades were unusual. *See Am. West*, 320 F.3d at 938 ("Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders . . .").

Defendants attack the Complaint's insider selling allegations in a couple of ways. First, they assert that "Plaintiffs misleadingly allege that Panero sold 99% of his XM stock holdings on December 6, 2005" and instead assert that Panero sold 27.1% of his XM securities holdings. Def. Mem. at 32. To make this distinction, Defendants claim that unexercised stock options and convertible debt holdings must be factored into the stock holdings. *See id.* That is not the law. In calculating an insider's stock holdings, courts look to the number of shares ***actually owned***, not to potential holdings that, for whatever reason, were not converted into actual shares. *See Am. West*, 320 F.3d at 939 n.16 (percentage of stock sold derived from common stock and ***exercised*** options).

Second, Defendants assert that any inference of insider trading by Panero is "undermined by the timing of his sales, which occurred on December 6, 2005 . . . more than two weeks before Christmas and more than three weeks before XM's year-end subscriber count or SAC and CPGA results could have been known." Def. Mem. at 33. This makes no sense. It is for the precise reason that Panero sold when "business was good," but shortly before the disclosure of adverse information,

that renders the timing of Panero's sales suspicious.  Thus, the fact that Panero sold shortly before the truth became known supports an inference of scienter.  *See Am. West*, 320 F.3d at 938.

Third, Defendants assert that allegations that other key XM insiders sold massive quantities of XM stock cannot be viewed as additional evidence of Defendants' scienter.  "[A]llegations of 'insider trading in suspicious amounts or at suspicious times' may permit an inference that the trader -- and by further inference, the company -- possessed material nonpublic information at the time." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 26 (1st Cir. 1992)).  In *Shaw*, the plaintiffs alleged in additional support of their allegations of defendants' knowledge that two insiders of the company, neither of whom was a defendant, sold company stockholdings during the third fiscal quarter.  *Id.*  One, the company's treasurer, sold 1,625 shares (68% of the officer's total holdings).  *Id.*  The other, the general manager and vice president of the company's personal computer business, sold 2,000 shares (20% of his position).  *Id.*  The *Shaw* court found that "the plaintiffs' allegations of insider trading, inasmuch as they are at least consistent with their theory of fraud, provide some support against the defendants' motion to dismiss under Rule 9(b).  *Id.*  Here, the allegations that several high-ranking XM insiders sold massive quantities of XM stock for illicit proceeds in excess of $60 million, should, contrary to Defendants' assertions, provide some additional support of Defendants' scienter.  *See id; see also In re Dynex Capital*, 2006 U.S. Dist. LEXIS 35386, at *4-5.

Accordingly, Plaintiffs have sufficiently alleged that Defendants had motive and opportunity to commit securities fraud.  Under the existing law of this Circuit, that is sufficient by itself to establish scienter.

### 2. The Complaint Sufficiently Pleads Circumstantial Facts Giving Rise to a Strong Inference that Defendants Were Reckless

Plaintiffs may plead scienter by pointing to circumstantial evidence showing the Defendants' state of mind.  *See In re Baan*, 103 F. Supp. 2d at 20 (plaintiffs must set forth "facts that constitute

circumstantial evidence of either reckless or conscious behavior."). The Complaint alleges that Defendants acted with scienter because, despite their awareness or reckless disregard for several key events and transactions, they continued to tout the Company's cost-effective business strategy throughout the Class Period. Defendants made these statements in spite of the fact that the problems facing the Company throughout the Class Period made XM's business model of growing while cutting costs impossible.

Specifically, Plaintiffs allege the following key facts that constitute circumstantial evidence showing Defendants' state of mind:

- Based on his position in the Company, Panero could not realistically disclaim knowledge of critical facts impacting the Company's business. ¶¶16-19.

- SAC and CPGA were two of the most important factors showing the strength of XM's business and the success of XM's business model, and Panero publicly discussed these factors. ¶40.

- The signing and launch of Howard Stern on Sirius was one of the most important events in the history of satellite radio. Indeed, XM had tried to sign Howard Stern, knew when his show would start airing, and geared an entire, expensive marketing campaign to combat his arrival. ¶¶33-34. In other words, because of a clearly perceived competitive threat, Defendants knew their costs would rise significantly.

