IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re XM Satellite Radio Holdings Inc. Securities Litigation | ) ) ) ) | Civil Action No. 06-0802 |
| This Document Relates To: All Actions | ) ) ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1615 L Street NW, Suite 1300
Washington, DC 20036
Tel:    202-223-7380
Fax:    202-223-7480

Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:    202-663-6000
Fax:    202-663-6363

*Attorneys for Defendants XM Satellite Radio
Holdings Inc. and Hugh Panero*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION..........................................................................................................1

ARGUMENT ................................................................................................................4

I.   PLAINTIFFS FAIL TO ALLEGE THE EXISTENCE OF FALSE OR
     MISLEADING STATEMENTS WITH PARTICULARITY……………………………4

     A.   The Contention that XM Concealed a Change in "Business Model"
          or "Strategy" Is Refuted by XM's Full and Accurate Disclosures for
          Q4 2005……………………………………………………………………4

     B.   Plaintiffs' Argument that XM Misleadingly "Conditioned" the
          Market With Statements Concerning Cost-Effective Growth
          Fails as a Matter of Law…………………………………………………9

II.  PLAINTIFFS' CLAIM IS PREMISED ON INACTIONABLE PUFFERY……………10

III. XM'S FORWARD-LOOKING STATEMENTS WERE ACCOMPANIED
     BY MEANINGFUL CAUTIONARY LANGUAGE AND ARE
     THEREFORE PROTECTED UNDER THE PSLRA SAFE HARBOR………………...13

IV.  THE RESIGNATION OF XM DIRECTOR JACK ROBERTS INDICATED
     THE EXISTENCE OF A BUSINESS DISAGREEMENT, NOT FRAUD. ................... 16

V.   PLAINTIFFS FAIL TO PLEAD CIRCUMSTANTIAL FACTS SUPPORTING
     A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER………17

VI.  THE COURT MAY CONSIDER ALL DOCUMENTS AND
     INFORMATION ACCOMPANYING THE MOTION TO DISMISS. .......................... 22

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................ 19

*AIG Global Sec. Lending Corp. v. Bank of Am. Sec. LLC*, 2006 WL 1206333 (S.D.N.Y. May 2, 2006) ...................................................................................................................... 18

*Amalgamated Bank v. Coca-Cola Co.*, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006) ............... 15

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001) ........................................... 23

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) ................................................... 23

*Burman v. Phoenix Worldwide Indus.*, 2006 U.S. Dist. LEXIS 46071 (D.D.C. Jul. 7, 2006).................................................................................................................................. 18

*Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316 (D.D.C. 2005) ....................... 18

*City of Phila. v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001) ............................................. 20-21

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006) ............................................................................................................ 14-15

*Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fla. 2002) ................................................ 12

*DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) ................................... 23-24

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006).................................. 20

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002).................................................................. 19

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ...................................................... 9, 13

*Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999) ...................................5-6

*In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................................ 14

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................... 9

*In re BMC Software*, 183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................... 23

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) ................................................ 10-11

*In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004)......................... 22

*In re Broadcom Sec. Litig.*, 2004 WL 3390052 (C.D. Cal. Nov. 23, 2004) ................................ 15

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................... 10

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (5th Cir. 2002) ................................................................ 22

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................ 10

*In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662 (E.D. Mich. 1999) ...................... 19

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005).................................................................... 20

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992) ................................... 5

*In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 1517580 (S.D.N.Y. Jun. 2, 2006) ...................... 18

*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................ 19

*In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 (W.D.N.C. 2001)................................. 19

*In re Geopharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................... 17

*In re iPass Sec. Litig.*, 2006 WL 496046 (N.D. Cal. Feb. 28, 2006) ............................................ 12

*In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................ 11, 13

*In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944 (C.D. Cal. 2003) ........................ 19

*In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003) ......................... 22

*In re Merck & Co., Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) ........................................................ 17

*In re New York Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466 (S.D.N.Y. 2006) ............... 5

*In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996) ...................................... 8

*In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166 (D.D.C. 1997) ........................................ 8

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 221 F. Supp. 2d 1090 (N.D. Cal. 2002)....................................................................................................................................... 22

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) ........................................... 19

*In re Silicon Storage Tech., Inc., Sec. Litig.*, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006).... 21-22

*In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063 (N.D. Cal. 2002) .......................... 22

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571
    (E.D. Va.  2006) ....................................................................................................8-9

*Kinsey v. Cendant Corp.*, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004)................................18-19

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................................... 5

*Limantour v. Cray*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) .................................................... 11

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) ........................................................ 13

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1999) .............................................. 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006)  .............................. 18

*Miller v. Champion Enterprises, Inc.,* 346 F.3d 660 (6th Cir. 2003)............................................ 15

*NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2004) .................................................................. 23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding
    Corp.*, 320 F.3d 920 (9th Cir. 2003)........................................................................... 19

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004)................................................ 14

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006)............................................................. 14

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ........................................................................ 19

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) .......................................................... 17

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)................................................................... 17, 19

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75
    F.3d 801 (2d Cir. 1996)................................................................................................. 9

*Santa Fe Industries v. Green*, 430 U.S. 462 (1977) ...............................................................16-17

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996) ................................ 5

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004).................... 18

*Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103 (2d Cir. 2005)................................................6-7

*Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991) .................................................10, 12-13

*Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005) ............................................................ 19

*Yellen v. Hake*, 437 F. Supp. 2d 941 (S.D. Iowa 2006) ...........................................................13-15

**STATUTES**

15 U.S.C. § 78u-5(c) ..........................................................................................................15-16

Defendants XM Satellite Radio Holdings Inc. ("XM" or the "Company") and Hugh Panero respectfully submit this Reply Memorandum in Support of their Motion to Dismiss the Consolidated Class Action Complaint ("Complaint").

## INTRODUCTION

In their Opposition, Plaintiffs cannot and do not dispute that XM: (i) warned in advance that its spending would increase in the fourth quarter of 2005 ("Q4 2005"); (ii) disclosed the competitive risks motivating this increase as well as the specific marketing campaigns it would undertake; and (iii) accurately disclosed its results for the quarter at its conclusion. Rather, they describe their claim as resting on XM's failure to characterize this disclosed spending increase as "abandon[ing] its established 'cost-effective growth' plan" for that quarter. *See* Opp. at 8; *see also id.* at 1-2, 14-15, 24. That XM – while disclosing the relevant underlying facts – did not employ Plaintiffs' proposed descriptive language is no basis for a securities law claim.

