# EXHIBIT A

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TEACHERS' RETIREMENT SYSTEM OF
LOUISIANA,
              *Plaintiff-Appellant,*

    and

BARRY SCHOENFELD, Individually and
on behalf of all others similarly
situated; SCHOENFELD GROUP;
BERNARDINELLI GROUP, Carmine
Bernardanelli, Joseph M. Hansen
and Frances C. Hunt being referred
to as Bernardinelli Group; GARY
SANDLER; ROCHELLE SANDLER; JUDY
A. SMITH; WILLIAM H. DAIL;
LOUISIANA SCHOOL EMPLOYEE
RETIREMENT SYSTEM,
              *Plaintiffs,*

    v.

No. 05-1988

FRED NEAL HUNTER; CYNTHIA B.
MERRELL; DOLPH W. VON ARX;
CHARLES SWOBODA; WALTER ROBB;
JOHN W. PALMOUR; CREE,
INCORPORATED; CALVIN H. CARTER,
JR.; JAMES E. DYKES,
              *Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge;
Wallace W. Dixon, Magistrate Judge.
(CA-03-549-1)

Argued: September 20, 2006

Decided: February 20, 2007

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Wilkinson joined. Judge Shedd wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Richard Ara Harpootlian, Columbia, South Carolina, for Appellant. Bruce C. Vanyo, KATTEN, MUCHIN & ROSENMAN, L.L.P., Los Angeles, California, for Appellees. **ON BRIEF:** Jay W. Eisenhofer, John C. Kairis, Sidney S. Liebesman, GRANT & EISENHOFER, P.A., Wilmington, Delaware, for Appellant. Carl N. Patterson, Jr., Donald H. Tucker, Jr., SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina; Lyle Roberts, Paul Chalmers, Nicholas I. Porritt, Ilana Kramer, WILSON, SONSINI, GOODRICH & ROSATI, Reston, Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

The district court dismissed plaintiffs' 168-page securities-fraud class-action complaint brought against Cree, Inc., a high-technology business in Durham, North Carolina,[1] which purported to allege

---

[1]Founded in 1987, Cree is a major innovator and manufacturer of silicon carbide-based products, including semiconductors, transistors, and light-emitting diodes, which are used in a variety of products such as digital cameras and wireless telephones.

claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaint claims that Cree made misleading statements about its business transactions with six companies over a period of almost four years, which were discovered when a former officer sued the company in June 2003. Relying on Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, the district court held that the complaint failed to allege *facts* sufficient to support the plaintiffs' claims that Cree's statements were misleading. The court also concluded that the plaintiffs did not sufficiently allege that the statements were made with the requisite scienter or that plaintiffs' losses were caused by the misrepresentations and omissions of which they complained.

Applying the Private Securities Litigation Reform Act and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) to plaintiffs' complaint de novo, we affirm, concluding that plaintiffs are complaining only about market risks, not particularized securities fraud.

I

On June 12, 2003, Eric Hunter, co-founder and CEO of Cree, Inc., from 1987 to 1994, and his wife filed suit against Cree, F. Neal Hunter (Eric Hunter's brother and co-founder of Cree, as well as its CEO from 1994 to 2001 and chairman of the board thereafter), and other officers, alleging violations of state and federal securities laws, defamation, and intentional infliction of emotional distress. Eric Hunter also sought a preliminary injunction against Cree and Neal Hunter to prevent alleged personal harassment that appeared to have attended an ongoing family fight. News of the lawsuit caused the price of Cree's stock to fall the next day from $22.21 to $18.10.

Although Eric Hunter promptly settled his suit in August 2003, the allegations in his complaint quickly spawned numerous class actions by purchasers of Cree stock who alleged securities fraud during a period beginning on August 12, 1999, when Cree filed an annual report on SEC Form 10-K, and ending on June 13, 2003, the day after Eric Hunter filed his suit, purportedly revealing the truth of Cree's fraud during the previous years. The cases were consolidated in the Middle District of North Carolina, and Teachers' Retirement System of Louisiana was named the lead plaintiff. In a consolidated class

action complaint, Teachers' Retirement System and the other plain-
tiffs (collectively, "plaintiffs") sought certification of a class of all
purchasers of Cree's common stock during the period from August
12, 1999 to June 13, 2003. The consolidated class action complaint
named Cree, as well as six of the corporation's officers and directors,
F. Neal Hunter, Cynthia B. Merrell, Dolph W. Von Arx, Charles
Swoboda, Walter L. Robb, and John W. Palmour, as defendants
(often hereafter referred to collectively as "Cree").

