The fact that Cree ultimately had to write down the value of UltraRF's goodwill or was unable to develop the LDMOS-8 technology in a timely fashion does not mean that Cree fraudulently overpaid for UltraRF or neglected to conduct LDMOS-8 research and development. These facts are just as consistent with Cree having taken a risk in the hope of securing profits, and it is well known that the risks are great in high-technology industries, such as Cree's. A failed venture, standing alone, does not permit a reasonable inference of fraud.

The complaint's primary basis for this allegation is the fact that the purchase price exceeded UltraRF's book value by about five times, forcing Cree to allocate approximately $81.6 million of the acquisition price to goodwill. While this fact, standing alone, might signal that Cree made an investment that carried great risk, and indeed potential for reward, it does not suggest an excessive price, much less a fraudulent price. A "fair" acquisition price depends on a wide variety of factors, including market value, dividends, earning prospects, the nature of the enterprise, and "any other facts . . . which throw any light on future prospects." *See Viacom Int'l, Inc. v. Icahn*, 946 F.2d 998, 1000-01 (2d Cir. 1991).

Most telling is the fact that the complaint is devoid of particular facts that speak to a fraudulent valuation of UltraRF at the time it was acquired. It relies on conclusory and hardly probative statements by four confidential sources besides Eric Hunter. For example, a Cree technician asserted that "it was well-known within Cree that they had overpaid for a company with dim prospects," but the complaint does not tie this "well-known" sentiment to any particular date or persons. In hindsight, Cree employees likely regretted the UltraRF acquisition, but this does not mean Cree knew *ex ante* that the investment would sour. Also, a former employee in Cree's IT department asserted that Cree was "'very aggressive' in cutting deals for Cree" and "would 'move the line' when necessary." This vague statement also provides no particularized fact that supports the belief that Cree intentionally overpaid for UltraRF. A former assistant to the president of Spectrian's UltraRF division asserted that UltraRF had no "saleable" products and that "the division would be worth its total value in facilities and infrastructure or between $5 million and $10 million." The complaint does not say, however, how this person would know this information or would have expertise in valuing a business. Moreover, his

assessment appears to be contradicted in the complaint by the fact that UltraRF, after being acquired by Cree, did sell approximately $30 million of products to Spectrian. Whether Spectrian found the products useful is immaterial; for Cree's purposes, these were bona fide sales because "real products were shipped to [a] real customer[ ] who then paid with real money." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004).

The complaint also fails to support the allegations of the second leg of the alleged round-trip with Spectrian — the "sham" product sales and R&D agreement. The complaint's basic problem is that the facts it alleges do not contradict Cree's public disclosures. Cree and Spectrian disclosed that Spectrian committed to purchase certain levels of UltraRF products, which is precisely what happened. The complaint assigns a sinister motive to the deal, in light of UltraRF's ultimate failure, but, as we noted above, there are no facts to support this claim or belief. To be sure, reciprocal contracts without more are not per se fraudulent.

In an attempt to cure their deficient pleading, plaintiffs' complaint alleges that Cree concealed what it knew upon entering the agreements with Spectrian in December 2000 — that UltraRF/Cree would be able neither to develop the LDMOS technology nor to attempt to develop it. The complaint proffers just one confidential source to support this allegation, a Spectrian vice president of operations who stated baldly, "Cree never performed any real R&D for Spectrian," and who called Cree's R&D work "smoke and mirrors." The complaint does not allege facts to support how this source would know that UltraRF/Cree performed no "real" R&D work for Spectrian. Moreover, even this source's observations, if they were in fact observations, do not support the conclusory allegation that Cree knew, when it entered into the R&D agreement, that it could not perform it.

In short, the complaint fails to plead with particularity facts that Cree made any misleading disclosures with respect to the Spectrian transactions.

### D.  *WTI, Xemod, and Lighthouse Investments and R&D Agreements*

Plaintiffs' complaint also alleges, in far less detail, that Cree entered into undisclosed "round-tripping" arrangements with three

other technology firms — World Theatre, Inc. ("WTI"), Xemod, Inc., and Lighthouse, Inc. The pattern alleged was that Cree overpaid for investments in those firms in exchange for the firm's promises to pay Cree for R&D services with the knowledge that Cree would not actually perform the services.

