## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____      )
                                       )
IN RE: XM SATELLITE                    )
RADIO HOLDINGS                         )      **Civil Action No. 06-0802 (ESH)**
SECURITIES LITIGATION                  )
                                       )
_____      )


### <u>MEMORANDUM OPINION</u>

Plaintiffs[1] seek recovery in this class action for their purchase of stock or stock options in

XM Satellite Radio Holdings, Inc. ("XM" or "the company") between July 28, 2005 and

February 16, 2006 (the "class period"). XM is a Delaware corporation with its principal place of

business and chief operating offices located in Washington, D.C. According to plaintiffs'

allegations, on February 16, 2006, XM disclosed that it had incurred significantly increased

marketing expenses in its fourth quarter and subsequently XM's stock dropped by nearly 28.5

percent. Since XM had never reported profits, its value and the value of its stock were based on

the number of subscribers it reported, as well as on metrics relating to the company's marketing

expenditures per each new subscriber. The plaintiffs allege that XM's stated business model was

to pursue "cost-effective" growth by consistently reducing marketing expenditures per new

subscriber. During the class period, XM had stated it would be able to meet its goal of signing

up six million subscribers by year-end 2005. As it tried to meet this target, plaintiffs allege, XM

spent extraordinary amounts on marketing without disclosing these expenditures to the market.

_____

[1] By order dated August 1, 2006, Boca Raton Firefighters and Police Pension Fund and
Plumbers Local 267 Pension Fund were appointed lead plaintiffs in this action.

Plaintiffs contend that XM knew it would be incapable of meeting its target metrics because it had "abandoned" its business model of cost-effective growth, and that several key XM insiders liquidated their own shares of XM stock while in possession of this material, adverse non-public information.  Plaintiffs therefore claim that the announcement on February 16, 2006, of the increase in XM's subscriber acquisition costs was foreseeable, and that the company materially misrepresented its financial outlook during the class period.

The consolidated complaint seeks recovery against XM and its Chief Executive Officer, Hugh Panero, for plaintiffs' losses under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Compl. ¶ 107.)  It also asserts a "controlling person" claim against Panero under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Compl. ¶ 120.)  Defendants have moved to dismiss the consolidated complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, for failure to state a claim of securities fraud.  As explained herein, because plaintiffs have failed to allege any actionable material misstatement or omission by XM or Panero, the Court grants defendants' motion to dismiss.

## BACKGROUND

XM launched its satellite radio service in September 2001, and currently provides satellite radio service in the United States on over 150 digital channels to over six million subscribers.  (Compl. ¶¶ 2, 28, 75.)  XM's subscribers include consumers who have purchased XM's satellite radios at retail electronics stores, as well as owners and lessors of automobiles manufactured with XM satellite radios which have been installed in the car.  (*Id.* ¶ 2.)  XM's

stock is traded on the NASDAQ under ticker symbol "XMSR."  (*Id.* ¶ 1.)  During the class

period, defendant Hugh Panero was CEO, President, and a director of XM.  (*Id.* ¶ 16.)  Satellite

radio is a relatively new medium, and XM has only one primary competitor in the field -- Sirius

Satellite Radio Inc ("Sirius") -- which launched its service in mid-2002.  (*Id.* ¶¶ 4, 31.)  Both

XM and Sirius offer a variety of music and other audio programming.  In October 2004, Sirius

made news when it announced that it had signed a deal to broadcast, beginning around January

1, 2006, the daily radio show of media personality Howard Stern, the number one national radio

host among eighteen- to forty-nine-year old men.  (*Id.* ¶ 33.)  XM offers programming by well-

known personalities such as Ellen DeGeneres.  (*See* Valentine Decl. Ex. R. [Brian Steinberg,

*Advertising: XM Aims to Neutralize Sirius, Stern*, WALL ST. J. (Nov. 14, 2005)] at B8.)  XM,

because it entered the market first, enjoyed an early lead over Sirius in market share, but

plaintiffs allege that Sirius was steadily gaining ground on XM in the time leading up to the class

period.  (Compl. ¶ 35.)

   As a new company selling a new technology, XM has not yet turned a profit.  (*Id.* ¶ 36.)

Plaintiff's complaint alleges that in lieu of profits, the market focuses on several "subscriber-

related metrics" to gauge the health of the company.  (*Id.*; Pl. Opp. at 4.)  Most relevant for

purposes of this action are subscriber acquisition costs ("SAC") and costs per gross addition

("CPGA").  SAC includes subsidies that XM offers on new radios as an enticement to potential

subscribers, distribution expenses, and negative margins from direct sales of merchandise,

divided by the number of new subscribers for the relevant period.  (Compl. ¶ 41; Valentine Decl.

Ex. G [Nov. 9, 2006 Form 10-Q] at 46.)  In other words, XM often sells its radio units at a loss in

order to gain subscribers, and SAC is an expression of that total loss divided by new subscribers

acquired for a given period.  CPGA includes the amounts included in SAC, as well as advertising

and marketing expenses and ongoing "loyalty payments" to distribution partners, again divided

by the number of new subscribers for the relevant period.  (Compl. ¶ 41; Valentine Decl. Ex. G

at 47.)

Plaintiffs contend that XM consistently "emphasized to the market" that it was achieving

rapid subscriber growth in a "cost effective manner" and promoting a trend of  "steadily

declining" subscriber costs.  (Compl. ¶¶ 42, 46, 47).  Indeed, immediately prior to the class

period, XM reported quarter-after-quarter declines in SAC and CPGA.  (*Id.* ¶ 46.)  However,

plaintiffs allege, because of increased competition from Sirius during the class period, XM

abruptly decided to abandon its "cost effective growth" strategy for a "growth at any cost"

approach, while letting the market believe that SAC and CPGA would continue to decline.  (*Id.*

¶ 47.)  In particular, XM launched a widespread marketing campaign called "Listen Large" in

the third quarter of 2005, designed to counter heavy promotion by Sirius of its deal with Howard

Stern.  (*Id.* ¶ 48.)  This campaign reportedly cost XM $25 million, but plaintiff's complaint

alleges that XM actually spent between $100,000,000 and $150,000,000 on this advertising.  (*Id.*

¶ 49.)  In addition, the complaint alleges, XM drastically reduced the prices of its radios and

offered other special promotions and rebates during the class period, in part to combat product

supply shortages.  (*Id.* ¶¶ 55-58.)  The complaint also alleges that "a former SVP of Human

Resources employed at XM during the Class Period commented that the major marketing and

subscriber growth initiatives undertaken during the fourth quarter of 2005 (including Listen

Large) had been fully budgeted well in advance because it was known as early as October 2004

that Howard Stern would begin broadcasting on Sirius in January 2006," and that the witness

"said these costs could simply not be viewed as any kind of surprise or unanticipated event."
(*Id.* ¶ 51.)  These business decisions, which apparently generated fewer new subscribers than
XM had forecast, caused SAC and CPGA numbers to increase substantially in the fourth quarter
of 2005: SAC increased approximately 39% and CPGA increased approximately 36% compared
to the fourth quarter of 2004.  (*Id.* ¶¶ 75, 77.)   Plaintiffs claim that XM's failure to disclose its
"concealed change in business philosophy" to the market, which artificially inflated XM's stock
price during the class period, is actionable under § 10(b) and Rule 10b-5. (*See* Pl. Opp. at 8;
Compl. ¶ 107.)

Plaintiffs quote extensively from a number of statements made on five separate dates
during the class period that they contend were materially false or misleading.  (*See* Pl. Opp. at 6
n.6).  These statements are discussed below.