- The Listen Large campaign was so expensive (between $100 million and $150 million) that there was simply no way that Panero could not have known about it and, in fact, XM, led by Panero, fired its entire marketing team in early 2006 because the campaign had been so expensive and ineffective. ¶¶47-52. Plaintiffs also allege that the Listen Large campaign was planned and budgeted well in advance of its publication, further supporting Panero's knowledge that XM's costs would rise significantly. ¶51.

On top of the foregoing, Roberts' resignation at the close of the Class Period provides additional circumstantial evidence of scienter because the issue of soaring costs within XM and the direction of the Company was pervasive and a frequent topic of discussion at the highest levels of the Company, including the Board of Directors, throughout the Class Period. *See* ¶¶79-83 (Robert was emphatic that XM needed to reign in its skyrocketing spending habits).

Defendants claim that Plaintiffs' scienter allegations are insufficient because they impute knowledge based on Panero's position in the Company and management style. *See* Def. Mem. at 37-38. That is not so. More than relying on mere titles, Plaintiffs allege that, given Panero's position within the Company, he could not credibly argue that he was not aware of the intricacies of significant events, trends, and occurrences at the Company during the Class Period that would impact the Company's key financial metrics. More specifically, the Company's increasing competition from Sirius and dramatic spending increases during the fourth quarter of 2005, such that the Company altered its fundamental business strategy of growing while reducing costs, were undoubtedly at the forefront of issues faced by XM and could not have been accomplished without the knowledge of Panero, the highest executive in the Company.

Under such circumstances, courts have repeatedly drawn the inference that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. *In re PeopleSoft, Inc. Sec. Litig.*, No. C99-00742 WHA, 2000 U.S. Dist. LEXIS 10953, at *10 (N.D. Cal. May 26, 2000); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) (same); *see also Nathenson*, 267 F.3d at 425 (scienter element was satisfied as to patent statement because information regarding patent protection was "obviously important," critical to the company's core performance, and about which the company had "ample opportunity to become familiar"); *Am. West*, 320 F.3d at 943 n.21 (court held that an assertion by defendants that a major company issue did not come to the attention of management was "patently incredible."); *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854, at *60-64 (E.D. La. Dec. 14, 2006) (scienter properly alleged where defendants materially overstated the value of its single largest asset). In this case, the imminent emergence of modern radio's most famous and controversial personality, Howard Stern, on its only rival's

programming menu is the precise type of core issue that Panero knew about and took active steps to combat.

Further, any claims of ignorance by Panero must be juxtaposed against allegations that he was an extremely "hands-on" executive, who was "excellent in that way" (*i.e.*, in terms of being closely involved in operations). ¶17. Panero is described in the Complaint by a former Company vice president as an executive who always "asked a lot of questions" and was involved in decision-making at XM regarding marketing and "business-side" operations. *Id.* Panero is further characterized as "one of those 'floor walkers,' [who] knows everything and everyone" at XM and who is "not a distance-type manager." *Id.* Contrary to Defendants' arguments, such allegations add to a strong inference of scienter. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (specific admission by defendant CEO that he loved "getting involved in every detail of the business" and that he monitored the company's global database helped to create a strong inference of scienter regarding improper revenue recognition allegations).

Defendants attempt to counter the Complaint's allegations by re-casting them and asserting that "Plaintiffs alleged in purely conclusory terms that, because XM did not hit its subscriber targets and experienced increased higher SAC and CPGA in the fourth quarter of 2005, XM and Panero must have intended to deceive the market or been reckless in doing so." Def. Mem. at 30-31. Defendants conclude that Plaintiffs cannot allege scienter because the denominators of SAC and CPGA were impacted by the final numbers of new subscribers obtained and argue that "[b]ecause XM ultimately missed its subscriber target, the denominators of both calculations were smaller than they would have been if XM had reached or exceeded its goal" and that "SAC and CPGA results were accordingly somewhat higher than they would have been if XM had obtained more new subscribers in the fourth quarter of 2005." Def. Mem. at 36. Defendants further attempt to recast the Complaint's allegations by asserting that because SAC and CPGA results were "inherently

unknowable," Plaintiffs can only plead scienter by pleading the Defendants knew the Company would miss its year-end subscriber goal (which would skew SAC and CPGA). *Id.* In other words, Defendants claim the Complaint depends on the Company's ability to meet its subscriber targets, which it does not, and then argue that the Complaint must be dismissed because it does not include factual allegations that Defendants were reckless in ignoring that XM would miss its subscriber goal. *See id.*