Plaintiffs' core argument – that XM should have disclosed that its increased spending was not "cost-effective" – suffers from an additional fatal flaw. Whether spending is "cost-effective" depends on whether it succeeds in attracting customers. That XM's spending did not in fact attract as many new subscribers as hoped for is no basis for a claim that XM was required to disclose in advance that its spending would not be "cost-effective."[1]

This memorandum makes the following key points:

---

[1]     Plaintiffs argue that XM's having fallen short of its guidance of 6 million total subscribers at year-end by 70,000 is irrelevant to the substantial increase in SAC and CPGA, because 70,000 is a very small percentage of 6 million. Opp. at 36-37. For the second time in this case, Plaintiffs use the wrong denominator. The correct denominator is not total subscribers, but rather the number of *new* subscribers obtained *during 4Q 2005. See* Mot. at 5 & n.5. Moreover, Plaintiffs' suggestion that the uncertainty as to new subscribers would make it irresponsible to forecast SAC and CPGA, Opp. at 37, highlights a key point: *there is no allegation that XM in fact forecasted either SAC or CPGA numbers*. In fact, XM merely predicted that those numbers would be higher than in prior quarters. *See infra* at 6.

**(1) Plaintiffs fail to plead the existence of a material misrepresentation or omission.**
Courts routinely dismiss securities fraud complaints that attempt to portray objectively accurate factual disclosures (which XM made here) as misleading simply because they are not couched in the pejorative terms plaintiffs would have liked. Here, XM disclosed the competitive risks posed by its rival, its plan to ramp up marketing and promotions in Q4 2005, and the anticipation that SAC and CPGA would increase – the very facts to which Plaintiffs point as the basis for their conclusion that XM had changed its business model for that quarter.

**(2) Defendants' use of general, subjective terminology concerning "cost-effective" growth is inactionable as a matter of law.** Plaintiffs argue that because investors cared about XM's costs, the use of the term "cost-effective" was more than the mere "puffery" that courts have held is an insufficient basis for a securities fraud claim. Opp. at 19, 21-22. This argument misses the point. The "puffery" doctrine holds that soft, positive language regarding fiscal discipline and similar matters simply cannot support a securities fraud claim – it is entirely subjective and cannot be held up against any standard for accuracy, and is therefore immaterial as a matter of law.

**(3) The Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision insulates Defendants from liability for claims based on the Company's forward-looking statements.** Plaintiffs argue that the cautionary language accompanying the forward-looking statements at issue was inadequate because it did not warn of the "known risk" that "competitive factors" had supposedly forced XM to abandon its cost-effective growth strategy. Opp at 26. But XM's disclosures plainly advised of those factors (including competition from Sirius) and the risks they posed to XM's business. *See* Mot. at 24 n.21. Under the PSLRA, no further cautionary language was required. In all events, Plaintiffs' allegations fail to establish the

requisite "strong inference" that XM or Panero disbelieved the Company's forward-looking statements at the time they were made. Those statements are accordingly entitled to safe harbor protection.

**(4) Director Jack Roberts' resignation is not evidence of fraud.** Plaintiffs contend that Roberts' resignation from XM's Board of Directors over a disagreement with the rest of the Board about XM's spending on marketing, programming, and promotions demonstrates that the Company abandoned its "cost-effective growth" business model in Q4 2005. In fact, however, the very documents on which Plaintiffs rely indicate that Roberts was not objecting to a change in corporate strategy, but rather that he was *advocating* (unsuccessfully) a change in strategy. Whether Plaintiffs think Roberts was right or wrong, his position lends no support to their claim that there had been a change that should have been disclosed.

**(5) Plaintiffs fail to plead sufficient circumstantial facts supporting a "strong inference" of scienter under the PSLRA.** No "strong inference" of scienter can be drawn where, as here, there was no underlying false statement – XM unambiguously disclosed its marketing and promotional plans for Q4 2005. The allegations that Panero was an active manager aware of those plans do not support an inference of intent to defraud under such circumstances. Moreover, Panero's sale of a small portion of his XM securities in early December 2005 does not provide a cognizable motive. Plaintiffs misstate the prevailing law to argue that Panero sold a far greater percentage of his investment in XM than he actually did. *See* Mot. at 32-33. In truth, Panero (and the four other XM personnel who sold in November and December 2005) retained the vast majority of their XM holdings. Likewise, Plaintiffs' assertion that Panero supposedly knew the "Listen Large" campaign would ultimately cost $100-$150 million (an incongruous allegation given that XM's disclosed marketing and advertising

expenses totaled only $66.7 million in Q4 2005) is not inconsistent with XM's disclosures that marketing and advertising expenditures would increase in the fourth quarter. Under the PSLRA, the uncorroborated account of the "former District Manager" who supplied that allegation does not give rise to an inference of scienter in any event, particularly where the Complaint provides no facts suggesting that individual was in a position to know such overall corporate information – the $50 million range of his estimate strongly suggests he was not.

      **(6) Defendants' submission of public information can properly be considered in ruling on this motion.** Plaintiffs purport to challenge Defendants' request that the Court consider the exhibits submitted in support of their Motion to Dismiss, which consist entirely of publicly available information. Because those documents are offered merely to establish that their contents were publicly disclosed, not for the truth of the matters asserted, they are of the type routinely and appropriately considered by the courts in deciding motions to dismiss under the federal securities laws.

### ARGUMENT

**I.**     **PLAINTIFFS FAIL TO ALLEGE THE EXISTENCE OF FALSE OR MISLEADING STATEMENTS WITH PARTICULARITY.**

    **A.**     **The Contention that XM Concealed a Change in "Business Model" or "Strategy" Is Refuted by XM's Full and Accurate Disclosures for Q4 2005.**

      In their Opposition, Plaintiffs concede that XM and Panero publicly disclosed the Company's marketing and advertising plans and subscriber cost metrics for Q4 2005. Indeed, Plaintiffs acknowledge that XM "did disclose an expected cost increase due to the holiday sales season[.]" Opp. at 15. Notwithstanding those disclosures, Plaintiffs argue "Defendants failed to disclose to the market that they had undertaken a fundamental shift in XM's business model … to combat the serious competitive threat posed by … Sirius Satellite Radio, Inc." Opp. at 2.

This argument amounts to quibbling over semantics (apart from being untrue):  Plaintiffs seek to manufacture a securities law claim by labeling a disclosed spending increase of a single quarter's duration as a "fundamental shift in XM's business model," and faulting XM for failing to apply that label itself – a tactic expressly rejected by the D.C. Circuit in *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994).  In *Kowal*, the plaintiffs alleged that MCI failed to disclose that its competitive position was "deteriorating"; that its funds were "insufficient" to compete "effectively"; and that AT&T placed "great pressure" on MCI.  *Id.*  In light of MCI's accurate factual disclosures about corporate events, general industry conditions, and its competitors' activities, the Court refused to credit the plaintiffs' contention that MCI made a material misstatement by not describing those issues in the negative terms advocated by the plaintiffs.  "Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public … such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory."  *Id.* (internal citations omitted and emphasis added).[2]

Here, as in *Kowal*, XM indisputably disclosed the competitive risk posed by Sirius, as well as the Company's intent to spend more on marketing and advertising in Q4 2005.[3]

---

[2]    *See also In re New York Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 480 (S.D.N.Y. 2006) ("A company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock.") (internal citations and quotations omitted); *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) ("Defendants were not obligated to describe in pejorative terms the types of Mortgage-backed securities in which the Trusts invested.").