Count I of the consolidated class action complaint alleged that Cree
violated § 10(b) of the Securities Exchange Act ("the Exchange Act"),
15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which
prohibits making false or misleading statements in connection with
the sale of securities. Count II claimed that the individual defendants
violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which
assigns joint and several liability to a person who controls another
who violates a securities regulation. The district court granted the
defendants' motion to dismiss that complaint for failing both to plead
fraud with particularity and to plead facts supporting a strong infer-
ence that Cree acted with scienter. *See In re Cree, Inc. Sec. Litig.*, 333
F. Supp. 2d 461, 474-75 (M.D.N.C. 2004).

In response, the plaintiffs filed the first amended consolidated class
action complaint (hereafter, "the complaint"), at issue in this appeal.
The complaint bolstered the allegations made in the original consoli-
dated class action complaint and named two more Cree directors as
defendants, Calvin H. Carter and James E. Dykes. Additionally, the
complaint added Counts III, IV, and V. Count III alleged that the indi-
vidual defendants engaged in insider trading, in violation of § 20A of
the Exchange Act, 15 U.S.C. § 78t-1(a). Count IV claimed that the
individual defendants are personally liable under § 18 of the
Exchange Act, 15 U.S.C. § 78r(a), for making misleading statements.
Count V claimed that Neal Hunter, Swoboda, and Merrell violated
§ 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, which requires
CEOs and CFOs to reimburse their corporations for bonuses and other
compensation if the corporation is required to prepare an accounting
restatement due to misconduct.

Each of the counts relies on allegations that Cree misrepresented
a series of its transactions with six other companies over a period of

46 months in an effort to artificially inflate the price of its stock. The complaint alleges that Cree engaged in a "channel-stuffing" scheme with Charles & Colvard ("C&C"), by which Cree forced C&C to purchase silicon carbide crystals far in excess of C&C's need and then booked the unqualified revenue from the sales of these crystals even though C&C held an undisclosed right to return the crystals later on. It also alleges that Cree improperly booked revenue from a research and development agreement with C&C and a sale of equipment to C&C, because these transactions were a sham.

The complaint further alleges that Cree engaged in "round-trip" transactions with five other companies, Microvision, Inc., Spectrian, Inc., World Theatre, Inc., Xemod, Inc., and Lighthouse, Inc. "Round-tripping" typically refers to reciprocal agreements, involving the same products or services, that lack economic substance but permit the parties to book revenue to improve their financial statements. The putative pattern of these deals as alleged in the complaint was that Cree would intentionally overpay for an investment in the stock of the other company in exchange for the other company's agreement to purchase bogus R&D services from Cree.

Although Cree disclosed aspects of these transactions in its public filings, the plaintiffs' complaint alleges that the true nature of the transactions became known only when Eric Hunter filed his action against Cree, his brother, and other officers of Cree in June 2003. The complaint alleges that what was learned in June 2003 differed from what Cree had disclosed publicly and that the public disclosures were materially misleading.

Cree filed a motion to dismiss plaintiffs' amended class-action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion in its entirety, finding that the complaint's impressive length did not portend similarly impressive substance. The court concluded first that "plaintiffs adequately identif[ied] the statements [of Cree] they believe[d] to be false and the reasons why they believe[d] them to be false, but fail[ed] to state with particularity facts supporting a strong inference of fraud." Second, the district court concluded that plaintiffs did not adequately plead that the defendants acted with the requisite scienter because the complaint neither identified misleading statements or omissions nor alleged suf-

ficient circumstantial evidence of scienter. Finally, the court found that "plaintiffs . . . failed to demonstrate a direct relationship between their losses and the alleged misrepresentations and have failed, therefore, to establish the required element of loss causation."

Having dismissed the first count alleging a claim under § 10(b) and Rule 10b-5, the court also dismissed plaintiffs' claims under §§ 20(a) and 20A of the Exchange Act because these claims depended upon the liability alleged in the first count. Similarly, the court dismissed plaintiffs' claim pursuant to § 18 of the Exchange Act because plaintiffs failed to plead facts showing that Cree made false statements. Finally, the court dismissed plaintiffs' claim under § 304 of the Sarbanes-Oxley Act because plaintiffs did not allege that Cree was required to issue any restatement of its financial reports.

From the district court's final order dismissing the complaint with prejudice, the plaintiffs filed this appeal, challenging each of the district court's grounds for dismissal and seeking either the reinstatement of their complaint or leave to amend it. Cree urges us to affirm the district court's order or, in the alternative, to find that the complaint was barred by the applicable statute of limitations. Cree argues that in a securities fraud case such as this, the limitations period began to run when a reasonable investor would have "inquiry notice" of potential fraud, citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

## II

The district court dismissed the plaintiffs' class-action complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "PSLRA"). Because the district court's order ruled on the legal sufficiency of the complaint, we review that order de novo. *See Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006).