With respect to the WTI arrangement, Cree filed a preliminary proxy on SEC Form PRE 14A in September 2000, which disclosed that in April 2000, Cree had invested $5 million in WTI. In the definitive proxy statement filed three weeks later, Cree disclosed that in late 2000, WTI entered into a four-year development agreement with Cree and that WTI had exercised its option to terminate that agreement in March 2001. In Cree's 2003 annual statement, filed in September 2003, Cree disclosed that it had taken several write-downs of its WTI investment, recognizing its value to be impaired. These write-downs occurred in the fourth quarter of fiscal 2001 in the amount of $750,000, in the second quarter of fiscal 2002 in the amount of $2.1 million, and in the fourth quarter of fiscal 2002 in the amount of $2.1 million.

Plaintiffs' complaint alleges that Cree knowingly overpaid for its investment in WTI and hid this fact by failing to disclose the write-downs until September 2003, over a year later. The complaint does not, however, make any allegations regarding the legitimacy of the development agreement that existed briefly between the companies.

With respect to Xemod, Cree announced in a press release on September 20, 2000, that it had invested $11.3 million in Xemod, a privately-held developer and maker of amplifier components for wireless communications. At some point, Cree also invested in an affiliate of Lighthouse, Inc., though the record contains no specific disclosure by Cree of the Lighthouse investment. Cree's 2003 annual statement, however, filed in September 2003, disclosed a series of write-downs that Cree took on its investments in Xemod and Lighthouse. In the fourth quarter of 2001, Cree took a write-down of $2.4 million on Xemod and $1.4 million on Lighthouse; in the second quarter of fiscal 2002, Cree took an $8.4 million write-down on Xemod and $1.8 million on Lighthouse; and in the fourth quarter of 2002, it took a $3.4 million write-down on Lighthouse. Cree's 2003 annual statement further disclosed that Cree had completed R&D agreements with Xemod

and Lighthouse in the recent past. Under these agreements, the two companies paid Cree $500,000 in 2001, $3.5 million in 2002, and $5.2 million in 2003.

Plaintiffs' complaint alleges that Cree intentionally overpaid for its investments in Xemod and Lighthouse in exchange for those companies returning the funds to Cree for "sham" R&D work. The complaint also alleges misrepresentations in that Cree did not disclose the existence of the investments or the development agreements until September 2003, even though some were executed as early as 2000. The record shows, however, that Cree did in fact disclose the write-downs on investments and developments with WTI, Xemod, and Lighthouse before 2003. Cree's annual reports in 2001 and 2002 described its write-downs on privately-held investments and R&D revenues in the aggregate. Cree's 2001 annual report disclosed that it took a $4.6 million write-down in the fourth quarter of fiscal 2001 "to establish a reserve for investments made in private companies that was considered to be other than temporary impairment to value." Cree's 2002 annual report discloses that it recorded a $20.4 million write-down on its privately held investments due to their impaired value. Cree explains that these disclosures related to the transactions about which the plaintiffs complain in their complaint.

The complaint alleges no documentary or personal source to support the allegation that Cree intentionally overpaid for these investments or failed to perform R&D pursuant to the agreements. It simply engages in pleading fraud by hindsight, noting that Cree had to write down these investments in fiscal years 2000, 2001, and 2002, and that Cree did not report these write-downs until it filed its 2003 annual report. Previous public filings of Cree, however, did report the write-downs, albeit in the aggregate, without breaking down which investments were overvalued and by what amounts. Even if Cree's choice of reporting method was improper accounting, which the complaint does not specifically allege, this method of reporting is not probative of plaintiffs' allegation of "round-tripping."

In sum, we affirm the district court's dismissal of the complaint on the ground that it fails to state with sufficient particularity facts needed to support the allegations that Cree made misleading statements.

IV

For the second element of a securities fraud claim under § 10b of the Exchange Act and Rule 10b-5 thereunder, a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with "severe recklessness" regarding the danger of deceiving the plaintiff. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003). A showing of mere negligence will not suffice. *Id.*

The PSLRA significantly strengthens the requirement for pleading this scienter. Whereas Federal Rule of Civil Procedure 9(b) allowed a person's state of mind to "be averred generally," the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference* that *the defendant* acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). Thus, to allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a "strong inference" that *each* defendant acted with at least recklessness in making the false statement. *See Tellabs, Inc.*, 437 F.3d at 602-03; *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-67 (5th Cir. 2004). And if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents. *See Tellabs, Inc.*, 437 F.3d at 602-03; *Southland Sec. Corp.*, 365 F.3d at 363-67.

The district court held that if the plaintiffs' allegations were true, the complaint may have sufficiently alleged scienter through a series of attenuated inferences based on the positions that individuals held in Cree. But it concluded that any more probing scienter inquiry was rendered moot by its conclusion that the complaint failed to plead that the defendants made any misleading statement or omission. Because

no misleading statement or omission was sufficiently alleged, the defendants could not have made misrepresentations or omissions intentionally or with sufficient recklessness.