## I.    July 28 and August 2, 2005 Statements

On July 28, 2005, XM issued a press release announcing its financial results for the
second quarter of 2005.  (Compl. ¶ 59.)  The company's revenues had more than doubled over
the second quarter of 2004, and it reported "Efficient Quarterly Subscriber Growth," with CPGA
at $98, compared to $101 for the second quarter of 2004.  (*Id.*)  The press release also announced
that XM had increased its 2005 subscriber guidance from five-and-a-half million to six million
ending subscribers for 2005, based on their "first half performance and an even stronger outlook
for the second half of the year."  (*Id.*)  That same day, XM hosted a conference call with
investors and financial analysts to discuss its second quarter 2005 earnings and financial outlook.
During the call, defendant Panero reiterated the increased subscriber guidance of six million
year-end subscribers and also announced that SAC and CPGA had improved over the second

quarter of 2004: SAC had dropped 12% from $57 compared to $50, and CPGA had dropped 3% from $101 to $98. (*Id.* ¶ 60.) He stated that the company was "achieving rapid growth with sound financial performance." (*Id.*) XM's Chief Financial Officer, Joe Euteneuer, added that XM's "efficient marketing efforts have enabled [them] to continue demonstrating cost-effective subscriber growth," reflected in SAC and CPGA improvements, and stated: "We expect CPGA to remain stable during the second half of the year." (*Id.* ¶ 61.) Later in the call, during a question and answer session, someone asked the XM representatives whether they expected SAC to remain stable in the second half of the year as well. (*Id.* ¶ 62.) In response, an unidentified XM representative reiterated that they thought CPGA would be stable, but stated that "SAC [can] bounce around a bit depending upon what your actual hardware subsidy elements are on any given timeframe." (*Id.*) The XM representative then re-emphasized the improvements in SAC and CPGA results over the previous year's numbers. (*Id.*) Additionally, when asked whether XM viewed Howard Stern's new programming at Sirius as a risk to its growth estimates, an unidentified XM representative remarked that "the announcement of Howard Stern['s deal with Sirius] has been in the marketplace for almost 1.5 years now, so we have seen no effect of that at all during that period . . . . That has been around for awhile, so we continue to have strong demand." (*Id.*) The representative noted, "clearly we would not be upping our [year-end subscriber] guidance if we thought that there was an issue with regards to how he would affect demand for our product." (*Id.*)

On August 5, 2005, XM filed its interim quarterly financial report, Form 10-Q, for the second quarter of 2005.[2] The 10-Q stated that during the second quarter, XM continued to

---

[2]XM's 10-Q forms were signed by Panero.

"grow [its] gross margin . . . while reducing [its] costs to acquire each new subscriber." (*Id.* ¶ 64.) The form also reported the SAC and CPGA numbers that had been announced on July 28. It noted that "timing of promotions and new contracts may cause SAC to fluctuate from period to period," and "timing of media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period," but the form stated that the company expected both SAC and CPGA "to decline in 2005 as compared to 2004." (*Id.*) The 10-Q also stated: "We are pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs."[3] (*Id.*)

Plaintiffs claim that these statements "were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed[,] and disclosure of which was necessary to make the statements not false and/or misleading." (*Id.* ¶ 65.) Specifically, plaintiffs allege that Panero and other XM officials then knew, based upon their "access to and review of internal XM data," that XM "would be forced to spend extraordinarily large sums of money in the fourth quarter of 2005" because of "competitive factors," including the arrival of Howard Stern at Sirius, in order to achieve its year-end goal of six million subscribers, and that XM was accordingly planning to spend large sums on the Listen Large campaign in the fourth quarter of 2005, which would cause SAC and CPGA to increase dramatically. (*Id.*) Plaintiffs argue that XM failed to disclose these planned expenditures to the market, despite knowing that the market expected SAC and CPGA to decline in the second half

---

[3]A number of financial analysts remarked on the SAC and CPGA improvements, which were "ahead of expectations," and based on XM's prediction that subscriber costs would remain stable for the rest of the year, some predicted that earnings would improve and SAC and CPGA would continue to fall in 2005. (*See* Compl. ¶ 63.)

of 2005 because of XM's statements "highlighting" its ability to increase subscribers while

reducing subscriber acquisition costs.  (*Id.*)

## II.    October 27, November 1, and November 7, 2005 Statements

On October 27, 2005, XM issued a press release announcing its third quarter results and

reaffirming its six million year-end subscriber guidance.  (*Id.* ¶ 67.)  It reported that SAC had

decreased to $53 compared to $57 in the third quarter of 2004, while CPGA was stable at $89 in

the third quarters of both 2004 and 2005.  (*Id.*)  The press release also stated that "XM expects to

accelerate its subscriber and revenue growth through the fourth quarter."  (*Id.*)  Also on October

27, 2005, XM hosted a conference call to discuss its third quarter results and financial outlook.

(*Id.* ¶ 68.)  During that call, Panero stated:

> The secret to XM's smart subscriber growth rather than growth at
> any cost is the ability to control marketing and product expenses
> while rapidly growing subscribers. This quarter, XM kept its fully
> loaded per unit costs of capturing a new subscriber, or CPGA,
> constant at $89 -- the same CPGA we reported in the third quarter
> last year. These results provide us the flexibility to aggressively
> advertise and market our service in the fourth quarter. And in fact,
> that is what we are doing – implementing a comprehensive media
> campaign comprised of advertisements, rebates, and other
> promotional techniques to fully exploit the holiday selling season
> again this year.

(*Id.*)  Similar to his comments in the August conference call, Euteneuer stated that "XM's

targeted and efficient sales and marketing efforts have enabled [them] to continue to demonstrate

cost-effective subscriber growth," reflected in decreased SAC and stable CPGA as compared to

the third quarter of 2004, but he also warned that "[s]imilar to past trends, [they] expect fourth

quarter SAC and CPGA to increase due to greater media and promotional activities during the

upcoming holiday season."[4]  (*Id.*)  Euteneuer also reaffirmed the six million year-end subscriber

guidance.  (*Id.*)  Later in this conference call, the XM representatives were asked about the

potential effects of the increased "level of rebating" for XM's radios going into the holiday

season.  (*Id.* ¶ 70.)  Steve Cook, an XM representative, replied that their "intent there is . . . to hit

lower and lower price points [on their radios] to really penetrate the mass-market," and that these

subsidies on XM's hardware would be reflected in SAC.  (*Id.*)  He further remarked that XM

"can maintain [its] SAC at very reasonable levels and still hit some of these attractive consumer

price points."[5]  (*Id.*)

On November 1, 2005, XM issued a press release "highlighting" the fact that it had

increased its retail market share to 59% in the third quarter of 2005, compared to 56% in the

second quarter.  (*Id.* ¶ 72.)  In the press release, Panero is quoted as saying "XM continues to

expand its leadership position while adding subscribers at about one-third the cost of our

competitor."  (*Id.*)  Then on November 7, 2005, XM filed its 10-Q form reporting financial

---

[4]Thereafter, on November 14, 2005, XM publicly announced the launch of its Listen
Large campaign, aimed at combating competition from Sirius and the upcoming arrival of
Howard Stern.  (*See* Valentine Decl. Ex. R. [Brian Steinberg, *Advertising: XM Aims to
Neutralize Sirius, Stern*, WALL ST. J. (Nov. 14, 2005)] at B8.)