Defendants cannot be permitted to recast the Complaint into one that hinges on whether Defendants were reckless in making statements that XM would achieve its subscriber targets. *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114 (M.D. Fla. 2005). The reality is that the Complaint alleges that Defendants were aware that XM would be forced to spend an extraordinarily high amount of money in the fourth quarter of 2005 – above and beyond any amounts spent in past quarters – and that because of those tremendous expenditures, Defendants were also aware that SAC and CPGA would soar to extremely high levels out of line with the Company's business model, past performance, and the market expectations Defendants fostered.

Further, the confidential witnesses identified and described with particularity in the Complaint confirm and corroborate that Defendants acted with at least recklessness in making false and misleading statements. Defendants wrongly attempt to downplay the strong inference of scienter by asserting that the "confidential witnesses merely provide general information . . . ." *See* Def. Mem. at 39-40. Where, as here, the Complaint contains specific descriptions of the former employee witnesses, including their positions, titles and dates of employment, the PSLRA pleading requirements are satisfied. *See Barrie*, 397 F.3d at 259*; Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101-03 (10th Cir. 2003); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 28-31 (1st Cir. 2002).

Defendants' red-herring "subscriber target" argument should be disregarded by the Court because it is misleading. Indeed, common sense and simple math expose the fallacy of Defendants'

position. The reality is that XM barely missed its year-end 2005 subscriber goal: XM ended the year with 5.933 million subscribers, approximately 1% shy of its 6 million subscriber goal. Put simply, the 1% subscriber goal miss could not have accounted for SAC increasing 39% over and above fourth quarter 2004 levels and a whopping 68% more than third quarter 2005 levels, and CPGA soaring 36% over fourth quarter 2004 levels and 58% more than in the third quarter 2005. If Defendants' argument was taken at face value, then it would have been virtually impossible, and inherently irresponsible, to ever make a CPGA or SAC forecast because immaterial changes to the subscriber number would dramatically alter SAC and CPGA by nearly 40% and 70%, respectively. The Court should see through Defendants' attempt to re-cast the Complaint as a "miss of subscribers"-based action, focus on Defendants' concealment of soaring expenses, and construe the Complaint's allegations in the light most favorable to Plaintiffs. *See Burman*, 384 F. Supp. 2d at 325.

In sum, given the weight of evidence set forth in the Complaint, Plaintiffs have sufficiently alleged specific facts that, when considered cumulatively, give rise to a strong inference that Defendants acted with the requisite scienter.

## IV.    CONTROL PERSON LIABILITY

Panero does not dispute that he is a "control person" for purposes of §20(a) of the Exchange Act. Instead, he bases his defense to this claim solely on the contention that Plaintiffs have failed to allege a primary violation of the securities laws. Thus, to the extent the Court finds that Plaintiffs have alleged primary violations under §10(b) of the Exchange Act, it should also sustain Plaintiffs' control person liability claims. *See, e.g., In re Baan*, 103 F. Supp. 2d at 23 (control person liability under §20(a) is contingent upon showing direct §10(b) liability of the controlled entity).

## V.    JUDICIAL NOTICE

Part and parcel with their motion to dismiss, Defendants ask this Court to take judicial notice of certain documents referenced in the Complaint and/or filed in connection with Defendants'

- 37 -

motion to dismiss. Defendants did not file a separate motion requesting the Court to take judicial notice of the 25 exhibits appended to the Valentine Declaration. Rather, they relegated their request to a footnote. *See* Def. Mem. at 4 n.1.

"[T]he general rule is that courts are prohibited from considering matters outside the pleadings in ruling on a motion to dismiss and must confine their analysis to the four corners of the complaint." *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875 (E.D. Tenn. 2005) ("the Court is careful to note it is only taking judicial notice of the ***existence*** of these documents and the specific statements and/or allegations contained within the documents. ***It would be improper for the Court to rely upon these documents to determine disputed factual issues…***").[19] "Only the facts alleged in the complaint, documents attached as exhibits, and matters about which the Court may take judicial notice can be considered." *Delano v. Roche,* No. Civ. A. 04-0830 RBW, 2006 WL 2687020, at *2 (D.D.C. Sept. 19, 2006) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C.Cir.1997)); *See Harris*, 182 F.3d at 802 n.2 ("[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute."). Moreover, the category of documents properly the subject of judicial notice, however, is not unlimited. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999) ("We stress that our holding [permitting judicial notice] relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.").