[3]    Even if XM had not disclosed the competitive threat from Sirius and Howard Stern, the market was plainly aware of that threat, *see* Opp. at 3; Compl. ¶¶ 31-32, and "there is no obligation under the securities laws … to set forth information which is widely available to the public and which a reasonable investor ought to be held accountable for knowing[.]"  *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 562 (D.N.J. 1992); *see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-81 (9th Cir. 1999) (holding that defendant corporation was not required to disclose the details of its tax strategy because "the market was aware of the mounting costs associated with the tax strategy, from

Plaintiffs' contention that Defendants "omitted critical information [about] XM's true financial condition," Opp. at 15, is belied by the very disclosures on which the Complaint is based:

- **XM warned that competition from Sirius could negatively affect its business operations and specifically disclosed Howard Stern's impending debut.** In an August 5, 2005 public filing listing Risk Factors for investing in XM stock, XM warned that, "[c]ompetition from Sirius Satellite Radio … could adversely affect our revenues." *See* Form 8-K (Aug. 5, 2005) at 3, Valentine Decl., Ex. V. The Company further explained: "In seeking market acceptance of our service, we encounter competition for both listeners and advertising revenues from many sources, *including Sirius Satellite Radio* . . . . In 2004, Sirius … announced that *beginning in 2006 the Howard Stern nationwide radio show will air exclusively on Sirius*." *Id.* (emphasis added). XM made an identical disclosure in its November 7, 2005 quarterly filing with the SEC. *See* Form 10-Q, at 35, Valentine Decl., Ex. F.

- **XM disclosed that it would ramp up its marketing and promotions for Q4 2005, including increasing advertising and offering rebates.** On October 27, 2005, Panero stated that XM's third quarter 2005 results, "provide us with the flexibility to *aggressively advertise and market* our service in the fourth quarter. And in fact, that is what we are doing – implementing a *comprehensive media campaign comprised of advertisements, rebates, and other promotional techniques* to fully exploit the holiday selling season again this year." Compl. ¶ 68; Mot. at 18 (emphasis added).

- **XM disclosed its expectation that Q4 2005 SAC and CPGA would rise.** On October 27, 2005, Joseph Euteneuer, XM's Chief Financial Officer, stated: "Similar to past trends, *we expect fourth quarter SAC and CPGA to increase due to greater media and promotional activities* during the upcoming holiday season." Compl. ¶ 69; Mot. at 18 (emphasis added).

- **XM disclosed the launch of its "Listen Large" marketing campaign.** On November 14, 2005, XM announced the launch of its "Listen Large" marketing campaign, "featuring television, print, radio, online and outdoor advertising," and "special holiday pricing on XM radios." News Release (Nov. 14, 2005), attached to Supplemental Declaration of John A. Valentine in Support of Motion to Dismiss ("Supp. Valentine Decl.") at Ex. A; *see also* Mot. at 29-30 & n.29.[4/]

In sum, Defendants' public disclosures reveal the very facts Plaintiffs allege were concealed. *See, e.g.*, *Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 110 (2d Cir. 2005)

---

which [it] could have inferred that the strategy might one day be abandoned as too costly" via various news sources, including a *Wall Street Journal* article.

[4/]        Defendants hereby request that the Court consider the documents in the Supplemental Declaration of John A. Valentine in Support of Defendants' Motion to Dismiss, filed contemporaneously with this Memorandum, as part of the Court's consideration of Defendants' Motion to Dismiss. *See* Mot. at 4 n.1.

(concluding that alleged omissions were immaterial as a matter of law because prior company disclosures contained the precise information alleged to have been withheld).

Contemporaneous reports by securities analysts, furthermore, demonstrate the market's independent awareness of XM's Q4 2005 plans.  Moreover, while recognizing that XM's spending would be higher than normal in Q4 2005, these analysts plainly did not view that circumstance as a fundamental alteration of XM's business model:

- ☐ **Bear Stearns (Oct. 28, 2005):** "*Higher marketing expense in 4Q does not imply the economic model has broken down.*  XM reported significantly lower than expected marketing expense during 3Q, effectively [shifting] the marketing dollars to 4Q05.  Taking advantage of the upcoming holiday selling season and its reduced equipment costs, XM plans to focus on reducing the upfront cost of entry for potential subscribers even as its advertising campaigns focus on building awareness of its programming lineup.  *See* Compl. ¶ 71.

- ☐ **Lehman Bros. (Oct. 28, 2005):**  "We now expect $68.0MM in advertising and marketing expense in 4Q05, up from $29.6MM in 3Q04 and up $3MM from our prior estimate, *as we believe management held off on 3Q05 ad spending (which was $4.5MM below our expectations) to keep their powder dry for a major push in 4Q05.*"  *See id.* (emphasis added).

- ☐ **Deutsche Bank (Feb. 17, 2006):**  "*With XM's above-trend 4Q05 costs in line with our prior expectations*, we view the company's 2006 expense guidance as the significant news, and see the higher expense as a worthwhile investment prior to the major OEM auto installation ramp we anticipate for 2006-2008…. We estimate that *XM's business model will demonstrate tremendous operating leverage* as it moves from break-even cash flow from operations (projected for 2007) to close to $1bn in [cash flow from operations] by 2010."  Supp. Valentine Decl., Ex. B, at 1 (emphasis added).

- ☐ **Citigroup (Feb. 17, 2006).**  "*As we highlighted in our 4Q05 preview note, XM priced aggressively in 4Q to battle the arrival of Stern on Sirius…. As such, a greater-than-usual jump in 4Q SAC/CPGA was expected.*  Still, XM reported SAC per gross add of $89, $17 higher than our recently-revised forecast.  On the other hand, the differential between SAC and CPGA of $52 was essentially in line with expectations (XM reported CPGA of $141).  In other words, *while subsidies on tuners in 4Q were higher than expected, marketing and advertising spending was in line with expectations.*"  Supp. Valentine Decl., Ex. C, at 2-3 (emphasis added).

Thus, Plaintiffs' assertion that "[defendants] did not disclose that the competitive threat posed by Sirius during the fourth quarter of 2005 was heightened and that XM had taken several

-7-

concrete steps (with predictable consequences) to address that threat," Opp. at 16, is not only

refuted by XM's public disclosures, but directly contrary to the informed views of many of the

analysts on which Plaintiffs' own Complaint relies.  *See* Compl. ¶¶ 63, 71; *see also Iron Workers*

*Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 580 (E.D. Va. 2006)

("Where information about a company was made available in an analyst report, or by newspaper

articles, any withholding of information by the company is immaterial and *cured any omissions*

*by the company*.") (emphasis in original).[5/]

Plaintiffs misstate the law in their reliance on the Court's decisions in *In re Newbridge*

*Networks Sec. Litig.*, 926 F. Supp. 1163 (D.D.C. 1996) (hereinafter, "Newbridge I") and *In re*

*Newbridge Networks Sec. Litig.*, 962 F. Supp. 166 (D.D.C. 1997) (hereinafter, "Newbridge II"),

arguing that courts must always leave the determination of whether an alleged omission is

misleading to a jury.  *See* Opp. 17 & n.10.  This conclusion has no basis.  If Plaintiffs' reading of

those cases were correct, even the most conclusory securities fraud complaint could survive a

motion to dismiss simply by alleging insufficient disclosure on the basis of material omissions.[6/]

On the contrary, it is quite common for courts to grant motions to dismiss in "failure to disclose"

cases based on the plaintiff's failure to (i) allege the existence of a misleading omission with

particularity, or (ii) identify a legal duty to disclose the allegedly withheld information in the first

---

[5/]    As the court in *Iron Workers* held, at the pleading stage, courts may properly consider "analyst reports announcing … matters … not alleged on the face of the complaint."  432 F. Supp. 2d at 581.