Ordinarily, the legal sufficiency of a complaint under Rule 12(b)(6) is determined by whether the complaint states a claim upon which relief can be granted in light of the pleading requirements of Rules 8 and 9, as well as the larger design of the Federal Rules. This design provides for simplicity in pleading that intends to give little more than

notice to the defendant of the plaintiff's claims and that defers until after discovery any challenge to those claims insofar as they rely on facts. Of course, the issue of whether the plaintiff is pursuing a claim upon which relief can be granted is a purely legal question that can be determined at virtually any stage of the federal process — in the beginning, under Rule 12(b)(6); after the pleadings have been filed, under Rule 12(c); after discovery, under Rule 56; or after the plaintiff has presented his case at trial, under Rules 50(a) or 52. When the issue of whether a complaint states a claim upon which relief can be granted is raised by a Rule 12(b)(6) motion and is dependent on the development of facts, however, the jurisprudence of Rule 12(b)(6) requires postponement of any final determination of the issue.

More precisely, under this scheme of notice pleading and broad discovery, consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery. As the Supreme Court has characterized this approach to Rule 12(b)(6) motions:

> Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted *under any set of facts that could be proved consistent with the allegations.*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal quotation marks and citation omitted) (emphasis added). Of course, when the matters alleged in the complaint are taken as true and the complaint still fails to state a claim upon which relief can be granted, it will be dismissed at the outset, under Rule 12(b)(6). *See Jordan*, 458 F.3d at 338.

Some have criticized this design of federal procedure as encouraging the filing of frivolous suits that have little hope of success and are designed to harass the defendant. The Supreme Court in *Swierkiewicz* considered the defendant's similar argument that "allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits." 534 U.S. at 514. The Supreme Court responded:

Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits. A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Id.* at 514-15 (internal quotation marks and citations omitted).

To address just the type of argument that the defendant advanced in *Swierkiewicz*, the Federal Rules of Civil Procedure require particularized pleadings in specific types of cases, including those alleging fraud. Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The reasons that have been given for applying this heightened pleading standard in fraud cases are numerous and continue to be debated. *See generally* 5A Charles Alan Wright & Arthur M. Miller, *Federal Practice and Procedure* § 1296 (3d ed. 2004). But one repeatedly given reason is summarized as follows:

[S]ome federal courts have expressed the view that allegations of fraud or mistake frequently are advanced only for their nuisance or settlement value and with little hope that they will be successful on the merits; indeed, there actually may be little or no incentive to secure the adjudication of the claim in some instances. Thus, unfounded fraud claims should be identified and disposed of early.

*Id.* at 37. Professors Wright and Miller also note, with particular relevance to the case before us, that this justification for Rule 9(b) encap-

sulates the goal of sorting out at an early stage "strike suits" in the securities field. *Id.* at 45-47.

Yet, the inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA. As the Committee of Conference that reported the PSLRA noted, "[Rule 9(b)] has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits." H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. The Committee of Conference stated that it was reacting to testimony on the need to establish "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits," and therefore intended "to strengthen existing pleading requirements." *Id.* Thus, the PSLRA was enacted in response to evidence presented to the Committee that

> abusive practices committed in private securities litigation include . . . the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action.

> \* \* \*

> This legislation implements needed procedural protections to discourage frivolous litigation.

*Id.* at 730-31.

The PSLRA provides that in pleading a material misrepresentation or omission, in violation of § 10(b) of the Exchange Act and Rule 10b-5, and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead *facts. Cf.* Fed. R. Civ. P. 8(a)(2) (providing that a pleading generally need only contain "a short and *plain statement of the claim* showing that the pleader is entitled to relief"

(emphasis added)). Thus, in alleging misrepresentations or omissions under the PSLRA, a complaint must include "*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). The PSLRA also directs that any complaint not meeting the pleading requirements be dismissed, *id.* § 78u-4(b)(3)(A), and that during the pendency of any motion to dismiss, discovery be stayed, subject to exceptions, *id.* § 78u-4(b)(3)(B).

Thus, while the Federal Rules generally allow a court, in ruling on a motion to dismiss under Rule 12(b)(6), to take into account *any set of facts that could be proved* consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff *to plead facts* to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission. 15 U.S.C. § 78u-4(b)(1). The Act also requires a plaintiff to plead sufficient facts to raise a *strong inference* of scienter. *Id.* § 78u-4(b)(2). Of course, the other elements of a securities fraud claim would be analyzed under the traditional pleading scheme of Rules 8 and 9, since Congress only addressed misrepresentations and scienter in § 78u-4(b).