We agree with this conclusion. While the complaint does allege facts that demonstrate that at least defendants Neal Hunter, Merrell, and Swoboda had fairly intimate knowledge of the various relevant transactions, any inferences that could be drawn from the facts are immaterial because the statements or omissions about those transactions were not misleading.

In addition, other facts stated in the complaint are too circumstantial to give rise to a "strong inference" that the defendants acted with scienter. The complaint suggests that the defendants artificially inflated Cree's share price in order to profit from personal sales of Cree stock. But insider trading can imply scienter only if the timing and amount of a defendant's trading were "unusual or suspicious." *See, e.g., In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d at 390; *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). The complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud. The complaint does not allege that defendants timed their sales to profit from any particular disclosures, and defendants' sales generally occurred at prices that were not especially high for the class period. *See Ronconi*, 253 F.3d at 435 (finding defendants' sales did not suggest "knowing falsehood" when sales were made at prices well below the stock's high point). Thus, for example, while Cree's shares reached a high of $198 per share during the class period, over 75% of Neal Hunter's trades within the class period occurred when Cree's shares traded below $30 per share. Additionally, the complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period. *See id.* at 436 (faulting plaintiff for stating defendants' trading history for only seven months before class period).

The complaint does emphasize the number of shares that the defendants traded within the class period in relation to their total holdings of Cree stock. Specifically, the complaint alleges that Neal Hunter, Merrell, and Swoboda sold 92%, 100%, and 82%, respectively, of their Cree stock during the class period. But this allegation is unre-

markable without taking into account the defendants' vested stock options. Cree argues, for example, that because Merrell held some 369,200 vested stock options at the end of the class period, her trading within the class period would have to appear much less significant. In any event, the complaint does not provide the facts sufficient to generate the required "strong inference."

In addition, plaintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent scheme lasted some 46 months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." *See In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002). Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

V

Finally, the district court relied on plaintiffs' failure adequately to allege loss causation, the fourth element of a securities fraud claim under § 10b and Rule 10b-5. As we have held, a plaintiff must allege and prove that the defendant's misrepresentations proximately caused the plaintiff's economic loss — in this case, the diminution of the value of their shares. *See Hillson*, 42 F.3d at 208.

Loss causation is not one of the elements with respect to which the PSLRA imposes a more stringent pleading requirement. But the Act does explicitly state that a plaintiff must prove loss causation in that the defendants' material misrepresentations or omissions caused the drop in the stock's value. As the PSLRA provides:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4). Because the PSLRA explicitly requires that the plaintiff *prove* loss causation, the general rules of pleading require that the plaintiff also *plead* it in his complaint. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("our holding about plaintiffs' need to *prove* proximate causation in economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements").

Neither the PSLRA nor the Supreme Court has established whether loss causation is a sufficient part of an "averment of fraud" to fall within the requirements of Federal Rule of Civil Procedure 9(b). A strong case can be made that because loss causation is among the "circumstances constituting fraud for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity." *See Dura Pharm.*, 544 U.S. at 343-44 (comparing § 78u-4(b)(4) to a common law action for deceit which requires that a plaintiff "show not only that he had known the truth he would not have acted but also that he suffered actual economic loss"); *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 231-32 (4th Cir. 2004) (explaining loss causation to require a showing that "defendant's misrepresentation was a *substantial* cause of the loss by showing 'a direct or proximate relationship between the loss and the misrepresentation.'" (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996))). Moreover, the Supreme Court has not ruled out a holding that Rule 9(b) governs a pleading of loss causation. *See Dura Pharm.*, 544 U.S. at 346.

Even in the absence of an explicit holding, the *Dura Pharmaceuticals* Court concluded that a plaintiff does not state a claim upon which relief can be granted — even under the relaxed pleading requirements of Rule 8(a) — by simply alleging that the plaintiff purchased defendant's stock at an "artificially inflated purchase price" and thereby sustained damages. *Id.* at 347. The Court required something more, stating:

> We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving

any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about the harm of the very sort that the [PSLRA] seek[s] to avoid.

*Id.* at 347 (citations omitted). A failure to recognize that loss causation be specifically alleged and demonstrated by the allegations of the complaint would

> permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence. Such a rule would tend to transform a private securities action into a partial downside insurance policy.

*Id.* at 347-48 (internal quotation marks and citations omitted).