[5]After these statements were made, analysts from Lehman Brothers, Deutsche Bank, and
Bear Stearns issued reports predicting that SAC and CPGA would rise because of more
extensive marketing efforts in the fourth quarter.  (Compl. ¶ 71.)  The Lehman Brothers analysts
stated that they believed that "the Street [was] underestimating 4Q marketing spending."
(Valentine Decl. Ex. O at 2.)  Deutsche Bank raised its full-year estimate for SAC from $58 to
$62, and raised its full-year estimate for CPGA from $103 to $108.  (Compl. ¶ 71(c).)  The Bear
Stearns report, noting that XM reported lower than expected marketing expenses during the third
quarter, remarked that "[h]igher marketing expense in 4Q does not imply the economic model
has broken down.  XM . . . effectively shifted the [3Q] marketing dollars to 4Q05."  (*Id.* ¶ 71(d).)
Bear Stearns expected total marketing outlay to remain the same for the year based on XM's
guidance.  (*Id.*)

results for the third quarter of 2005, which were "substantially similar" to those reported in the October 27th press release, and reflected decreased SAC and stable CPGA as compared to third quarter of 2004. (*Id.* ¶ 73.) The 10-Q stated that XM had continued to "grow [its] subscription margin . . . while reducing [its] [s]ubscriber acquisition costs," and that XM was "pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs." (*Id.*)

Plaintiffs again argue that these statements were false and misleading when made because they misrepresented and/or omitted adverse facts. (*Id.* ¶ 74.) Specifically they allege that XM knew that it was planning to spend "extraordinary sums of money" on its Listen Large campaign in the fourth quarter, and that "XM was expecting fourth quarter SAC and CPGA to soar above historical levels, in complete reversal of the declining cost trends touted by defendants." (*Id.* ¶¶ 74, 95.) They also argue that defendants knew that XM was "deeply discounting radios and offering steep subsidies in order to combat supply shortages and inflate subscription numbers," which they knew would contribute to a sharp increase in fourth quarter SAC and CPGA. (*Id.* ¶ 74.) Plaintiffs further allege that Euteneuer's statement that a fourth quarter increase in SAC and CPGA would be "[s]imilar to past trends" of the holiday season "gave the market a false indication of the true impact that the Listen Large campaign and competitive forces would have on XM's financial performance in the fourth quarter." (*Id.* ¶ 74.)

Plaintiffs do not challenge the accuracy of any of the second and third quarter financial numbers reported by the company in the statements quoted above. Instead, plaintiffs claim that these reports "caus[ed] the market to expect and anticipate that XM's SAC and CPGA would continue to decline," while the company knew that SAC and CPGA would rise significantly.

(Compl. ¶ 85; *see* Pl. Opp. at 6, 10.)  Plaintiffs also argue that even if defendants' public statements were literally true, they were nonetheless "false and misleading because they failed to provide investors with the known facts concerning XM's choice to abandon its strategy of decreasing its key SAC and CPGA metrics with achieving rapid subscriber growth."  (Pl. Opp. at 14.)

Plaintiffs also allege that Panero and other XM insiders took advantage of XM's artificially inflated price to "unload vast sums of XM stock in order to reap millions of dollars in gain from illicit insider trading" during the class period.  (Compl. ¶ 85.)  Specifically, the complaint alleges that Panero sold 99% of his then-owned XM shares during the fourth quarter of 2005,[6] and it makes similar claims about four other XM insiders.  (*Id.* ¶¶ 88, 89.)

## III.    Fourth Quarter and Year-End 2005 Results

On February 16, 2006, XM issued a press release announcing its financial results for the fourth quarter of 2005 and year-end 2005.  (Compl. ¶ 75.)  SAC and CPGA both increased significantly in the fourth quarter: SAC was $89, compared to $64 in the same period in 2004 and compared to $53 in the third quarter of 2005.  (*Id.* ¶¶ 75, 77.)  Fourth quarter CPGA was $141, compared to $104 in the same period in 2004 and $89 in the third quarter of 2005.  (*Id.* ¶¶ 75, 77.)  The press release attributed these increases "primarily . . . to higher marketing expenses to meet a one-time competitive event in the fourth quarter."  (*Id.* ¶ 75.)  For full-year

---

[6]This allegation appears to be somewhat misleading, however, as plaintiffs' calculation of Panero's stock sales does not take into account the entirety of Panero's XM securities holdings. Defendants explain that Panero exercised vested stock options and then immediately sold the resulting stock, so plaintiffs are technically correct that he sold nearly 100% of his stock. (*See* Def. Mem. in Supp. at 32 n.30.)  However, according to defendants, when all of Panero's vested, exercisable stock options and convertible debt holdings are considered, he sold only 27.1% of his holdings of XM securities at the time. (*Id.* at 32.)

2005, SAC was $64, compared to $62 in 2004, and CPGA was $109, compared to $100 in 2004. (*Id.*)  XM predicted decreased SAC and CPGA in 2006 due to "a more normalized market environment."  (*Id.*)  When this information was revealed to the market, plaintiff alleges, it "caus[ed] XM's stock price to drop approximately 13% on abnormally high trading volume." (*Id.* ¶ 98.)

Also on February 16, 2006, XM announced the resignation of Pierce J. Roberts, a member of XM's Board of Directors.  (*Id.* ¶ 79.)   Roberts' resignation letter, dated February 13, 2006, stated that he had "been troubled about the current direction of the company and [did] not believe that it is in the best interests of the company's shareholders," and that he had made his "analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company."  (*Id.*)  He further stated that he believed that there was "a significant chance of a crisis on the horizon."  (*Id.*)  When it announced the resignation on February 16, XM stated that "the Company believes that the disagreement with Director Roberts primarily involves the strategic balance of growth versus cash flow," and that "Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures."  (*Id.* ¶ 80.)  Plaintiffs allege that XM's expensive marketing campaigns were "major factors" that led to Roberts' resignation, and that the resignation is further proof that XM's spending was out of control in the fourth quarter.  (Pl. Opp. at 9.)

Defendants have moved to dismiss plaintiff's complaint under the PSLRA and Rule 9(b), arguing, *inter alia*, that plaintiffs have not alleged with sufficient particularity why the quoted statements were materially false or misleading; that the statements on which plaintiffs premise

their claim were forward-looking in nature and protected by the PSLRA's safe harbor provision for forward-looking statements; that plaintiff's claims are actually premised upon hindsight disagreement with XM's business decisions, not on fraud; and that plaintiffs have failed to satisfy the PSLRA's requirement that they plead facts giving rise to a "strong inference" that defendants acted with the requisite scienter.  (Def. Mot. at 2.)  The thrust of defendants' argument is that XM accurately reported its financial results to the market, and did in fact warn the market in October that they expected subscriber acquisition costs to rise in the fourth quarter of 2005 due to aggressive marketing during the holiday season.  (Def. Mem. in Supp. at 1.) Indeed, they argue, based on their disclosures, market analysts predicted the increase in XM's costs, and in fact, one Deutsche Bank analyst report from October 28, 2005 predicted with near-perfect accuracy the SAC and CPGA 2005 metrics that were released in 2006.[7]  (*Id.* at 2.)  And because SAC and CPGA cannot finally be calculated until it is determined how many new subscribers the company acquired for that period, the company could not have known that SAC and CPGA would rise substantially until the new subscriber counts for the fourth quarter, which were lower than XM projected, were known after the end of 2005.  (*Id.*)  At best, defendants argue, plaintiffs claims are based on XM's "positive descriptions of its past successes or expressions of corporate optimism regarding the Company's ability to achieve 'rapid and cost effective growth,'" neither of which is actionable under § 10(b).  (*Id.* at 2-3.)

 Plaintiffs' opposition to the instant motion insists that "this action is not about missed cost or subscriber projections, a failure to update those projections, or even a disagreement with

---

[7]The Deutsche analyst predicted 2005 SAC would be $62 (in actuality it was $64) and that 2005 CPGA would be $108 (in actuality it was $109).  (Compl. ¶¶ 71(c), 75.)

[d]efendants' business judgment . . . ." (Pl. Opp. at 1-2.) Instead, plaintiffs' claims are

essentially based on defendants' alleged failure "to disclose to the market that they had

undertaken a fundamental shift in XM's business model during the Class Period to combat a

serious competitive threat posed by its competitor, Sirius . . . ." (*Id.* at 2.) Specifically, plaintiffs

argue that throughout the class period defendants misled the market regarding "(1) the

Company's ability to achieve rapid growth with sound performance; (2) the Company's key

metrics remaining stable in the second half on 2005 and [declining] as compared to 2004; and (3)

the Company's business plan to increase subscribers and revenues while reducing or maintaining

subscriber acquisition costs." (*Id.* at 14.)