---

[19] Generally speaking, while the Court may consider evidence outside the pleadings that is undisputedly authentic and on which Plaintiffs specifically relied in the Complaint, it may not do so to prove the truth of their contents. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996).

Here, Defendants have asked the Court to take judicial notice of a host of documents in ruling on the motion to dismiss.[20]  With respect to the Class Period SEC filings, press releases, analyst reports, and conference call transcripts upon which Plaintiffs rely in the Complaint, Plaintiffs do not object to the Court taking judicial notice of their existence.  Plaintiffs do object, however, to the extent that Defendants seek judicial notice of the Class Period SEC filings, press releases, analyst reports, and conference call transcripts to prove the truth of the matters asserted therein.  *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (holding district court properly refused to take judicial notice of Form 10-K to decide facts in dispute); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640 n.2 (5th Cir. 2005) (observing, in a securities fraud case, that SEC filings may be considered for their content, but not for the truth of statements therein).  While Defendants may cite to these documents, they cannot ask the Court to use those documents to draw inferences in their favor, particularly at the pleadings stage.

Defendants go above and beyond relying on the documents referenced in the Complaint.  For example, the exhibits to the Valentine Declaration include: (1) stock sales charts created by defense counsel; and (2) a timeline of "relevant" statements created by defense counsel.  *See* Exh. A and B to the Valentine Declaration.  These exhibits, which were **created by Defendants' attorneys**, are not the proper subject of judicial notice and cannot be relied on by the Court at the pleadings stage.  *See Bryant*, 187 F.3d at 1277.[21]

---

[20] The lone case relied on by Defendants from this Circuit, *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991), was decided in the context of a newspaper publisher appealing the district court's denial of the publisher's petition for writ of mandamus to compel the magistrate judge to release portions of a plead agreement under seal, not a motion to dismiss.

[21] The cases relied on by Defendants do not support judicial notice of documents created by defense counsel.  *See, e.g., Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655, n.4 (4th Cir. 2004) (the Fourth Circuit only took notice of published stock prices); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of SEC filings and press releases, but holding that district court erred in accepting "for the truth of the matter asserted" certain statements in SEC

## VI.    CONCLUSION

On the basis of the facts alleged in the Complaint and the arguments set forth above,

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

DATED:  January 12, 2007               LERACH COUGHLIN STOIA GELLER
                RUDMAN & ROBBINS LLP
              NANCY M. JUDA (DC BAR # 445487)


                     _/S/ Nancy M. Juda_
                   NANCY M. JUDA

              1100 Connecticut Avenue, N.W., Suite 730
              Washington, DC 20036
              Telephone:  202/822-6762
              202/828-8528 (fax)

              LERACH COUGHLIN STOIA GELLER
                RUDMAN & ROBBINS LLP
              SAMUEL H. RUDMAN
              DAVID A. ROSENFELD
              MARIO ALBA, JR.
              58 South Service Road, Suite 200
              Mellville, NY  11747
              Telephone:  631/367-7100
              631/367-1173 (fax)

              LERACH COUGHLIN STOIA GELLER
                RUDMAN & ROBBINS LLP
              DAVID J. GEORGE
              DOUGLAS WILENS
              ROBERT J. ROBBINS
              120 East Palmetto Park Road, Suite 500
              Boca Raton, FL  33432
              Telephone:  561/750-3000
              561/750-3364 (fax)

              Lead Counsel for Plaintiffs

---

filings); _Ieradi v. Mylan Lab., Inc._, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (taking judicial notice of newspaper article).

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone: 215/561-3600
215/561-3000 (fax)

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd, Suite 750
Coral Gables, FL  33314
Telephone: 305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 12th day of January, 2007, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.  I further certify that on the same date I e-mailed and sent via U.S. mail the foregoing document to counsel of record listed below:

                         */S/ Nancy M. Juda*
                         NANCY M. JUDA

John Valentine
Michael A. Mugmon
WILMER CUTLER & PICKERING HALE
& DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006