[6/]    As *Newbridge I* makes clear, securities fraud plaintiffs must satisfy a heightened pleading standard (requiring plaintiffs to satisfy Federal Rule of Civil Procedure 9(b)); in that case, the plaintiffs failed to do so and their complaint was dismissed.  *Newbridge* I, 926 F. Supp. at 1171.  In *Newbridge II*, Judge Oberdorfer explained that an "analysis of Rule 10b-5 claims 'begins with two interrelated inquiries. First, were defendants under a duty to disclose the information at issue?  Second, were the alleged omissions material?'"  962 F. Supp. at 180 (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir 1989)).  Not only have Plaintiffs improperly conflated these separate inquiries, they have ignored Judge Oberdorfer's statement that "'the ultimate issue of materiality may be decided as a matter of law'"

place.  *See*, *e.g.*, *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-12 (2d Cir. 1996) (dismissing plaintiffs' securities fraud claim where defendant had no duty to disclose an alternative pricing strategy and plaintiffs' complaint "lack[ed] sufficient allegations demonstrating the falsity of any statements made by [defendant] during the class period").[2/]  The Court should do likewise here.

**B.     Plaintiffs' Argument that XM Misleadingly "Conditioned" the Market With Statements Concerning Cost-Effective Growth Fails as a Matter of Law.**

Plaintiffs suggest that the Company "conditioned the market, through affirmative statements [concerning XM's focus on reducing subscriber acquisition costs], to expect the application of the Company's stated business model to produce consistent results – declining or stabilizing SAC and CPGA."  Opp. at 18.  This argument fails for two reasons.

*First*, far from conditioning the market to expect "declining or stabilizing SAC and CPGA" in Q4 2005, Opp. at 18, XM explicitly warned that the Company expected "fourth quarter SAC and CPGA to *increase* due to greater media and promotional activities during the upcoming holiday season."  Compl. ¶ 69; Mot. at 18.  As the reports of analysts who follow XM

---

when "'the [alleged] disclosures or omissions are so clearly unimportant that reasonable minds could not differ[.]'"  *Id.*

[2/]      *See also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118-19 (10th Cir. 1997) (holding that "courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)," or where the defendant "had no duty to disclose the information allegedly omitted"); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) ("Absent identification of some duty to disclose and specific allegations as to how [defendant's] existing disclosure was rendered false, plaintiffs' fail to state a claim upon which relief may be granted."); *Iron Workers*, 432 F. Supp. 2d at 579-83 (dismissing plaintiff's securities fraud claim where "plaintiff fail[ed] to plead that Defendants made a material misstatement or omission" in part because "the information was available to investors through analyst reports," and "plaintiff fail[ed] to show Defendants had a duty to disclose the information").

made clear, the market quite sensibly interpreted XM's use of the word "increase" as an indication that SAC and CPGA would *rise*, not decline or stabilize. *See supra* at 7-8.[8/]

Second, as XM and Panero pointed out in their opening brief, Mot. at 19-20, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *see also In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (rejecting plaintiff's allegation "that Citigroup's reporting of revenue figures implicitly represented that such results would continue"). If Plaintiffs' theory were law, every reversal of business fortune would constitute securities fraud.

## II.    PLAINTIFFS' CLAIM IS PREMISED ON INACTIONABLE PUFFERY.

XM showed in its opening brief that general positive statements such as "cost effective growth" cannot give rise to a securities fraud claim under what has come to be known as the "puffery" doctrine. Plaintiffs have two responses: first, that cost containment was important to investors; and second, that under *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), statements of opinion can give rise to a securities fraud claim where the opinion is not genuinely held. Opp. at 19-22. Neither response addresses XM's argument.

Regardless of the importance of the topic, vague commitments to fiscal discipline and optimistic generalizations about "growth," such as XM's publicly stated goal of "cost-effective growth," are precisely the type of "general, positive, … forward looking comments" that this and other courts routinely deem inactionable "puffery." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 12-13 (D.D.C. 2000) (deeming corporation's "general, positive, … forward looking

---

[8/]    Deutsche Bank, whose projections of XM's SAC and CPGA for full-year 2005 were right on target, certainly was not "conditioned" in that manner. *See* Mot. at 10.

comments" about its "strong momentum" and ability to "sustain its continued growth"
inactionable puffery); *see also Limantour v. Cray*, 432 F. Supp. 2d 1129, 1146 (W.D. Wash.
2006) (concluding statements that defendants "expect continued strong growth" and are "very
optimistic and expect[] 2004 to be good," and "confident about prospects for growth" constitute
puffery; *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005)
(dismissing complaint and noting that "generalizations regarding … fiscal discipline … amount
to no more than [inactionable] puffery"); Mot. at 27-28 (citing additional cases). In all of these
cases, the topic – generally anticipated corporate growth and profitability – was indisputably
important to investors.

The puffery doctrine is not premised on the insignificance of the underlying topic, but on
the fact that vague terms such as "cost-effective growth" are too subjective to be relied upon by
investors or judged in litigation for accuracy. In 2003, for example, XM reported SAC and
CPGA of $75 and $137, respectively, *see* Form 10-K (Mar. 15, 2004), Supp. Valentine Decl.,
Ex. D, at 37, while the Company reportedly pursued "effective cost containment efforts."
Conference Call Tr. (Feb. 12, 2004), Supp. Valentine Decl., Ex. E, at 2. Thus, XM experienced
what it described, in effect, as cost-effective growth, despite the fact that the Company's year-
end SAC and CPGA for 2003 were significantly *higher* than the corresponding results of $64
and $109, respectively, for 2005. *See* Form 10-K (Mar. 3, 2006), Valentine Decl., Ex. C, at 33.[9/]
Because whether a particular level of spending to attract subscribers is cost-effective is a
judgmental determination that can be "neither quantified nor specified in any way," the Court

---

[9/]    The same is true of prior years, such as 2002, when XM reported a CPGA result of $430, *see*
Form 10-K (Mar. 31, 2003), Supp. Valentine Decl., Ex. F, at 41, while executing a "business plan"
described as involving "tight cost controls[.]" Conference Call Tr. (Mar. 27, 2003), Supp. Valentine
Decl., Ex. G, at 8. Compared to Sirius, which calculates SAC much like XM does, there is no question

has no basis on which to assess Plaintiffs' claim that XM "abandoned" its cost-effective growth

strategy. *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1239 (M.D. Fla. 2002) (statement that

acquisition "adds value" was impossible to measure and thus inactionable puffery). The inherent

inability to define the parameters of "cost-effective" growth reduces Plaintiffs' claim to nothing

more than a personal disagreement with a vague statement of corporate optimism – a hallmark of

inactionable puffery. *See, e.g.*, *In re iPass Sec. Litig.*, 2006 WL 496046, at *2, *4 (N.D. Cal.