In purporting to allege claims under § 10(b) and Rule 10b-5, the plaintiffs were required to allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages."[2] *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42

---

[2]Breaking down these elements further, the Supreme Court recently stated:

> In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:

F.3d 204, 208 (4th Cir. 1994). In dismissing the plaintiffs' complaint, the district court held the complaint to be wanting as to elements (1) (misrepresentation or omission), (2) (scienter), and (4) (loss causation). Thus, with respect to elements (1) and (2), we will apply the pleading standard created by the PSLRA, and with respect to element (4) — that the misrepresentation caused the plaintiffs' loss — we will apply the general pleading standards of Rules 8 and 9, as applicable to any fraud claim.

III

In dismissing the plaintiffs' complaint, the district court concluded first that the complaint failed to satisfy § 78u-4(b)(1)'s heightened requirements for pleading misrepresentations or omissions. While it found that the complaint adequately specified the allegedly misleading statements and the reasons why they were misleading, it concluded that, with respect to every single statement, the complaint fell short of alleging facts sufficient to support the plaintiffs' information and belief that the statements were misleading, as required by § 78u-4(b)(1).

---

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see *Basic [Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988)] (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in the absence);

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted).

Section 78u-4(b)(1) provides:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant —
>
> > (A) made an untrue statement of a material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall *specify each statement* alleged to have been misleading, *the reason or reasons why the statement is misleading*, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added). Thus, plaintiffs must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, "with particularity *all facts* on which that belief is formed."

The "all facts" requirement is imposed for several reasons. First and most obviously, it is included to determine the legal sufficiency of the complaint under Rule 12(b)(6). Under Rule 12(b)(6), a complaint is legally sufficient if it "state[s] a claim upon which relief can be granted." As explained above, under the generally applicable notice pleading rules, this standard requires the court to ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations that would permit relief to be granted. *See Swierkiewicz*, 534 U.S. at 514. The PSLRA's "all facts" standard, however, changes the relevant set of facts for alleging misrepresentations and omissions to those alleged in the complaint. Under the PSLRA, therefore, our inquiry becomes whether, if those facts alleged in the complaint are true, relief could be granted on the plaintiffs' claim. Stated another way, we must ascertain whether the complaint states *sufficient*

*facts* to permit a *reasonable* person to find that the plaintiff satisfied this element of his claim — that the defendant made a false or misleading statement.

If the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (endorsing *Novak*'s standard); *California Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (same); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003) (same). This construction of § 78u-4(b)(1) logically follows from the inquiry required by Rule 12(b)(6), which tests only the *legal sufficiency* of the complaint.

In interpreting § 78u-4(b)(1)'s "all facts" standard in the context of a Rule 12(b)(6) motion to require a pleading of "sufficient facts," we do not read the "all facts" standard out of the statute. It remains relevant to other aspects of the court's supervision of securities fraud class action litigation. For example, the court must be able to determine whether some discovery will be permitted, despite the general bar against discovery pending motions to dismiss. *See* 15 U.S.C. § 78u-4(b)(3)(B). Having the assurance that *all facts* upon which the plaintiffs' belief is based could be relevant in making this decision. The court might be similarly assisted in supervising the preservation of evidence "relevant to the allegations" under § 78u-4(b)(3)(C). And of course, at the conclusion of every lawsuit covered by the PSLRA, the court must make specific findings as to the parties' compliance with Federal Rule of Civil Procedure 11(b) as it applies to "*any complaint*, responsive pleading, or dispositive motion." *See id.* § 78u-4(c)(2) (emphasis added).

Reading § 78u-4(b)(1) to require the pleading of *all* facts which support a plaintiff's belief on the sanction of dismissal authorized by § 78u-4(b)(3)(A) could theoretically lead to some harsh results in the management of discovery and PSLRA litigation in general. *See Novak*, 216 F.3d at 314 (discussing these possibilities). But since Rule 12(b)(6) focuses on whether the complaint states a claim upon which

relief "*can be granted*," we need only determine in the circumstances before us whether plaintiffs' complaint alleges *sufficient facts* upon which a *reasonable belief* can be formed that Cree's representations or omissions were misleading.

Determining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole. We will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading. *See Adams*, 340 F.3d at 1102-03; *Chubb Corp.*, 394 F.3d at 147-55. When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources "with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged' or in the alternative provide other evidence to support their allegations." *Tellabs, Inc.*, 437 F.3d at 596 (*quoting Novak*, 216 F.3d at 314).