Accordingly, we conclude that a plaintiff purporting to allege a securities fraud claim must not only prove loss causation — that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages — but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005).

The complaint in this case outlines a theory of loss causation, identifying the plaintiffs' loss as the $4.11 drop in the price of Cree's stock that followed publicity of Eric Hunter's lawsuit against Cree in June 2003. According to plaintiffs, Hunter's complaint finally revealed the "true facts" of Cree's fraudulent schemes over the years, causing the market to reduce its valuation of Cree's shares. But this theory must fail for various reasons. First, Eric Hunter's 2003 complaint contained no allegations relating to the "round-trip" transactions with Microvision, Spectrian, WTI, Xemod, or Lighthouse, about which he now complains. Because Hunter's 2003 complaint did not reveal the "true facts" of these transactions, the 2003 revelations could not have *caused* the plaintiffs' loss. While plaintiffs respond that "the market would have construed Hunter's allegations [in his 2003 complaint] broadly since Cree had previously denied it engaged in round

tripping," the problem remains that Hunter's 2003 complaint is devoid even of general allegations of round-tripping. We thus agree with the district court's dismissal for lack of pleading loss causation with respect to Cree's dealings with Microvision, Spectrian, WTI, Xemod, and Lighthouse.

Second, with respect to Cree's dealings with C&C, plaintiffs' theory of loss causation suffers from a different but no less fatal flaw. Eric Hunter's 2003 complaint did contain allegations relating to C&C, accusing Cree and Neal Hunter of:

> (d) Entering into an undisclosed and long-term requirements contract with Jeff Hunter, Chairman of [C&C] Corporation . . . which required [C&C] to accept shipments of silicon carbide crystals . . . far in excess of market demand, in order to artificially increase the operating and income of Cree by approximately forty percent or more, and artificially increased the per share value of Cree stock.

> (e) Misleading investors and the [SEC] by purchasing in excess of $4.0 million worth of equipment from [C&C] in which Cree already held a beneficial interest, with the understanding that [C&C]'s Chairman would restrict use and allocation of the proceeds to payments under the long-term requirements contract, thereby disguising [C&C]'s severe cashflow deficit and forced inventory surplus of silicon carbide crystals.

The problem with plaintiffs' theory on the C&C transactions is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline. Cree's May 1999 quarterly filing with the SEC included a copy of its supply contract with C&C, which obligated C&C to purchase set amounts of silicon carbide crystals. Likewise, C&C's April 2000 quarterly report and Cree's 2000 annual report disclosed that Cree agreed to repurchase crystal-growing equipment for $5 million and apply that amount as a credit to C&C for future crystal purchases. Disclosure of these facts by Eric Hunter in his 2003 complaint could not therefore have caused Cree's stock price to decline. As the district court explained, "Eric Hunter's complaint discloses

nothing new, but merely attributes an improper purpose to the previously disclosed facts."

To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed Cree's previous representations to have been fraudulent.[3] Because no such facts were disclosed, the drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.

The plaintiffs argue in the alternative that they should at least be granted leave to amend their complaint in light of the Supreme Court's decision in *Dura Pharmaceuticals*, 544 U.S. 336 (2005). The Supreme Court decided *Dura Pharmaceuticals* in April 2005, after plaintiffs had filed their complaint and before the district court granted Cree's motion to dismiss. As noted above, however, we do not understand *Dura Pharmaceuticals* to have changed the standard for pleading loss causation. Even before Congress enacted PSLRA, plaintiffs were required to allege that the defendant's misrepresentation caused him actual loss. *See Harnett v. Billman*, 800 F.2d 1308, 1315-16 (4th Cir. 1986). And our discussion in *Miller v. Asensio & Co.*, 364 F.3d at 232-33, decided months before plaintiffs filed their complaint, aligns well with the Supreme Court's decision in *Dura Pharmaceuticals*, requiring a plaintiff to show a causal link between the defendant's misrepresentation and the decline in the stock value.

---

[3]We acknowledge the possibility that a plaintiff could successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss. In such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of fraud that caused plaintiffs' loss. *See, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-07 (S.D.N.Y. 2005) (accepting plaintiffs' allegations of loss causation where news that Parmalat could not service its debt revealed that previous disclosures concealed the company's true position and caused the share price to tumble). But the plaintiffs have not alleged that any previously concealed risk materialized in June 2003, causing their loss.