## ANALYSIS

### I.    Standard of Review

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure

12(b)(6), a court must construe the complaint liberally in plaintiffs' favor, and afford plaintiffs

all reasonable inferences that can be derived from the facts alleged. *See Schuler v. United States*,

617 F.2d 605, 608 (D.C. Cir. 1979). "A complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

However, the Court need not accept inferences that are unsupported by the facts in the

complaint, or "legal conclusions cast in the form of factual allegations." *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265,

286 (1986)). In deciding a motion to dismiss, the Court must typically confine its analysis "to

facts stated on the face of the complaint, in documents appended to the complaint or

incorporated into the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citations omitted). In securities fraud actions, the Court may also consider documents that are required to be filed, and actually have been filed, with the SEC.[8] *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

## II.    Securities Fraud under Section 10(b), Rule 10b-5 and the PSLRA

Section 10(b) provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j(b). Rule 10b-5 is the implementing regulation for § 10(b), and provides that it is unlawful, in connection with the purchase or sale of a security:

> (a) To employ any device, scheme, or artifice to defraud.
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . .

---

[8]Plaintiffs do not object to the Court taking judicial notice of the "existence" of the SEC filings, press releases, analyst reports and conference call transcripts upon which plaintiffs rely in their complaint, but they do object to the Court relying on these documents "to prove the truth of the matters asserted therein." (Pl. Opp. at 39.) It is well-established that a court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001). Accordingly, the Court will consider these documents to establish the content of the disclosures therein.

.

17 C.F.R. § 240.10b-5.  To state a claim under § 10(b) and Rule 10b-5, a complaint must include

six elements:  (1) a material misstatement or omission, (2) scienter – an intent to deceive or

defraud, (3) in connection with the purchase or sale of a security, (4) through the use of interstate

commerce or a national securities exchange, (5) upon which plaintiffs relied, and (6) which

caused injury to plaintiffs.  *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 11 (D.D.C. 2000)

(citing *In re Newbridge Networks Sec. Litig.*, 767 F. Supp. 275, 281 (D.D.C. 1991)).

Because a claim under § 10(b) involves fraud, Fed. R. Civ. P. 9(b) requires plaintiffs to

plead "the circumstances constituting fraud" with particularity.   To satisfy this requirement,

plaintiffs must "state the time, place, and content of the false misrepresentations, the fact

misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal*, 16

F.3d at 1278 (citation and quotation marks omitted).   The PSLRA, which was enacted in 1995 to

stem a growing tide of meritless securities fraud actions, *see* 141 Cong. Rec. S19060-02 (1995),

further provides that where plaintiffs allege that the defendant made a misleading statement or

omission, the complaint must specify each such statement or omission and explain why it is

misleading, and, "if an allegation regarding the statement or omission is made on information

and belief, the complaint shall state with particularity all facts on which that belief is formed."

15 U.S.C. § 78u-4(b)(1).  "Thus, while the Federal Rules generally allow a court, in ruling on a

motion to dismiss under Rule 12(b)(6), to take into account *any set of facts that could be proved*

consistent with the allegations of the complaint, even though such facts have not been alleged in

the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff *to plead facts* to state

a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the

facts upon which he bases his allegation of a misrepresentation or omission." *Teachers'*

*Retirement System of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (citing 15 U.S.C.

§ 78u-4(b)(1)) (emphasis in original).

The PSLRA also heightened the requirement for pleading scienter so that plaintiffs must

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2). The D.C. Circuit has not yet addressed how

the PSLRA's scienter requirement may be established, *see In re Interbank Funding Corp. Sec.*

*Litig.*, 329 F. Supp. 2d 84, 90 (D.D.C. 2004), and the issue is currently pending before the

Supreme Court. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 853, 853 (2007).

Other circuits have held that scienter is sufficiently pled if plaintiffs "allege facts that show that

defendants had both motive and opportunity to commit fraud" or "facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness." *See Burman v. Phoenix*

*Worldwide Indus.*, 384 F. Supp. 2d 316, 331 (D.D.C. 2005) (citing *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) and *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-

35 (3d Cir. 1999)). When a complaint fails to meet these requirements, dismissal is required.

*See* 15 U.S.C. § 78u-4(b)(3)(A).

It is clear that not every corporate prediction that does not come to fruition is actionable

as securities fraud. Securities fraud claims may not be based on "fraud by hindsight" -- in other

words, "there is no reason to assume that what is true at the moment plaintiff discovers it was

also true at the moment of the alleged misrepresentation, and that therefore simply because the

alleged misrepresentation conflicts with the current state of facts, the charged statement must

have been false." *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (*en banc*).

Indeed, when a company such as XM runs into difficulties that ultimately prevent it from meeting its financial goals during a particular period, "that is precisely the risk that every investor takes when investing in a high technology company . . . ." *Fitzer v. Sec. Dynamics Tech.*, 119 F. Supp. 2d 12, 23 (D. Mass. 2000). "The fact that [a] company's performance did not conform to that predicted supports no inference that [the company's] statements lacked a reasonable basis when made." *Kowal*, 16 F.3d at 1278. "Where fraudulent projections are alleged, the plaintiff[s] must . . . identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994).

Moreover, only "material" false or misleading statements or omissions are actionable under § 10(b). 17 C.F.R. § 240.10b-5(b). A statement or omission is material if a reasonable investor would consider it important in deciding whether to buy or sell a stock. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Materiality also depends on whether the information is already available to the market. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (information that was already publicly available held not to be material to company's earnings or the price of its stock). A statement or omission will only be considered material if it "significantly alter[s] the 'total mix' of information" available to the market. *TSC Indus.*, 426 U.S. at 449. Accordingly, it is well-established under the "puffery" doctrine that "generalized statements of optimism that are not capable of objective verification" are not actionable "because reasonable investors do not rely on them in making investment

decisions." *Grossman*, 120 F.3d at 1119 (citing *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993)); *see also In re Baan*, 103 F. Supp. 2d at 13 ("vague, positive, . . . forward looking statements" about a company's "strong momentum" and the "high demand" for their products in the market held to be an inadequate basis for a § 10(b) claim). "Combining puffery with accurate historical statements does not render the puffery material." *Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at * 4 (S.D. Ohio Sept. 19, 2002). However, "predictions which are worded as guarantees or are supported by specific factual assertions generally are not regarded as puffing." *Id.* (citing *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1122 (W.D. Mich. 1996)). Under the doctrine established by *Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1091 (1991), statements of opinion, if they are material, may be actionable if they are not actually believed when made, if there is no reasonable basis for them, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statements' accuracy.[9] *See Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994).