Feb. 28, 2006) (statement that results demonstrated "business momentum" held to be

inactionable puffery because, "[i]n light of the vague sense in which 'momentum' is used . . . an

investor could not reasonably rely on the representations of momentum in drawing specific

conclusions about [defendant's] financial health").

    In all events, Plaintiffs' reliance on *Virginia Bankshares* is misplaced. (Opp. at 19-22.)

That case did not address the puffery doctrine, but rather whether false "statements of reasons,

opinion, or belief" may support claims under section 14(a) of the Securities Exchange Act of

1934. 501 U.S. at 1095. Answering that question in the affirmative, the Supreme Court

emphasized further that "liability … must rest not only on deceptiveness *but materiality as well*

(*i.e.*, it has to be significant enough to be important to a reasonable investor deciding how to

vote)." *Id.* at 1097 (emphasis added). Because puffery is, by definition, not material, Plaintiffs'

invocation of *Virginia Bankshares* does not permit them to validly premise claims on allegedly

false puffing statements concerning "cost-effective growth." Even courts that have considered

the *Virginia Bankshares* rule in the context of allegedly false statements of optimism have not

hesitated to dismiss claims – such as those asserted here – that lacked any concrete factual basis

---

that XM was cost-effective: Sirius' SAC result for 2005 was $139, $75 more than XM's. Sirius Form
10-K (Mar. 3, 2006), Valentine Decl., Ex. W, at 27. *See also* Mot. at 26 n.26.

and thus clearly constituted puffery. *See, e.g.*, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683-86 (4th Cir. 1999) (citing *Virginia Bankshares* and affirming summary judgment to defendants with respect to puffing statements concerning corporation's positive treatment of employees and cleanliness of stores); *Grossman*, 120 F.3d at 1119, 1121-22 (citing *Virginia Bankshares* and affirming dismissal on ground that statements concerning success of merger and opportunities created by merger constituted puffery).[10/]

## III.    XM'S FORWARD-LOOKING STATEMENTS WERE ACCOMPANIED BY MEANINGFUL CAUTIONARY LANGUAGE AND ARE THEREFORE PROTECTED UNDER THE PSLRA SAFE HARBOR.

With respect to the applicability of the PSLRA safe harbor to Defendants' forward-looking statements, Plaintiffs contend that the "cautionary language [accompanying those statements] was not meaningful because it did not warn about a known risk: that competitive factors had forced XM to abandon its cost effective growth strategy." Opp. at 26. In reality, however, XM disclosed both the risk of competition from Sirius and the expectation that XM's increase in marketing and promotional expenditures would cause SAC and CPGA to increase in Q4 2005. *See supra* at 5-7; Mot. at 18, 23-24. That XM did not use the pejorative phrasing Plaintiffs now prefer is irrelevant: the underlying risks and their potential impact on XM's business were disclosed to the market. *See, e.g.*, *Yellen v. Hake*, 437 F. Supp. 2d 941, 962-63 (S.D. Iowa 2006) (concluding that risk disclosures in defendant corporation's quarterly reports –

---

[10/]    Moreover, as *Virginia Bankshares* acknowledged, statements of opinion or belief are only actionable where: (i) the defendant's "disbelief, or undisclosed belief and motivation" are shown; and (ii) the statements lack "a factual basis that justifies them as accurate." *Virginia Bankshares*, 501 U.S. at 1093, 1095; *see also In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) ("Even if defendants' statements were more than puffery, plaintiffs have failed to allege adequately that the assertions were materially misleading."). The Complaint here falls short in both respects. In light of XM's disclosure of the relevant facts regarding its Q4 2005 marketing and promotional plans and the absence of allegations suggesting XM or Panero intended to mislead the market, Plaintiffs have no basis for a claim under *Virginia Bankshares* (or otherwise). *See supra* Part I; *infra* Part IV.

which warned that "the cost and availability of raw materials," "the availability and cost of energy," and "price competition" "*may* cause . . . actual results to differ materially" – constituted "meaningful" cautionary language) (emphasis added); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 585 (W.D. Pa. 2006) (deeming forward-looking statements protected where cautionary language warned that "while management believes no additional material loss will be incurred related to these claims and change orders, as adjusted, the actual amounts realized *could* be materially different than the amount recorded") (emphasis added); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 844-45 (N.D. Tex. 2005) (concluding that defendant's cautionary disclosures, "containing terms such as can, may, will, expect, plan and similar terms, are subject to various risks and uncertainties [and thus were] forward-looking and sufficient to clearly warn investors of the risks-in fact").

Nor do Defendants lose safe harbor protection because XM's cautionary language used the word "may[,]" Opp. at 27, rather than referring to a "known risk[,]" *id.* at 26. That is precisely what cautionary language accompanying a forward-looking statement does: warn of *potential* problems that may occur in the future. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass[] in dealing with the contingent or unforeseen future."). Plaintiffs argue that cautionary language must be phrased in terms of "then-existing" problems rather than potential risks. Opp. at 27. But as noted above, whether marketing and promotional expenditures prove to be "cost-effective" – even if one could quantify the term – depends on how many subscribers ultimately respond, which before the end of Q4 2005 was clearly not a "then-existing" fact. *See* Mot. at 2, 5-6, 33-34; *see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 358

(S.D.N.Y. 2006) ("The securities laws do not require defendants to speculate about future events.").

Last, Plaintiffs argue that XM's forward-looking statements do not qualify for safe harbor protection because Defendants knew them to be false at the time.  For the reasons discussed *infra*, Part IV, the Complaint provides no factual allegations to support that assertion.  Moreover, numerous courts have held – and the plain language of the PSLRA dictates – that once a statement has been determined to be forward-looking and accompanied by meaningful cautionary language, the safe harbor is satisfied and the defendant's state of mind is irrelevant.[11] *See, e.g., Miller v. Champion Enters., Inc.*, 346 F.3d 660, 674 (6th Cir. 2003) ("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."); *Amalgamated Bank v. Coca-Cola Co.*, 2006 WL 2818973, at *4 (N.D. Ga. Sept. 29, 2006) ("Once a court determines that a statement is protected under the safe harbor, the defendant's state of mind is irrelevant") (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)); *Yellen*, 437 F. Supp. 2d at 961 (concluding that, if defendants' statements were forward-looking and accompanied by meaningful cautionary language, "this alone would be sufficient to invoke the Safe Harbor," without regard for defendants' state of mind); *In re Broadcom Sec. Litig.*, 2004 WL 3390052, at *3 (C.D. Cal. Nov. 23, 2004) (concluding that defendants were entitled to partial summary judgment where their forward-looking statements were accompanied by meaningful cautionary language, "irrespective of whether Defendants acted with scienter"); *see also* 15 U.S.C. § 78u-

---

[11]    The safe harbor provision is stated as a disjunctive:  it is available if (a) the forward-looking statement is so identified and accompanied by meaningful cautionary statements, *or* (b) plaintiff fails to prove that it was made with actual knowledge of its falsity.  *See* 15 U.S.C. § 78u-5(c).