The complaint at issue here adequately specifies the statements alleged to have been misleading and the reasons why they were misleading. Indeed, it identifies no less than 48 statements publicly made over nearly four years regarding Cree's transactions. But after each misleading statement, the complaint simply repeats a formulaic set of allegations why, upon "information and belief," the statement was misleading. The facts alleged in support of these formulaic reasons fail to support a reasonable belief that the statements were in fact misleading, and therefore we conclude that the complaint fails to satisfy the PSLRA and Rule 12(b)(6)'s requirement that the complaint shall state with particularity sufficient facts on which a reasonable belief can be formed. This becomes clear when we consider the facts supporting the allegations about each transaction.

### A.  *C&C Crystal Supply Agreement, R&D Agreement, and Equipment Sale*

In multiple public filings from 1997 to 2002, Cree disclosed two agreements entered into with Charles & Colvard ("C&C"), a company founded in 1995 by Eric Hunter and then managed by his brother, Jeff

Hunter. One agreement was a long-term supply agreement, dated June 6, 1997, in which C&C agreed to purchase half of its requirements for silicon carbide crystals from Cree during each calendar quarter. Cree, in turn, agreed to supply specific quantities and colors of crystals exclusively to C&C. The agreement also provided that if C&C would order more crystals than Cree had a capacity to produce, C&C would have the right either to reduce the quantity of its order or to purchase crystal-growing equipment from Cree. If C&C opted to purchase equipment, Cree would construct the equipment on its premises to produce the additional crystals for C&C, and C&C would become obligated to purchase at least six months' output from the new equipment. After the equipment was fully depreciated, C&C would be required to transfer title to the equipment to Cree.

Under the second agreement, entered into at the same time as the crystal supply agreement, C&C agreed to pay Cree for research and development of colorless silicon carbide crystals. As amended in 1998, this agreement required C&C to pay Cree for R&D efforts at a level totaling $2.88 million annually for four years. In an amendment in May 1999, however, the parties lowered the level of R&D to $1.44 million annually.

For fiscal year 1999, Cree reported booking $11.4 million in revenue from the agreements, and in fiscal year 2000, $16.2 million. These sales were boosted by C&C's exercise of its option to purchase equipment in May 1999 for Cree's production of more silicon carbide crystals. As disclosed that month, this decision triggered C&C's contractual obligation to purchase the output of the new equipment over the next two years. C&C's payments during these years constituted a substantial portion of Cree's revenue for the relevant periods. For instance, sales of silicon carbide crystal materials to C&C for the second half of the calendar year 1999 represented 35% of Cree's revenue for the period.

In late 1999, C&C's fortunes began to take a downward turn, and C&C's need for silicon carbide crystals thereafter steadily declined. Cree disclosed in its January 3, 2000 SEC registration statement that C&C's sales were slow and inventory had grown, and Cree acknowledged that "a substantial portion of [its] revenue has come from large purchases by a small number of customers," of which C&C was one.

Cree reported that it "anticipate[d] that sales to [C&C] will decrease in calendar 2000" and that Cree "agreed that [C&C] could reschedule approximately one-half of its purchase commitments from the first half of calendar 2000 to the second half of the year." In April 2000, Cree disclosed in its quarterly report that, due to C&C's anemic sales and high inventory, "We anticipate that overall sales to [C&C] will decrease to less than 10 percent of our revenue for the fourth quarter of fiscal 2000, and will continue to decline as a percentage of revenue through the first half of 2001." Likewise, in February 2001, Cree's quarterly report stated, "We anticipate little or no revenue from the gemstone business over the next several quarters as [C&C] balance[s] their inventory levels. C&C sales made up approximately 5% of total revenue during the second quarter of fiscal 2001." By May 2001, Cree reported that it had made no sales to C&C in the third quarter of 2001 and expected "little to no revenue" from C&C in the several upcoming quarters. Because C&C's weakening sales hindered its ability to pay for Cree's crystals, Cree repurchased the crystal-growing equipment that it had constructed and sold to C&C, financing the purchase by giving C&C a $5 million credit against C&C's future crystal purchases. C&C disclosed this equipment sale in its own April 2000 quarterly report.

Plaintiffs' complaint alleges that Cree's disclosures were false or misleading because Cree's arrangement with C&C was a "channel-stuffing" scheme, by which Cree "exerted actual control over C&C" in their business dealings and caused "C&C to purchase SiC [silicon carbide] materials in excess of its demand for such materials, knowing that such purchases were leading to excessive inventory buildup" and which signaled "growth in recurring business that did not exist." The complaint also alleges that Cree overstated its revenues by booking "payments by C&C for SiC material which C&C had a right to reject and return." The complaint alleges that Cree overstated its revenues by "book[ing] payments from C&C for Cree's R&D work as revenue when Cree never conducted such R&D work." Finally, the complaint alleges that Cree fraudulently "booked revenues from the sale of equipment to C&C, and booked that transaction as a sale to C&C followed by Cree's repurchase of the equipment when no such sale and repurchase had occurred."