We can find no basis for concluding that *Dura Pharmaceuticals* provides plaintiffs with a cure for the deficient allegations of loss causation in their complaint. The information that Eric Hunter's complaint revealed to the world on June 12, 2003, were historical facts that plaintiffs could not change. The plaintiffs have, therefore, demonstrated no reason why we should permit them leave to amend their complaint.

For all of these reasons, we affirm the district court's order dismissing plaintiffs' claim under § 10(b) of the Exchange Act and Rule 10b-5 for failure to state a claim for which relief can be granted.

VI

The district court dismissed plaintiffs' four other causes of action as essentially dependent upon plaintiffs' success in alleging a claim under § 10(b) of the Exchange Act and Rule 10b-5. Count II alleges a claim under § 20(a) of the Exchange Act, which imposes liability on each person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Count III is based on § 20A of the Exchange Act, which provides a private right of action against one who engaged in insider trading. *Id.* § 78t-1(a). Count IV brings a claim under § 18 of the Exchange Act which holds a person, who makes a misleading statement in an SEC filing, liable to one who detrimentally relied on that misstatement. *Id.* § 78r(a). Each of these counts requires a predicate allegation of a violation of law. Because, as we explained above, the complaint fails to allege that Cree made any misleading statement or omission in violation of § 10(b) and Rule 10b-5, we affirm the district court's dismissal of these claims.

Plaintiffs' final claim arises under § 304 of the Sarbanes-Oxley Act, which mandates that corporate officers forfeit bonuses and profits if the corporation is "required to prepare an accounting restatement" due to the issuer's "misconduct." 15 U.S.C. § 7243. While Cree has not, to date, issued any accounting restatement that could provide a basis for this claim, plaintiffs argue that § 304 is not dependent upon a restatement having actually been issued, but upon one being "required." They note that the complaint alleges numerous GAAP violations which "require" Cree to issue restatements.

Even if this were the case, for the reasons we rejected the complaint's § 10(b) and Rule 10b-5 claim, we conclude that the complaint does not adequately allege that any restatement is required.

In addition, plaintiffs have not presented a convincing analysis that § 304 provides private litigants with a cause of action, although we do not now reach that issue. *See Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 805 (4th Cir. 1996) (noting this court's "presumption that if a statute does not expressly create a private cause of action, one does not exist").

## VII

Because we uphold the district court's dismissal of plaintiffs' complaint in its entirety, we have no cause to pass upon Cree's argument that plaintiffs' claim is barred by the applicable statute of limitations.

## VIII

This case boils down to the continuing fallout from an intra-Hunter-family dispute. In June 2003, Eric Hunter, a former officer of Cree, sued his brother Neal Hunter, an officer of Cree, purportedly over dissatisfaction in the way Cree was being operated. With Eric Hunter's filing of that action, the price of Cree shares dropped over $4 per share. For this temporary drop in the price of Cree's stock, the plaintiffs in this case filed their complaint, attributing the drop to the way Cree was run during the four years prior to June 2003. While plaintiffs point to some reciprocal business dealings and high risk investments with six different companies during that period, the transactions were disclosed in public filings over the years, and the plaintiffs have not been able to point to facts supporting a reasonable belief that the disclosures were misleading.

The district court properly dismissed this case as one of the type that Congress sought to eliminate by enacting the PSLRA. The PSLRA's requirements that were applied in this case are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on actual fraud. The district court correctly concluded that this case fell into the former class of claims.

As an epilogue, it appears that the market reached the same conclusion regarding plaintiffs' allegations. The record shows that although Cree's share price dropped from $22.21 to $18.10 the day after Eric Hunter filed his complaint on June 12, 2003, and then dropped to a low of $11.84 in August 2003, the price recovered quickly, trading above $18.00 by the end of 2003, and at $22.00 or higher for most of 2004.

We affirm the judgment of the district court.

*AFFIRMED*

SHEDD, Circuit Judge, dissenting:

The district court dismissed the 170-page First Amended Consolidated Class Action Complaint ("Complaint") of Teachers' Retirement System of Louisiana ("TRSL"), which named as defendants Cree, Inc. and several of its managers (collectively, "Cree") in a complicated securities fraud action, holding that the Complaint failed to plead facts sufficient to support a cause of action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. In reaching its conclusion, the district court interpreted and applied the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737. In my view, the factual allegations in the Complaint satisfy the heightened pleading requirements of the PSLRA as well as the ordinary pleading requirements that apply to any action for fraud, as provided in Rules 8 and 9 of the Federal Rules of Civil Procedure. Accordingly, I would reverse the decision of the district court and remand this case for further proceedings consistent with this opinion.