In addition, the PSLRA explicitly created a "safe harbor" to shield defendants from liability for certain "forward-looking statements." 15 U.S.C. § 78u-5(c). Forward-looking statements include statements about financial projections, management's plans and objectives for future operations, future economic performance, and the assumptions underlying or relating to

---

[9]As defendants point out, *Virginia Bankshares* addressed the question of whether false statements of reasons, opinion, or belief, may support claims under § 14(a) -- not § 10(b) -- of the Securities Exchange Act of 1934. (Def. Reply at 12.) However, courts routinely follow rules adopted under § 14 when analyzing claims under § 10(b). *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993) (citing *Basic*, 485 U.S. at 232 (adopting materiality standard under § 14 for § 10(b))).

any of these types of statements. *Id.* § 78u-5(i)(1). Under the PSLRA's safe harbor provisions, defendants may avoid liability for such oral or written statements if (1) "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the statement is immaterial; or (2) if plaintiffs fail to prove that the statement was made with "actual knowledge" that it was "false or misleading." *Id.* § 78u-5(c)(1)(A)-(B). To be considered "meaningful," cautionary language must be substantive and tailored to the specific predictions made in the allegedly misleading statement. *See In re Donald J. Trump Casino Sec. Litig. -- Taj Mahal Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.* at 371; *see also Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (Language is meaningful and cautionary if it puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."). A company, however, need not list all factors that might affect financial results, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001) (citing H.R. Conf. R. No. 104-369, at 43 (1995), U.S. Code Cong. & Admin. News at 742), and "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44. Similarly, under the "bespeaks caution" doctrine -- the judicially-created counterpart of the PSLRA's safe harbor provisions -- "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading. The

substantial disclosure of specific risks may render alleged misrepresentations concerning soft

information immaterial and thus nonactionable as securities fraud." *Harden v. Raffensperger,*

*Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (citing 3B HAROLD S. BLOOMENTHAL,

SECURITIES & FEDERAL CORPORATE LAW § 8.26[1] at 8-110 (1995)); *see also San Leandro*

*Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811

(2d Cir. 1996) (The bespeaks caution doctrine protects forward-looking statements which

"reflect hope, adequately tinged with caution, [where] the total mix of information available to

the market cannot reasonably be found to be misleading."); *In re Baan*, 103 F. Supp. 2d at 15

("[T]he 'bespeaks caution' doctrine requires courts to consider alleged misstatements and

omissions in the context of the warnings issued by the defendant.")

Furthermore, there is no general duty on the part of a company to provide the public with

all material information.   *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432-33

(3d Cir. 1997).  However, under Rule 10b-5, a company has a duty to disclose "when silence

would make other statements misleading or false." *Taylor v. First Union Corp.*, 857 F.2d 240,

243-44 (4th Cir. 1988); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir.

1993) ("A duty to disclose arises whenever secret information renders prior public statements

materially misleading . . . ."); *see also In re Par Pharm. Inc. Sec. Litig.*, 733 F. Supp. 668, 678

(S.D.N.Y. 1990) ("[O]nce corporate officers undertake to make statements, they are obligated to

speak truthfully and to make such additional disclosures as are necessary to avoid rendering the

statements misleading.").  "The touchstone of the inquiry is . . . whether defendants'

representations or omissions, considered together and in context, would affect the total mix of

information and thereby mislead a reasonable investor regarding the nature of the securities

offered." *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

## III. XM's Alleged Material Misstatements or Omissions

Plaintiffs characterize their complaint as "delineat[ing] a simple case of securities fraud based on misrepresentations concerning a concealed change in business philosophy." (Pl. Opp. at 2). The Court cannot agree, for plaintiffs have failed to allege any actionable material misstatement or omission.[10] Plaintiffs claims are essentially based on two types of statements quoted in their complaint: (1) statements relating to XM's pursuit of "cost effective" growth, and (2) statements offering specific predictions of a decrease or stabilization of SAC and CPGA in the second half of 2005. The Court will address each of these types of statements seriatim.[11]

## A.    XM's Statements about its "Cost Effective" or "Efficient" Growth Strategy

The majority of the allegedly misleading statements in plaintiffs' complaint relate to what plaintiffs characterize as XM's purported pursuit of "cost effective growth." (Pl. Opp. at 14; *see, e.g.*, Compl ¶ 59 ("Efficient Quarterly Subscriber Growth"); *Id.* ¶ 60 ("And the ultimate test, we are achieving rapid growth with sound financial performance."); *Id.* ¶ 64 ("We are focused on

---

[10]Because this determination is dispositive of plaintiffs' securities fraud claims, the Court need not address the issue of whether plaintiffs have adequately alleged that defendants acted with the required scienter, or whether plaintiffs can state a "controlling person" claim against Panero under § 20(a). *See Fidel*, 2002 WL 31545952, at *3.

[11]As a preliminary matter, the Court notes that many of the statements quoted in the complaint are simply reports of certain financial results for the second and third quarters of 2005, including subscriber numbers, net losses, revenues, SAC and CPGA. (*See, e.g.*, Compl. ¶¶ 59, 60, 61, 64, 67, 73.) Plaintiffs do not contest the accuracy of any of these reports, but state that they include these statements in the complaint "to demonstrate XM's stated business model and to show how [d]efendants conditioned the market, through affirmative statements, to expect the application of the Company's stated business model to produce consistent results -- declining or stabilizing SAC and CPGA." (Pl. Opp. at 18.) Moreover, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue," *Burlington Coat Factory*, 114 F.3d at 1432, and therefore, these statements -- accurate reports of historical financial performance -- are not actionable as securities fraud.

increasing subscribers and scaling our business while managing growth and containing costs . . .

. We are pursing a business plan designed to increase subscribers and revenues while reducing

or maintaining subscriber acquisition costs."); *Id.* ¶ 68 ("The secret to XM's smart subscriber

growth rather than growth at any cost is the ability to control marketing and product expenses

while rapidly growing subscribers."); *Id.* ¶ 73 ("We are pursuing a business plan designed to

increase subscribers and revenues while reducing or maintaining subscriber acquisition costs.").)

Plaintiffs argue that these statements were rendered misleading because during the class period

XM decided to "abandon" its "cost effective growth business strategy," and that because the

company had made affirmative statements "touting [its] ability to achieve rapid subscriber

growth as its key SAC and CPGA metrics would continue to decline," defendants had a duty to

disclose the alleged change in strategy to the market.  (Pl. Opp. at 8, 21-22, 33.)  "Put simply,

[p]laintiffs claim that, once [d]efendants undertook the fundamental shift to their business model,

they needed to disclose it and the adverse effects they knew or recklessly disregarded it would

have on the Company's key financial metrics."  (Pl. Opp. at 24.)

     First, even assuming *arguendo* that plaintiffs have alleged sufficient facts to show that

XM did in fact "abandon" its cost effective growth strategy during the class period, its failure to

disclose that change would not be misleading because the language XM used to describe what

the plaintiffs call its "cost effective growth strategy" was merely puffery -- *i.e.*, it was so vague

and incapable of objective verification as to be immaterial as a matter of law.  *See Grossman*,

120 F.3d at 1125 (holding that a "vague, optimistic statement" about future earnings was

immaterial and did not give rise to a duty to disclose actual earnings forecasts before the actual

earnings themselves were known).  Plaintiffs' complaint focuses on a number of statements in

which XM generally describes its model for subscriber growth as "cost effective," "smart," "sound" and "efficient," and states that it was "pursuing a business plan designed to increase subscribers and revenues while reducing or maintaining subscriber acquisition costs." (*See* Compl. ¶¶ 59, 60, 64, 68, 73). Of course, the fact that XM did not meet its financial goals for the fourth quarter and full-year 2005 does not in and of itself support an inference that it was being untruthful when stating prospectively that it was "pursuing a business plan" aimed at increasing subscribers while reducing marketing costs, for companies' optimistic predictions of their progress often are not fully realized. *See Kowal*, 16 F.3d at 1278. More importantly, whether marketing expenditures are "cost effective," "sound," "smart," or "efficient" is for the most part a relative and subjective judgement and can "neither be quantified nor specified in any way." *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1239 (M.D. Fla. 2002). For example, as defendants point out, in 2003 XM reported SAC and CPGA numbers far higher than the 2005 numbers at issue here -- $75 and $137 respectively as compared to $64 and $109 in 2005 -- but nevertheless used language similar to that which plaintiffs complain of to describe its growth, stating that XM pursued "effective cost containment efforts" during that period. (*See* Def. Reply at 11; Supp. Valentine Decl. Ex. D [Mar. 15, 2004 Form 10-K] at 37 .)