5(c).  Indeed, to permit plaintiffs to nullify the safe harbor merely by inserting allegations of knowledge in their complaint would defeat Congress' purpose in enacting it.

## IV.    THE RESIGNATION OF XM DIRECTOR JACK ROBERTS INDICATED THE EXISTENCE OF A BUSINESS DISAGREEMENT, NOT FRAUD.

Plaintiffs attempt to portray Jack Roberts' resignation from XM's Board of Directors as a revelation supporting their claim, when in fact it is just the opposite.[12/]  Although Plaintiffs now argue that his resignation was recognition of an undisclosed change of corporate spending strategy, their quotation of his reasons demonstrates just the contrary:  Roberts was opposing the status quo and arguing *for* a change of strategy.  "I have been troubled about the current direction of the company….  For some time I have made my analyses and observations known….  I believe that XM will inevitably serve its shareholders poorly without major changes."  Compl. ¶ 79; Form 8-K (Feb. 16, 2006), Valentine Decl., Ex. H, Resignation Letter, at Ex. 17.1.

There is simply no basis in the factual allegations for Plaintiffs' mischaracterization of the Roberts resignation as anything more than an ongoing business disagreement among members of XM's Board of Directors.  *See* Mot. at 28-30 & n.28.  As the Supreme Court held in *Santa Fe Industries v. Green*, Section 10(b) and Rule 10b-5 were not intended to regulate such internal corporate management issues.  430 U.S. 462, 479 (1977) (holding that Section 10(b) does not "regulate transactions which constitute no more than internal corporate

---

[12/]    *See, e.g.*, Opp. at 23-25 (contending that Roberts' resignation suggests that Defendants "kept the market in the dark" about the Company's abandonment of its subscriber growth strategy); 27 (arguing that Defendants' statements should not receive protection under the PSLRA's safe harbor because Roberts' resignation shows that they "knew their forward-looking statements were false and misleading when made); 33 (asserting that Roberts' resignation provides "additional circumstantial evidence" that Defendants acted with scienter).

mismanagement"); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("Generally, poor

business judgment is not actionable under Section 10(b) and Rule 10b-5.").[13/]

## V.   PLAINTIFFS FAIL TO PLEAD CIRCUMSTANTIAL FACTS SUPPORTING A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.

Given the fact that XM made no false or misleading statements during the putative class

period, there is no need for the Court to reach the issue of whether XM or Panero acted with

scienter.  *See, e.g.*, *In re Merck & Co., Sec. Litig.*, 432 F.3d 261, 271 n.9 (3d Cir. 2005)

(declining to address scienter and reliance where defendant corporation's disclosure in Form S-

1 "was not materially false or misleading and did not omit sufficient facts").  The only

reasonable inference to be drawn from the Complaint, analyst and news reports, and SEC filings

is that XM disclosed both its anticipated increase in Q4 2005 expenses and, at the end of the

period, its actual results.  This is inconsistent with an inference of scienter. [14/]  Nowhere does

the Opposition come close to identifying allegations providing a "strong inference" that

Defendants' statements satisfy the standard Plaintiffs themselves accept for recklessness:  "'an

extreme departure from the standards of ordinary care … present[ing] a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have

---

[13/]    Moreover, a director's resignation in and of itself does not give rise to a strong inference of scienter.  *See, e.g.*, *In re Geopharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 451 (S.D.N.Y. 2006) (finding "unavailing" plaintiffs' allegation that member of defendant's board of directors resigned without explanation two days after disclosure of allegedly false and misleading press release in part because of "the overall weakness of scienter created by the Amended Complaint").

[14/]    *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.") (emphasis in original); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (holding that "the PSLRA's pleading standards explicitly contemplate [weighing the facts] by requiring the district court to determine whether or not the facts support a '*strong* inference' of scienter") (emphasis in original).

been aware of it.'"  Opp. at 28 (quoting *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F.

Supp. 2d 316, 332 (D.D.C. 2005).[15/]

Plaintiffs argue they have alleged scienter based on:  (1) the stock sales by Defendant

Panero and others, Opp. at 30-32; (2) Panero's "hands on" role in management of XM, *id.* at 32-

34; and (3) Panero's alleged knowledge of the actual cost of XM's "Listen Large" marketing

campaign, Opp. at 33.  All three arguments lack merit.

---

[15/]    Plaintiffs attempt to circumvent the requirement to plead facts supporting a "strong inference" that XM and Panero acted with at least extreme recklessness by citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006), and *In re Dynex Capital, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 35386 (S.D.N.Y. Jun. 2, 2006) as establishing the applicable standard for scienter-pleading.  Opp. at 29, 32.  Those cases, however, are the subject of extraordinary appeals and have no persuasive value.

*First*, no other court in this District has adopted the relaxed scienter-pleading standard of either case.  *See Burman v. Phoenix Worldwide Indus., Inc.*, 2006 U.S. Dist. LEXIS 46071, at *15 (D.D.C. July 7, 2006) (mentioning, but not endorsing, the holding in *Tellabs*).  Indeed, last month, the Supreme Court granted certiorari in *Tellabs* to address the "strong inference" standard under the PSLRA and determine whether, and to what degree, courts should weigh competing inferences in determining whether a plaintiff has adequately pleaded scienter.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 437 F.3d 588 (7th Cir. 2006), *cert. granted*, 127 S. Ct. 853 (2007).  Likewise, in *Dynex*, the Second Circuit on September 18, 2006 granted the defendant's petition for an interlocutory appeal to determine "the permissibility of pleading corporate or collective scienter."  2006 WL 1517580, at *3 (S.D.N.Y. June 2, 2006); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, No. 1:05-CV-01897, Dkt. # 41, Order of U.S. Court of Appeals for 2d Cir. (Sept. 18, 2006).