The complaint, however, completely fails to include facts sufficient to permit a reasonable belief that Cree exercised any control over

C&C and caused C&C to purchase unneeded crystals in a "channel stuffing" scheme. Far from impeaching the truth of Cree's public disclosures, the facts alleged in the complaint are consistent with the performance of the publicly disclosed supply contract, which obligated C&C to purchase certain outputs of crystals. The complaint alleges testimony of a former Cree process engineer who observed Cree selling consistent quantities of silicon carbide crystals to C&C during 2000 — precisely what the publicly disclosed supply contract called for. It also includes the statement of a confidential source, an undisclosed former C&C director of technology, who stated that "C&C spent money like 'drunken sailors' by regularly writing checks to Cree for $200,000-$300,000." This, too, is indicative of C&C's actual payments to Cree pursuant to the contract. To the extent that the complaint alleges that Cree somehow forced C&C to enter the supply contract, the facts are even more wanting. The complaint's only support of this claim is that managing officers from the two companies were related and met periodically to negotiate and supervise the agreements. It is impossible to infer from this that the publicly disclosed agreements were fraudulent.

    To plead facts sufficient to permit a reasonable belief that Cree improperly booked sales of silicon carbide crystals to C&C, the complaint depends on the existence of a right of C&C to return the crystals. The complaint works under the assumption that Cree would not have been entitled to book the sales if C&C had purchased the crystals on the condition that they could be rejected and returned. Even if this assumption were correct, the complaint fails to provide facts from which a reasonable person could conclude that C&C held any such right of return. Moreover, the complaint fails to suggest that Cree ever had to adjust its revenues due to any returns of crystals from C&C. If such a right of return had existed and the purchases were a sham, one would expect that C&C would have exercised the right of return, requiring Cree to adjust its books. Yet, no such scenario is even suggested in the complaint.

    Instead, the complaint relies on two personal sources who alleged that Cree concealed C&C's right of return — Eric Hunter and an unidentified former Cree process engineer. First, Eric Hunter's statement cannot reasonably be taken to support such an agreement because his service as a Cree officer ended in 1994 — three years

before the class period began — and the complaint provides no basis for his assertions about the Cree-C&C agreements. While Eric Hunter was under contract as a Cree employee during the class period, the complaint states that Eric Hunter never actually performed work under the contract. Nor does the bare fact that Eric Hunter is the brother of Neal Hunter help because the complaint does not allege that Neal Hunter ever communicated with Eric Hunter regarding Cree's operations. To the contrary, Eric Hunter's personal complaint filed against Cree in June 2003, which the plaintiffs incorporated in their complaint, alleged that Neal Hunter and other Cree officials harassed, threatened, intimidated, and defamed Eric Hunter and his family. The complaint's allegations based on Eric Hunter's statement do not, in short, support a reasonable belief that Cree afforded C&C a secret right to return silicon carbide crystals.

The complaint's second source alleging a secret right of return is a "former Cree process engineer who worked as the lead engineer on and manager of the C&C product line" from mid-2000 to mid-2001. This source stated that in his last few months of his employment (i.e., early 2001), C&C began rejecting large quantities of crystals. He claimed that "the rejected products were kept in C&C's facilities to create justification as to why Cree was not required to create a reserve or take a charge for the purportedly rejected and nonconforming goods." But these facts are not meaningful in light of the settled, publicly disclosed history. By early 2001, Cree's sales to C&C had slowed to a trickle; Cree reported booking no revenue from sales to C&C in January to March 2001 and expected "little to no revenue" in the subsequent quarters. Thus, even if this source correctly recalls C&C rejecting large shipments of silicon carbide crystals from Cree, he is simply wrong regarding Cree's revenue recognition methods. Cree booked no sales to C&C during this time.

Finally, this leaves the complaint's allegations that Cree improperly booked revenue for R&D that it never performed and that Cree improperly accounted for the crystal-growing equipment transaction. Again, these allegations rest entirely upon Eric Hunter's assertions. As discussed above, the complaint advances insufficient facts to show how Eric Hunter could have had any access to this information and therefore fails to satisfy PSLRA's stringent requirements for pleading misleading statements or omissions.