I

We review *de novo* the decision of the district court to grant a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006). A court should grant a Rule 12(b)(6) motion only if "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in sup-

port of his claim entitling him to relief." *Edwards v. City of Golds-boro*, 178 F.3d 231, 244 (4th Cir. 1999).[1]

Generally speaking, the majority opinion correctly summarizes the law of securities fraud. To plead a *prima facie* case, one must allege: (1) a false statement or omission of material fact by the defendant, (2) scienter, (3) reasonable reliance by the plaintiff, and (4) loss causation. *Hillson Partners L.P. v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994). However, in contrast to an ordinary action for fraud, a securities fraud action must meet the heightened standards imposed by the PSLRA when pleading the first two of these four elements. 15 U.S.C. § 78u-4(a)(1). When pleading the final two elements of securities fraud, a plaintiff must simply satisfy the generally applicable requirements of Rules 8 and 9 of the Federal Rules of Civil Procedure.

As the majority notes, the district court dismissed the Complaint for three reasons: (1) failure to plead with particularity all facts giving rise to the belief that a false statement or omission of material fact occurred, (2) failure to plead with particularity facts giving rise to a strong inference of scienter, and (3) failure to adequately plead loss causation.[2] The majority approach to testing the adequacy of the Complaint examines in isolation each individual suspect transaction in order to ascertain whether the elements of securities fraud have been adequately pled with respect to each one.[3] However, this approach ignores the fact that this case revolves around a single securities fraud action against a single company, Cree.

---

[1] With the exception of requiring a strong inference of scienter, the PSLRA does not change our normal standard of review for a 12(b)(6) motion. For the most part, the PSLRA simply modifies the quantum of information that must be included in a complaint. Accordingly, for purposes of my analysis, I assume the truth of all well-pleaded allegations in the Complaint, and I draw all reasonable factual inferences in favor of TRSL.

[2] This is a fraud-on-the-market case; thus, investor reliance upon publicized market prices is presumed. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).

[3] This approach is substantially the same as the one employed by the district court, which, like the majority, divided its opinion into sections titled according to the companies that Cree dealt with: *i.e.*, C&C, Microvision, Spectrian, WTI, Xemod, and Lighthouse.

Therefore, the Complaint does not — and need not — allege an action for securities fraud with respect to all six companies with which Cree dealt. Instead, the Complaint alleges a single cause of action for securities fraud, as evidenced by many transactions with multiple companies. If even one of these transactions is pled adequately enough to meet the pleading requirements under the PSLRA and Rules 8 and 9, the cause of action must survive the motion to dismiss. Moreover, if the totality of Cree's actions reveals a larger picture of fraud sufficient to meet the necessary pleading requirements, this case must advance beyond the current stage of the proceedings. In my opinion, the C&C transactions alone, especially when viewed in conjunction with the numerous other transactions as a whole, permit a reasonable inference of fraud that requires denial of Cree's motion to dismiss.

II

A.

To plead a material misrepresentation or omission of material fact under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). TRSL has alleged a multitude of misleading statements by Cree. The Complaint plainly specifies each of these statements under the heading, "Defendants' False and Misleading Statements During the Class Period." J.A. 1007. The statements include 23 SEC filings, 22 press releases, two conference calls, and one news article. Therefore, the Complaint clearly meets the first prong of this element by specifying each statement believed to be misleading.

Further, the Complaint gives adequate reasons why each of the statements is misleading. TRSL has alleged that Cree was involved in numerous activities to inflate its revenue artificially. These fraudulent schemes, known as "channel stuffing" and "round-tripping," involved a series of sham deals in which Cree, in collusion with insiders at other companies, would exchange goods or services subject to either secret rights of return or secret agreements that excused Cree's

non-performance.[4] Cree included or referenced the favorable portions
of these agreements in its SEC filings, press releases, conference
calls, and the news article. However, the secret portions of the agree-
ments, which rendered the agreements futile, were, of course, omitted.
Thus, Cree's public representations about these agreements were mis-
leading because they made material omissions — *i.e.*, the secret
"handshake" deals that vitiated any substance the contracts otherwise
appeared to retain.[5]

Finally, it is important to note that all of TRSL's allegations
regarding Cree and its transactions are made on information and
belief; thus, I agree with the majority that the Complaint must state
at least "*sufficient facts* to support a *reasonable belief* in the allega-
tion" that the material omissions were misleading. Maj. Op. 13. TRSL
has alleged sufficient facts to support such a reasonable belief by bas-
ing many of its allegations on information obtained from a lawsuit
filed by Eric Hunter, one of Cree's co-founders. The day before the
class period closed, Eric Hunter filed suit against Cree, alleging, *inter
alia*, securities fraud. In his complaint, Eric Hunter alleged that Cree
had engaged "in a series of undisclosed corporate activities, including
but not limited to" the following: (1) Cree's public filings omitted
material facts in connection with stock offerings and (2) Cree entered
into an undisclosed requirements contract with C&C that amounted