　　　Because such generalized positive statements about "cost effective," "smart," "sound" and "efficient" growth are vague and incapable of objective verification, they are not the type of statement upon which a reasonable investor would rely "in considering the 'total mix' of facts available," *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002), and courts routinely dismiss securities fraud claims based on comparable puffery. *See, e.g.*, *In re Baan*, 103 F. Supp. 2d at 12-13 (dismissing company's "general, positive, . . . forward looking

statements" about "momentum" and sustained growth under the puffery doctrine); *In re Datatec Systems, Inc. Securities Litigation*, 04-CV-525, 2006 WL 3095951, at *17 (D.N.J. Oct. 30, 2006) (dismissing as unactionable puffery the statement that a company's software products allowed the company "to rapidly and efficiently deliver high quality and cost effective large-scale technology deployment solutions to its clients"); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (dismissing claims based on statements about the "viability" of company's "growth strategy," "synergies," and "cost savings"); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 413 n.15 (S.D.N.Y. 1998) (noting that company's statements about its "cost controls," "integrity," and "strategic planning" were mere puffery). Indeed, as every business venture presumably desires its advertising and marketing expenditures to ultimately generate a substantial increase in customers and/or revenues, describing the company's strategy as being "cost effective" is effectively the same as telling the reasonable investor that the company plans to be a successful business. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (holding that statement that company's "business strategies [would] lead to continued prosperity" constituted "precisely the type of 'puffery' that this and other circuits have continually held to be inactionable").

Moreover, despite the optimistic language about cost effective growth cited in the complaint, no reasonable investor would have expected SAC and CPGA to decline in the fourth quarter of 2005 -- as plaintiffs argue XM "conditioned the market to believe" (*see* Pl. Opp. at 18; Compl. ¶¶ 7, 76) -- because XM told the market in October of 2005 that those numbers would *rise* in the fourth quarter because of aggressive marketing (as apparently had been the trend in previous fourth quarters). Specifically, during the October 27, 2005 conference call, Panero

stated that XM's low third quarter CPGA "provide[d] us the flexibility to aggressively advertise

and market our service in the fourth quarter. And in fact, that is what we are doing --

implementing a comprehensive media campaign comprised of advertisements, rebates, and other

promotional techniques to fully exploit the holiday selling season this year." (Compl. ¶ 68.) On

that same call, Euteneuer stated: "Similar to past trends, we expect fourth quarter SAC and

CPGA to increase due to greater media and promotional activities during the upcoming holiday

season." (*Id.* ¶ 69.) Plaintiffs argue that these disclosures led the market to believe that the

increase in holiday advertising would be similar in scale to previous years, but in actuality it was

much higher, and they allege that at that point defendants had a duty to "speak the full truth" and

disclose to the market that XM had "abandoned" its "cost effective growth business strategy" for

a "growth at any cost approach." (Pl. Opp. at 13-16.) But in disclosing this accurate information

about its rising fourth quarter marketing costs, XM had no duty to couch these disclosures in the

particular pejorative terms that the plaintiffs now suggest -- *i.e.* that these expenditures were cost

ineffective or that they were undertaken pursuant to a "growth at any cost approach." "[A]

company has no duty to disparage its own competitive position in the market where it has

provided accurate hard data from which analysts and investors can draw their own conclusions

about the company's condition and the value of its stock." *In re N.Y. Cmty. Bancorp, Inc. Sec.

Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (quoting *In re Donna Karan Int'l Sec. Litig.*,

97-CV-2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998)) (internal quotation marks

omitted) (also noting that "up to a point, companies must be permitted to operate with a hopeful

outlook, and . . . executives are not required to take a gloomy, fearful, or defeatist view of the

future" (quoting *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397-98

(S.D.N.Y. 2006)) (internal quotation marks omitted)).  In *Kowal v. MCI Communications Corp.*,
16 F.3d at 1277, the D.C. Circuit dismissed a securities fraud complaint for failure to state a
claim, emphasizing that "many of plaintiffs' allegations called for pejorative characterizations of
disclosed factual matters."  *Id.* at 1277.  For example, the *Kowal* plaintiffs alleged that
defendants did not disclose "that MCI's competitive position was deteriorating," "that MCI's
operating margins were facing increasing pressure as the company was forced to respond to
competitors' intensive marketing campaigns with dramatic increases in its own sales and
marketing outlays," "that MCI's increased expenditures on sales and marketing were inadequate
to maintain its prior revenue and market share growth rate" or "that MCI's cumbersome
management structure was impeding its ability to react timely and effectively to changes in
competitive conditions, and MCI would soon need to engage in a costly restructuring of its
operations."  *Id.* at 1275.  The Court determined that "[s]ince the use of a particular pejorative
adjective will not alter the total mix of information available to the investing public . . . such
statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action
under any theory."  *Id.* at 1277 (internal citations omitted).  Similarly, in the instant case, XM's
failure to describe its anticipated fourth quarter marketing expenditures in the negative terms
plaintiffs use in their complaint does not constitute an actionable material omission.[12]

---

[12] To the extent that plaintiffs' complaint is based on the idea that XM failed to inform
the market of the competitive pressures brought to bear by Sirius and their promotion of  Howard
Stern in the fourth quarter of 2005, those alleged omissions are also immaterial as a matter of
law.  (*See* Pl. Opp. at 18-19 ("Defendants' Class Period statements were undermined by the
looming threat of Howard Stern and the corresponding severely increased competition and media
blitz from Sirius."); *Id.* at 15 ("Defendants were aware of crucial facts, namely increased
competition and the imminent arrival of Howard Stern at Sirius, regarding XM's inability to
reduce costs of adding critical new subscribers as it attempted to reach its goal of 6 million
subscribers by year-end 2005, which Defendants recklessly disregarded was contrary to the
market expectations they had fostered.").)  In a "fraud on the market" case such as this one, *see*

The fact that at least one investment bank's analysts accurately predicted XM's full-year SAC and CPGA following the company's October statements about aggressive holiday marketing bolsters the Court's conclusion that XM's positive language about its "cost effective" and efficient growth amounted to no more than puffery. *See Grossman*, 120 F.3d at 1124 ("[A]n analyst's response to a statement by the company is not dispositive, [but] it certainly needs to be taken into account in determining whether the statement could, as a matter of law, be determined to be immaterial."). The day after the October 27 conference call, analysts from Deutsche Bank revised their full year estimates for SAC and CPGA "[i]n anticipation of more extensive marketing efforts than [they] previously expected." (Compl. ¶ 71(c).) The Deutsche analysts predicted that full-year 2005 SAC would be $62 (it was $64) and that full year CPGA would be $108 (it was $109). (*Id.*) In light of XM's disclosures of increased fourth quarter marketing expenditures, its use of language like "cost effective" and "efficient" to describe the company's growth strategy did not "significantly alter the 'total mix' of information" available to the

---

*Basic*, 485 U.S. at 241-42, "an omission is materially misleading only if the information has not already entered the market. If the market has become aware of the allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock's price' and the market 'will not be misled.'" *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989)); *see also Kurtzman v. Compaq Computer Corp.*, No. Civ.A.H-99-779, 2000 WL 34292632, at *9 (S.D. Tex. Dec. 12, 2000) ("The market does not rely on defendants for . . . information outside of their exclusive knowledge; instead investors rely on companies for firm-specific information, which is combined by analysts and market professionals with 'knowledge and macroeconomic facts' to set the appropriate price for a company's shares." (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993))); *Kowal*, 16 F.3d at 1275 (noting that "much of the information allegedly omitted" consisted of "negative characterizations of disclosed corporate events, general industry conditions, *or the activities of [defendant's] competitors*" (emphasis added)). Here, it is undisputed that market had been aware since October 2004 that Howard Stern would begin broadcasting on Sirius in January 2006, and financial analysts took his potential effect on XM's market share into account when evaluating the company during the class period. (*See* Compl. ¶¶ 33, 63(i).)

market, and was not materially misleading under § 10(b).[13]   *TSC Indus.*, 426 U.S. at 449.