*Second*, both cases get the PSLRA's heightened pleading standard for scienter dead wrong.  In *Tellabs*, the Seventh Circuit established the most lenient standard for pleading scienter of any court of appeals, holding that self-serving inferences of scienter advanced by the plaintiff may be considered, but competing inferences of innocence offered by the defendant may not.  *See Tellabs*, 437 F.3d at 601 ("Congress chose neither to adopt nor reject particular methods of pleading scienter – such as alleging facts showing motive and opportunity – but instead only required plaintiffs to plead facts that together establish a strong inference of scienter."); *see also* Brief for Petitioner Tellabs, 2006 WL 2849388, at *5, *Tellabs v. Makor Issues & Rights, Ltd.*, No. 06-484 (U.S. Oct. 3, 2006).  In addition, many courts have rejected the *Dynex* notion of "collective corporate scienter" as inconsistent with basic tenets of corporate law, which recognize that corporations act only through their employees and therefore can only have liability when their individual employees act with scienter.  *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366-67 (5th Cir. 2004) (citing agency principles in refusing to aggregate collective knowledge of all corporate officers to determine scienter); *AIG Global Sec. Lending Corp. v. Bank of Am. Sec. LLC*, 2006 WL 1206333, at *3 (S.D.N.Y. May 2, 2006) (holding, in context of discovery dispute, that "in assessing the scienter of a corporate seller of securities, a fact finder does not consider the knowledge or intent of employees not connected to the sale"); *Kinsey v. Cendant Corp.*, 2004 WL 2591946, *13 (S.D.N.Y. Nov. 16, 2004) ("'A defendant corporation is deemed to have the requisite scienter ... only if the individual ... making the statement has the requisite level of scienter ....'").

**Panero's Sale of Stock.** Plaintiffs disregard both the overwhelming weight of authority and common sense in arguing that the Court should ignore nearly all of Panero's economic stake in XM in calculating the percentage of his holdings that he sold. As discussed in XM's and Panero's opening brief,[16] the law is clear that courts consider the *entirety* of a defendant's salable securities holdings, including vested, exercisable stock options, in examining a defendant's alleged motives.[17] To do otherwise would be to ignore reality.[18] When those holdings are applied to this case, it is evident that Panero retained 72.9% of his exercisable XM securities, a far cry from the paltry 1% suggested by Plaintiffs.[19]

---

[16]    *See* Mot. at 10-11 & n.13, 32-34 & n.30-31.

[17]    *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (considering amount of shares and stock options held after date of sale); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (finding Plaintiffs' calculations of percentages of defendants' stock holdings "inaccurate because they [did] not account for the stock options held by [the defendants], which must be considered *along with shares actually held* in determining whether insider sales are significant") (emphasis added); *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1166 (D. Ariz. 2005) (calculations of percentages of stock holdings sold have no probative value where plaintiffs fail to include exercisable stock options); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 n.28 (W.D.N.C. 2001) ("actual stock shares *plus exercisable stock options* represent[] the owner's trading potential more accurately than the stock shares alone") (emphasis added); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("The ownership of options must be considered in evaluating the Defendants stock sale activities.").

[18]    Citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), Plaintiffs erroneously assert that unexercised stock options and convertible debt holdings should be excluded from the Court's calculation of the Defendants' stock holdings. *See* Opp. at 31. Not only is this argument contrary to the clear weight of authority, but as courts within the Ninth Circuit have recognized, *America West* represents a deviation from the Ninth Circuit's widely accepted methodology, which routinely considers the total number of shares and exercisable stock options held by an insider. *See In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 955 (C.D. Cal. 2003) (refusing to "read so much into the *America West* case as to assume that it lays down a new rule regarding vested options"); *see also Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) (stating that "[s]tock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them"); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) ("[A] sale involving a significant portion of an insider's actual shares, but only a small portion of his shares and options combined, is less suspicious than were the insider to hold no options.").

[19]    *See* Mot. at 10-11, 32-34 (citing cases holding that scienter could not be inferred from similarly small stock sales by corporate executives). Likewise, George Haywood (a director) retained 64.2% of his exercisable holdings, Executive Vice President/Engineering and Technology Stelios Patsiokas 77.7%;

-19-

Nor does the timing of the sales in early December support an inference of scienter. Panero himself had told investors more than a month earlier that, because CPGA had been constant with prior results in the third quarter, XM would "aggressively advertise and market our service in the fourth quarter."   Compl. ¶ 68.  Had Panero sold *before* XM had alerted the market to expect this increase in spending, one might understand Plaintiffs' theory.  But where the sales occurred *after* this disclosure, and before the Christmas season results could be known (and the "cost-effectiveness" of the campaign evaluated), Plaintiffs' scienter theory makes no sense.

**Panero's Management Style.**  Plaintiffs attempt to allege scienter by praising Panero as an "excellent," "hands on" executive who is "one of those 'floor walkers.'" Opp. at 34-35.  Were diligent management a sufficient basis to satisfy the heightened scienter pleading requirements of the PSLRA, those pleading requirements would be meaningless:  with a few boilerplate allegations (which few defendants would contest), an inference of scienter would be automatic in every case.  For this obvious reason, the courts have routinely rejected it.  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) ("[O]fficers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (concluding that "[g]eneral allegations of defendants' 'hands-on' management style" cannot lead to a strong inference of scienter); *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001) ("[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which

---

General Counsel and Executive Vice President Joseph Titlebaum 70.8%; and Executive Vice President/Sales and Marketing Stephen Cook 81.9%.  *See id.*

[courts], on numerous occasions, have determined to be inadequate") (quotations and citations omitted).

**Panero's Alleged Knowledge of Cost of "Listen Large" Campaign.** Plaintiffs allege that Panero would have known about the "Listen Large" marketing and advertising campaign during the fourth quarter which, according to an anonymous "former District Manager[,]" was budgeted at $25 million but ultimately cost between $100 and $150 million. Opp. at 33; Compl. ¶¶ 48-50. This allegation fails for three reasons. First, if true, this allegation simply means that XM incurred higher expenses in the fourth quarter, exactly as it had told the market it would do. Second, Plaintiffs' estimate of the cost of the "Listen Large" campaign ($100-$150 million) makes no sense because it is much higher than XM's advertising and marketing expenses for all of 4Q 2005 ($66.7 million). *See* Form 10-K, Valentine Decl., Ex. C, at 35 (disclosing advertising and marketing expenditures for 2005 of $163.3 million); Form 10-Q (Nov. 7, 2005), Valentine Decl., Ex. F, at 14 (disclosing advertising and marketing expenditures for the nine months ended September 30, 2005 of $96.6 million); *see also* Citigroup Report, *supra* at 7. Third, the uncorroborated allegation of a former employee whose job position (District Manager) does not on its face put him in a position to know overall corporate financial data such as this (and who provides such a wide range of numbers) does not satisfy the particularity requirements of the PSLRA.[20] "In pleading fraud under the PSLRA, plaintiffs may rely on anonymous

---

[20] The Complaint's other anonymous witness allegations are not only deficient in corroborating details, but lack relevance. *See* Mot. at 39-40. For example, the "former Regional Account Manager of Sales and Activations," "former District Activation Manager," and "former Regional Sales Manager" allegedly supply information about XM's "subsidies" of radio purchases, including "free" radios given to new subscribers. *See* Compl. ¶ 55. Those individuals' alleged accounts add nothing to Plaintiffs' theory that the abandonment of XM's "cost-effective growth" model was concealed because XM in fact *disclosed* its plan to heavily subsidize radio purchases in Q4 2005, which the media recognized – through XM's public advertisements – included the provision of free radios after rebates. *See, e.g.*, *XM and Sirius' Promotional Environment is "Worse Than the Companies Expected,"* COMMC'NS DAILY

sources for information," but only "so long as they plead 'corroborating details' when allegations are based on non-public information." *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2006 WL 648683, at *10 (N.D. Cal. Mar. 10, 2006).[21/]  In any event, the cost of the "Listen Large" campaign, by itself, is irrelevant in light of XM's disclosures about its marketing and promotional spending increases for the fourth quarter of 2005 – disclosures that permitted at least one analyst (Deutsche Bank) to predict the Company's full-year SAC and CPGA with striking accuracy.  *See* Mot. at 19.