B.   *Microvision Investment and R&D Agreement*

In its 1999 annual report, Cree reported that in May 1999, it purchased $4.5 million of the stock of Microvision, Inc., a Washington corporation. At the same time, Microvision agreed to pay Cree $2.6 million for research and development on light-emitting diodes.

In its quarterly report of April 2000, Cree reported that on March 17, 2000, it purchased an additional 250,000 shares of Microvision, when Microvision stock was trading at $63.75. The stock purchase agreement contemplated a closing on April 13, 2000, and provided for a revision of the purchase price to $50 per share if Microvision's share price dropped substantially by that date. Because Microvision's shares in fact traded at $36.88 at the closing date, Cree paid Microvision $50 per share ($12.5 million), in accordance with the agreement. Microvision's quarterly report of March 30, 2000, discloses that, at that time, Microvision also entered into an identical stock purchase agreement with General Electric.

In its April 2000 quarterly report, Cree also disclosed that Cree and Microvision had amended their prior R&D contract, bringing its total value to $12.6 million over two years. In its 2000 annual report, Cree stated that it would apply this funding from Microvision to reduce Cree's R&D expenses over fiscal years 2000, 2001, and 2002.

Also in its 2000 annual report, Cree disclosed that in June 2000, it sold 162,200 of its Microvision shares, realizing a $3.6 million gain. Microvision's shares, however, steadily declined in value thereafter, and Cree ultimately sold the remainder of the stock in December 2002 for $1.8 million.

Plaintiffs' complaint alleges that Cree misrepresented what, in reality, were meaningless "round-trip" transactions with Microvision, entered into only for purposes of creating "sham" income. The complaint alleges that Cree intentionally overpaid in making its $12.5 million investment in Microvision, paying $50 per share when Microvision's shares traded at $36.88. The complaint alleges that Cree made this overpayment in exchange for Microvision's return of the money in payments for "sham" R&D work, which neither company intended Cree to actually perform. The complaint further alleges

that rather than using the payments for R&D to perform research beneficial to Microvision, "Cree simply continued doing the very same research it had been doing in the ordinary course of business." The alleged goal of the Microvision deal was to reduce Cree's R&D costs and thereby overstate its net income.

A typical "round-tripping" scheme involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services. *See, e.g., In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1024-25 (C.D. Cal. 2003) (describing the bartering of like services to artificially inflate revenues). Such transactions can be improper because the parties book revenues even though the transactions "wash out" without any economic substance. But the basis for alleging "round-tripping" does not exist when either of the transactions have economic substance because those transactions would not wash out. The mere existence of reciprocal dealing does not suggest "round-tripping." Indeed, it is a common, legitimate, and perhaps useful business practice for one company to invest in the stock of a second company with which it is entering into a major contract for products or services.

The plaintiffs do not allege the usual "round-tripping" exchange of like services. Instead, their theory is that Cree paid an extra amount of money for Microvision's stock beyond its market value, and that Microvision returned that excess amount in the disguise of a payment for R&D work that Cree did not actually perform. This allegation of round-tripping is plausible, however, only if both transactions involve this same excess amount of payment and otherwise lack economic substance. If either transaction has economic substance, the transactions cannot be a wash, and there would be no artificial inflation of revenue. Thus, the complaint must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham, washing each other out. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the claim is one that simply makes no economic sense — [the plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary").

The complaint fails adequately to allege facts supporting the conclusion that either leg of Cree's "round-trip" transactions with

Microvision lacked economic substance. As to Cree's intentional overpayment, plaintiffs rely solely on the fact that Cree paid $50.00 per share when Microvision's shares were trading at $36.88 on the deal's closing date. The public filings about this transaction show, however, that Cree's agreement to invest in Microvision was signed when Microvision's shares were trading at $63.75. Moreover, the agreement provided a neutral formula that established a purchase price of $50.00 if Microvision's share price dropped substantially by the closing date. Because Microvision's share price in fact dropped, the agreement operated to fix the price at $50.00 per share. It is noteworthy that Microvision's quarterly report of March 30, 2000, shows that Microvision also entered into an identical stock-sale agreement with General Electric. These facts do not support a reasonable belief that Cree *intentionally* overpaid for its investment in Microvision.

As for the second leg of this alleged "round-trip" — that Cree provided no R&D for Microvision's payments — the complaint relies on statements from two confidential sources besides Eric Hunter. An unnamed former Microvision project manager who purportedly had "personal knowledge of the contract between Cree and Microvision" stated that the R&D contract "made no mention of the development of improvements in blue and green laser devices for mobile handsets" and that "the contract did not contain any milestones or deadlines for the development of any products." But the actual contract belies these statements, providing that "Cree will undertake . . . the development of blue and green LEDs and LDs useful in scanned beam display systems." Additionally, the contract lays out specific program goals and deadlines. Given this source's evident lack of familiarity with the R&D contract, the facts he stated cannot support the complaint's assertion that Cree performed no R&D work.