---

[4]An example is Cree's alleged channel stuffing agreement with C&C.
C&C would "purchase" silicon carbide crystals from Cree, subject to a
secret right of return. C&C would then exercise its secret right of return
and "reject" shipments of crystals. However, instead of actually returning
the crystals to Cree, C&C would store the crystals at its facilities, thereby
allowing Cree to avoid accounting for reserves or charges for its returned
products. Thus, this agreement allowed Cree to create the appearance of
permanent sales and profits that were, in fact, illusory. Cree allegedly
entered into similarly illusory "exchanges" with Microvision, Spectrian,
and others.

[5]Both the district court and the majority seem to miss the crux of
TRSL's argument on this point. Simply because a contract is publicly
disclosed and appears to be legitimate does not prevent it from being
materially misleading. The secret agreements between Cree and the other
companies caused the publicly disclosed contracts to appear to be some-
thing that they were not. These omissions are what rendered the public
statements materially misleading.

to channel stuffing and round-tripping.[6] J.A. 672. Eric Hunter is the brother of Neal Hunter, Cree's chairman during the class period. Eric Hunter is also the brother of Jeff Hunter, C&C's chairman during the class period. In addition to being a co-founder of Cree, Eric Hunter was Cree's CEO until 1994, and during the class period, he was a paid consultant for Cree.[7] Eric Hunter's statements and his close professional and familial relationship to the allegedly fraudulent actors certainly support a reasonable belief that the omissions in Cree's public statements were misleading.

Though Eric Hunter's allegations alone would likely suffice to satisfy the particularity requirements that the PSLRA imposes on allegations made under information and belief, TRSL identifies numerous other sources who attest to the fraudulent, secret agreements between Cree and other companies. The majority refers to these individuals as "confidential sources." Maj. Op. 14.[8] In addressing these confidential

---

[6]Though Eric Hunter's complaint never used the words "channel stuffing" or "round-tripping," it alleged facts sufficient to reasonably infer such schemes.

[7]The fact that Eric Hunter performed no work in his capacity as a consultant only underscores the continuation of his "insider" status with Cree, despite the fact that he was no longer an executive in the company. Only someone with close personal ties to a corporation would receive a salary in exchange for no substantial work.

[8]I question if the characterization as "confidential" is particularly useful in this context, where the sources are readily discernable by Cree. These sources are confidential only in that they are not specifically named; however, TRSL identified them by title and the years they were employed by various companies. Though their names do not appear in the Complaint, a modest inquiry by Cree would likely establish who they are. These so-called confidential sources cited by TRSL are numerous, and they certainly provide sufficient facts to form a reasonable belief that Cree's public statements were misleading.

For example, TRSL identifies a former Cree process engineer employed during the class period; this source learned from a top manager at Cree that a secret deal existed between Cree and C&C, which required C&C to accept shipments of crystals far in excess of its needs. TRSL also reveals a former C&C director and vice president of marketing, who claimed that C&C was simply "feeding Cree" and spending money like "drunken sailors" because of the close familial relationship between the directors of Cree and C&C. Many more examples of such unnamed sources are presented in the Complaint.

sources, the majority adopts the analysis of the Seventh Circuit in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006). The *Tellabs* court held that a complaint which relies on confidential sources must allege facts sufficient "'to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* at 596 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

I would resolve the issues surrounding unnamed sources differently because the approach adopted by the majority does not inhere in the plain language of the PSLRA. The plain language of the PSLRA does not subject unnamed sources to higher scrutiny than other averments made upon information and belief. Accordingly, in my view, a complaint must simply identify unnamed sources "with particularity," as required by the plain language of the PSLRA, which might include the source's job title and years of employment, or possibly, other facts sufficient to support a reasonable belief that the plaintiff did not merely invent sources. The purpose of the PSLRA's particularity requirement is to prevent the fabrication of information, not to weigh its reliability or credibility.[9] For example, a personal aide or administrative assistant to the CEO could plausibly overhear a pertinent piece of information that may later form the basis for a securities fraud action, notwithstanding his job title. Accordingly, I believe that both Eric Hunter and the numerous unnamed sources listed in the Complaint provide sufficient particularity to form a reasonable basis for believing that the disclosed contracts made materially misleading omissions.