In addition, plaintiffs have failed to allege sufficient facts to establish that there was indeed a "fundamental shift" in XM's business model that could render plaintiff's statements about cost containment and cost effective growth misleading.  The PSLRA requires plaintiffs to "plead with particularity *sufficient* facts to support [their] beliefs" as to why defendants' statements were misleading, *see Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000) (emphasis in original), and Rule 9(b) requires plaintiffs to "explain why the statements were fraudulent" in order to survive a motion to dismiss.  *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).  It is undisputed that SAC and CPGA rose significantly in the fourth quarter of 2005, and plaintiffs claim that these increases were "dramatically out of line with prior holiday season trends."  (Pl. Opp. at 16 n. 8.)  To support their allegation that there was a

---

[13]Plaintiffs argue that under *Virginia Bankshares*, statements such as these that "reflect the [d]efendants' opinions or 'subjective assessment'" are actionable if they lack "a factual basis that justifies them as accurate, the absence of which renders them misleading."  (Pl. Opp. at 20-21 (quoting *In re Premiere Techs., Inc. Sec. Litig.*, No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *15 (N.D. Ga. Dec. 8, 2000), and *Virginia Bankshares,* 501 U.S. at 1093).)  However, such statements of opinion may only be actionable under § 12(b) if they are *materially* misleading. *See Virginia Bankshares,* 501 U.S. at 1097 (noting that "liability . . . must rest not only on deceptiveness but *materiality* as well[,] *i.e.*, it has to be significant enough to be important to a reasonable investor . . .").  As explained *supra*, XM's optimistic language about cost effective growth is immaterial as a matter of law, and thus, plaintiffs' reliance on *Virginia Bankshares* is misplaced.  Plaintiffs also argue, citing *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1170 (D.D.C. 1996) ("*Newbridge I*") and *In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 170 (D.D.C. 1997) ("*Newbridge II*"), that "[w]hether a failure to disclose company problems is an omission causing statements to be misleading is . . . a factual determination left to the jury," and thus should not be decided on a motion to dismiss.  (Pl. Opp. at 17.)  But because plaintiffs have not identified any *material* statements made during the class period that would give rise to a duty to disclose additional facts, plaintiffs' reliance on the *Newbridge* cases is also misplaced.  *See Newbridge II*, 962 F. Supp. at 180 ("[D]efendants have a duty to 'disclose any material facts that are necessary to make disclosed *material* statements . . . not misleading.'" (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir.1989)) (emphasis added)).  "[W]hen the disclosures or omissions are so clearly unimportant that reasonable minds could not differ, . . . the ultimate issue of materiality [should] be decided as a matter of law."  *Id.*

concealed change in XM's business model, plaintiffs allege that during the fourth quarter "XM was 'in a frenzy to try to one-up'" Sirius, and spent a "tremendous amount" on national and local advertising and "drastically reduced" the price of its radios as a result.  (Compl. ¶¶ 47, 51, 53, 54; Pl. Opp. at 17-18.)  Specifically, plaintiffs allege that the Listen Large campaign was reported to cost $25 million but actually cost between $100 and $150 million, according to a former XM District Manager.  (Compl. ¶ 49.)  These "major marketing and subscriber growth initiatives," including Listen Large, which caused the fourth quarter increases to SAC and CPGA, were "fully budgeted well in advance," according to a former XM human resources executive quoted in the complaint.  (*Id.* ¶ 51.)

While these facts may demonstrate why it was ultimately impossible for XM to meet its financial goals for the fourth quarter and for full-year 2005, they do not establish that the defendants had, at the time the alleged misstatements were made in July, August, October and November 2005, made a "choice to abandon" XM's "cost effective growth business strategy." (Pl. Opp. at 14-15.)   Significantly, defendants did not and could not have known what their subscriber acquisition costs for the fourth quarter would be until after that period was over and the number of newly acquired subscribers was known.  Moreover, though plaintiffs allege that XM's fourth quarter marketing costs were "fully budgeted well in advance," (Compl. ¶ 51), they do not allege *when* these expenses were budgeted or *how much* was budgeted for them.  Indeed, elsewhere plaintiffs allege that XM's fourth quarter marketing costs "spiraled out of control." (*See* Pl. Opp. at 9, 15.)  If fourth quarter spending was in fact "out of control," it would certainly support a claim of company mismanagement, but it would also mean that the extent of XM's fourth quarter expenditures was *not* known in advance by the company's executives.  Nor do

plaintiffs allege any additional facts to support their belief that XM had abandoned its so-called "cost effective growth strategy" at the time of the allegedly misleading statements: *e.g.*, they point to no internal memoranda or reports or any other documentary evidence that would indicate that such a change had occurred.  Because they fail to plead sufficient facts to support an inference that there had been a dramatic change in business strategy at the time each of the allegedly misleading statements were made, plaintiffs' allegations that throughout the class period defendants "knew or were severely reckless in ignoring that XM was planning to spend extraordinary sums of money . . . in the fourth quarter of 2005, which would cause XM's SAC and CPGA to increase dramatically," (*see* Compl. ¶ 74) fall short of the heightened pleading requirements of the PSLRA and Rule 9(b).  *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002) ("Conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy 9(b)."); *Goplen v. 51Jobs, Inc.*, 453 F. Supp. 2d 759, 768 (S.D.N.Y. 2006) (dismissing as insufficient under Rule 9(b) and the PSLRA plaintiffs' allegations that defendants "knew or should have known" that revenues were misstated where plaintiffs "fail[ed] to identify any documents, meetings, or reports that show that the defendants knew or should have known that the . . . revenues were misstated" at the time the statements were made").  And XM's "out of control" spending itself is not actionable as securities fraud, as "allegations constituting nothing more than assertions of general mismanagement or nondisclosures of mismanagement cannot support claims under § 10(b) of the Exchange Act." *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *9-10 (dismissing allegations of cost-control problems and allegations that assailed the conduct, judgement and abilities of management).

**B.**    **XM's Predictions of Decreased SAC and CPGA for Full-Year 2005**

Though plaintiffs insist that "this action is not about missed cost or subscriber projections" (Pl. Opp. at 1), the complaint alleges that XM's predictions of declining or stabilizing SAC and CPGA made after the close of the second quarter of 2005 were false, and that XM knew the statements to be false when they were made.  (*See* Compl. ¶ 65; Pl. Opp. at 14 ("Throughout the Class Period, Defendants made false and misleading statements regarding . . . the Company's key metrics remaining stable in the second half of 2005 and to decline as compared to 2004.").)  These more specific predictions about SAC and CPGA trends for second half of 2005 differ in kind from the general statements about "cost effectiveness" and "efficiency" discussed *supra*, and they are subject to a slightly different analysis.

In conjunction with XM's announcement of its second quarter financial results, during the July 28, 2005 conference call, Euteneuer stated: "We expect CPGA to remain stable during the second half of the year."  (Compl. ¶ 61.)  On the same phone call, an unidentified XM representative reiterated that "we do think CPGA will be stable," but noted that "you can see SAC bounce around a bit depending upon what your actual hardware subsidy elements are on any given time frame." (*Id.* ¶ 62.)  The company's August 5, 2005 10-Q form then stated that the company "expect[ed]" both SAC and CPGA "to decline in 2005 as compared to 2004."  (*Id.* ¶ 64.)  Plaintiffs allege that these predictions were false when made because defendants then knew, "or disregarded with severe recklessness," that XM would be forced to spend "extraordinarily large sums of money in the fourth quarter of 2005" to meet its subscriber targets in the face of "competitive factors" such as the arrival of Howard Stern at Sirius, and that these fourth quarter expenditures "would cause XM's SAC and CPGA to increase dramatically."  (*Id.*

-32-

¶ 65.)