## VI.    THE COURT MAY CONSIDER ALL DOCUMENTS AND INFORMATION ACCOMPANYING THE MOTION TO DISMISS.

Plaintiffs challenge Defendants' request that the Court consider the public documents and other publicly available information submitted as exhibits to Defendants' Motion to Dismiss. *See* Opp. at 37-39.  Plaintiffs do not question the authenticity of these exhibits or dispute that SEC filings, press releases, analyst reports, and conference call transcripts are all proper subjects

---

(11/28/2005) ("Both satellite radio operators are offering free lower-end radios at Circuit City after rebates[.]"), Supp. Valentine Decl., Ex. H; *see also supra* at 5-7.

[21/]      *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (5th Cir. 2002) (evaluating "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia" in determining whether confidential witness material satisfies the PSLRA's particularity requirement); *In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308, at *13 (N.D. Tex. Apr. 26, 2004) (dismissing claims because "it is … not probable that two store managers and one district manager would know the rates of company-wide shrinkage in [Q4] 2002"); *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 221 F. Supp. 2d 1090, 1098 (N.D. Cal. 2002) (statements attributed to anonymous sources fall short where "informants' allegations provide no indication through 'signal words' whether the witness learned of the underlying facts firsthand or secondhand"); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (allegations insufficient where "none of the confidential witnesses [had] any first-hand knowledge of [defendant's] accounting decisions"); *In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003) (allegations insufficient where the  "complaint does not state how long these sources worked for [defendant] …. that they had any connection with [defendant's] accounting department or that their work responsibilities would provide them a basis for knowing the details of the accounting").

for judicial notice.[22/]  Rather, Plaintiffs object "to the extent that the XM Defendants seek

judicial notice of the [documents] to prove the truth of the matters asserted therein."  *Id.* at 39.

        In securities fraud cases, courts routinely consider the contents of SEC filings and other

public statements to establish, for purposes of a motion to dismiss, that disclosure of those

contents occurred.[23/]  Defendants do not offer their exhibits for any other purpose here, and

Plaintiffs' objection is therefore irrelevant.

        Plaintiffs also take issue with Defendants' submission of two exhibits created by

Defendants' counsel, one summarizing the stock sales at issue and the other setting out a timeline

of public statements made by Defendants.  *See* Valentine Decl. Ex. A & B.  The information in

these exhibits was derived exclusively from public filings with the SEC.[24/]  Moreover, Plaintiffs

cite no authority precluding judicial consideration of such compilations.  Indeed, courts have not

hesitated to consider similar compilations derived from SEC filings.  *See DeMarco v. DepoTech

Corp.*, 149 F. Supp. 2d 1212, 1218 (S.D. Cal. 2001) (taking judicial notice of chart compiling

risk disclosure statements from SEC filings and press releases that was created by defense

---

[22/]    Plaintiffs seem to imply that Defendants should have burdened the Court with a separate motion
for judicial notice, but Rule 201(c) merely requires that courts take "judicial notice if *requested* by a party
and supplied with the necessary information. *See* Fed. R. Evid. 201(c) (emphasis added).  The rule does
not require a separate motion.

[23/]    *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 n.10 (11th Cir. 1999) (taking judicial
notice of SEC documents because the cautionary statements contained in the document were relevant in
their existence and were not being used to prove the truth of the matter); *see also In re NAHC, Inc. Sec.
Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2004) (taking judicial notice of SEC filings, press releases, and stock
price data in securities fraud action); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.
1999) (taking judicial notice of SEC filings in securities fraud action); *Bovee v. Coopers & Lybrand
C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001) ("Court may consider the full text of the SEC filings,
prospectus, analysts' reports and statements integral to the complaint, even if not attached, without
converting the motion into one for summary judgment under Fed. R. Civ. P. 56." (internal citations and
quotations omitted)); *see also supra* at 6 n.4.

[24/]    Even if the Court does not grant with the XM Defendants' request to consider these exhibits at
issue, the Court could obtain the very same information Defendants provided in the charts by consulting
the relevant SEC filings, which are indisputably a proper subject of judicial consideration.

counsel "because it is simply a collection of quotations from documents the Court may

independently consider"); *In re BMC Software, Inc. Sec. Litig.*, 183 F. Supp. 2d 860, 884 (S.D.

Tex. 2001) (taking judicial notice of chart showing stock sold by defendants because the chart

summarized information contained in SEC filings).  Given that Plaintiffs do not challenge the

accuracy of the information in Defendants' compilations, consideration of those exhibits is

appropriate.

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: February 12, 2007

Respectfully submitted,

/s/ Charles E. Davidow
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Charles E. Davidow, D.C. Bar No. 331702
1615 L Street NW, Suite 1300
Washington, DC 20036
Tel:  (202) 223-7380
Fax:  (202) 223-7480

WILMER CUTLER PICKERING
  HALE AND DORR LLP

/s/ John A. Valentine
John A. Valentine, D.C. Bar No. 473072
Michael A. Mugmon, D.C. Bar No. 485150
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT to the Clerk of Court for filing and uploading to the CM/ECF system on February 12, 2007.  I further certify that on the same date I e-mailed and sent via U.S. mail the foregoing document to counsel of record listed below:

Nancy M. Juda, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
1100 Connecticut Avenue NW, Suite 730
Washington, DC 20036

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Jr., Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747

David J. George, Esq.
Douglas Wilens, Esq.
Robert J. Robbins, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

*Lead Counsel for Plaintiffs Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund*

Deborah R. Gross, Esq.
LAW OFFICES OF BERNARD M. GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107

*Counsel for Plaintiffs Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund*

Robert Sugarman, Esq.
SUGARMAN AND SUSSKIND
2801 Ponce De Leon, Suite 750
Coral Gables, FL 33134

*Counsel for Plaintiffs Boca Raton Firefighters and Police Pension Fund and Plumbers Local 267 Pension Fund*

Kimberly A. Chadwick, Esq.
DOHERTY, SHERIDAN & PERSIAN LLP
8408 Arlington Blvd., Suite 200
Fairfax, VA 22031

*Counsel for Booth Family Trust*

William B. Federman, Esq.
FEDERMAN & SHERWOOD
120 North Robinson, Suite 2720
Oklahoma City, OK 73102

*Counsel for Booth Family Trust*

/s/ Michael A. Mugmon_____
Michael A. Mugmon
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20037
Tel:  (202) 663-6000
Fax:  (202) 663-6363