Plaintiffs' second basis for impugning the R&D contract was statements from a confidential former Microvision R&D director, who stated that his position gave him knowledge of Microvision's "internal and external research projects." But the complaint also states that Microvision and Cree officials denied that director access to information about the R&D agreement. Thus, this source's only firsthand testimony is that *he did not know* whether Cree performed R&D work. Yet, plaintiffs argue that these allegations support the belief that Cree

in fact performed no other R&D work for Microvision. Fraud is not a reasonable inference to be drawn from the statements of this source.

### C.   *UltraRF Acquisition and Spectrian R&D Agreement*

The complaint also alleged a "round-tripping" arrangement with Spectrian. In a January 2001 SEC filing, Cree disclosed that in December 2000, it had acquired UltraRF, a division of Spectrian located in Sunnyvale, California, for $100 million. UltraRF was engaged in the design and manufacturing of transistors and laterally diffused metal oxide semiconductors ("LDMOS"). At the same time, Cree also announced that Spectrian agreed to pay Cree $2.4 million for the further development of LDMOS devices for Spectrian and to purchase from Cree $58 million of UltraRF/Cree products over a period of two years. In March 2001, Cree amended its January filing, reporting that it had allocated $81.6 million of its purchase price for UltraRF to goodwill.

As it turned out, UltraRF/Cree reported better-than-expected reve-nues in fiscal 2001 of $19.2 million, of which about 90% came from its sales to Spectrian. Cree's May 2001 quarterly report spoke of UltraRF with cautious optimism: "In the long term, UltraRF's success will depend on the rate at which we diversify our Spectrian-concentrated business. . . . We believe that LDMOS product line will enable growth of our products to customers other than Spectrian." During the first quarter of fiscal 2002, Cree announced that the high level of sales from its UltraRF operations continued, reporting another $9.6 million in revenue.

Cree, however, began to have trouble developing a newer LDMOS device, dubbed "LDMOS-8," which Spectrian required. In its Febru-ary 2002 quarterly report, Cree announced that the companies had modified the supply agreement in October 2001 to push back Spectri-an's purchases to the two subsequent quarters and give Spectrian a $2.1 million credit if UltraRF/Cree did not meet specified develop-ment goals. In a March 12, 2002 press release, Cree announced that it expected to complete the LDMOS-8 development and to deliver it during the fourth quarter of fiscal 2002. But it also stated that the delays prompted Cree to consider writing down UltraRF's goodwill in a one-time charge of $60 to $77 million. Cree's May 2002 quar-

terly report disclosed that the companies again modified the supply agreement to extend it by six months and reduce Spectrian's total purchase commitment to $54.8 million, subject to further reduction if Cree did not complete the development of the LDMOS-8 technology. The quarterly report also disclosed that Cree wrote down the entirety of UltraRF's goodwill in March 2002, having determined that its value was fully impaired.

During the course of a July 30, 2002 conference call, the defendants Merrell and Swoboda stated that Cree had achieved important development milestones in the LDMOS devices and expected testing to be completed by September 2002. But Cree's annual statement, filed August 19, 2002, was less optimistic and simply stated, "If we are unable to complete the full product qualification process and ramp up production of our recently released LDMOS-8 products adequately, Spectrian may reduce the amount it purchases during the applicable quarter under the agreement."

The next quarterly report dated October 29, 2002, disclosed that UltraRF/Cree's sales to Spectrian in that quarter totaled only $190,000. It also disclosed that the amended supply agreement "permits Spectrian to significantly reduce its purchase obligations if we were not able to complete our qualification of our LDMOS-8 products prior to the end of the first quarter of fiscal 2003 and for each subsequent month until those parts are qualified."

Finally, in Cree's January 31, 2003 quarterly report, Cree disclosed that the LDMOS-8 development delays caused Spectrian to cancel the supply agreement with a final $5 million payment in late 2002, as the agreement allowed.

Plaintiffs' complaint alleges that the truth of the matter was that Cree engaged in "round-tripping" with Spectrian and that Cree "intentionally overpaid for UltraRF with the understanding that the overpayment would be returned to Cree as revenues under the Supply Agreement." The complaint further alleges that Cree's disclosures were misleading because they failed to disclose that "prior to the acquisition, Cree knew it did not have the ability to perform the R&D contemplated in Cree's agreements" and that "Cree never performed the R&D work required under its agreements with Spectrian."