### B.

To plead adequately the scienter element of a securities fraud action, a complaint must allege "with particularity facts giving rise to

---

[9]Like the district court, the majority weighs the credibility of various unnamed sources and discredits them because their recollections conflict with publicly available information. However, assessing a 12(b)(6) motion requires that we refrain from weighing evidence and assume all facts in favor of the plaintiff. This is particularly relevant in the current case, where the crux of TRSL's claim is that Cree falsified publicly available information.

a strong inference that the defendant acted with" scienter. 15 U.S.C.
§ 78u-4(b)(2). We have noted that scienter may be pled by allegations
that amount to severe recklessness. *Ottmann v. Hanger Orthopedic
Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). In *Ottman*, we
rejected a categorical approach that would require a pleading to allege
motive and opportunity in order to satisfy the heightened scienter
pleading standards under the PSLRA. *Id.* at 345. Instead, we adopted
a case-specific approach, which requires courts to "examine all of the
allegations in each case to determine whether they collectively estab-
lish a strong inference of scienter." *Id.*

Based on a reading of the Complaint as a whole, I believe it ade-
quately pleads scienter. Assuming the truth of the material misrepre-
sentation allegations, the individuals named as defendants certainly
would have known about the secret agreements between Cree and
various other companies. Aside from the personal wealth that Cree
management allegedly gained from the channel stuffing and round-
tripping agreements,[10] the mere fact that individual executives and
directors were the people actively entering into fraudulent agreements
to inflate Cree's revenues supports a strong inference of scienter. The
material omissions from Cree's public statements could not have
occurred without the agents of the company knowingly facilitating the
fraudulent transactions. Accordingly, a strong inference of scienter is
supported under the facts alleged in the Complaint as a whole.

C.

Finally, the Complaint must adequately allege loss causation,
which is not subject to any heightened pleading requirement under the
PSLRA. I agree with the majority that the Supreme Court in *Dura
Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), expressly
refused to decide whether loss causation must meet the ordinary
pleading requirements of Rule 8 or the heightened pleading require-
ments for fraud under Rule 9. Instead, the Court "assume[d], at least
for argument's sake," that the ordinary requirements of Rule 8

---

[10]I do not rely on the timing or substance of stock trades in finding a
strong inference of scienter. Rather, scienter may be directly shown by
the nature of the fraudulent acts at issue here — intentionally omitting
salient details from otherwise publicly disclosed contracts.

applied. *Id.* at 346. Following the example of the Court in *Broudo*, I analyze the allegations of loss causation in the Complaint under the ordinary Rule 8 "short and plain statement" requirement.

The Complaint alleges loss causation by referencing the precipitous decline in stock value upon the filing of Eric Hunter's lawsuit against Cree. Though Eric Hunter's complaint specifically referenced only the secret agreements with C&C, it clearly stated that Cree had engaged in a "series of undisclosed . . . violation[s] of the federal securities . . . laws, including but not limited to" the agreements with C&C. J.A. 672. Eric Hunter's complaint contradicted, or at least called into question, Cree's prior denials of round-tripping. When the information in Eric Hunter's complaint became public knowledge, Cree's stock price dropped by nearly 20%. Under the normal pleading standards of Rule 8, a reasonable inference of loss causation plainly exists under these facts. I simply cannot envision a more direct and proximate causal link than an insider's disclosure of fraud that causes a sudden and severe drop in stock price.[11] These facts, which are assumed to be true for purposes of my review, plainly give rise to a reasonable inference of loss causation.

### III

Accordingly, I would reverse the district court and remand for further proceedings.[12]

---

[11] I note that this case is distinguishable from *Dura* because the corrective disclosure in *Dura* was much more tenuously connected to the allegations made in Broudo's complaint. The corrective disclosure in *Dura* — a company press release — simply stated that earnings would be diminished because of reduced drug sales. *Id.* at 339. However, the primary misrepresentations that Broudo allegedly relied upon related to the pending approval of an asthmatic spray device by the Federal Drug Administration. To the contrary, in the case before us, the corrective disclosure was a lawsuit filed by an insider that revealed secret fraudulent agreements; the misrepresentations that TRSL relied upon were public disclosures that failed to mention these secret agreements. Thus, compared to *Dura*, this case has a much closer nexus between the corrective disclosure and the misrepresentations relied upon by TRSL.

[12] Because the district court disposed of TRSL's other claims based on its dismissal of the securities fraud claim, I would remand for further proceedings on these claims as well.