An examination of the July 28 and August 5, 2005 statements reveals that the SAC and CPGA predictions were forward-looking statements accompanied by effective cautionary language, and therefore they are non-actionable under the bespeaks caution doctrine and/or the PSLRA's safe harbor. The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). A company need not list all factors that might affect financial results, *Helwig*, 251 F.3d at 558 (citing H.R. Conf. R. No. 104-369, at 43), and"[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44. "If a statement is 'accompanied by meaningful cautionary statements,' the defendants' state of mind is not relevant." *Kurtzman*, 2000 WL 34292632, at * 6 n. 15 (citing *Harris*, 182 F.3d at 803). Similarly, the bespeaks caution doctrine requires courts to consider alleged misstatements and omissions in the context of the warnings issued by the defendant, *see In re Baan*, 103 F. Supp. 2d at 15, and protects forward-looking statements which "reflect hope, adequately tinged with caution, [where] the total mix of information available to the market cannot reasonably be found to be misleading." *San Leandro Emergency Med. Group*, 75 F.3d at 811. Under the PSLRA, forward-looking statements include financial projections and statements about future economic performance such as the ones at issue here. 15 U.S.C. § 78u-5(i)(1).

Though the relevant language is not quoted in the complaint, at the beginning of the July

28, 2005 conference call, XM's general counsel cautioned: "Before we begin our prepared remarks, I would like to remind everyone that certain information on this call may contain forward-looking statements. Due to a number of factors, our actual results may differ materially from those projected in such forward-looking statements. Those factors include future demand for the Company's service . . . ." (Valentine Decl. Ex. J [XM 2Q05 Conference Call Tr. (July 28, 2005)] at 2.) Similarly, XM's August 5, 2005 10-Q form stated: "Although we believe that our expectations are based on reasonable assumptions, we can give no assurance that our expectations will be achieved. . . . Our costs may exceed or our revenues may fall short of our estimates, our estimates may change, and future developments may affect our estimates. . . . The timing of promotions and new contracts may cause SAC to fluctuate from period to period. . . . The timing of our media campaigns and discretionary advertising may cause CPGA to fluctuate from period to period." (Valentine Decl. Ex. M [Aug. 5, 2005 Form 10-Q] at 17, 19, 25.) These warnings "relate directly to [the language] by which plaintiffs claim to have been misled," *In re Donald J. Trump Casino*, 7 F.3d at 371, and alert investors to the fact that demand for XM's services, future media campaigns, advertising and promotions may cause SAC and CPGA to increase, thereby conveying "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-00109, 2000 WL 1727377, at *7 (N.D. Cal. Sept. 29, 2000). And the use of the words "expect" and "think" in the predictions "convey[] opinion and hope, and thus a potential of nonrealization." *Kurtzman*, 2000 WL 34292632, at * 8 (internal quotation marks omitted) (noting that "[s]tatements that a company 'expects' a particular level or range of results are unactionable as a matter of law because 'on its fac[e], the word 'expects'

limits the statement's potential to mislead'" (quoting *Pache v. Wallace*, No. 93-5164, 1995 WL

118457, at *4 (E.D. Pa. Mar. 20, 1995)) (internal quotation marks omitted)).  Accordingly, the

predictions "reflect hope, adequately tinged with caution, [and] the total mix of information

available to the market cannot reasonably be found to be misleading."[14]  *San Leandro Emergency*

*Med. Group*, 75 F.3d at 811.

Moreover, for substantially the same reasons as described in the prior section, plaintiffs

fail to allege sufficient facts to establish that these predictions of SAC and CPGA trends lacked a

reasonable basis when made.  In *Kowal*, the D.C. Circuit noted that "[f]inancial projections and

generalized statements of optimism represent management's opinion of how the company is

expected to perform within a defined time frame. . . . Such projections are not guarantees of

future financial performance, nor are they understood as such by reasonable investors." *Kowal*,

16 F.3d at 1276 (internal citations omitted).  "Accordingly, projections and statements of

optimism are false and misleading for the purposes of the securities laws if they were issued

without good faith or lacked a reasonable basis when made."  *Id.* at 1277.  And when "plaintiffs

---

[14]Plaintiffs mistakenly argue that these predictions are not protected by the PSLRA's safe harbor because defendants knew them to be false or misleading when made.  (Pl. Opp. at 27.) The PSLRA protects forward-looking statements if: (1) "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the statement is immaterial; "*or*" (2) if plaintiffs fail to prove that the statement was made with "actual knowledge" that it was "false or misleading."  15 U.S.C. § 78u-5(c) (emphasis added).  The provision is worded disjunctively: the forward-looking statement must either be accompanied by meaningful cautionary language, *or* plaintiffs must fail to prove that it was made with actual knowledge of its falsity.  Accordingly, courts have held that once the first clause of the provision is satisfied, "the defendants' state of mind is not relevant."  *Kurtzman*, 2000 WL 34292632, at * 6 n. 15 (citing *Harris*, 182 F.3d at 803); *see also Miller v. Champion Enters., Inc.*, 346 F.3d 660, 674 (6th Cir. 2003) ("[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in the PSLRA makes the state of mind irrelevant.").

seek to base a claim of securities fraud on false and misleading projections or statements of

optimism, their complaint must also plead sufficient facts that if true would substantiate the

charge that the company lacked a reasonable basis for its projections or issued them in less than

good faith." *Id.* at 1278. "[I]t is not enough for plaintiffs to merely allege that defendants

'knew' their statements were fraudulent or that defendants 'must have known' their statements

were false." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).

Plaintiffs allege that XM's fourth quarter marketing and subscriber growth initiatives "had been

fully budgeted well in advance" according to one unidentified witness, and that "these costs

could simply not be viewed as any kind of surprise or unanticipated event." (Compl. ¶ 51.)  But

as previously noted, the complaint does not allege *when* these costs were budgeted, and

specifically, it does not allege that they had been budgeted by the time these SAC and CPGA

predictions were made on July 28 and August 5, 2005.  Under the heightened pleading

requirements of the PSLRA and Rule 9(b), plaintiffs asserting securities fraud claims must

explain why each statement is fraudulent, and must specify "the who, what, when, where, and

how:  the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at

534.  Notwithstanding plaintiffs' conclusory allegation that at the time of these statements,

defendants "kn[e]w or were severely reckless in ignoring that XM was planning to spend

extraordinary sums of money" on marketing in the fourth quarter of 2005 (Compl. ¶ 65), without

specifically alleging when defendants decided to undertake the "extraordinary" fourth quarter

marketing expenses or how much was prospectively budgeted for them, plaintiffs have not pled

sufficient facts to support the claim that the SAC and CPGA predictions made on July 28 and

August 6, 2005 lacked a reasonable basis when made.  Nor does "the fact that the company's

-36-

performance did not conform to that predicted" support such an inference. *Kowal*, 16 F.3d at 1278 ("Every prediction of success that fails to materialize cannot create on that account an action for securities fraud, since statements of anticipated earnings hardly constitute a guarantee that earnings will be forthcoming in particular amounts. A failure to meet projected earnings or revenues does not in itself suggest the goal fell outside the realm of reasonable probability and therefore lacked a reasonable basis." (quoting *Raab*, 4 F.3d at 288, and *Roots Partnership v. Land's End, Inc.*, 965 F.2d 1411, 1418 (7th Cir. 1992)) (internal quotation marks, citations, and alterations omitted)).

In sum, defendants' predictions about declining or stabilizing SAC and CPGA are not actionable because these forward-looking statements, which were accompanied by meaningful cautionary language, are protected by the PSLRA's safe harbor and/or the common law bespeaks caution doctrine, and also because plaintiff has failed to plead sufficient facts to suggest that these statements lacked a reasonable basis when made

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs have failed to identify any materially misleading statements or omissions that are actionable under § 10(b). Accordingly, defendants' Motion to Dismiss is granted and the case is dismissed with prejudice.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: March 28, 2007